## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CORTEVA AGRISCIENCE LLC,                 )
PIONEER HI-BRED INTERNATIONAL,           )
INC., and AGRIGENETICS, INC.             )
                                         )
       Plaintiffs,                       )
                                         )   C.A. No. _____
                                         )
v.                                       )
                                         )   **JURY TRIAL DEMANDED**
                                         )
INARI AGRICULTURE, INC. and INARI        )
AGRICULTURE NV,                          )
                                         )
       Defendants.                       )

## COMPLAINT

Plaintiffs Corteva Agriscience LLC ("Corteva Agriscience"), Pioneer Hi-Bred International, Inc. ("Pioneer"), and Agrigenetics Inc. ("Agrigenetics" and collectively with Corteva Agriscience and Pioneer, "Corteva") hereby allege, for their Complaint against Defendants Inari Agriculture, Inc. ("Inari USA") and Inari Agriculture NV ("Inari Belgium," and collectively with Inari USA, "Inari" or "Defendants"), on personal knowledge as to Corteva's own actions and on information and belief as to the actions of others, as follows:

## NATURE OF THE ACTION

1.    Corteva is a leading, global agriculture innovator, at the forefront of research and development of novel seeds, including for staples such as corn and soybean. Corteva uses its vast experience in agricultural genetics to generate new seed varieties with highly desirable traits, resulting in crops that produce greater yields, survive unfavorable weather conditions, and withstand environmental hazards like insects and other pests. Such innovations are predicated on Corteva's significant sustained investment, as well as literally decades of time and effort. This lawsuit seeks to prevent Inari from continuing its brazen efforts to steal Corteva's groundbreaking,

patent-protected work. Inari's deceptive and unlawful conduct violates Corteva's intellectual property rights, as well as Inari's own contractual obligations.

2.      For more than 100 years, the companies that make up Corteva have invested in developing new seed lines that allow farmers to grow their crops more efficiently and increase productivity. Over just the last ten years alone, Corteva has invested hundreds of millions of dollars and decades of time successfully developing such seed lines. Corteva depends on intellectual property rights to support and protect these long-standing and substantial research investments. In particular, Corteva has obtained patents and Plant Variety Protection ("PVP") certificates on many of its seed lines (the "protected seeds"). These patents and PVP certificates prohibit others from, among other things, selling or exporting the protected seeds and using them for commercial purposes. Corteva is now forced to bring this lawsuit because of Inari's exportation out of the United States, for commercial purposes, of hundreds of different varieties of Corteva's protected seeds, in violation of Corteva's intellectual property and other rights.

3.      Inari USA is a Massachusetts-based company, run by former executives at some of the largest crop-producing companies in the United States. Inari claims it can improve the quality of seeds through genetic modification. Inari openly touts that its business strategy is "to do unreasonable       things"       so       that       it       can       "achieve       unreasonable       outcomes." *https://www.youtube.com/watch?v=8Q3u1Q6FJxI* at 42:40. But, on information and belief, Inari does not have its own breeding program to develop its own seeds. Instead, Inari purloins high-quality seeds, including Corteva's protected seeds, and makes slight genetic modifications to those seeds. Inari then seeks patent protection for the resulting modifications. Inari has announced publicly that it intends to commercialize seeds containing these modifications in the coming years, including in the United States.

4.      Inari believes that "[p]lant varieties and seeds are high-tech products *in an easy-to-copy form*." *See upov.int/edocs/mdocs/upov/en/upov_sem_ge_23/upov_sem_ge_23_ppt_12.pdf* at 3 (emphasis added). Accordingly, Inari recognizes that such varieties and seeds "need IP protection for a sustainable business." *Id.* Inari further recognizes that such protections include "patents" and "plant breeders rights." *Id.* at 4. And yet, these are the same protections that Inari has violated through its misappropriation of Corteva's protected seeds.

5.      One way Inari misappropriated seeds was by misusing seed deposits at the American Type Culture Collection ("ATCC"). To comply with legal requirements for intellectual property protection, Corteva deposited samples of its protected seeds with ATCC—a nonprofit organization that collects, stores, and distributes standard reference microorganisms, cell lines, seeds, and other biologic materials *for research purposes only*. Corteva made these deposits in connection with filing applications to obtain patents covering the protected seeds. After the applicable patents were issued, ATCC made the protected seeds available for public inspection but expressly prohibited members of the public from using those seeds for commercial purposes, from transferring them outside their organization, or from using them in contravention of Corteva's intellectual property rights.

6.      Despite these express prohibitions, Corteva learned in December 2022 that Inari—through an elaborate scheme apparently aimed at concealing its actions—had illegally obtained hundreds of varieties of Corteva's protected seeds from ATCC and illegally exported them to Belgium for commercial purposes, without Corteva's knowledge or approval.

7.      Inari's actions infringe upon Corteva's patent rights, violate Corteva's PVP certificates, and breach ATCC's explicit prohibition on using the seeds obtained from ATCC for commercial purposes. Corteva brings this action to hold Inari fully accountable for its flagrant

3

disregard of Corteva's rights and US law. Corteva seeks damages to adequately compensate for Inari's past unlawful actions as well as a permanent injunction against Inari prohibiting any future actions in violation of Corteva's intellectual property and state-law rights or benefitting from their actions in violation of such rights.

## **PARTIES**

8.      Corteva Agriscience is a limited liability company organized and existing under the laws of Delaware with a principal place of business located at 9330 Zionsville Road, Indianapolis, Indiana 46268. It is one of the world's largest commercial seed and plant producers. Corteva Agriscience uses genetic research to develop crop plants designed to increase quantity, quality, and sustainability of yields for farmers, including insect-resistant corn and soybean varieties.

9.      Pioneer is a corporation organized and existing under the laws of Iowa with a principal place of business at 7100 NW 62nd Avenue, Johnston, Iowa 50131. The company was founded in 1926 by farm journal editor and future United States Vice President Henry Wallace. Over the past 97 years, Pioneer has developed and tested products to meet the local needs of farmers, both domestically and internationally.

10.     Agrigenetics is a corporation organized and existing under the laws of Delaware with a principal place of business at 9330 Zionsville Road, Indianapolis, Indiana 46268. Agrigenetics, which previously has done business as Mycogen Seeds, is an agricultural seed company.

11.     Corteva Agriscience, Pioneer, and Agrigenetics are each wholly-owned subsidiaries of Corteva Inc., which is organized and existing under the laws of Delaware and maintains its principal place of business at 9330 Zionsville Road, Indianapolis, Indiana 46268.

12.     Corteva Inc., in conjunction with its subsidiaries including Corteva Agriscience, Pioneer, and Agrigenetics, (the "Corteva Group of Companies") is a leading global provider of seed and crop protection solutions that contribute to a healthier and more secure and sustainable food supply. The Corteva Group of Companies is focused on advancing its science-based innovation, which aims to deliver a wide range of improved products and services to its customers. The Corteva Group of Companies has one of the broadest and most productive new product pipelines in the agriculture industry. It leverages its rich heritage of scientific achievement to advance its robust innovation pipeline and continues to shape the future of responsible agriculture. New products are crucial to solving farmers' productivity challenges amid a growing global population. The Corteva Group of Companies' investment in technology-based and solution-based product offerings allows it to meet farmers' evolving needs.

13.     The Corteva Group of Companies has invested billions of dollars in research and development to develop high-quality crop seeds, including the protected seeds at issue in this Complaint. As a result of those efforts, the Corteva Group of Companies has developed revolutionary seeds that provide greater yields at lower costs, and that can withstand environmental hazards.

14.     Inari describes itself as "the next-generation seed company" that purportedly relies on "disruptive technologies" to "enhance nature's genetic diversity" in seeds. *See* August 6, 2019, Press Release *available at https://inari.com/inari-raises-89-million-to-bring-innovative-disruptive-technologies-to-growers/*. Inari is run by former executives of some of the largest agricultural companies in the country, including Syngenta and Bayer CropScience. Since its founding in 2016, Inari has achieved a reported $1.5 billion valuation and now employs more than

270 people across its three facilities in Cambridge, Massachusetts, West Lafayette, Indiana, and Ghent, Belgium. *See https://inari.com/* (list of addresses at the bottom of the page).

15.    Upon information and belief, the Cambridge, Massachusetts and West Lafayette, Indiana facilities are owned and operated by Defendant Inari USA, a corporation organized and existing under the laws of Delaware that maintains its principal place of business at One Kendall Square, Building 600/700, Suite 7-501, Cambridge, Massachusetts 02139.

16.    Upon information and belief, the additional facility in Ghent, Belgium is owned and/or operated by Defendant Inari Belgium, which maintains its principal place of business at Industriepark 7A, 9052 Zwijnaarde, Belgium.

17.    Upon information and belief, Inari does not have a seed breeding program of its own. Instead, it employs genetic modification techniques to alter high quality seeds that other entities have already engineered and brought to market. In 2019, Inari stated in a press release, "Inari partners with independent seed producers, using its unique computational and genetic toolbox to introduce high performing varieties that improve the economic and environmental realities of production agriculture." *See* August 6, 2019, Press Release *available at https://inari.com/inari-raises-89-million-to-bring-innovative-disruptive-technologies-to-growers /*. However, Inari has never "partnered with" Corteva and has no agreement, license, or other authorization from Corteva to access, use, or genetically modify any of Corteva's protected seeds.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Corteva's claims arise under the laws of the United States, and 28 U.S.C. § 1338, which provides that district courts have original jurisdiction over any civil action arising under any Act of Congress relating to patents or plant variety protection.

Additionally, this Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Corteva's state-law claims, because, *inter alia*, they form part of the same case or controversy.

### A.   Inari USA

19.   This Court has personal jurisdiction over Inari USA because, *inter alia*, Inari USA is incorporated in Delaware. Upon information and belief, Inari USA has continuous and systematic contacts with Delaware; regularly conducts business in Delaware, either directly or through one or more of its affiliates, agents, and/or alter egos; has purposefully availed itself of the privilege of doing business in Delaware; and intends to sell Inari products in Delaware.

20.   Venue is proper in this Court with respect to Inari USA pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(b) because Inari USA is incorporated, and thus resides, in Delaware.

### B.   Inari Belgium

21.   This Court has personal jurisdiction over Inari Belgium under Fed. R. Civ. P. 4(k)(2) because the claims Corteva asserts against Inari Belgium each arise under federal law, Inari Belgium would not be subject to personal jurisdiction in any state court of general jurisdiction, and exercising jurisdiction over Inari Belgium would be consistent with the United States Constitution and laws because Inari Belgium plays an essential role in Inari's general efforts to violate Corteva's patent and PVP rights within the United States.

