IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORTEVA AGRISCIENCE LLC, | : | CIVIL ACTION |
| PIONEER HI-BRED | : | |
| INTERNATIONAL, INC. and | : | |
| AGRIGENETICS, INC., | : | |
| | : | |
| v. | : | NO.  23-1059 |
| | : | |
| INARI AGRICULTURE, INC., and | : | |
| INARI AGRICULTURE NV. | : | |

## MEMORANDUM

**MURPHY, J.***                                                    **August 2, 2024**

We want inventors to share their ideas with the world rather than keep them secret.  So in exchange for limited exclusivity, inventors teach us how the trick was done.  Competitors get the benefit of that knowledge.  And they may make improvements, and even be rewarded with their own patents on those improvements.  But the competitor does not get free license to use the original invention however it wishes.  That's Patent Law 101, and easy enough to understand when everything is on paper.  What happens when the original disclosure of the invention was not just words or drawings on a page, but also a plant seed stored in a public depository in the United States?

The amended complaint in this case tells the story of a competitor, Inari, who wanted to use and improve upon Corteva's plant technology without asking nicely.  So Inari purchased Corteva's seeds from the seed depository in the United States under an agreement that forbid commercial use, and then, after some mandatory testing for diseases, shipped the seeds to its

---

* Judge John Frank Murphy, of the United States District Court for the Eastern District of Pennsylvania.

affiliate abroad.  There, outside the reach of U.S. patents, Inari exploited and improved upon the seeds in furtherance of its business objectives.  Inari then confidently approached Corteva and proposed a deal: we will hold off marketing our new and improved seeds if you partner with us on a different project.  After Corteva figured out what had happened, they sued Inari for infringing plant variety protection certificates and a utility patent, as well as state-law claims relating to Inari's violation of the agreement with the depository.  Inari moved to dismiss under a unified theory positing that once Corteva deposited its seeds with a depository and made them available to the public, it was open season.

Many of Inari's arguments require the assumption that whatever Inari is accused of doing is nothing more than what any member of the public is entitled to do with a deposited seed.  An interesting notion, but is it true?  That's what Corteva's allegations are testing — various theories of liability that, if proven, demonstrate that Inari exceeded the bounds of mere public availability.  In its motion to dismiss, Inari repeatedly tries to assume away Corteva's case.  For essentially that reason, with many details to follow, we deny Inari's motion to dismiss.

## I.     Factual background according to the amended complaint

**The parties.**  For simplicity's sake, we will usually refer to the plaintiffs collectively as "Corteva" and the defendants collectively as "Inari."[1]  Corteva and Inari develop genetically modified plants.  Corteva has been around a while — some of its businesses date back 100 years — and it is now one of the largest agriscience companies in the world.  DI 19 ¶¶ 1, 2, 8-12.

---

[1] When the distinction is important, we will use "Inari USA" for Inari Agriculture, Inc. and "Inari Belgium" for Inari Agriculture NV.

2

Corteva "has invested billions of dollars in research and development to develop high-quality crop seeds" and accompanying intellectual property. *Id.* ¶¶ 13, 43, 52, 58.

Inari is an 8-year-old company that bills itself as "'the next-generation seed company' that purportedly relies on 'disruptive technologies' to 'enhance nature's genetic diversity' in seeds." *Id.* ¶ 14 (quoting Inari's website). Inari's leaders are formerly of leading agriscience companies like Syngenta and Bayer CropScience. *Id.* Inari has had success, growing to over 270 employees at several locations including Cambridge, Massachusetts and Ghent, Belgium, and reporting a $1.5 billion valuation. *Id.*

**The technology.** This case involves the development of novel plant varieties said to have great commercial value. Farmers and scientists have been carefully breeding new and useful plant varieties long before the companies involved in this dispute existed. Most of the details are unimportant for this motion, but a few aspects of the technology will aid in understanding the issues.

Novel and valuable plants may be created in several ways, including traditional breeding techniques or genetic engineering. One traditional breeding technique for sexually reproducing plants like corn and soybean involves creating candidate inbred seeds with interesting characteristics and then crossbreeding them to yield valuable hybrid plants. *Id.* ¶¶ 24-36. Importantly, the inbred seeds are highly valuable, carefully protected, and not sold commercially. *Id.* ¶¶ 32-33. Genetic engineering techniques — often combined with traditional techniques — involve directly inserting transgenes from some other organism into candidate plant cells to yield desirable qualities. *Id.* ¶¶ 37-39. Corteva emphasizes that the process of

3

creating a valuable new plant is arduous, time-consuming, expensive, and must be frequently repeated for different growing environments and needs. *Id.* ¶¶ 40-42.

The term "event" comes up in this case. In the context of agricultural biotechnology, event refers to the insertion of a particular transgene into a particular location in a plant chromosome. As the amended complaint puts it, "[w]hen a transgene is incorporated into a plant germplasm at a specific location in the chromosome, resulting in the desired trait, it is known as an 'event.'" *Id.* ¶ 38. An event, in essence, is the relevant unit of technology in a transgenic plant.

**The intellectual property and protected seeds.** Corteva pursues intellectual property protection of its novel plant varieties, and then subjects its customers to license agreements that prohibit exploiting the seeds for crop breeding or research. *Id.* ¶¶ 45-47. Congress provides several overlapping[2] ways to protect novel plant varieties, including traditional utility patents, 35 U.S.C. § 101 et seq., so-called "plant patents" for asexually reproducing plants (other than tubers), §§ 161-164, and certificates of plant variety protection granted under the Plant Variety Protection Act (PVPA), 7 U.S.C. § 2321 et seq. That last form of intellectual property is somewhat patent-like and usually referred to as a "PVP certificate." *E.g.*, 7 U.S.C. § 2531 ("[P]lant variety protection shall have the attributes of personal property.").