22.   Venue is proper in this Court with respect to Inari Belgium pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(b) because Inari Belgium is not a resident of the United States and thus venue is appropriate in any judicial district.

## PLANT BREEDING BACKGROUND

23.     Plant breeding is the human manipulation of the characteristics, structure, and composition of plants resulting in heritable changes to make them more useful for current and future generations. Corteva and its predecessors have spent decades upon decades carefully selecting and breeding plants to develop the desirable traits found in currently available commercial seed products, like soybean and corn. This process can include use of both traditional breeding techniques as well as genetic engineering technologies. These techniques and technologies are briefly described below. These brief descriptions, however, do not delve into the details of the enormously complex, time consuming, and investment-heavy inventive process involved in plant breeding.

### A.     Traditional Breeding Techniques

24.     Plants can be bred using sexual or asexual reproduction. Sexual reproduction combines the genetic material of two parent plants to form the genetic material of the progeny plant.

25.     Sexually reproducing plants produce seeds carrying genes from each of the parent plants. The protected corn and soybean seeds at issue in this Complaint are produced from sexually reproducing plants.

26.     Plants, like other living organisms, contain cells. Chromosomes are the organized units of genetic material in a cell. Each chromosome comprises different genes. Plant genes confer different traits, just as they do in people. Examples of plant traits include yield, disease resistance, size, and drought tolerance.

27.     Different versions of a gene—such as a gene for plant height—are called alleles. Most plants have two alleles for each gene. Progeny of two parents will generally inherit two alleles—one from each parent—at every gene. A simplified diagram showing basic chromosomal

structure and how a gene for determining the trait of plant height is passed from parents to progeny is shown below:



28.     Generally, genes can be dominant or recessive. In the two progeny plants above with one tall allele and one short allele, the dominant of the two alleles will determine whether the plant is tall or short. Here, the tall gene is dominant, so the progeny plant with one tall allele and one short allele will be tall. The progeny plant with two tall alleles will also be tall, but the progeny plant with the two short alleles will be short. When two copies of the same allele are inherited by progeny, the progeny is referred to as "homozygous" for that allele.

29.     The genetic makeup of a plant is referred to as its germplasm. Germplasm includes, among other things, the genetic material in the chromosomes of a plant that may be transmitted from one generation of a plant to another.

30.     Traditional plant breeding implements a variety of methods to develop elite lines with desired traits. Two important methods are inbreeding and hybridization.

9

31.     Inbred development is a method whereby plants are self-pollinated over many generations or manipulated using a laboratory technique over fewer generations. Both result in all, or nearly all, of the genes in the germplasm becoming homozygous (i.e., for each gene they contain two copies of the same allele, as discussed above). The resulting seeds are referred to as "inbred seeds."

32.     The inbred development process generally starts with breeding or "crossing" a number of existing inbred parental plants. The resulting progeny are then inbred through self-pollination or laboratory techniques as described above. The inbred progeny plants are referred to as "candidates." The candidates are then evaluated—in different geographies and over numerous years—for several characteristics including, for example, yield and disease resistance. After each growing season in the field, the high-performing candidates are advanced into the next round of testing and evaluation. To generate elite commercial inbred seeds, hundreds and thousands of different candidates are generated, tested, and evaluated.

33.     Inbred seeds are highly valuable because of their predictability in passing on their traits to progeny. As a result, inbred seeds are considered the core germplasm used as parent seeds by plant breeders. Inbred seeds typically are not sold commercially, and their use is carefully restricted.

34.     Hybridization involves crossing two different inbred plants. The resulting seeds are called "hybrid seeds." Hybridization can be used to create hybrid seeds with multiple beneficial traits inherited from both parents.

35.     Careful selection of inbred seeds with traits that will be complementary when crossed has led to the productive crops seen today. For example, one inbred plant has genes that allow it to grow tall. A second inbred plant has a different set of genes that allow it to be disease

10

resistant. When bred to one another, the inbred plants can result in progeny with germplasm that allows the plant to become both tall and disease resistant:



36.     For hybrid crops such as corn, hybrid seeds are considered the commercial product of plant breeding and are sold to commercial farmers for planting and harvesting.

**B.     Genetic Engineering Techniques**

37.     Plant breeders may also artificially introduce desired traits into a plant genome by inserting transgenes through genetic engineering technologies. A transgene is a gene that has been

11

transferred from one organism to another. For example, plant breeders have incorporated bacterial genes into plant germplasm to confer increased resistance to certain insects or herbicides.

38.     Transgenes can be inserted into the genome of plants using various genetic engineering techniques. When a transgene is incorporated into a plant germplasm at a specific location in the chromosome, resulting in the desired trait, it is known as an "event" or a "transgenic event."

39.     Traditional plant breeding techniques can then be used to develop inbred seeds incorporating events with desired traits. The inbred seeds can then be used to produce hybrid seed products containing such traits.

40.     The simplified examples provided above belie the practical realities of commercial plant breeding, which is not a trivial undertaking. Cultivating new varieties of plants through various breeding methods is a time-consuming, expensive, and uncertain endeavor. Elite breeders must breed large numbers of plants and then screen the progeny produced from the new seeds to select those that successfully retained the desired combination of traits and perform well in the field in a variety of environments.

41.     To add another layer of complexity in the production of elite commercial seeds, breeders must account for substantial differences in climate, soil type, geographical locations, and other factors. It takes a significant investment of time and resources to achieve a gain of even one bushel in yield for a particular crop that will be sold in a particular geography. Corteva and its predecessors-in-interest have been making such investments for the last century to develop the seeds they provide today.

42.     Each year, the Corteva Group of Companies breeds hundreds of thousands of plants and then screens the resulting progeny to select desired candidates. The costs of such efforts are

substantial—hundreds of millions of dollars per year. The seeds at issue in this Complaint reflect nearly 100 years of such careful selection and breeding that has resulted in the increased productivity seen in today's agriculture. In North America alone, there has been an almost seven-fold increase in productivity over the last century.

## CORTEVA'S DEVELOPMENT OF VARIETIES BASED ON ITS PROTECTED SEEDS

43.     Corteva specializes in the development of novel varieties of numerous important crops, including corn and soybeans. Development of each of Corteva's varieties necessitated expenditures in the tens to hundreds of millions of dollars and involved the iterative crossing of seeds, year after year, for the past century to build the foundational elite genetics that serve as the basis for the high-yielding hybrid seeds that Corteva sells to customers.

44.     In combination with this iterative process that occurs over decades, development of just a single innovative transgenic event to the point of commercialization can take, on average, more than sixteen years to accomplish. This lengthy period includes time spent discovering the trait, testing it, developing it through multiple generations of breeding, and seeking regulatory approvals, among other phases.

45.     Corteva sells proprietary seeds, including proprietary hybrid seeds, to customers subject to a Technology Use Agreement ("TUA"). The TUA is available publicly on Corteva's website,[1] which states explicitly that customers in the United States "must sign a [TUA] before obtaining, planting, or growing seed containing Corteva traits." *See https://www.corteva.us/Resources/trait-stewardship.html*. Corteva's product use guides, which

---

[1] Corteva's current form of TUA is also available to the public as part of Corteva's "product use guides," an example of which is available at *https://www.corteva.us/content/dam/dpagco/corteva/na/us/en/files/trait-stewardship/product-use-guides/DOC-2024-US-PUG-Soybean.pdf*.

include the TUA, assert that "Corteva's innovations are protected by a variety of intellectual property protection, such as patents and plant variety certificates so that we can reinvest in the future and continue to deliver high yielding, adapted, and sustainable products for years to come" and prohibit, *inter alia*, the supply, sale, transfer, or distribution of Corteva seed, and use of Corteva seed, crop, or plant material, for crop breeding or research. Prior versions of the product use guides and TUA have contained similar restrictions.

46.     Agreements similar to the TUA are commonplace within the agricultural industry. For example, Syngenta requires customers to sign a "Stewardship Agreement," which states that Syngenta's customers may not "supply, transfer, license or sublicense any Seed Products to any other person or entity for planting or any other purpose." *See https://www.syngenta-us.com/stewardship/downloads/syngenta_stewardship_agreement_2021%20final.pdf*.   Similarly, Bayer requires customers to sign a "Technology Stewardship Agreement" that also prohibits them from transferring seeds to any other entity or using the seeds for any purpose other than commercial planting. *See https://tug.bayer.com/tsa/united-states/*. Thus, upon information and belief, Inari (which is managed by former executives of Syngenta and Bayer) knew that any Corteva seeds that were sold to the public in the United States would have been subject to an agreement, like the TUA, that placed strict limitations on the use of the seeds for any purpose other than planting to produce a single commercial grain crop by the customer that purchased the seeds.

47.     Corteva does not sell inbred seeds to customers. Instead, Corteva strictly limits access to such seeds, including through PVP certificates and patents as noted in the TUA and elsewhere.

## CORTEVA'S PLANT VARIETY PROTECTION CERTIFICATES

48.     The Plant Variety Protection Act ("PVPA") provides intellectual property protection to breeders of certain novel plant varieties, and their assignees, conferring on the holder of a PVP certificate the right to prevent others from, among other things, exporting the variety for a period of twenty years. 7 U.S.C. § 2483. A "variety" may be represented by seed. *See* 7 U.S.C. § 2401(a)(10).

49.     The Plant Variety Protection Office ("PVPO") of the United States Department of Agriculture implements the PVPA by examining new applications from, and granting certificates to, breeders of new varieties of, among other things, sexually reproduced plant varieties. These PVP rights "create an incentive for the development of new and improved varieties . . . [that] promote agriculture production and food security for an increasing world population." *https://www.ams.usda.gov/services/plant-variety-protection*. Consistent with these incentives, the Corteva Group of Companies has invested hundreds of millions of dollars in researching and developing new varieties and has sought to protect that investment with PVP certificates, among other things.

50.     Section 2541 of the PVPA provides that it is an infringement of the owner's rights in a protected variety, *inter alia*, to deliver, ship, consign, exchange, or transfer possession of the variety without authorization of the owner. Section 2541 also provides that it is an infringement, *inter alia*, to dispense the variety to another in a form that can be propagated without notice that it is a protected variety, or to export the protected variety from the United States without authority. Section 2541 further provides that it is an infringement, *inter alia*, to stock the variety for any of the foregoing purposes, or to instigate or actively induce any act that constitutes an infringement.

51.     Section 2561 of the PVPA provides that an owner shall have a remedy by civil action for infringement of a plant variety protection certificate under Section 2541.