Corteva asserts one utility patent in this case, No. 8,575,434 (the "434 patent"). DI 19-2. The 434 patent is entitled "Maize Event DP-004114-3 and Methods for Detection Thereof." *Id.* The patent "discloses and claims corn seeds, plants, and tissues that include corn plant event DP-

---

[2] The Supreme Court's discussion of the overlapping intellectual property regimes for plants in *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.* is the best place for beginners to get a primer. 534 U.S. 124 (2001).

004114-3, which confers insect resistance to the corn." DI 19 ¶ 56. Although the insect-resistance event is the crux of the invention, the 434 patent claims its subject matter in several ways: a DNA construct (claim 1), a plant (claims 2-7), a seed (claims 8), a plant grown from that seed (claim 9), a seed produced from that plant (claim 10), a plant grown from that seed (claim 11), an isolated nucleic acid (claim 12), an amplicon (claim 13), a biological sample (claims 14-17), an extract (claims 18-20), several different methodologies (claims 21-27), and one more seed (claim 28). 434 patent 83:1-85:30. The 434 patent also explains that seeds representative of the invention were deposited as part of the patent application. The 434 patent's explanation of the deposit is lengthy, but it is consistent with Patent Office regulations and serves as a good foundation for the issues raised by Inari's motion:

> Compositions of this disclosure include seed deposited as Patent Deposit No. PTA-11506 and plants, plant cells, and seed derived therefrom. Applicant(s) have made a deposit of at least 2500 seeds of maize event DP-004114-3 with the American Type Culture Collection (ATCC), Manassas, Va. 20110-2209 USA, on Nov. 24, 2010 and the deposits were assigned ATCC Deposit No. PTA-11506. These deposits will be maintained under the terms of the Budapest Treaty on the International Recognition of the Deposit of Microorganisms for the Purposes of Patent Procedure. These deposits were made merely as a convenience for those of skill in the art and are not an admission that a deposit is required under 35 U.S.C. § 112. The seeds deposited with the ATCC on Nov. 24, 2010 were taken from the deposit maintained by Pioneer Hi-Bred International, Inc., 7250 NW 62nd Avenue, Johnston, Iowa 50131-1000. Access to this deposit will be available during the pendency of the application to the Commissioner of Patents and Trademarks and persons determined by the Commissioner to be entitled thereto upon request. Upon allowance of any claims in the application, the Applicant(s) will make available to the public, pursuant to 37 C.F.R. §1.808, sample(s) of the deposit of at least 2500 seeds of hybrid maize with the American Type Culture Collection (ATCC), 10801 University Boulevard, Manassas, Va. 20110-2209. This deposit of seed of maize event DP-004114-3 will be maintained in the ATCC depository, which is a public depository, for a period of 30 years, or 5 years after the most recent request, or for the enforceable life of the patent, whichever is longer, and will be replaced if it becomes nonviable during that period. Additionally, Applicant(s) have satisfied all the requirements of 37 C.F.R. §§ 1.801-1.809, including providing an indication of the viability of the sample

> upon deposit.  Applicant(s) have no authority to waive any restrictions imposed
> by law on the transfer of biological material or its transportation in commerce.
> Applicant(s) do not waive any infringement of their rights granted under this
> patent or rights applicable to event DP-004114-3 under the Plant Variety
> Protection Act (7 USC § 2321 et seq.).  Unauthorized seed multiplication
> prohibited. The seed may be regulated.

434 patent 6:34-7:6.  ATCC, referred to in that passage, is the seed depository.  More on that in a

moment.

Corteva also alleges that Inari infringed Corteva's rights in 230 PVP certificates.  Corteva

listed the asserted certificates in its complaint, including the PVP certificate numbers, assignees,

crop type, and other data.  DI 19-1.  As but one example, the first entry on Corteva's list is No.

200100025, for an inbred field corn variety denoted 7SH382 (the 200100025 certificate).[3]  The

200100025 certificate is 24 pages long, and contains a variety of legal and scientific information,

for example, a lengthy description of the genealogy of 7SH382, measurements of various traits,

photographs, and the following "novelty statement":

> Exhibit B - Novelty Statement (Statement of Distinctness)
>
> 7SH382 is most similar to B73.  However, there are numerous differences
> including different silk and cob color, the expression of anthocyanin pigment in
> brace roots and other morphological traits.  7SH382 will reach mid silk and mid
> pollen shed later than B73 (73 and 74 days versus 71 and 70 days respectively OR
> 1445 and 1465 H.U. versus 1411 and 1396 H.U. respectively). The silk color of
> 7SH382 ear shoots are pink (Munsell code 2.5R 7/6) while silks of B73 are light
> green (Munsell code 2.5 GY 8/4).  7SH382 has a white cob (Munsell code SY
> 9/1) while B73 has a light red cob (Munsell code l0R 5/8).  7SH382 exhibits faint
> anthocyanin expression in its brace roots while B73 exhibits dark anthocyanin
> pigment. 7SH382 has significantly fewer lateral tassel branches that B73 (6.2
> versus 7.6 respectively).  The tassel length for 7SH382 is significantly longer than
> B73 (44.2 cm versus 39.9 cm respectively).  The number of kernel rows for
> 7SH382 is significantly fewer (average 14.2 per ear) than B73 (average 17.3 per
> ear).  7SH382 kernel caps often have very little or no indentation while those of
> B73 most commonly do have a moderate to large cap dent (see photo plates), this

---

[3] The 200100025 certificate is available at:
https://apps.ams.usda.gov/CMS//AdobeImages/200100025.pdf.

typically results in a smaller quantity of soft endosperm (cap) for 7SH382. The ear height is significantly lower in 7SH382 than B73 (90.7 cm versus 99.2 cm respectively).  The leaf length is significantly shorter for 7SH382 versus B73 (77.9 cmv versus 82.3 cm respectively).  7SH382 typically has more leaves above the top ear than B73 (6.36 cm versus 5.59 respectively).