52.     As part of protecting its ongoing investment in developing innovative plant varieties, Corteva seeks and obtains PVP certificates. Corteva owns the PVP certificates set forth in Exhibit A for some of its most valuable corn and soybean varieties. Each of these PVP certificates covers a single variety represented by a single seed line at issue in this case. At all times relevant herein, the listed PVP certificates were, and remain, in full force and effect.

### CORTEVA'S U.S. PATENT NO. 8,575,434

53.     Pioneer, a wholly-owned subsidiary of Corteva, Inc., is the owner of all right, title and interest in and to U.S. Patent No. 8,575,434 (the "'434 patent"), entitled "Maize Event DP-004114-3 and Methods for Detection Thereof," which was duly and legally issued by the United States Patent and Trademark Office on November 5, 2013. A true and correct copy of the '434 patent is attached hereto as Exhibit B. The '434 patent issued as assigned to Plaintiff Pioneer and E.I. Du Pont De Nemours and Company ("du Pont"), now known as EIDP, Inc., from U.S. Patent Application No. 12/970,052, filed December 16, 2010, and claims priority to U.S. Provisional Application Nos. 61/413,536 and 61/287,462, filed on November 15, 2010, and 61/287,462 filed December 17, 2009, respectively. Pursuant to an assignment effective October 1, 2021, and recorded with the USPTO, all of du Pont's interest was assigned to Corteva Agriscience. Pursuant to an assignment effective September 20, 2023, and recorded with the USPTO, all of Corteva Agriscience's interest has been assigned to Pioneer such that Pioneer fully owns the '434 patent. At all times relevant herein, the '434 patent was, and remains, in full force and effect.

54.     The '434 patent is directed to the field of plant molecular biology, and more specifically, to DNA constructs for conferring insect resistance to a plant.

55.     As explained in the '434 patent, "[c]orn is an important crop and is a primary food source in many areas of the world. Damage caused by insect pests is a major factor in the loss of the world's corn crops, despite the use of protective measures such as chemical pesticides. In view of this, insect resistance has been genetically engineered into crops such as corn in order to control insect damage and to reduce the need for traditional chemical pesticides." Exhibit B ('434 patent) at 1:32-38.

56.     The '434 patent discloses and claims corn seeds, plants, and tissues that include corn plant event DP-004114-3, which confers insect resistance to the corn. DP-004114-3 identifies a transgenic event. Transgenic "events" are defined by the DNA sequence that has been incorporated into the target genome (here, of a corn plant) and the specific point(s) of insertion. The '434 patent explains that a "transgenic event is produced by transformation of plant cells with a heterologous DNA construct(s), including a nucleic acid expression cassette that comprises a transgene of interest, the regeneration of a population of plants resulting from the insertion of the transgene into the genome of the plant, and selection of a particular plant characterized by insertion into a particular genome location." *Id.*, 10:26-32. In the context of the '434 patent, specific corn (maize) strains were engineered by the inventors to express agriculturally desirable traits, such as resistance to insects or herbicides.

57.     More specifically, in the '434 patent, a DNA construct is provided that, when expressed in plant cells and plants, confers resistance to insects. According to one aspect of the invention, a DNA construct, capable of introduction into and replication in a host cell, is provided that when expressed in plant cells and plants confers insect resistance to the plant cells and plants. Maize event DP-004114-3 was produced by *Agrobacterium*-mediated transformation with plasmid PHP27118. This event contains the cry1F, cry34Ab1, cry35Ab1, and pat gene cassettes, which

confer resistance to certain lepidopteran (*e.g.*, moth) and coleopteran (*e.g.*, beetle) pests, as well as tolerance to phosphinothricin (also known as glufosinate, an herbicide). *See id.*, 2:46-56.

58.    Corteva expended substantial money, resources, and time to support the development of the inventions relating to the novel transgenic event claimed in the '434 patent. This is neither an easy nor inexpensive task. The '434 patent explains:

> The expression of foreign genes in plants is known to be influenced by their location in the plant genome, perhaps due to chromatin structure (e.g., heterochromatin) or the proximity of transcriptional regulatory elements (e.g., enhancers) close to the integration site (Weising et al. (1988) Ann. Rev. Genet. 22:421-477). At the same time the presence of the transgene at different locations in the genome will influence the overall phenotype of the plant in different ways. For this reason, it is often necessary to screen a large number of events in order to identify an event characterized by optimal expression of an introduced gene of interest. For example, it has been observed in plants and in other organisms that there may be a wide variation in levels of expression of an introduced gene among events. There may also be differences in spatial or temporal patterns of expression, for example, differences in the relative expression of a transgene in various plant tissues, that may not correspond to the patterns expected from transcriptional regulatory elements present in the introduced gene construct. For this reason, it is common to produce hundreds to thousands of different events and screen those events for a single event that has desired transgene expression levels and patterns for commercial purposes. An event that has desired levels or patterns of transgene expression is useful for introgressing the transgene into other genetic backgrounds by sexual outcrossing using conventional breeding methods. Progeny of such crosses maintain the transgene expression characteristics of the original transformant. This strategy is used to ensure reliable gene expression in a number of varieties that are well adapted to local growing conditions.

*Id.*, 1:52-2:13. To this end, the inventors of the '434 patent invented a novel DNA construct that, when expressed in plant cells (*i.e.*, corn), confers resistance to insects.

59.    Corteva deposited a representative biological sample comprising seeds that incorporate the claimed invention, *i.e.*, the transgenic event DP-004114-3, with ATCC. Seeds of the novel DP-004114-3 event were given an ATCC accession number: PTA-11506. *See id.*, 6:34-

41. In addition to being protected under U.S. patent law, such seed deposits are governed by ATCC's policies, terms of use, and agreements, including a Material Transfer Agreement ("MTA"). *See https://www.atcc.org/policies/product-use-policies/material-transfer-agreement.*

## **AVAILABILITY OF CORTEVA'S PROTECTED SEED DEPOSITS**

60.     An applicant for a patent involving plants may bolster the patent's disclosure by depositing plant material, including seeds, that are covered by the patent's claims into a depository. ATCC is one such depository. Corteva has deposited large quantities of seeds containing its intellectual property with ATCC, in addition to the seeds containing the DP-004114-3 event that are described above. In each instance, these deposits were made for the purpose of *protecting* Corteva's patent rights.

61.     Procedures exist for members of the public to request seed samples deposited with ATCC after the applicable patent has issued. ATCC makes seeds deposited with it available to U.S.-based requestors directly. For requestors in Europe and Africa, ATCC makes seeds accessible through a partnership with LGC Standards, ATCC's exclusive distributor for Europe. *See https://www.atcc.org/about-us/who-we-are/our-partnerships/atcc-and-lgc-partnership*.   ATCC's website explains that "ATCC products can be found on both the LGC and ATCC websites, but purchasing ATCC products occurs through LGC for our customers in Europe and Africa." *Id*.

62.     When depositing seeds with ATCC for patent purposes, Corteva had every expectation that ATCC would only allow the public to access those seeds *exclusively for research purposes*. ATCC's website discloses certain "Product Use Policies" that state unequivocally that "ATCC products may only be used for noncommercial and non-clinical research." *See atcc.org/policies/product-use-policies*. The policies further specify that any commercial use "extends beyond the scope" of permitted use and is not allowed without a "commercial use license

from ATCC." To date, Corteva has never authorized ATCC to provide a commercial use license to anyone.

63.     To ensure that seeds obtained from ATCC will not be misused, ATCC requires a requesting party to sign an MTA before delivering a sample to the requesting party. ATCC publishes a sample MTA on its website at the following address: *https://www.atcc.org/policies/product-use-policies/material-transfer-agreement*.   The sample MTA discusses the rights of three parties with respect to the requested samples, which are referred to as the "ATCC Materials": (1) the "Contributor," which is the entity that deposited the ATCC Materials (*e.g.*, one of Plaintiffs), (2) ATCC, and (3) the "Recipient," which is the party requesting the ATCC Materials.

64.     ATCC explains on its website that "[t]he MTA protects the rights of all parties involved in the exchange of biomaterials from the original contributor and distribution of the material to the end-user." *See https://www.atcc.org/support/technical-support/faqs/material-transfer-agreement-mta*. ATCC further states that the MTA "protects the right of the contributor." *See https://www.atcc.org/support/technical-support/faqs/importance-of-material-transfer-agreement*.

65.     Under the heading "Scope of Use," the sample MTA states explicitly that a Recipient may only use ATCC Materials for non-commercial research purposes and cannot use the Materials for any commercial purpose without a "Commercial Use" license. The Scope of Use also warns the Recipient that the ATCC Materials "may also be subject to restrictions from a Contributor, a patent owner, or a governmental entity" and "ATCC Materials shall not be used in any manner that infringes a valid patent in force." The MTA states that the "Recipient shall have sole responsibility for identifying and obtaining any third party licenses required."

66.     The MTA defines the term "Commercial Use" broadly to include the following actions, all of which are expressly prohibited under the terms of the MTA:

  a.     Using the materials "for sale, license, lease, export, transfer or other distribution for financial purposes or other commercial purposes;"

  b.     "Produc[ing] or manufactur[ing] products for general sale or ultimately intended for general sale, including use in a commercial manufacturing process such as fermentation, bioproduction or isolation processes;"

  c.     "Collect[ing] and commercially exploit[ing] data regarding sequences of nucleic acids, proteins or other biological polymers, or relative amounts of biological substances or biological activities;" or

  d.     "Generat[ing] a whole or partial genome sequence and us[ing] the foregoing for financial purposes."

67.     The MTA also places strict limitations on the Recipient's ability to transfer the ATCC Materials. Under the section titled "Transfers," the Recipient is permitted to transfer the materials *only* within the Recipient's "organization" and only "for the purposes of the research project." The MTA forbids the materials from being transferred "for unrelated projects within Recipient's organization." The MTA also forbids the Recipient from transferring the materials outside of the Recipient's organization without ATCC's "prior written approval."

68.     ATCC's publicly available policies also explain when and how a Recipient may transfer seeds it has received. Under those policies, seeds may only be transferred without further authorization from ATCC in specifically enumerated scenarios, which are limited to non-commercial uses for research purposes only. *See https://www.atcc.org/policies/product-use-*

*policies/material-transfer-request*. These policies reiterate that any effort by the Recipient to "distribute, sell, transfer or otherwise make available the ATCC Material to any other entity, including its affiliates, without ATCC's prior written approval" is "prohibited."