200100025 certificate at 6.  Presumably, this is all intended to show that the variety is new, distinct, uniform, and stable, as the statute requires.  7 U.S.C. § 2422.  An application for a PVP certificate requires that the applicant deposit in a public repository and periodically replenish "a viable sample of basic seed (including any propagating material) necessary for propagation of the variety."  7 U.S.C. § 2422(4); *see also* 7 C.F.R. § 97.6(d).

**The seed depository.**  As mentioned, an applicant for a utility patent covering a plant may deposit sample seeds in an appropriate depository, and that depository will make the seeds available to the public.  Corteva deposited many of its seeds with the American Type Culture Collection (ATCC).  DI 19 ¶¶ 5, 60.  ATCC is a nonprofit that collects, stores, and distributes biological materials.  *Id.* ¶ 5.  Among Corteva's deposited seeds are "seeds that incorporate the claimed invention" of the 434 patent and seeds corresponding to all of the PVP certificates named in the amended complaint.  *Id.* ¶¶ 59, 123-24, Exhibit A (DI 19-1).  For each PVP certificate, Corteva's list identifies an ATCC deposit number.[4]  DI 19-1.

---

[4] The amended complaint does not spell this out, but it is fairly clear that the deposits made with ATCC listed in Exhibit A were not necessarily made *in order to obtain* the corresponding PVP certificates listed in Exhibit A.  PVPA deposits are kept at the National Laboratory for Genetic Resources Preservation in Ft. Collins, Colorado, and are not available to the public until after expiration of the PVP certificate.  *See* https://www.ams.usda.gov/services/plant-variety-protection/pvpo-frequently-asked-questions.
Corteva's deposits with ATCC, relevant to this case, were probably made for some other reason (e.g., in connection with applications for utility patents not at issue in this lawsuit).  DI 26 at 4.  The amended complaint keeps it at a general level: "To comply with legal requirements for intellectual property protection, Corteva deposited samples of its protected seeds with ATCC."  DI 19 ¶ 5.

7

When Corteva deposited its seeds with ATCC, the transfer was conditional.  DI 19 ¶ 162.
It is unclear whether Corteva and ATCC entered into a separate written contract that governs one
or more of the deposits.  But, at a minimum, the amended complaint alleges that ATCC lacked
authorization from Corteva "to sell or transfer seeds for commercial use."  *Id.*; *see also id.* ¶ 94
("nor did ATCC have any authority to grant such a license in the first place").  Further, ATCC
has certain product use policies and a standard material transfer agreement (MTA) that restrict all
those who purchase deposited seeds from ATCC.  *Id.* ¶¶ 61-65.  The most important such
restriction for our purposes is that purchasers "agree that the purchased seeds will be used for
research purposes only and that any commercial use of the purchased seeds is expressly
forbidden."  *Id.* ¶ 63.

Along those lines, Inari Belgium executed an MTA with ATCC in 2019.  DI 19-3 ("2019
MTA").  The 2019 MTA repeatedly forbids commercial use by the purchaser:

- "ATCC Material and Progeny **may only be used by** Purchaser's Investigator for research
  purposes and only in Investigator's laboratory."  *Id.* at 1.

- A purchaser's investigator to allowed to make, use, and transfer modifications or
  derivatives of materials only for "non-commercial use," such research or collaborative
  research projects, and is subject to other conditions.  *Id.* at 2.

- "**Any Commercial Use of the Biological Material is strictly prohibited without
  ATCC's prior written consent.**"  *Id.*

The 2019 MTA defines commercial use broadly, including essentially any type of transfer or use
for "financial gain," activities intended toward "general sale," in connection with proficiency
testing.  *Id.* at 1.  Further, the 2019 MTA required Inari Belgium to acknowledge that the

deposited materials may be subject to restrictive terms or intellectual property of third parties known or unknown to ATCC.  *Id.* at 2.  And ATCC or the contributor of the deposited material "retain[ed] ownership of all right, title and interest in the Biological Materials."  *Id.* at 3.

The amended complaint alleges that Inari Belgium signed a revised MTA with ATCC in 2022 ("2022 MTA") that incorporates all the terms of the sample MTA available on ATCC's website at the time of filing of the amended complaint.[5]  DI 19 ¶¶ 76-83.  The 2022 MTA superseded the 2019 MTA, but otherwise includes similar restrictions.

**The dispute.**  According to the amended complaint, Inari executed a calculated plan to commercially exploit Corteva's protected seeds without Corteva's authorization.  The alleged scheme had four essential steps: first, Inari Belgium purchased sample Corteva seeds from the ATCC depository in the United States; second, Inari arranged for Corteva's seeds to be exported to Inari Belgium; third, presumably outside the reach of Corteva's U.S. intellectual property, Inari Belgium reproduced the seeds and used them to develop its own genetically modified strains for commercial gain; and fourth, Inari attempted to extort Corteva into a business arrangement by telling Corteva that it was prepared to commercialize corn product with a derivative of the event covered by the 434 patent.  Here's how the amended complaint tells it.