69.     ATCC also is obligated to provide notice to the Contributor when deposited seeds are requested. These notices, which are typically transmitted in the form of an "informing report" or a "furnishing report," reveal, among other things, a description of the requested seeds, including the Patent Deposit number, the date the requested seeds were shipped, and the address of the third party to whom the requested seeds were shipped.

70.     Upon information and belief, ATCC previously has used versions of the MTA that differ in form and content from the version currently available on ATCC's website. However, upon information and belief, any prior versions that may exist between ATCC and Inari would contain similar restrictions on the use and transfer of Corteva's protected seeds.

71.     Thus, Corteva deposited seeds with ATCC under the assurance that (1) anyone who acquired samples of Corteva's protected seeds through ATCC would be contractually prohibited under an MTA from using those materials for commercial purposes or transferring those materials to anyone other than employees working on the same non-commercial research project for which the materials were originally acquired, and (2) ATCC would notify Corteva whenever a third party requested Corteva's seeds. Anyone receiving seeds via ATCC also remains subject to Corteva's patents, PVP certificates, and other intellectual property rights as no license to such rights is, or could be, conferred by ATCC.

## INARI IMPROPERLY PROCURED CORTEVA'S PROTECTED SEEDS FOR PROHIBITED COMMERCIAL USE

72.     On information and belief, Inari devised, coordinated, and executed a premeditated scheme to improperly obtain Corteva's protected seeds for Inari's commercial use.

73.     Starting in May 2020, Inari placed several orders with LGC Standards for Corteva's protected seeds. On information and belief, LGC Standards transmitted Inari's orders to ATCC, which—without notifying Corteva as required—fulfilled those orders and delivered them, at Inari's request, to Infinite-Eversole Specialty Crop Services LLC ("IE-SCS"). IE-SCS is a consulting firm based in Arlington, Massachusetts that acted as Inari's agent for the purposes of acquiring and exporting Corteva's protected seeds.

74.     An example of a purchase order from ATCC by Inari with instructions to ship the seeds to IE-SCS is its October 20, 2021 invoice, reproduced below:



75.     According to IE-SCS's website, IE-SCS "provide[s] _contract_ research and services related to regulatory aspects of agricultural crops, including all aspects of work _required for commercialization_ and production of plants of importance for agriculture, silviculture, horticulture, or nursery purposes." _See_ http://www.eversoleassociates.com/IE-SCS (emphasis added).

76.     On information and belief, at all times relevant herein, Defendants had actual notice and knowledge that these seeds were protected by Corteva's intellectual property rights, including patents and PVP certificates. However, Defendants and IE-SCS never obtained a license for the commercial use of any of Corteva's protected seed lines.

77.     Inari is run by former employees of some of the largest agricultural companies in the country, including Syngenta and Bayer CropScience. On information and belief, such employees are plainly aware that plant breeders, including Corteva, protect their seeds through patents, PVP certificates, and contracts like the TUA. Indeed, Inari's business is predicated on attempting to evade the intellectual property rights of innovators like Corteva. On information and belief, one of Inari's goals has been, and will be, to infringe the intellectual property rights of competitors like Corteva by misappropriating their protected seeds, transporting the seeds outside the United States, and then genome-editing or otherwise using those seeds for commercial use. Inari had and currently has knowledge of the intellectual property it is attempting to evade. In correspondence with Corteva dated October 12, 2021, Inari acknowledged that, in the course of its attempt to develop its own competing seed, it was aware of "the scope of Corteva's patents." Indeed, industry analysts have noted that they "fully expect" Inari to face "freedom-to-operate legal challenges from . . . Corteva." Byrne *et al*., "Cornbelt trip takeaways; Robust outlook across seeds, crop chems, and fertilizer," Bank of America Global Research (September 19, 2022) ("BoA Report") at 4.

78.     Further, breeders deposit their germplasm with depositories (like ATCC) to, *e.g.*, bolster patent disclosures. However, deposited seeds are generally not available publicly until after the patent covering those seeds issues. On information and belief, Defendants knew that one reason Corteva deposited its seeds with ATCC was to bolster its patent disclosures in connection with

obtaining patent protection. On information and belief, Defendants knew that Corteva's seeds were covered by patents because ATCC generally only made Corteva's seeds available to the public when a patent covering the seeds had issued.

79.     Despite such knowledge, Inari retained IE-SCS to act as Inari's agent to acquire and export Corteva's protected seeds outside of the United States. IE-SCS then accepted delivery of Corteva's protected seeds and, acting as Inari's agent, exported them to Inari Belgium's headquarters in Belgium, where Inari began work to commercialize the germplasm of Corteva's protected seeds (or modifications thereof).

80.     On information and belief, Inari or one of its agents executed one or more MTAs with ATCC to request and accept delivery of Corteva's protected seeds. Upon information and belief, such MTAs would have been substantially similar to the sample MTA discussed above that ATCC has released publicly.

81.     As such, upon information and belief, Inari agreed that Corteva's protected seeds could be used for research purposes only, could not be used commercially, could not be used in a manner that infringes a patent, and the party signing the MTAs could not transfer the seeds to anyone other than its own employees who were involved in the same non-commercial research project for which the seeds were originally acquired.

82.     On information and belief, Inari did not first obtain, and has failed to subsequently obtain, a commercial use license for Corteva's protected seeds from ATCC, nor did ATCC have any authority to grant such a license in the first place. Inari also has not obtained any license from Corteva with respect to Corteva's patent and PVP rights. On information and belief, Inari procured Corteva's protected seeds with an intent to use the germplasm of Corteva's protected seeds in connection with commercializing one or more future Inari commercial products.

25

## CORTEVA DISCOVERS INARI'S MISAPPROPRIATION

83.     Corteva did not discover that Inari had misappropriated hundreds of Corteva's protected inbred seeds until December 2022. There were, however, many opportunities for Inari to disclose this information to Corteva since Corteva began asking questions about Inari's modifications and use of Corteva's patented seeds more than a year earlier.

84.     On September 14, 2021, a Corteva representative participated in a videoconference that included the Chief Executive Officer of Inari USA. The meeting was arranged at the request of Inari USA. During the meeting, Inari USA revealed that Inari had already performed development activities to commercialize two of Corteva's protected transgenic events. Specifically, Inari detailed a "product launch plan" intended to occur over the next "1-4 Years" (meaning between 2022 and 2025). The "product" to be launched included corn seeds containing the DP-004114-3 event described above, as well as another of Corteva's proprietary events, referred to as TC-1507. Inari represented that it had made certain genetic modifications to DP-004114-3 but that it intended to use TC-1507 without any modification at all. At the time, Inari had no business relationship with Corteva that would have allowed Inari to use either of these events. However, despite the mention of these two transgenic events, Inari failed to disclose its elaborate scheme of accessing hundreds of Corteva's protected seeds and having an agent export them outside the United States.

85.     At no point during this videoconference did Inari explain how it had acquired seeds containing TC-1507 or DP-004114-3, nor did Inari mention that it had already acquired *hundreds* of Corteva's protected seeds through ATCC.

86.     During the same videoconference on September 14, 2021, Inari proposed a *quid pro quo*: Inari would not sell corn seeds containing these two proprietary events without a license

if Corteva would collaborate with Inari regarding the use of Inari's soybean products. Corteva rejected that offer.

87.     In a letter to Inari USA dated October 1, 2021, Corteva requested that Inari USA explain, *inter alia*, (1) how it obtained Corteva's seeds or plant materials, including when, where, and from whom all such material was obtained; (2) the geographical location where Inari USA used, stored, or otherwise possessed such material; and (3) the germplasm background of such material. In this same letter, Corteva reiterated that its protected seeds were covered by patent and PVP certificates.

88.     Inari USA responded in a letter dated October 12, 2021. In the letter, after first conceding knowledge of Corteva's intellectual property rights, Inari USA revealed that its "Belgian affiliate" had accessed Corteva's protected seeds relating to the DP-004114-3 event from ATCC. Inari USA spoke on behalf of both itself and its "Belgian affiliate." Inari USA further explained that those seeds were used at its Ghent, Belgium location and that "for event DP4114 ("Qrome®") . . . [it] used [its] proprietary genome editing technology to develop a modified event outside the scope of Corteva's patents." Inari further represented that "[g]enetic materials containing DP4114 are used by Inari Belgium in its laboratory in Ghent for gene editing under the applicable experimental use exemption," confirming that Inari had used genetic material derived from DP-004114-03 for gene editing in Belgium. Inari USA did not identify the hundreds of protected seeds that it acquired from ATCC, nor the means by which that material arrived in Belgium. Again, Inari was silent regarding the full extent of its misappropriation of Corteva's protected inbred seeds.

89.     Inari's letter of October 12, 2021, also indicated that Inari's "Belgian affiliate" had "legitimately accessed" TC-1507 "from publicly available grain not subject to any contractual

restrictions" and that this Belgian affiliate had incorporated TC-1507 into Inari's seeds in a facility in Chile. Inari did not identify the source of this supposedly "publicly available grain," nor did Inari explain its basis for concluding that this source was not subject to any contractual restrictions like the TUA.

90.    Corteva responded on December 16, 2021, and explained, *inter alia*, that Inari USA's October 12, 2021, letter did not adequately answer Corteva's inquiries regarding Inari USA's activities with Corteva's protected seeds. Corteva further stated that it has no record of Inari Belgium accessing Corteva's protected seeds from ATCC. Inari USA did not respond to Corteva's December 16, 2021, letter.

91.    During a conversation on April 1, 2022, Inari's General Counsel represented to Corteva that Inari had made a single genome modification to the DP-004114-3 event and directed Corteva to the publication of Inari's patent filing for more information concerning what Inari had done with Corteva's trait. Upon information and belief, the patent filing referenced by Inari was U.S. Patent No. 11,214,811 (the "'811 patent"). Inari's General Counsel further represented that any additional information about Inari's acquisition and modification of the DP-004114-3 event, beyond what was provided in that patent filing, would need to be obtained through discovery in litigation.

92.    Even before this conversation on April 1, 2022, and based on Inari's prior inadequate response, among other things, on March 29, 2022, Corteva contacted ATCC and requested a comprehensive report containing, *inter alia*, all requests made by any party for Corteva's protected seeds relating to the DP-004114-3 event deposited as ATCC Accession No. PTA-11506, as well as all requests made by any entity with Inari in its name for seed deposits owned by Corteva or its predecessor companies. On the same day, ATCC responded and provided

28

Corteva with a report indicating that ATCC shipped Corteva's protected seeds relating to the DP-004114-3 event to Kellye Eversole at IE-SCS. However, ATCC claimed that it did not have the capabilities to respond regarding all requests made by any entity with Inari in its name for seed deposits owned by Corteva or its predecessor companies.