Under the umbrella of the 2019 MTA, Inari Belgium began to purchase Corteva's seeds from the ATCC in May 2020.  *Id.* ¶ 86.  To put a finer point on it, when the purchaser is from Europe (like Inari Belgium), the purchase goes through an ATCC distributor called LGC Standards.  *Id.* ¶ 61.  And Inari Belgium directed that the seeds be shipped to a consulting firm called Infinite-Eversole Specialty Crop Services LLC (IE-SCS).  *Id.* ¶ 87.  An example purchase

---

[5] *See* https://www.atcc.org/policies/product-usepolicies/material-transfer-agreement.

order by Inari to ATCC indicates a purchase of 12 different seed types, from LGC Standards, invoiced to Inari Belgium but shipped to IE-SCS in Arlington, Massachusetts.  *Id.*

After IE-SCS accepted delivery of Corteva's seeds, "IE-SCS acted as Inari Belgium's agent to process the seeds for the required USDA phytosanitary certificate, package and ship the seeds to Inari Belgium." *Id.* ¶ 92.  Once it received the seeds in Belgium, Inari then "began work to commercialize the germplasm of Corteva's protected seeds (or modifications thereof)." *Id.* Corteva alleges that Inari knew that the Corteva's seeds were protected by intellectual property and concealed its intent to commercially exploit the seeds from ATCC. *Id.* ¶¶ 89-94.

Corteva and Inari had no business relationship. *Id.* ¶ 96.  But in 2021, Inari approached Corteva and told Corteva that it "had already performed development activities to commercialize two of Corteva's protected transgenic events" including a modified form of DP-004114-3 (the subject of the 434 patent), and was planning a product launch. *Id.*  Inari proposed that it would not sell corn seeds containing Corteva's events without a license "if Corteva would collaborate with Inari regarding the use of Inari's soybean products." *Id.* ¶ 98.  Corteva declined but also asked about how Inari had acquired its seeds and what Inari was doing with them. *Id.* ¶ 99. Over the course of many months, Corteva learned — from Inari's responses and public statements, and directly from ATCC — that Inari had acquired hundreds of Corteva seeds from ATCC, shipped them to Belgium, and commercially exploited them as outlined above. *Id.* ¶¶ 100-112.  According to Corteva, Inari's scheme of misappropriation and intellectual property infringement will give Inari an unlawful free ride into a market that Corteva spent decades and billions of dollars building. *Id.* ¶¶ 113-20.

**Corteva's causes of action.**  Corteva sued Inari in September 2023.  The amended complaint states 7 counts.  In count I, Corteva accuses Inari of knowingly violating its rights under the PVP certificates listed in Exhibit A (DI 19-1) "by delivering, shipping, consigning, and/or exchanging, and/or exporting from the United States, Corteva's seeds."  DI 19 ¶¶ 121-33.  The PVPA defines infringement differently than the Patent Act — the PVPA includes the acts identified by Corteva, among many others.  *See* 7 U.S.C. § 2541(a).

In count II, Corteva accuses Inari of directly infringing the 434 patent by using its seeds in the United States.  DI 19 ¶¶ 134-39.  To make out "use," Corteva alleges that "IE-SCS, as [an] agent of Inari Belgium, used the patented seeds in the United States to conduct, or have conducted, the required testing and inspection to obtain a USDA phytosanitary certificate" for exporting the seeds.  *Id.* ¶ 138.

Count III asserts infringement of the 434 patent under § 271(f)(2), which in essence is a form of contributory infringement that occurs where "any component of a patented invention that is especially made or especially adapted for use in the invention" is supplied from the United States.  Corteva's theory here is that when Inari shipped the seeds containing DP-004114-3 to Belgium, it was supplying from the United States a component of the invention of claim 9 of the 434 patent (a plant grown from such a seed).  DI 19 ¶¶ 140-59.

Count IV is induced infringement of the 434 patent under § 271(b).  DI 19 ¶¶ 160-70.  Under this theory, ATCC directly infringed the 434 patent by selling patented seeds to Inari because ATCC lacked authority "to sell or transfer seeds for commercial use."  *Id.* ¶ 162.  And by acquiring the seeds under the MTA knowing that DP-004114-3 was covered by the 434 patent, Inari induced ATCC to directly infringe.  *Id.* ¶¶ 166-68.

In count V, Corteva accuses Inari Belgium of breaching the 2019 MTA or 2022 MTA, of which Corteva alleges it is a third-party beneficiary.  According to Corteva, the MTAs were designed to protect the interests of those who deposit seeds, so when Inari acquired Corteva's seeds from ATCC and commercially exploited them, that breach harmed Corteva and gives it standing here.  *Id.* ¶¶ 171-83.

In count VI, Corteva alleges that Inari USA violated chapter 93A of the Massachusetts General Laws, which prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  *Id.* ¶¶ 184-93.  Corteva's theory here centers around Inari's alleged scheme of wrongly exploiting Corteva's seeds and then pressuring Corteva "into a *quid pro quo* agreement under which Inari offered to not sell [Corteva's technology] only if Corteva would provide Inari financial incentive in the form of an agreement to use Inari's soybean products."  *Id.* ¶ 187.

Lastly, count VII is conversion.  *Id.* ¶¶ 194-99.  Corteva alleges that, in bad faith, Inari acquired its protected seeds and used them "for impermissible and unauthorized commercial uses, including outside the United States," which amounts to wrongful exertion of dominion and control over Corteva's property.  *Id.* ¶ 196.

## II.     Inari's motion to dismiss

In response to the amended complaint, Inari filed a comprehensive motion to dismiss.  DI 22.  The gravamen of the motion is that Inari was entitled to do what Corteva alleges, and Corteva is improperly attempting to restrict the availability of the seeds that it deposited with ATCC.  According to Inari, when an applicant for a utility patent deposits seeds with ATCC, the applicant authorizes unrestricted availability to the public of those seeds — regardless of any

utility patents or PVP certificates covering those seeds — and that availability encompasses at least what Inari did.  Furthermore, the territorial limits of United States patent law allow Inari to use Corteva's seeds however it wishes after the seeds arrive in Belgium.  In essence, what Corteva calls an illegal scheme is nothing more than Inari carefully coloring within the lines of patent law.