93.     In a series of communications that occurred between April and July 2022 involving Corteva and Ms. Eversole of IE-SCS, Ms. Eversole explained that a client, which she did not name, had an agreement with ATCC, and that it was that unnamed client that accessed Corteva's protected seeds. Ms. Eversole stated that her client ordered Corteva's protected seeds and instructed that the shipment of those seeds arrive at IE-SCS for the purpose of IE-SCS sending the seeds to her client. Ms. Eversole claimed that IE-SCS acted on behalf of another entity to obtain Corteva's protected seeds from ATCC. Specifically, IE-SCS was acting as an agent for its unnamed client to receive and ship Corteva's protected seeds to the client, and IE-SCS did not use any of Corteva's protected seeds for any internal research purpose. Ms. Eversole maintained that IE-SCS' actions were in full compliance with the law, and ATCC knew that IE-SCS was transferring the seeds to their unnamed client.

94.     Corteva reached out to ATCC again on July 26, 2022, explaining that it was Corteva's understanding that ATCC shipped Corteva's protected seeds to Ms. Eversole. Corteva asked for clarification regarding whether Ms. Eversole was the signatory on the applicable MTAs related to those shipments, and if she was not, identification of the signatory. ATCC refused to identify the signatory or signatories to the applicable MTAs.

95.     Corteva continued to pursue information regarding the identity of the signatory to the applicable MTAs from August to November 2022. To this point, ATCC had failed to notify Corteva that it had shipped Corteva's protected seeds to an entity, IE-SCS, that did not itself

request the seeds. ATCC allowed that practice to continue for at least two years, even though it is contrary to ATCC policy and procedures to ship seeds to anyone other than the party requesting the seeds.

96.     Finally, on or around December 1, 2022, ATCC provided to Corteva two quotations from LGC Standards dated May 18, 2020, and September 8, 2020, respectively. The quotations make clear that Inari directed ATCC to send the protected seeds to IE-SCS, instead of to Inari directly. The quotations included a "Document Address": Inari Agriculture SA, Industriepark 7A, BE-9052 ZWIJNAARDE, BELGIUM, which is the address identified on Inari USA's website for its Belgian facility but recited a different "Delivery Address": Infinite-Eversole Strategic Crop Services, 1337 Massachusetts Avenue #311, Arlington, MA 02476, UNITED STATES.

97.     Additionally, on or around December 1, 2022, ATCC provided to Corteva copies of three purchase orders dated May 20, 2020, September 8, 2020, and October 20, 2021, corresponding to three shipments of Corteva's protected seeds that were requested by Inari and shipped to Ms. Eversole or IE-SCS.

98.     The signatory to each of these purchase orders was the Managing Director of Inari Belgium. The May 20, 2020, September 8, 2020, and October 20, 2021, purchase orders list 110 seed lines, 274 seed lines, and 12 seed lines, respectively. The October 20, 2021, purchase order listed a shipping address for: "Kellye Eversole, Infinite Eversole Strategic Crop Services (IESCS), 1337 Massachusetts Avenue # 311, Arlington, MA 02476, USA."

99.     Neither Inari nor ATCC provided Corteva any notice of these shipments of Corteva's seed lines in 2020 or 2021. When Corteva received copies of these quotations and purchase orders in December 2022, Corteva learned, for the first time, that Inari had induced ATCC to sell and ship *hundreds* of Corteva's protected seed lines to IE-SCS in Massachusetts.

Inari did this so that they could then export the protected seed lines to their Belgian facility, where they would be used primarily (if not exclusively) for commercial purposes, in contravention of Corteva's patents, PVP certificates, and ATCC's MTAs. Each of the PVP certificates asserted in Count 1 *infra* corresponds to one of these protected seed lines.

## HARM RESULTING FROM INARI'S PROCUREMENT OF CORTEVA'S PROTECTED SEEDS

100.    On information and belief, Inari improperly acquired Corteva's protected seeds and already has used those seeds in connection with Inari's commercial ambitions. In doing so, Inari is improperly attempting to leverage nearly a hundred years and hundreds of millions of dollars of Corteva's research and development for its own commercial gain. Essentially, Inari seeks to short-cut one hundred years of plant breeding by using Corteva's seeds as its own. Corteva acquired patents and PVP certificates covering its protected seeds to prevent this very situation from occurring. Corteva's protected seeds are not available from ATCC for commercial purposes.

101.    On information and belief, one of Inari's goals has been, and will be, to infringe the intellectual property rights of companies like Corteva by misappropriating these companies' protected seeds, transporting the seeds outside the United States, and then genome editing or otherwise using those seeds for commercial use.

102.    On information and belief, Inari acquired at least the seeds comprising the DP-004114-3 event for commercial use and to further its commercial interests to bring seed products to the market in less time and with less expense. For example, Inari has stated its intent to modify existing protected plant events, such as Corteva's branded Qrome® hybrid corn seed product that utilizes the DP-004114-3 event, to sell competing seeds and attempt to avoid paying royalty costs for the use of the intellectual property, including the '434 patent, that protects such branded product. Upon information and belief, Corteva believes Inari has already genome edited seeds

containing the DP-004114-3 event. In the BoA Report, the authors stated that they met with Inari's senior leadership in West Lafayette, Indiana and reported, among other things, that:

> And lastly, and likely the most controversial, Inari has developed modified versions of existing biotech events (e.g. Xtend, Qrome, Roundup Ready, and Enlist) that contain the same off-patent genes, but with portions of the event DNA sequence removed, resulting in new patentable events. While the introgression of these Inari traits into elite germplasm could take several years, this concept could enable Inari to sell best-in-class seeds without any royalty costs to the major seed companies. We note Inari has received US patents for some of these modified events, but we fully expect freedom-to-operate legal challenges from Bayer, Corteva, and Syngenta.

BoA Report at 4. On its "Trait Stewardship" website, Corteva posts a non-exhaustive list of patents that cover its products. *See https://www.corteva.us/Resources/trait-stewardship.html*. The '434 patent appears on this list in connection with Qrome®.

103.    Indeed, Inari has publicly admitted that it "creat[ed] revolutionary seed that reduces the footprint of agriculture while increasing yield" with an intent to "bring these advanced products to market in less time and with less expense than the industry norm." *See https://inari.com/wp-content/uploads/2023/04/Inari-Fact-Sheet_04-2023.pdf*.

104.    On information and belief, Inari misappropriated Corteva's protected seeds so that Inari could modify them genetically abroad and subsequently seek patent protection on and eventually sell the modified variety in the United States and elsewhere. Recent reporting confirms that Inari has already begun efforts to sell modified seeds in the United States. Inari has already partnered with at least one "test customer," called 1st Choice Seeds, which is offering "proof of concept" seeds to "at least 1,000 farms in Indiana and seven Eastern states." *See https://www.ibj.com/articles/2023-innovation-issue-inari-aims-to-boost-crop-yields-through-unique-gene-editing-technology*. Indeed, Inari has stated that the reason it established its facility in Indiana was to "allow us to ramp up our product development efforts." *See*

*https://www.prnewswire.com/news-releases/inari-introduces-the-worlds-first-seed-foundry-and-strategic-expansion-to-the-us-midwest-at-purdue-research-park-300746301.html*.

105.    With knowledge of the '434 patent and knowledge of the prohibited commercial use of the patented deposited seeds relating to the DP-004114-3 event, on information and belief, Inari nevertheless used the patented seeds acquired from ATCC for an unauthorized and improper commercial use. For example, using the patented DP-004114-3 event seeds, Inari obtained at least two issued patents and filed other patent applications purporting to claim an invention based on Inari's alteration of Corteva's seeds containing the DP-004114-3 event.

106.    Specifically, Inari obtained the '811 patent, entitled "INIR6 Transgenic Maize," which issued on January 4, 2022. The '811 patent issued from U.S. Patent Application No. 17/249,640, filed March 8, 2021, and claims priority to U.S. provisional applications dated as early as July 31, 2020. The '811 patent expressly admits that its purported invention comprises "modifications of the DP-004114-3 maize locus"—*i.e.*, modifications of the patented DP-004114-3 transgenic event described and claimed in Corteva's '434 patent. More recently, Inari obtained U.S. Patent No. 11,753,648 (the "'648 patent"), which issued on September 12, 2023. The '648 patent issued from U.S. Patent Application No. 17/680,647, filed February 25, 2022, and claims priority to U.S. provisional applications dated as early as July 31, 2020. Similar to the '811 patent, the '648 patent also expressly admits that its purported invention also comprises "modifications of the DP-4114 maize locus"—*i.e.*, modifications of the patented DP-004114-3 transgenic event described and claimed in Corteva's '434 patent.

107.    Ultimately, Corteva and its predecessors spent billions of dollars—and nearly one hundred years—researching, developing, and protecting its seeds. Inari chose to ignore Corteva's intellectual property rights in its protected seeds and now, through its infringement, is damaging

and irreparably harming Corteva's core business by preparing for sale Inari-branded versions of Corteva's protected seed lines that Inari accessed through a scheme designed to misappropriate Corteva's seeds.

## COUNT I

### Infringement of U.S. Plant Variety Protection Certificates

### (Asserted Against All Defendants)

108.    Corteva incorporates herein by reference paragraphs 1 through 107 above as if fully set forth herein.

109.    Defendants have violated, and on information and belief are continuing to violate, under 7 U.S.C. §§ 2402, 2483, and 2541, Corteva's rights under the PVP certificates listed in Exhibit A by delivering, shipping, consigning, and/or exchanging, and/or exporting from the United States, Corteva's seeds for its protected variety as identified in Exhibit A, and/or by instigating or actively inducing such conduct. Each of the PVP certificates listed in Exhibit A corresponds to a single protected seed line misappropriated by Inari.

110.    For example, Defendants purchased and then exported, or instigated or actively induced the purchase and exportation of, the following inbred seeds from ATCC:

| 38 | ATCC-PTA-11340 Inbred corn (maize) seed: PH128Z | ea | 1 | 249.00 | 249.00 |
|----|------------------------------------------------|----|---|--------|--------|

111.    This example, ATCC-PTA-11340, relates to a Corteva proprietary inbred corn seed PH128Z, which is covered by PVP certificate no. 200900369. Defendants were not authorized to, and did not have a license allowing them to, engage in this wrongful infringing conduct.

112.    In like or nearly identical fashion, Defendants purchased and then exported, or instigated, or actively induced, the purchase and exportation of the protected seeds listed in Exhibit A.