Inari makes several other points as well.  With respect to direct infringement of the 434 patent, Inari argues that phytosanitary testing cannot be "use" as a matter of law.  On § 272(f)(2), Inari argues that a seed cannot be considered a "component" of a plant.  For induced infringement, Inari argues that ATCC cannot be a direct infringer because it was expressly authorized by Corteva to transfer the seeds to Inari or other requesters.  The same goes for the breach of contract count.  Inari adds that even if the MTAs purport to forbid anything that Inari did, the statutory and regulatory intellectual property concerns override the contracts.  As a third attack on the breach of contract claim, Inari argues that disputes under the 2019 MTA must be raised in the Eastern District of Virginia.  Turning to chapter 93A of the Massachusetts General Laws, Inari advances three additional flaws in the pleadings: Corteva failed to plead that (i) Inari USA took action in Massachusetts; (ii) Corteva suffered actual injury or loss arising from the unfair conduct; and (iii) Inari USA's conduct was unfair or deceptive.  Finally, on conversion, Inari argues that Corteva took possession of the seeds lawfully, or, in any event, any conversion claim is preempted by federal intellectual property laws.

We heard oral argument, and in the meantime have ordered the case into discovery.  DI 31, 35.

III.   **Standard of Review**

13

Rule 8 requires a complainant to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). On a Rule 12(b)(6) motion to dismiss, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). We grant such a motion when, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, we conclude that those allegations "could not raise a claim of entitlement to relief." *Id.* at 558. We "are not bound to accept as true a legal conclusion couched as a factual allegation." *Wood v. Moss*, 572 U.S. 744, 755 n.5 (2014) (citation omitted). "To resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint." *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999). We may also rely on "a document integral or explicitly relied upon in the complaint" assuming no dispute over its authenticity. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

## IV.   Analysis

The motion to dismiss covers a fair amount of ground; we take the issues count by count.

### a.   Count I, infringement of Corteva's PVP certificates, survives because Corteva did not waive its PVPA rights by depositing seeds as part of other utility patent applications.

Inari's argument goes as follows. All of Corteva's asserted PVP certificates correspond to seeds that Corteva deposited with the ATCC as part of the process of applying for various other utility patents. And because those deposits were made to comply with 35 U.S.C. § 112 disclosure requirements, the seeds must be made available to the public without restriction by any PVP certificates that may cover those seeds. The first part of the argument — the reason for

14

the ATCC deposits — is not something that can be gleaned from the face of the amended

complaint.  *See supra* note 4.  But Inari did its homework, DI 22 at 4-5, and Corteva does not

quibble, DI 26 at 8-9.  But Inari researched the deposits and endeavored to demonstrate that they

were made in connection with utility patent applications, DI 22 at 4-5, and Corteva does not

quibble, DI 26 at 8-9.  Corteva focuses on rebutting the second part of the argument — the legal

effect of making the deposits.

To back up, a patent's "specification shall contain a written description of the invention,

and of the manner and process of making and using it, in such full, clear, concise, and exact

terms as to enable any person skilled in the art to which it pertains, or with which it is most

nearly connected, to make and use the same."  35 U.S.C. § 112.  But sometimes, "because of the

particular area of technology involved, [a patent application] cannot sufficiently disclose by

written word how to obtain the microorganism starting material from nature."  *In re Argoudelis*,

434 F.2d 1390, 1392 (C.C.P.A. 1970).  Perhaps with a nod to § 114,[6] patent applicants began to

deposit biological material in a public depository, and then reference that deposit in their patent

applications, as a way to satisfy the quid pro quo of § 112.  *Id.* at 1393.  Initially, the Patent

Office balked, but the CCPA held that this was an acceptable way to supplement a patent's

disclosure.  *Id.*  Making the sample available to the public after issuance of the patent "is

sufficient to permit a thorough examination by the Patent Office and to preclude the possibility

that a patent could issue without any person skilled in the art being thenceforth enabled to make

and use the invention."  *Id.*  "Thus the then Patent Office established the requirement that

---

[6] "When the invention relates to a composition of matter, the Director may require the applicant to furnish specimens or ingredients for the purpose of inspection or experiment."  35 U.S.C. § 114.

physical samples of such materials be made available to the public, as a condition of the patent grant." *In re Lundak*, 773 F.2d 1216, 1220-21 (Fed. Cir. 1985).

Depositing biological material like seeds is not automatically required — it is an option available to an applicant who wishes to supplement his disclosure in that way.  It may or may not be necessary to provide adequate disclosure, depending on the exact issue.  *See Lundak*, 773 F.2d at 1221; *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 965 (Fed. Cir. 2002) (explaining how deposits may help satisfy either the written description or enablement requirements).

"Recognizing the importance of biological deposits to patent practice, the [Patent Office] has promulgated rules to address the procedural requirements relating to such deposits." *Enzo*, 323 F.3d at 965.  Those rules are codified at 37 C.F.R. §§ 1.801-09.  The Patent Office's rules and procedures govern the deposit process, but take a light touch on the substantive effect of a deposit.  "37 CFR § 1.801 does not attempt to identify what biological material either needs to be or may be deposited to comply with the requirements of 35 U.S.C. § 112.  For the most part, this issue must be addressed on a case-by-case basis."  Manual of Patent Examination Procedure § 2403.  The Patent Office rules also reinforce what the CCPA and Federal Circuit have held — to support § 112 disclosure, the samples must be available to the public after the patent issues. 37 C.F.R. § 1.808(a)(2).  Corteva's 434 patent contains a typical example of a patent applicant's statement consistent with all of this.  434 patent 6:34-7:6.