34

113.    This infringing conduct was not undertaken by Defendants with authorization from Corteva or for the purpose of plant breeding or bona fide research. Instead, Defendants misappropriated Corteva's protected seeds, and transported the seeds outside the United States, with the intent to genome-edit or otherwise use those seeds for commercial use.

114.    This infringing conduct was done with notice that the seeds listed in Exhibit A were protected by the corresponding PVP certificates. Inari is run by former employees of some of the largest agricultural companies in the country, including Syngenta and Bayer CropScience. On information and belief, such employees are plainly aware that seed developers, including Corteva, protect their seeds through both patents and PVP certificates. Indeed, Inari has stated publicly that "plant varieties and seeds . . . need IP protection," including "patents" and "plant breeders rights," "for a sustainable business" because they are "high-tech products in an easy-to-copy form." *See upov.int/edocs/mdocs/upov/en/upov_sem_ge_23/upov_sem_ge_23_ppt_12.pdf*.

115.    Inari's business is predicated on attempting to evade the intellectual property rights of competitors like Corteva. On information and belief, one of Inari's goals has been, and will be, to seek to evade the intellectual property rights of competitors like Corteva by misappropriating their protected seeds, transporting the seeds outside the United States, genome-editing or otherwise using those seeds for commercial use, and claiming ownership of the resulting, genome-edited seeds. On information and belief, Inari had and has knowledge of the intellectual property, including PVP certificates, it is attempting to evade. Industry analysts have in fact noted that they "fully expect" Inari to face "freedom-to-operate legal challenges from . . . Corteva." BoA Report at 4. Indeed, Corteva's October 1, 2021, letter reiterated that its protected seeds were covered by both patents and PVP certificates and Inari's October 12, 2021, letter conceded knowledge of such rights.

116.     Additionally, Inari has violated under 7 U.S.C. §§ 2402, 2483, and 2541, Corteva's rights under one or more PVP certificates listed in Exhibit A by instigating or actively inducing ATCC to sell Corteva seeds as identified in Exhibit A. On information and belief, Inari was aware of the PVP certificates listed in Exhibit A at least as of May 2020, the month during which it first ordered Corteva's protected seeds. Notwithstanding its knowledge of these PVP certificates, on information and belief, Inari induced ATCC to sell Corteva's protected seeds to Inari's exportation agent with the knowledge and specific intent to cause them to be exported in violation of Corteva's PVP Certificates. *See* 7 U.S.C. § 2541(a)(1)&(2) (listing "sell[ing] . . . the protected variety" and "export[ing] it from the United States" as an infringing acts).

117.     On information and belief, IE-SCS, acting as Inari's agent, delivered, shipped, consigned, exchanged, transferred possession of, and/or exported from the United States, Corteva's protected seeds as identified in Exhibit A. On information and belief, Inari instigated or actively induced such conduct as principal. On information and belief, Inari was aware of the PVP certificates listed in Exhibit A at least as of May 2020, the month during which it first ordered Corteva's protected seeds. Notwithstanding its knowledge of these PVP certificates, Inari induced IE-SCS to export from the United States Corteva's protected seeds with the knowledge and specific intent to encourage and facilitate infringing exportation of Corteva's protected seeds by IE-SCS.

118.     Alternatively, Inari delivered, shipped, consigned, exchanged, and/or exported from the United States, Corteva seeds as identified in Exhibit A through IE-SCS.

119.     On information and belief, Defendants' infringing conduct will continue unless enjoined by this Court, as to Corteva's protected seeds and/or seeds within the scope of 7 U.S.C. § 2541(c).

36

120.     As a direct and proximate consequence of Defendants' infringing conduct, Corteva has suffered and will continue to suffer irreparable injury and damages in an amount not yet determined for which Corteva is entitled to relief.

## COUNT II

**Infringement Of U.S. Patent No. 8,575,434 Under 35 U.S.C. § 271(f)(2)**

**(Asserted Against All Defendants)**

121.     Corteva repeats and incorporates by reference paragraphs 1 through 120 above as if fully set forth herein.

122.     As discussed above, the '434 patent discloses and claims corn seeds, plants, and tissues that include corn plant event DP-004114-3. A biological sample comprising seeds that incorporate the invention, *i.e.*, the transgenic event DP-004114-3, was deposited with ATCC and given an ATCC accession number: PTA-11506. For example, claims 1, 8, and 9 of the '434 patent recite:

Claim 1:

A DNA construct comprising: a first, second, third and fourth expression cassette, wherein said first expression cassette in operable linkage comprises:
(a) a maize ubiquitin promoter;
(b) a 5′ untranslated exon of a maize ubiquitin gene;
(c) a maize ubiquitin first intron;
(d) a Cry1F encoding DNA molecule; and
(e) a poly(A) addition signal from ORF 25 terminator;
said second expression cassette in operable linkage comprises:
     (1) a maize ubiquitin promoter;
     (2) a 5′ untranslated exon of a maize ubiquitin gene;
     (3) a maize ubiquitin first intron;
     (4) a Cry34Ab1 encoding DNA molecule; and
     (5) a PinII transcriptional terminator;
said third expression cassette in operable linkage comprises;
         (i) a wheat peroxidase promoter;
         (ii) a Cry35Ab1 encoding DNA molecule; and
         (iii) a PinII transcriptional terminator; and
         said fourth expression cassette in operable linkage comprises;

> (a) a CaMV 35S promoter;
> (b) a pat encoding DNA molecule; and
> (c) a 3′ transcriptional terminator from CaMV 35S; wherein the four cassettes are flanked by SEQ ID NO: 27 at the 5′ end and SEQ ID NO: 28 at the 3′ end.

Claim 8:

> A seed comprising corn event DP-004114-3, wherein said seed comprises the DNA construct of claim 1, wherein a representative sample of corn event DP-004114-3 seed has been deposited with American Type Culture Collection (ATCC) with Accession No. PTA-11506.

Claim 9:

> A corn plant, or part thereof, grown from the seed of claim 8.

123.    Inari obtained samples from ATCC of the corn seed comprising corn event DP-004114-3 deposited under Accession No. PTA-11506 and exported those samples from the United States to Inari Belgium, including by directing IE-SCS to arrange for this exportation at least in or about May 2020 and again in October 2021.

124.    This exportation was for commercial purposes.

125.    The exported seeds fall within at least claims 1 and 8 of the '434 patent.

126.    Defendants and IE-SCS never possessed a license to the '434 patent for commercial use, either expressly or implicitly.

127.    None of these entities or their agents has any right to use any seeds claimed by the '434 patent beyond the limited non-commercial uses permitted by the Budapest Treaty and ATCC's MTA for deposited seed.

128.    Inari, with knowledge of the '434 patent, but without authority, via IE-SCS, supplied or caused to be supplied from the United States to Belgium corn seed comprising corn event DP-004114-3 for which a representative sample is deposited under Accession No. PTA-11506 with ATCC.

129.     Components of Corteva's patented inventions that Inari exported include at least the corn seed for which a representative sample was deposited under Accession No. PTA-11506 with ATCC. When combined with at least water, nutrients, light, air, and physical support, this seed produces (or grows) a plant as claimed in, *e.g.*, claim 9. These components are especially made and adapted to be combined in a manner that would infringe the '434 patent, *e.g.*, growing, manipulating, and/or transforming a corn plant or part thereof from the exported seed, producing further seed from plants grown from the seed, deriving biological samples from said seed, and producing further corn varieties resistant to certain lepidopteran and coleopteran pests.

130.     The corn seed for which a representative sample was deposited under Accession No. PTA-11506 with ATCC, including the cells and tissues comprising each seed, and corn event DP-004114-3 that the genomes of each seed comprise that Inari has exported from the United States and imported into Belgium are not staple articles of commerce suitable for substantial non-infringing use.

131.     Inari has admitted that it exported seeds containing corn event DP-004114-3 to Belgium and used the exported seeds to then purportedly modify event DP-004114-3, confirming an actual combination of claimed components and/or intent that such components be combined.

132.     Upon information and belief, for Inari to attempt to modify corn event DP-004114-3, Inari at least directly practices claim 9 of the '434 patent in a manner that would infringe if done in the United States. Upon information and belief, Inari cannot introduce its genome engineering technology into cells comprising corn event DP-004114-3 without obtaining a "plant" as broadly defined in the '434 patent from the exported seeds. Upon information and belief, Inari combines the exported seed or cells or tissue therefrom with, *inter alia*, sufficient water, nutrients, light, air,

and physical support to obtain a "plant" compatible with methods by which Inari can introduce any genome engineering technology component or components.

133.    Inari has directly infringed at least claim 9 of the '434 patent in violation of 35 U.S.C. § 271(f)(2). Inari knew that the components it exported and/or caused to be exported from the United States were adapted for the purpose of growing a plant, or part thereof, and intended this export to allow Inari to make the required combinations outside the U.S. infringing at least claim 9 of the '434 patent. Additionally, Inari intended to use and did use the exported components for the commercial purpose of growing a plant and then using the plant tissue and/or cells to develop a modified DP-4114 event and seeds containing the modified event.

134.    For example, a mode by which Inari purportedly modified corn event DP-004114-3 was disclosed in Inari's patent directed to modifying corn event DP-004114-3—the '811 patent—which expressly discusses modifying Corteva's DP-004114-3 event. For example, the abstract of the '811 patent states that "[t]ransgenic INIR6 maize plants comprising modifications of the DP-4114 maize locus which provide for facile excision of the modified DP-004114-3 transgenic locus or portions thereof, methods of making such plants, and use of such plants to facilitate breeding are disclosed." The disclosure of the '811 patent also refers directly to Corteva's '434 patent protecting DP-004114-3 no fewer than six times.[2] A second, more recently issued

_____

[2] *See e.g.*, the '811 patent, available at
https://patentcenter.uspto.gov/applications/17249640?application=, col. 5:22-26 ("As used herein, the term "DP-4114" is used to refer to any of a transgenic maize locus, transgenic maize plants and parts thereof including seed set forth in U.S. Pat. No. 8,575,434, which is incorporated herein by reference in its entirety"); *see also id.*, col. 12:12-18 ("Sequences of the junction polynucleotides as well as the transgenic insert(s) of the DP-4114 transgenic locus which can be improved by the methods provided herein are set forth or otherwise provided in SEQ ID NO: 1, U.S. Pat. No. 8,575,434, the sequence of the DP-4114 locus in the deposited seed of ATCC accession No. PTA-11506, and elsewhere in this disclosure.").

patent, the '648 patent, includes a similar disclosure plus additional details and examples of Inari's purported modifications to corn event DP-004114-3.[3]

135.    During the September 14, 2021, videoconference between Inari and Corteva, Inari represented that it had genome edited the DP-004114-3 event and was taking affirmative steps to commercially market corn seeds expressing that trait.