But this is where Corteva and Inari diverge.  According to Inari, compliance with § 1.808(a)(2) means that Corteva "waived any right to assert infringement of a PVP certificate resulting from the purchase and transport of patent deposit seeds."  DI 22 at 9.  To put a finer point on it, Inari is not trying to argue that when Corteva deposits seeds, anyone can obtain those

seeds and do whatever they want with them regardless of any patents or PVP certificates.[7] Rather, Inari is saying that, at a minimum, the public is entitled to obtain the seeds from ATCC and then move them (out of the country, perhaps). This argument pertains to PVP certificates specifically because they may be infringed by mere delivery, shipping, transfer of possession, and export from the United States.[8] 7 U.S.C. § 2541(a). Thus, Inari reasons, Corteva is trying to use its PVP certificates to frustrate Inari's entitlement to adequately understand Corteva's utility patents under 35 U.S.C. § 112.

We agree that Inari has identified a tension in the way that the Patent Act and the PVPA overlap. But Inari paints with too broad a brush. Beyond the general principles discussed above, Inari cites no authority that grants the sweeping immunity from PVP certificate infringement that Inari seeks. Indeed, the Supreme Court considered overlapping requirements of the Patent Act and the PVPA and deemed them not "irreconcilable." *J.E.M. Ag Supply*, 534 U.S. at 141-42. Tension between overlapping regimes of intellectual property is not uncommon. The Supreme Court "has allowed dual protection in other intellectual property cases." *Id.* at 144. Aspects of the same object might be subject to both patent and copyright protection, which might be an unwelcome surprise to someone who believes he is entitled to replicate that object after the

---

[7] Inari never comes right out and says that the whole system of biological deposits ought to come to an end (which would be the result if making a deposit waived all intellectual property rights). So we will assume that is not what Inari is going for here.

[8] For utility patents, it is very difficult to make out a case of infringement for mere acquisition and transport, because 35 U.S.C. § 271(a) lists five specific categories of infringing acts: make, use, sell, offer to sell, or import. So in a strictly utility patent realm, there is little concern about merely obtaining biological samples and moving them. And Inari has other reasons why it believes it did not run afoul of § 271 with the rest of its actions, discussed below.

patent expires. *Mazer v. Stein*, 347 U.S. 201, 217 (1954). The same is true for patents and

trademarks. *In re Mogen David Wine Corp.*, 328 F.2d 925, 930 (C.C.P.A. 1964) (observing that

patents and trademarks "exist independently . . . under different law and for different reasons").

And so on. Therefore, Inari's motion to dismiss Corteva's PVP certificate infringement count is

denied.[9]

> **b. Count II, infringement of the 434 patent under 35 U.S.C. § 271(a), survives because phytosanitary testing could be use.**

Turning to direct infringement of the 434 patent, Inari argues that Corteva pled no act,

taken in the United States, recognizable as infringement under § 271(a). Corteva does not

suggest that merely taking possession of seeds and exporting them is infringement under

§ 271(a). Rather, Corteva points to Inari's performance, in the United States, of phytosanitary

testing on the seeds and argues that this constituted "use" under § 271(a). DI 19 ¶ 138. Inari

responds that phytosanitary testing is not use because it "did not grow the seeds, put them into

service, or benefit in any way from the invention of the '434 patent." DI 28 (citing, e.g.,

*Centillion Data Sys., LLC v. Qwest Commc'ns Int'l Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011)).

There is nothing special about testing as a use. The Federal Circuit "has established that

testing is a use of the invention that may infringe under § 271(a)." *Waymark Corp. v. Porta Sys.

Corp.*, 245 F.3d 1364, 1366 (Fed. Cir. 2001); *see also Roche Prods., Inc. v. Bolar Pharm. Co.*,

733 F.2d 858, 863 (Fed. Cir. 1984) (holding that testing is a "use"). And "use" generally means

---

[9] Another reason to deny this aspect of Inari's motion is that the arguments are somewhat underdeveloped at this stage. Exactly which act(s) under 7 U.S.C. § 2541(a) will Corteva focus on? Do any of the exceptions listed in that statute apply? Exactly which PVP certificates will be relevant, and exactly what was the nature of any seed deposits in corresponding utility patents (if any)? Were the seed deposits in fact material to whether the corresponding utility patent met the § 112 requirements? And is a defense to PVP certificate infringement the right way to resolve the tension Inari identified (if it needs resolving at all)?

"put into action or service." *NTP, Inc. v. Rsch. in Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005) (citing Webster's Third New International Dictionary 2523 (1993)).  The Federal Circuit has not restricted what that action or service might be.  Rather, "[u]se is general and indicates any putting to service of a thing, usually for an intended or fit purpose."  Webster's Third New International Dictionary 2524 (1993).  "Interpret[ing] the term 'use' broadly," as the Federal Circuit instructs, we cannot say that Corteva has failed to state a claim that its seeds were used for the purpose of phytosanitary testing.  *NTP*, 418 F.3d at 1316.

Inari urges a somewhat stricter definition of use for a seed that requires the accused infringer to "grow the seeds, put them into service, or benefit in any way from the invention."  DI 28.  Inari relies on *NTP* and *Centillion*, but those were cases about multi-component and cross-border computer systems.  In that context, there is often a dispute about exactly *who* the user of the system is — both for the sake of suing the right entity and ensuring the infringing act (the use) happened in the United States.  So those cases concluded that the *user* is the party that "put[s] the invention into service, i.e., control[s] the system as a whole and obtain[s] benefit from it."  *Centillion*, 631 F.3d at 1284.  And the *place* of use is where "the system as a whole is put into service, i.e., the place where control of the system is exercised and beneficial use of the system obtained."  *NTP*, 418 F.3d at 1317.  In *NTP* and *Centillion*, it made sense to focus on the flow of benefits, and who is in control of the system, because that would help identify the infringer and its location.  Here, the dispute is about what exactly is being done with the invention — a distinctly different question.  And on that score, the Federal Circuit's broad

conception of "use" could sweep in phytosanitary testing.[10]  *See, e.g., Bell Helicopter Textron Inc. v. Airbus Helicopters*, 78 F. Supp. 3d 253, 269-70 (D.D.C. 2015) (holding that drop-testing landing gear qualifies as a use under § 271(a) even though being dropped is not landing gear's primary purpose).  Therefore, we deny Inari's motion as to direct infringement.