136.    Likewise, as further quoted above, in a letter from Ponsi Trivisvavet, Chief Executive Officer of Inari USA, dated October 12, 2021, Inari represented that (i) Inari used its laboratory in Ghent to perform its genome editing on event DP-004114-3 and (ii) Inari obtained corn event DP-004114-3 from the ATCC depository in the United States.

137.    Further, on or around April 1, 2022, Inari told Corteva that it had made a genome modification to the DP-004114-3 event, which was described in the patent filings for the '811 patent and the '648 patent.

138.    Inari's infringement of the '434 patent was, and continues to be, willful and deliberate since March 8, 2021, at the latest, which is when Inari filed the '811 patent disclosing, *inter alia*, the '434 patent as an "example[] of a selected transgenic corn event which confers lepidopteran and coleopteran insect pest tolerance [through] the DP-4114 transgenic maize event."

139.    Corteva has been and continues to be damaged by Inari's infringement of the '434 patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

140.    Inari's conduct in infringing the '434 patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

---

[3] *See e.g.*, the '648 patent, available at
https://patentcenter.uspto.gov/applications/17680647/ifw/docs?application=, col. 5:48-59; *see also id.*, col. 11:35-12-24; *see also id.*, col. 13:5-54; *see also id.*, col. 21:30-22:18; *see also id.*, col. 31:44-52; *see also id.*, col. 33:7-30; *see also id.*, col. 38:57-67; *see also id.*, col.39: 9-12.

## COUNT III

### Induced Infringement Of U.S. Patent No. 8,575,434

### (Asserted Against All Defendants)

141.     Corteva incorporates herein by reference paragraphs 1 through 140 above as if fully set forth herein.

142.     A biological sample comprising seeds reflecting the invention of the '434 patent, *i.e.*, the transgenic event DP-004114-3, was deposited with ATCC. Specifically, seeds of the novel DP-004114-3 event were deposited with ATCC and given an ATCC accession number: PTA-11506. *See id.*, 6:34-41. Such seed deposits are governed by ATCC's policies, terms of use, and agreements, including an MTA. *See https://www.atcc.org/policies/product-use-policies/material-transfer-agreement*.

143.     Inari obtained, without authorization and for a commercial use, seeds relating to the DP-004114-3 event of the '434 patent from ATCC. Inari did so by inducing ATCC, on at least three occasions—June 25, 2020, July 24, 2020, and November 18, 2021—to sell seeds deposited with the ATCC under PTA-11506 and reflecting the patented DP-004114-3 transgenic event and ship them to Kellye Eversole, Infinite Eversole Strategic Crop Services, Arlington, Massachusetts. Neither ATCC nor LGC Standards was authorized to sell or transfer seeds for commercial use. Indeed, as discussed above, ATCC's standard MTA expressly prohibits a Recipient from using seeds for commercial purposes. On information and belief, Inari never intended to abide by these restrictions at the time it sought and obtained the seeds.

144.     IE-SCS was acting as an agent for Inari to acquire the patented DP-004114-3 event seeds and transferred the patented seeds to Inari.

145.    On information and belief, at the time that Inari obtained the seeds comprising corn event DP-004114-3 from ATCC, Inari had knowledge of the '434 patent covering the protected seeds for the DP-004114-3 event. On its "Trait Stewardship" website, Corteva posts a non-exhaustive list of patents that cover its products. The '434 patent appears on this list in connection with Qrome®. Furthermore, in its October 12, 2021, letter to Corteva, Inari USA admitted that "for event DP4114 ("Qrome®") . . . [it] used [its] proprietary genome editing technology to develop a modified event outside the scope of Corteva's patents," indicating that Inari USA had actual knowledge of at least the '434 patent.

146.    At the time that Inari obtained the seeds comprising corn event DP-004114-3 from ATCC, Inari had, on information and belief, a specific intent to induce infringement of the '434 patent by having ATCC sell and/or transfer the protected seeds to Inari's agent who then further transferred such seeds to Inari.

147.    With knowledge of the '434 patent and knowledge that no commercial use of the patented deposited seeds relating to the DP-004114-3 event was permitted, Inari at all relevant times intended to use, and did use, the patented seeds acquired from ATCC for unauthorized and improper commercial use. Inari acquired at least the seeds comprising the DP-004114-3 event for commercial use and to further its commercial interests.

148.    Indeed, Inari has publicly admitted that it acted with an intent to "bring these advanced products to market in less time and with less expense than the industry norm." *See https://inari.com/wp-content/uploads/2023/04/Inari-Fact-Sheet_04-2023.pdf*.

149.    Specifically, through at least the foregoing acts, Inari induced infringement of at least claim 8 of the '434 patent by inducing ATCC to sell, without authorization, the seed comprising corn event DP-004114-3 to Inari. Claim 8 of the '434 patent recites:

8. A seed comprising corn event DP-004114-3, wherein said seed comprises the DNA construct of claim 1, wherein a representative sample of corn event DP-004114-3 seed has been deposited with American Type Culture Collection (ATCC) with Accession No. PTA-11506.

150. Through its infringement, Inari acquired an unfair commercial advantage, thereby damaging and causing irreparable harm to Corteva.

151. Inari's inducement of infringement of the '434 patent was done intentionally and willfully. Inari had knowledge of the '434 patent covering the corn event comprising DP-004114-3. Inari had knowledge that ATCC would not (and could not) sell the patented deposited seeds relating to the corn event comprising DP-004114-3 for any commercial use, particularly in view of the claims of the '434 patent. With knowledge of the '434 patent and knowledge of the prohibited commercial use of the patented deposited seeds relating to the DP-004114-3 event, Inari willfully and intentionally induced ATCC to sell or otherwise transfer patented seeds comprising the corn event DP-004114-3, with knowledge and/or willful blindness to the fact that such sale or transfer by ATCC of the patented seeds to Inari for its commercial use was unauthorized and would, and did, infringe the '434 patent.

## COUNT IV

### Breach Of Material Transfer Agreements

### (Asserted Against Inari USA)

152. Corteva incorporates herein by reference paragraphs 1 through 151 above as if fully set forth herein.

153. Upon information and belief, each sale of Corteva's protected seeds by ATCC to Inari is subject to an MTA that would have been executed by ATCC and Inari USA.

154.     ATCC explains on its website that "[t]he MTA protects the rights of all parties involved in the exchange of biomaterials from the original contributor and distribution of the material." *See https://www.atcc.org/support/technical-support/faqs/material-transfer-agreement-mta*. ATCC further states that the MTA "protects the right of the contributor." *See https://www.atcc.org/support/technical-support/faqs/importance-of-material-transfer-agreement*.

155.     Although both ATCC and IE-SCS have declined to provide Corteva with copies of the executed MTAs governing the sales at issue, MTAs are form agreements, and ATCC makes the general terms of these agreements available to the public on ATCC's website. Those terms further clarify that these agreements are intended to protect the rights of "contributors," like Corteva. Such terms include:

       a.     The "Scope of Use" for the requested materials expressly prohibits any "commercial use" without license, which can only be understood as a benefit intended for the Contributor because ATCC has no commercial interest in the seeds and is a non-profit international depository association;

       b.     The "Scope of Use" further states that the use of the requested seeds "may also be subject to restrictions from a Contributor, patent owner, or governmental entity" and "ATCC Materials shall not be used in any manner that infringes a valid patent in force;"

       c.     Under "Property Rights," the MTA states that "ATCC and/or its Contributors shall retain ownership of all right, title and interest in the [requested materials];"

     d.     The MTA expressly requires the Recipient to indemnify the Contributor against all third-party claims, losses, expenses and damages relating to Recipient's use of the requested seeds;

     e.     The MTA does <u>not</u> contain any disclaimer of third-party beneficiaries, as is common in commercial contracts where such an exclusion is intended.

156.    Because Corteva is the "contributor" within the context of the MTAs, and the MTAs protect the rights of contributors, Corteva is an intended third-party beneficiary of the MTAs and may enforce their terms.

157.    The MTAs expressly prohibit Inari USA from (1) exporting, transferring, or otherwise distributing the seeds for financial or commercial purposes; (2) using the requested seeds to produce or manufacture products for general sale or ultimately intended for general sale; (3) collecting and commercially exploiting data regarding sequences of nucleic acids, proteins or other biological polymers, or relative amounts of biological substances or biological activities; and (4) generating a whole or partial genome sequence for financial purposes.

158.    In clear disregard of these restrictions, Inari USA, acting on its own or through its agents and affiliates, obtained and used Corteva's protected seeds for the express purpose of developing their own commercial products, which Inari intends to sell for its own commercial benefit. Indeed, Inari's February 9, 2022, press release brags that "Inari has created a unique opportunity to deliver proven GM [genetically modified] traits in combination with novel gene edits to plants' natural DNA." *See inari.com/inari-to-bring-growers-proprietary-gm-traits-in-tandem-with-novel-gene-edits/.* Those "GM Traits" include traits that Corteva has developed through its painstaking research and development, at great time and cost, and which are subject to

Corteva's patents and PVP certificates. The February 9, 2022, press release highlights that Inari had successfully obtained a patent over certain "corn plants comprising an edited DP-004114-3 corn trait," which is a trait developed and patented by Corteva that was contained in protected seeds stored at ATCC, and, according to Inari, "[t]he grant of [this patent] . . . makes [Corteva's variety] *proprietary to Inari*." *Id.* (emphasis added).

159.    In other words, Inari, with the help of their agent IE-SCS, took Corteva's protected seeds from ATCC, exported them out of the country in a transparent attempt to avoid the reach of patent and PVP protection laws within the United States, genetically modified them abroad, and now seeks to bring these genetic modifications to market in the United States. Inari's February 9, 2022, press release *admits* that its purpose for acquiring and using Corteva's protected seed lines was always commercial in nature: "We aim to commercialize our products in the coming years." *Id.* Such blatantly commercial activity violates the MTAs' express prohibition on using the seeds Inari acquired from ATCC for any commercial purpose.

160.    The sample MTA also states: "Recipient acknowledges that any breach may create . . . irreparable injury" and authorizes ATCC to seek preliminary and permanent injunctive relief. Although ATCC has not yet chosen to seek such relief, Corteva is suffering irreparable injury by Inari's actions. As an intended beneficiary of the MTA, Corteva is also entitled to seek equitable relief.