### c. Count III, infringement of the 434 patent under 35 U.S.C. § 271(f)(2), survives because a seed could be a component of a plant.

Roughly speaking, infringement under § 271(f)(2) is a form of contributory infringement where the especially adapted component is exported from the United States.  It provides:

> (2)Whoever without authority supplies or causes to be supplied in or from the United States any ***component of a patented invention*** that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

35 U.S.C. § 271(f)(2) (emphasis added).  Corteva's theory of infringement of the 434 patent under § 271(f)(2) is that the "component of a patented invention" is the seed that Inari exported from the United States to Belgium, and the "patented invention" is the plant into which the seed grows.  *See* 434 claim 9 ("A corn plant, or part thereof, grown from the seed of claim 8.").  Inari argues that a seed cannot be a component of a plant as a matter of law, because a plant is not a multicomponent invention, i.e., it has no components.  DI 22 at 13.[11]  Corteva does not dispute

---

[10] It is worth noting that there is nothing definitive in the record about exactly what phytosanitary testing entails.

[11] Inari also argues in passing that the seed (of claim 8) is "not an unpatented component of a multicomponent invention" because it "is the claimed invention of the 434 patent."  *Id*.  This argument elides the axiom that each claim defines an invention.  And nothing about § 271(f)(2) requires that the component be unpatented, or forbids the component from being claimed in some other claim of the patent.  Inari cites no authority suggesting otherwise.

that § 271(f)(2) requires suitability for combination.  Rather, Corteva argues that a seed is suitable for combination with water, nutrients, light, air, and physical support to yield a plant. Inari responds that this argument fails because "[t]he components must be in the claims."  DI 28 at 7.

Starting with Inari's last argument, Inari identified no authority suggesting that the § 271(f)(2) applies only to exported components that are suitable for combination *with other claimed components*.  And there are good reasons to think Inari is incorrect.  First, the statute discusses one, and only one, component: the especially adapted one that is being exported. § 271(f)(2).  This is in contrast to § 271(f)(1), which addresses multiple components.  *See Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 146-50 (2017) (examining § 271(f)(1) under a microscope and holding that it requires "plural" components).  Second, the "focus" of § 271(f)(2) is the domestic act of exporting the one especially adapted component.  *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 415 (2018).  We have no basis to agree with Inari that the other components, whatever they may be, must be in the claims.

Nor do we agree with Inari that plants are inherently single-component inventions (and thus, nothing, not even a seed, could be especially adapted for combination to become a plant). The plant of claim 9 of the 434 patent is manifestly a multi-component invention.  Among other things, it comprises what it inherited from the seed, such as the DNA construct of claim 1, which in turn comprises all sorts of things.  And we may accept, as the amended complaint alleges, that a plant also requires water, nutrients, light, air, and physical support.  Furthermore, the Supreme Court defined "component" broadly in the context of § 271(f)(1) in accordance with the word's ordinary meaning, which is "a constituent part, element, or ingredient."  *Microsoft Corp. v.*

21

*AT&T Corp.*, 550 U.S. 437, 449 n.11 (2007) (quoting Webster's Third New International Dictionary of the English Language 466 (1981)).  Broadly construed, we cannot hold that a seed is not a component of a plant.  Therefore, we deny Inari's motion with respect to § 271(f)(2).

> ### d.  Count IV, infringement of the 434 patent under 35 U.S.C. § 271(b), survives because ATCC could be a direct infringer.

Corteva's next theory is induced infringement, which of course requires identifying an underlying act of direct infringement.  *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 920-21 (2014).  Corteva alleges that ATCC directly infringed the 434 patent by selling patented seeds to Inari.  Inari argues that this allegation fails as a matter of law because ATCC was "expressly authorized by Corteva" to sell the seeds to Inari.  DI 22 at 15.  According to Inari, Corteva's seed deposit authorized the sales under 37 C.F.R. § 1.808(a)(2) (the provisions of which are consistent with what the 434 patent states on its face (434 patent at 6:34-41)).

This aspect of Inari's motion to dismiss may be denied on the strength of Inari's allegation that Corteva never authorized ATCC to sell the seeds *for commercial use*.  DI 19 ¶ 162 ("Neither ATCC nor LGC Standards was authorized to sell or transfer seeds for commercial use."); *id.* ¶ 94 ("nor did ATCC have any authority to grant such a license in the first place").  Selling a patented seed without authority is, by definition, direct infringement.  35 U.S.C. § 271(a).  Inari argues regardless of whatever restrictions Corteva imposed on the ATCC, the rules for deposits require that "all restrictions imposed by the depositor on the availability to the public of the deposited material will be irrevocably removed upon the granting of the patent." 37 C.F.R. § 1.808.  What Inari is missing is that the rules do not require that Corteva give the world a blanket license to its invention just because it deposited the seeds.  The public is entitled to ***availability*** of the deposits — not to exploit them in any way.  A restriction on commercial use

22

is entirely consistent with the Patent Office's rules.  Therefore, Inari's motion to dismiss

Corteva's count of induced infringement of the 434 patent is denied.