161.    Defendants have injured Corteva by misappropriating Corteva's protected seeds and using them for commercial purposes that are expressly prohibited by the MTAs, which prohibitions exist primarily for Corteva's benefit. As an intended third-party beneficiary of the MTAs, Corteva seeks all appropriate equitable relief, which may include specific performance of the MTAs, an injunction requiring the return of Corteva's protected seeds, and any progeny or

derivatives thereof, and/or an injunction prohibiting Inari from further pursuing any commercial endeavor based on the materials it obtained pursuant to the MTAs. Corteva further seeks compensatory damages in an amount to be proven at trial.

## COUNT V

### Violation of Massachusetts General Law Chapter 93A

### (Asserted against Inari USA)

162.    Corteva incorporates herein by reference paragraphs 1 through 161 above as if fully set forth herein.

163.    Inari USA maintains its principal place of business in Massachusetts and, accordingly, is subject to the laws of Massachusetts, including Chapter 93A of Massachusetts' General Laws ("Chapter 93A"), which prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

164.    Inari USA participated in unfair and deceptive acts that violate Chapter 93A. As set forth above, Inari USA knowingly violated its own contractual obligations under the MTA in an effort to obtain an unauthorized commercial benefit from the use of Corteva's patent-protected and PVP-protected seeds. Upon information and belief, ATCC would not have provided the protected seeds to Inari if Inari had disclosed its commercial intentions.

165.    After misappropriating the protected seeds for its own financial gain, Inari USA carefully avoided disclosing to Corteva the full extent to which Inari was impermissibly exploiting Corteva's property. When Inari first disclosed to Corteva, in September 2021, that it had acquired two of Corteva's proprietary events and would seek to monetize them, Inari sought to pressure Corteva into a *quid pro quo* agreement under which Inari offered to not sell corn seeds containing

these two proprietary events that Corteva had developed only if Corteva would provide Inari financial incentive in the form of an agreement to use Inari's soybean products.

166.    After September 2021, Corteva began to inquire how Inari USA had obtained Corteva's protected seed lines, but Inari USA still withheld essential information about the full extent of its actions. It was not until late 2022, after a lengthy communication effort with ATCC, that Corteva learned for the first time that Inari USA had obtained literally hundreds of Corteva's protected seed lines, for Inari's exclusive financial benefit, without Corteva's knowledge or approval.

167.    Upon information and belief, Inari USA took these unscrupulous actions because it hoped, and still hopes, to commercialize a product built on the foundation of Corteva's protected seed lines. Inari USA has made this intention clear in its own press releases.

168.    Upon information and belief, the actions and transactions constituting these unfair business practices occurred primarily or substantially within Massachusetts, which is where Inari USA and IE-SCS both maintain their principal places of business. Massachusetts also is where Defendants directed ATCC to ship Corteva's protected seeds so that they could then be exported from Massachusetts to Belgium.

169.    Pursuant to Mass Gen. Law c. 93A § 11, Corteva seeks equitable relief and monetary damages as a result of Inari USA's deceptive trade practices. Moreover, because this deceptive and unfair conduct was committed willfully, Corteva seeks treble damages "on all claims arising out of the same and underlying transaction or occurrence." Mass Gen. Law c. 93A § 11.

## COUNT VI

**Conversion**

**(Asserted against Inari USA)**

170.    Corteva incorporates herein by reference paragraphs 1 through 47 and 60 through 107 above as if fully set forth herein.

171.    Corteva retained ownership and possessory interests in the protected seeds that had been deposited with ATCC. Indeed, the MTAs (which, upon information and belief, were signed either by or on behalf of Inari USA) state explicitly that "ATCC and/or its Contributors shall retain ownership of all right, title and interest in the ATCC Materials." These agreements also made clear that the seeds were subject to strict use limitations, which existed exclusively for Corteva's continuing benefit.

172.    By acquiring Corteva's protected seeds and using them for impermissible and unauthorized commercial uses, including outside the United States, Inari has wrongfully exerted dominion and control over Corteva's valuable property, which seriously interferes with the property rights that Corteva has diligently sought to protect. Indeed, Corteva ensured that its seeds would be held in a depository that expressly prohibited any commercial use of the seeds. This prohibition was stated explicitly in the MTAs that Inari signed, as well as in ATCC's policies and procedures. Inari could only have accessed Corteva's protected seeds from the ATCC by agreeing to the commercial use prohibition set forth in that contract. As is set forth in detail above, Inari has wholly disregarded that prohibition.

173.    Corteva first learned of Inari's conversion of seeds containing the DP-004114-3 and TC-1507 events in September 2021, but did not learn that Inari had converted hundreds of

Corteva's protected seeds until December 2022, which is when ATCC first informed Corteva of Inari's actions.

174.    Inari converted Corteva's property willfully and with full knowledge that its actions would violate Corteva's property rights and the MTA.

175.    Because Inari has not acquired the protected seeds in good faith, no pre-suit demand for the return of the seeds is required. Accordingly, Corteva seeks damages in an amount to be proven at trial and further seeks equitable and injunctive relief requiring Inari to return Corteva's protected seeds and prohibiting Inari from taking any further action to commercialize Corteva's protected seeds, or any modified seeds that Inari has derived therefrom.

## PRAYER FOR RELIEF

Through the actions described above, Inari has willfully and intentionally violated Corteva's patent rights, Corteva's PVP certificates, and Inari's own contractual obligations, all as part of a scheme to steal fruits of Corteva's decades and decades of groundbreaking research and innovation. WHEREFORE, Corteva respectfully requests that this Court enter judgment in its favor and against Defendants and grant the following relief:

A.    Judgment that Defendants have infringed the '434 patent under 35 U.S.C. § 271(b) and § 271(f)(2);

B.    Judgment that Defendants have directly infringed and continue to infringe the PVP certificates listed in Exhibit A under 7 U.S.C. §§ 2402, 2483, and 2541;

C.    Judgment that Defendants have instigated or actively induced conduct by ATCC and/or IE-SCS that directly infringed and continues to infringe one or more of the PVP certificates listed in Exhibit A under 7 U.S.C. §§ 2402, 2483, and 2541;

D.    Judgment that Defendants have materially breached the MTA;

E.      Judgment that Defendant Inari USA has violated the Massachusetts Deceptive Trade Practices Act;

F.      Judgment that Defendant Inari USA is liable for conversion;

G.      Judgment that Defendants' infringement was willful and enhancement of any monetary damages pursuant to 35 U.S.C. § 284 and 7 U.S.C. § 2564(b);

H.      Monetary damages adequate to compensate for Defendants' infringement of the '434 patent in accordance with 35 U.S.C. § 284, and the PVP certificates listed in Exhibit A in accordance with 7 U.S.C. § 2564, in an amount to be determined at trial, including without limitation lost profits and/or a reasonable royalty, and an accounting and/or ongoing royalty for any post-judgment infringement if the equitable relief below for an injunction under 7 U.S.C. § 2563 and/or 35 U.S.C. § 283 is not granted;

I.      Monetary damages in an amount to be determined at trial for breach of the MTA and for violation of the Massachusetts Deceptive Trade Practices Act, and conversion;

J.      Permanent injunction for Defendants' infringement of one or more of the PVP certificates listed in Exhibit A in accordance with 7 U.S.C. § 2563;

K.      Permanent injunction for Defendants' infringement of the '434 patent in accordance with 35 U.S.C. § 283;

L.      All appropriate equitable and injunctive relief including, without limitation (a) relief requiring Defendants to disclose all of Corteva's protected seeds that Defendants have acquired and the manner in which Defendants have acquired them, (b) relief requiring Defendants to return Corteva's protected seeds and any

derivatives, and (c) specific performance of the MTA's prohibition on the use of Corteva's protected seeds (including any progeny or information derived therefrom) for commercial purposes;

M.     Compensatory damages in an amount to be determined at trial;

N.     Treble damages, attorneys' fees, and costs;

O.     A declaration that this is an exceptional case under 35 U.S.C. § 285 and 7 U.S.C. § 2565 and an award of attorneys' fees, costs, and expenses to Corteva; and

P.     All other relief deemed appropriate by this Court.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Corteva respectfully demands a jury trial as to all issues so triable.

Dated: September 27, 2023                    **BARNES & THORNBURG LLP**

                                             */s/  Chad S.C. Stover*
                                             Chad S.C. Stover (No. 4919)
                                             222 Delaware Avenue, Suite 1200
                                             Wilmington, DE 19801
                                             Tel. (302) 300-3474
                                             Email: Chad.Stover@btlaw.com

                                             OF COUNSEL:

                                             Peter Bicks (*Pro hac vice* forthcoming)
                                             Brian Raphel (*Pro hac vice* forthcoming)
                                             ORRICK, HERRINGTON & SUTCLIFFE LLP
                                             51 West 52nd Street
                                             New York, NY 10019-6142
                                             Tel: +1 212 506 5000
                                             Fax: +1 212 506 5151
                                             pbicks@orrick.com
                                             braphel@orrick.com

                                             David Gindler (*Pro hac vice* forthcoming)
                                             Lauren Drake (*Pro hac vice* forthcoming)
                                             ORRICK, HERRINGTON & SUTCLIFFE LLP
                                             355 South Grand Avenue, Suite 2700
                                             Los Angeles, CA 90071-1596
                                             Tel: +1 213 629 2020
                                             Fax: +1 213 612 2499
                                             dgindler@orrick.com
                                             ldrake@orrick.com

                                             Gary Frischling (*Pro hac vice* forthcoming)
                                             ORRICK, HERRINGTON & SUTCLIFFE LLP
                                             631 Wilshire Blvd., Suite 2-C
                                             Santa Monica, CA 90401
                                             Tel: +1 310 633 2800
                                             Fax: +1 310 633 2849
                                             gfrischling@orrick.com

                                             Todd Vare (*Pro hac vice* forthcoming)
                                             BARNES & THORNBURG LLP
                                             11 S. Meridian St.
                                             Indianapolis, IN 46204
                                             Tel: (317) 231-7735
                                             Todd.Vare@btlaw.com

Ronald Cahill (*Pro hac vice* forthcoming)
BARNES & THORNBURG LLP
One Marina Park Drive, Suite 1530
Boston, MA 02210
Tel: (617) 316-5312
Ronald.Cahill@btlaw.com

Lauren Baker (*Pro hac vice* forthcoming)
BARNES & THORNBURG LLP
3340 Peachtree Road N.E., Suite 2900
Atlanta, GA 30326
Tel: (404) 264-4036
Lauren.Baker@btlaw.com

*Attorneys for Plaintiffs*