> **e. Count V, breach of material transfer agreements, survives because the commercial use restrictions in the MTAs are not inconsistent with Patent Office rules on biological deposits.**

Turning to the MTAs, Inari argues that it could not have breached the MTAs as a matter

of law because to the extent that some part of either MTA purports to restrict use of the

purchased seeds, those restrictions are ineffective because of the Patent Office regulations on the

public availability of deposits.  For the 2019 MTA, Inari relies on the following language under

the "Compliance with Laws" heading:

> Distribution by ATCC of Budapest Treaty patent deposits are made pursuant to, and in compliance with, all applicable laws and regulations, including the Budapest Treaty and related 37 C.F.R. provisions.  If there is any conflict between the terms of this MTA and any applicable law or regulation with respect to ATCC Material that is supplied hereunder by ATCC from the stock of a Budapest Treaty deposit, then the terms of the applicable law or regulation shall govern.

DI 19-3 at 3.  According to Inari, to provision incorporates 37 C.F.R. § 1.808's requirement that

"all restrictions imposed by the depositor on the availability to the public of the deposited

material will be irrevocably removed upon the granting of the patent."  Therefore, Inari reasons,

the 2019 MTA does not forbid Inari from purchasing, testing, and exporting seeds for

commercial use.  For whatever reason, the 2022 MTA does not include the provision quoted

above; Inari argues that the 2022 MTA is either (i) irrelevant because it does not govern the seed

purchases at issue in this case or (ii) superseded by the Patent Office regulations.

For purposes of Inari's motion to dismiss, it does not matter which MTA we focus on, or

whether the reference to 37 C.F.R. § 1.808 is incorporated expressly or assumed to supersede

any restrictive provisions of the MTA.[12]  It is sufficient to repeat our earlier conclusion: the

Patent Office regulations require that the seeds be available to the public, and that is not

inconsistent with the restrictions on commercial use at issue here.  Corteva's amended complaint

alleges that Inari breached the MTAs by acquiring and using the seeds "for commercial purposes

that are expressly prohibited by the MTAs."  DI 19 ¶ 183.  That defeats Inari's motion to dismiss

the breach of contract count.[13]

> **f.  Count VI, violation of Massachusetts General Law Chapter 93A, survives
> because there are adequate allegations of unfair or deceptive conduct in
> Massachusetts.**

Inari attacks Corteva's allegations under chapter 93A of the Massachusetts General Laws

on three fronts.  First, Inari argues that "Inari Belgium ordering seeds through LGC in Europe"

cannot be "an act by Inari US[A] occurring in Massachusetts."  DI 22 at 17.  We disagree,

because Corteva alleged that Inari USA directed the course of events from its Massachusetts

headquarters.  DI 19 ¶¶ 3, 14, 15, 86, 109-112, 186, 192.  Second, Inari argues that Corteva

failed to plead actual injury or loss arising from the unfair conduct.  DI 22 at 18.  But that is not

grounds to dismiss the count at least because Corteva pled that Inari's conduct has "already

resulted in damages to Corteva" and because Corteva seeks injunctive relief.  DI 19 ¶¶ 191, 193

& Prayer for Relief.  Third, Inari argues Corteva failed to plead that Inari USA's conduct was

---

[12] We take no position on whether the Patent Office regulations on biological deposits
actually could supersede the terms of an MTA if there were some conflict.

[13] In a single sentence, Inari argues that we should dismiss the breach of contract count
because the 2019 MTA provides that "[a]ny disputes arising under this Agreement shall be tried
exclusively in the United States District Court for the Eastern District of Virginia."  DI 22 at 17;
DI 19-3 at 3-4.  Inari relies on *River Valley Ingredients, LLC v. Am. Proteins, Inc.*, 2020 WL
2220148 (D. Del. May 7, 2020).  In *River Valley Ingredients*, the district court granted a motion
to remand to state court in light of a contractual agreement to bring disputes in courts of the State
of Delaware.  *Id.* at *2.  Inari did not explain how *River Valley Ingredients* counsels in favor of
an outright dismissal here, and we decline to take up the argument any further.

unfair or deceptive.  DI 22 at 18.  Inari's argument might work if we had agreed with them that Corteva's seeds were "obtained legitimately" because Inari's conduct was authorized.  *Id.* Because we already disagreed with that argument, we also disagree that Corteva failed to plead unfair or deceptive conduct.

> ### g. Count VII, conversion, survives because Corteva adequately pled a possessory interest in the deposited seeds that Inari converted by violating the MTAs.

Corteva's conversion claim, as pled, is that after it deposited seeds with ATCC, it retained ownership of, or possessory interest in, the seeds.  DI 19 ¶ 195.  And when Inari purchased the seeds for commercial use in (alleged) violation of the MTAs, that amounted to wrongful conversion of that property.  *Id.* ¶ 196.  Inari argues that there could not have been conversion because the seeds "were available to the public without restriction."  DI 22 at 19.  We disagree that making the seeds available to the public without restriction nullifies any commercial use restrictions for the same reasons already discussed above.  And we agree with Corteva that it adequately pled an ownership or possessory interest in the seeds it deposited with ATCC.  DI 19 ¶¶ 195-96; *see* DI 19-3 at 3 ("As between the parties, ATCC and/or its Contributors shall retain ownership of all right, title and interest in the Biological Materials.").  Therefore, we deny Inari's motion to dismiss Corteva's conversion count.[14]

## V.    Conclusion

For the reasons set forth above, Inari's motion to dismiss the amended complaint is denied.  This case will continue to progress through discovery.

---

[14] Inari also argues that Massachusetts law does not recognize conversion of intellectual property (and if it did, it would be preempted by federal law), but Corteva points out that the amended complaint alleges conversion of the physical seeds — not intellectual property.