**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CORTEVA AGRISCIENCE LLC, PIONEER HI-BRED INTERNATIONAL, INC., and AGRIGENETICS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 23-1059-JFM |
| v. | ) ) ) | **JURY TRIAL DEMANDED** |
| INARI AGRICULTURE, INC. and INARI AGRICULTURE NV, | ) ) ) | **REDACTED VERSION** |
| Defendants. | ) ) | |

**SECOND AMENDED COMPLAINT**

Plaintiffs Corteva Agriscience LLC ("Corteva Agriscience"), Pioneer Hi-Bred International, Inc. ("Pioneer"), and Agrigenetics Inc. ("Agrigenetics" and collectively with Corteva Agriscience and Pioneer, "Corteva") hereby allege, for their Second Amended Complaint against Defendants Inari Agriculture, Inc. ("Inari USA") and Inari Agriculture NV ("Inari Belgium," and collectively with Inari USA, "Inari" or "Defendants"), on personal knowledge as to Corteva's own actions and on information and belief as to the actions of others, as follows:

**NATURE OF THE ACTION**

1.      Corteva is a leading, global agriculture innovator, at the forefront of research and development of novel seeds, including for staples such as corn and soybean. Corteva uses its vast experience in agricultural genetics to generate new seed varieties with highly desirable traits, resulting in crops that produce greater yields, survive unfavorable weather conditions, and withstand environmental hazards like insects and other pests. Such innovations are predicated on Corteva's significant sustained investment, as well as literally decades of time and effort. This lawsuit seeks to prevent Inari from continuing its brazen efforts to steal Corteva's groundbreaking,

1

patent-protected work. Inari's deceptive and unlawful conduct violates Corteva's intellectual property rights, as well as Inari's own contractual obligations.

2. For more than 100 years, the companies that make up Corteva have invested in developing new seed lines that allow farmers to grow their crops more efficiently and increase productivity. Over just the last ten years alone, Corteva has invested hundreds of millions of dollars and decades of time successfully developing such seed lines. Corteva depends on intellectual property rights to support and protect these long-standing and substantial research investments. In particular, Corteva has obtained patents and Plant Variety Protection ("PVP") certificates on many of its seed lines (the "protected seeds"). These patents and PVP certificates prohibit others from, among other things, selling or exporting the protected seeds and using them for commercial purposes. Corteva is now forced to bring this lawsuit because of Inari's exportation out of the United States, for commercial purposes, of hundreds of different varieties of Corteva's protected seeds, in violation of Corteva's intellectual property and other rights.

3. Inari USA is a Massachusetts-based company, run by former executives at some of the largest crop-producing companies in the United States. Inari claims it can improve the quality of seeds through genetic modification. Inari openly touts that its business strategy is "to do unreasonable things" so that it can "achieve unreasonable outcomes." *https://www.youtube.com/watch?v=8Q3u1Q6FJxI* at 42:30. But, on information and belief, Inari does not have its own breeding program to develop its own seeds. Instead, Inari purloins high-quality seeds, including Corteva's protected seeds, and makes slight genetic modifications to those seeds. Inari then seeks patent protection for the resulting modifications. Inari has announced publicly that it intends to commercialize seeds containing these modifications in the coming years, including in the United States.

4.      Inari believes that "[p]lant varieties and seeds are high-tech products *in an easy-to-copy form.*" *See upov.int/edocs/mdocs/upov/en/upov_sem_ge_23/upov_sem_ge_23_ppt_12.pdf* at 3 (emphasis added). Accordingly, Inari recognizes that such varieties and seeds "need IP protection for a sustainable business." *Id.* Inari further recognizes that such protections include "patents" and "plant breeders rights." *Id.* at 4. And yet, these are the same protections that Inari has violated through its misappropriation of Corteva's protected seeds.

5.      One way Inari misappropriated seeds was by misusing seed deposits at the American Type Culture Collection ("ATCC"). To comply with legal requirements for intellectual property protection, Corteva deposited samples of its protected seeds with ATCC—a nonprofit organization that collects, stores, and distributes standard reference microorganisms, cell lines, seeds, and other biologic materials *for research purposes only*. Corteva made these deposits in connection with filing applications to obtain patents covering the protected seeds. After the applicable patents were issued, ATCC made the protected seeds available for public inspection but expressly prohibited members of the public from using those seeds for commercial purposes, from transferring them outside their organization, or from using them in contravention of Corteva's intellectual property rights.

6.      Despite these express prohibitions, Corteva learned in December 2022 that Inari—through an elaborate scheme apparently aimed at concealing its actions—had illegally obtained hundreds of varieties of Corteva's protected seeds from ATCC and illegally exported them to Belgium for commercial purposes, without Corteva's knowledge or approval. ███████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████

7.      Inari's actions infringe upon Corteva's patent rights, violate Corteva's PVP certificates, and breach ATCC's explicit prohibition on using the seeds obtained from ATCC for commercial purposes. Corteva brings this action to hold Inari fully accountable for its flagrant disregard of Corteva's rights and US law. Corteva seeks damages to adequately compensate for Inari's past unlawful actions as well as a permanent injunction against Inari prohibiting any future actions in violation of Corteva's intellectual property and state-law rights or benefitting from their actions in violation of such rights.

## **PARTIES**

8.      Corteva Agriscience is a limited liability company organized and existing under the laws of Delaware with a principal place of business located at 9330 Zionsville Road, Indianapolis, Indiana 46268. It is one of the world's largest commercial seed and plant producers. Corteva Agriscience uses genetic research to develop crop plants designed to increase quantity, quality, and sustainability of yields for farmers, including insect-resistant corn and soybean varieties.

9.      Pioneer is a corporation organized and existing under the laws of Iowa with a principal place of business at 7100 NW 62nd Avenue, Johnston, Iowa 50131. The company was founded in 1926 by farm journal editor and future United States Vice President Henry Wallace. Over the past 97 years, Pioneer has developed and tested products to meet the local needs of farmers, both domestically and internationally.

10.     Agrigenetics is a corporation organized and existing under the laws of Delaware with a principal place of business at 9330 Zionsville Road, Indianapolis, Indiana 46268. Agrigenetics, which previously has done business as Mycogen Seeds, is an agricultural seed company.

4

11.    Corteva Agriscience, Pioneer, and Agrigenetics are each wholly-owned subsidiaries of Corteva Inc., which is organized and existing under the laws of Delaware and maintains its principal place of business at 9330 Zionsville Road, Indianapolis, Indiana 46268.

12.    Corteva Inc., in conjunction with its subsidiaries including Corteva Agriscience, Pioneer, and Agrigenetics, (the "Corteva Group of Companies") is a leading global provider of seed and crop protection solutions that contribute to a healthier and more secure and sustainable food supply. The Corteva Group of Companies is focused on advancing its science-based innovation, which aims to deliver a wide range of improved products and services to its customers. The Corteva Group of Companies has one of the broadest and most productive new product pipelines in the agriculture industry. It leverages its rich heritage of scientific achievement to advance its robust innovation pipeline and continues to shape the future of responsible agriculture. New products are crucial to solving farmers' productivity challenges amid a growing global population. The Corteva Group of Companies' investment in technology-based and solution-based product offerings allows it to meet farmers' evolving needs.

13.    The Corteva Group of Companies has invested billions of dollars in research and development to develop high-quality crop seeds, including the protected seeds at issue in this Complaint. As a result of those efforts, the Corteva Group of Companies has developed revolutionary seeds that provide greater yields at lower costs, and that can withstand environmental hazards.

14.    Inari describes itself as "the next-generation seed company" that purportedly relies on "disruptive technologies" to "enhance nature's genetic diversity" in seeds. *See* August 6, 2019, Press Release *available at https://inari.com/inari-raises-89-million-to-bring-innovative-disruptive-technologies-to-growers/.* Inari is run by former executives of some of the largest

agricultural companies in the country, including Syngenta and Bayer CropScience. Since its founding in 2016, Inari has achieved a reported $1.5 billion valuation and now employs more than 270 people across its three facilities in Cambridge, Massachusetts, West Lafayette, Indiana, and Ghent, Belgium. *See https://inari.com/* (list of addresses at the bottom of the page).

15. Upon information and belief, the Cambridge, Massachusetts and West Lafayette, Indiana facilities are owned and operated by Defendant Inari USA, a corporation organized and existing under the laws of Delaware that maintains its principal place of business at One Kendall Square, Building 600/700, Suite 7-501, Cambridge, Massachusetts 02139.

16. Upon information and belief, the additional facility in Ghent, Belgium is owned and/or operated by Defendant Inari Belgium, which maintains its principal place of business at Industriepark 7A, 9052 Zwijnaarde, Belgium.

17. Upon information and belief, Inari does not have a seed breeding program of its own. Instead, it employs genetic modification techniques to alter high quality seeds that other entities have already engineered and brought to market. In 2019, Inari stated in a press release, "Inari partners with independent seed producers, using its unique computational and genetic toolbox to introduce high performing varieties that improve the economic and environmental realities of production agriculture." *See* August 6, 2019, Press Release *available at https://inari.com/inari-raises-89-million-to-bring-innovative-disruptive-technologies-to-growers/.* However, Inari has never "partnered with" Corteva and has no agreement, license, or other authorization from Corteva to access, use, or genetically modify any of Corteva's protected seeds.

**JURISDICTION AND VENUE**

18.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Corteva's claims arise under the laws of the United States, and 28 U.S.C. § 1338, which provides that district courts have original jurisdiction over any civil action arising under any Act of Congress relating to patents or plant variety protection. Additionally, this Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Corteva's state-law claims, because, *inter alia*, they form part of the same case or controversy.

**A.    Inari USA**

19.    This Court has personal jurisdiction over Inari USA because, *inter alia*, Inari USA is incorporated in Delaware. Upon information and belief, Inari USA has continuous and systematic contacts with Delaware; regularly conducts business in Delaware, either directly or through one or more of its affiliates, agents, and/or alter egos; has purposefully availed itself of the privilege of doing business in Delaware; and intends to sell Inari products in Delaware.

20.    Venue is proper in this Court with respect to Inari USA pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(b) because Inari USA is incorporated, and thus resides, in Delaware.

**B.    Inari Belgium**

21.    This Court has personal jurisdiction over Inari Belgium under Fed. R. Civ. P. 4(k)(2) for the claims Corteva asserts against Inari Belgium arising under federal law because Inari Belgium would not be subject to personal jurisdiction in any state court of general jurisdiction and exercising jurisdiction over Inari Belgium would be consistent with the United States Constitution and laws because Inari Belgium plays an essential role in Inari's general efforts to violate Corteva's patent and PVP rights within the United States. This Court also has pendent

7

personal jurisdiction over Inari Belgium for all other claims arising from the same common nucleus of operative facts as the claims asserted under federal law.

22.     Venue is proper in this Court with respect to Inari Belgium pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(b) because Inari Belgium is not a resident of the United States and thus venue is appropriate in any judicial district.

## PLANT BREEDING BACKGROUND

23.     Plant breeding is the human manipulation of the characteristics, structure, and composition of plants resulting in heritable changes to make them more useful for current and future generations. Corteva and its predecessors have spent decades upon decades carefully selecting and breeding plants to develop the desirable traits found in currently available commercial seed products, like soybean and corn. This process can include use of both traditional breeding techniques as well as genetic engineering technologies. These techniques and technologies are briefly described below. These brief descriptions, however, do not delve into the details of the enormously complex, time consuming, and investment-heavy inventive process involved in plant breeding.

### A.     Traditional Breeding Techniques

24.     Plants can be bred using sexual or asexual reproduction. Sexual reproduction combines the genetic material of two parent plants to form the genetic material of the progeny plant.

25.     Sexually reproducing plants produce seeds carrying genes from each of the parent plants. The protected corn and soybean seeds at issue in this Complaint are produced from sexually reproducing plants.

26.     Plants, like other living organisms, contain cells. Chromosomes are the organized units of genetic material in a cell. Each chromosome comprises different genes. Plant genes confer

different traits, just as they do in people. Examples of plant traits include yield, disease resistance, size, and drought tolerance.

27.     Different versions of a gene—such as a gene for plant height—are called alleles. Most plants have two alleles for each gene. Progeny of two parents will generally inherit two alleles—one from each parent—at every gene. A simplified diagram showing basic chromosomal structure and how a gene for determining the trait of plant height is passed from parents to progeny is shown below:



28.     Generally, genes can be dominant or recessive. In the two progeny plants above with one tall allele and one short allele, the dominant of the two alleles will determine whether the plant is tall or short. Here, the tall gene is dominant, so the progeny plant with one tall allele and one short allele will be tall. The progeny plant with two tall alleles will also be tall, but the progeny plant with the two short alleles will be short. When two copies of the same allele are inherited by progeny, the progeny is referred to as "homozygous" for that allele.

9

29. The genetic makeup of a plant is referred to as its germplasm. Germplasm includes, among other things, the genetic material in the chromosomes of a plant that may be transmitted from one generation of a plant to another.

30. Traditional plant breeding implements a variety of methods to develop elite lines with desired traits. Two important methods are inbreeding and hybridization.

31. Inbred development is a method whereby plants are self-pollinated over many generations or manipulated using a laboratory technique over fewer generations. Both result in all, or nearly all, of the genes in the germplasm becoming homozygous (i.e., for each gene they contain two copies of the same allele, as discussed above). The resulting seeds are referred to as "inbred seeds."

32. The inbred development process generally starts with breeding or "crossing" a number of existing inbred parental plants. The resulting progeny are then inbred through self-pollination or laboratory techniques as described above. The inbred progeny plants are referred to as "candidates." The candidates are then evaluated—in different geographies and over numerous years—for several characteristics including, for example, yield and disease resistance. After each growing season in the field, the high-performing candidates are advanced into the next round of testing and evaluation. To generate elite commercial inbred seeds, hundreds and thousands of different candidates are generated, tested, and evaluated.

33. Inbred seeds are highly valuable because of their predictability in passing on their traits to progeny. As a result, inbred seeds are considered the core germplasm used as parent seeds by plant breeders. Inbred seeds typically are not sold commercially, and their use is carefully restricted.

34.     Hybridization involves crossing two different inbred plants. The resulting seeds are called "hybrid seeds." Hybridization can be used to create hybrid seeds with multiple beneficial traits inherited from both parents.

35.     Careful selection of inbred seeds with traits that will be complementary when crossed has led to the productive crops seen today. For example, one inbred plant has genes that allow it to grow tall. A second inbred plant has a different set of genes that allow it to be disease resistant. When bred to one another, the inbred plants can result in progeny with germplasm that allows the plant to become both tall and disease resistant:



36.     For hybrid crops such as corn, hybrid seeds are considered the commercial product of plant breeding and are sold to commercial farmers for planting and harvesting.

**B.      Genetic Engineering Techniques**

37.     Plant breeders may also artificially introduce desired traits into a plant genome by inserting transgenes through genetic engineering technologies. A transgene is a gene that has been transferred from one organism to another. For example, plant breeders have incorporated bacterial genes into plant germplasm to confer increased resistance to certain insects or herbicides.

38.     Transgenes can be inserted into the genome of plants using various genetic engineering techniques. When a transgene is incorporated into a plant germplasm at a specific location in the chromosome, resulting in the desired trait, it is known as an "event" or a "transgenic event."

39.     Traditional plant breeding techniques can then be used to develop inbred seeds incorporating events with desired traits. The inbred seeds can then be used to produce hybrid seed products containing such traits.

40.     The simplified examples provided above belie the practical realities of commercial plant breeding, which is not a trivial undertaking. Cultivating new varieties of plants through various breeding methods is a time-consuming, expensive, and uncertain endeavor. Elite breeders must breed large numbers of plants and then screen the progeny produced from the new seeds to select those that successfully retained the desired combination of traits and perform well in the field in a variety of environments.

41.     To add another layer of complexity in the production of elite commercial seeds, breeders must account for substantial differences in climate, soil type, geographical locations, and other factors. It takes a significant investment of time and resources to achieve a gain of even one bushel in yield for a particular crop that will be sold in a particular geography. Corteva and its

12

predecessors-in-interest have been making such investments for the last century to develop the seeds they provide today.

42.    Each year, the Corteva Group of Companies breeds hundreds of thousands of plants and then screens the resulting progeny to select desired candidates. The costs of such efforts are substantial—hundreds of millions of dollars per year. The seeds at issue in this Complaint reflect nearly 100 years of such careful selection and breeding that has resulted in the increased productivity seen in today's agriculture. In North America alone, there has been an almost seven-fold increase in productivity over the last century.

**CORTEVA'S DEVELOPMENT OF VARIETIES BASED ON ITS PROTECTED SEEDS**

43.    Corteva specializes in the development of novel varieties of numerous important crops, including corn and soybeans. Development of each of Corteva's varieties necessitated expenditures in the tens to hundreds of millions of dollars and involved the iterative crossing of seeds, year after year, for the past century to build the foundational elite genetics that serve as the basis for the high-yielding hybrid seeds that Corteva sells to customers.

44.    In combination with this iterative process that occurs over decades, development of just a single innovative transgenic event to the point of commercialization can take, on average, more than sixteen years to accomplish. This lengthy period includes time spent discovering the trait, testing it, developing it through multiple generations of breeding, and seeking regulatory approvals, among other phases.

45.    Corteva sells proprietary seeds, including proprietary hybrid seeds, to customers subject to a Technology Use Agreement ("TUA"). The TUA is available publicly on Corteva's

13

website,[1] which states explicitly that customers in the United States "must sign a [TUA] before obtaining, planting, or growing seed containing Corteva traits." *See https://www.corteva.us/Resources/trait-stewardship.html*. Corteva's product use guides, which include the TUA, assert that "Corteva's innovations are protected by a variety of intellectual property protection, such as patents and plant variety certificates so that we can reinvest in the future and continue to deliver high yielding, adapted, and sustainable products for years to come" and prohibit, *inter alia*, the supply, sale, transfer, or distribution of Corteva seed, and use of Corteva seed, crop, or plant material, for crop breeding or research. Prior versions of the product use guides and TUA have contained similar restrictions.

46.    Agreements similar to the TUA are commonplace within the agricultural industry. For example, Syngenta requires customers to sign a "Stewardship Agreement," which states that Syngenta's customers may not "supply, transfer, license or sublicense any Seed Products to any other person or entity for planting or any other purpose." *See https://www.syngenta-us.com/stewardship/downloads/syngenta_stewardship_agreement_2021%20final.pdf* at 2. Similarly, Bayer requires customers to sign a "Technology Stewardship Agreement" that also prohibits them from transferring seeds to any other entity or using the seeds for any purpose other than commercial planting. *See https://tug.bayer.com/tsa/united-states/*. Thus, upon information and belief, Inari (which is managed by former executives of Syngenta and Bayer) knew that any Corteva seeds that were sold to the public in the United States would have been subject to an

---

[1] Corteva's current form of TUA is also available to the public as part of Corteva's "product use guides," an example of which is available at *https://www.corteva.us/content/dam/dpagco/corteva/na/us/en/files/trait-stewardship/product-use-guides/DOC-2024-US-PUG-Soybean.pdf* at 18-19.

14

agreement, like the TUA, that placed strict limitations on the use of the seeds for any purpose other than planting to produce a single commercial grain crop by the customer that purchased the seeds.

47.    Corteva does not sell inbred corn seeds to customers. Instead, Corteva strictly limits access to such seeds, including through PVP certificates and patents as noted in the TUA and elsewhere. Corteva does sell inbred soybean seeds to customers, but strictly limits use of such seeds, including through PVP certificates and patents as noted in the TUA and elsewhere.

## CORTEVA'S PLANT VARIETY PROTECTION CERTIFICATES

48.    The Plant Variety Protection Act ("PVPA") provides intellectual property protection to breeders of certain novel plant varieties, and their assignees, conferring on the holder of a PVP certificate the right to prevent others from, among other things, exporting the variety for a period of twenty years. 7 U.S.C. § 2483. A "variety" may be represented by seed. *See* 7 U.S.C. § 2401(a)(10).

49.    The Plant Variety Protection Office ("PVPO") of the United States Department of Agriculture implements the PVPA by examining new applications from, and granting certificates to, breeders of new varieties of, among other things, sexually reproduced plant varieties. These PVP rights "create an incentive for the development of new and improved varieties . . . [that] promote agriculture production and food security for an increasing world population." *https://www.ams.usda.gov/services/plant-variety-protection*. Consistent with these incentives, the Corteva Group of Companies has invested hundreds of millions of dollars in researching and developing new varieties and has sought to protect that investment with PVP certificates, among other things.

50.    Section 2541 of the PVPA provides that it is an infringement of the owner's rights in a protected variety, *inter alia*, to deliver, ship, consign, exchange, or transfer possession of the

15

variety without authorization of the owner. Section 2541 also provides that it is an infringement, *inter alia*, to dispense the variety to another in a form that can be propagated without notice that it is a protected variety, or to export the protected variety from the United States without authority. Section 2541 further provides that it is an infringement, *inter alia*, to stock the variety for any of the foregoing purposes, or to instigate or actively induce any act that constitutes an infringement.

51.    Section 2561 of the PVPA provides that an owner shall have a remedy by civil action for infringement of a plant variety protection certificate under Section 2541.

52.    As part of protecting its ongoing investment in developing innovative plant varieties, Corteva seeks and obtains PVP certificates. Corteva owns the PVP certificates set forth in Exhibits A and B for some of its most valuable corn and soybean varieties. Each of these PVP certificates covers a single variety represented by a single seed line at issue in this case. At all times relevant herein, the listed PVP certificates were, and remain, in full force and effect.

### CORTEVA'S U.S. PATENT NO. 8,575,434

53.    Pioneer, a wholly-owned subsidiary of Corteva, Inc., is the owner of all right, title and interest in and to U.S. Patent No. 8,575,434 (the "'434 patent"), entitled "Maize Event DP-004114-3 and Methods for Detection Thereof," which was duly and legally issued by the United States Patent and Trademark Office on November 5, 2013. A true and correct copy of the '434 patent is attached hereto as Exhibit C. The '434 patent issued as assigned to Plaintiff Pioneer and E.I. Du Pont De Nemours and Company ("du Pont"), now known as EIDP, Inc., from U.S. Patent Application No. 12/970,052, filed December 16, 2010, and claims priority to U.S. Provisional Application Nos. 61/413,536, filed on November 15, 2010, and 61/287,462 filed December 17, 2009, respectively. Pursuant to an assignment effective October 1, 2021, and recorded with the USPTO, all of du Pont's interest was assigned to Corteva Agriscience. Pursuant to an assignment

16

effective September 20, 2023, and recorded with the USPTO, all of Corteva Agriscience's interest has been assigned to Pioneer such that Pioneer fully owns the '434 patent. At all times relevant herein, the '434 patent was, and remains, in full force and effect.

54.    The '434 patent is directed to the field of plant molecular biology, and more specifically, to DNA constructs for conferring insect resistance to a plant.

55.    As explained in the '434 patent, "[c]orn is an important crop and is a primary food source in many areas of the world. Damage caused by insect pests is a major factor in the loss of the world's corn crops, despite the use of protective measures such as chemical pesticides. In view of this, insect resistance has been genetically engineered into crops such as corn in order to control insect damage and to reduce the need for traditional chemical pesticides." Ex. C at 1:32-38.

56.    The '434 patent discloses and claims corn seeds, plants, and tissues that include corn plant event DP-4114,[2] which confers insect resistance to the corn. DP-4114 identifies a transgenic event. Transgenic "events" are defined by the DNA sequence that has been incorporated into the target genome (here, of a corn plant) and the specific point(s) of insertion. The '434 patent explains that a "transgenic event is produced by transformation of plant cells with a heterologous DNA construct(s), including a nucleic acid expression cassette that comprises a transgene of interest, the regeneration of a population of plants resulting from the insertion of the transgene into the genome of the plant, and selection of a particular plant characterized by insertion into a particular genome location." *Id*., 10:26-33. In the context of the '434 patent, specific corn (maize) strains were engineered by the inventors to express agriculturally desirable traits, such as resistance to insects or herbicides.

---

[2] "DP-4114" is also known as "DP-004114-3" and "DP4114".

17

57.　More specifically, in the '434 patent, a DNA construct is provided that, when expressed in plant cells and plants, confers resistance to insects. According to one aspect of the invention, a DNA construct, capable of introduction into and replication in a host cell, is provided that when expressed in plant cells and plants confers insect resistance to the plant cells and plants. Maize event DP-4114 was produced by *Agrobacterium*-mediated transformation with plasmid PHP27118. *See id*., 2:52-54. This event contains the cry1F, cry34Ab1, cry35Ab1, and pat gene cassettes, which confer resistance to certain lepidopteran (*e.g.*, moth) and coleopteran (*e.g.*, beetle) pests, as well as tolerance to phosphinothricin (also known as glufosinate, an herbicide). *See id*., 2:46-56.

58.　Corteva expended substantial money, resources, and time to support the development of the inventions relating to the novel transgenic event claimed in the '434 patent. This is neither an easy nor inexpensive task. The '434 patent explains:

> The expression of foreign genes in plants is known to be influenced by their location in the plant genome, perhaps due to chromatin structure (e.g., heterochromatin) or the proximity of transcriptional regulatory elements (e.g., enhancers) close to the integration site (Weising et al. (1988) Ann. Rev. Genet. 22:421-477). At the same time the presence of the transgene at different locations in the genome will influence the overall phenotype of the plant in different ways. For this reason, it is often necessary to screen a large number of events in order to identify an event characterized by optimal expression of an introduced gene of interest. For example, it has been observed in plants and in other organisms that there may be a wide variation in levels of expression of an introduced gene among events. There may also be differences in spatial or temporal patterns of expression, for example, differences in the relative expression of a transgene in various plant tissues, that may not correspond to the patterns expected from transcriptional regulatory elements present in the introduced gene construct. For this reason, it is common to produce hundreds to thousands of different events and screen those events for a single event that has desired transgene expression levels and patterns for commercial purposes. An event that has desired levels or patterns of transgene expression is useful for introgressing the transgene into other genetic backgrounds by sexual outcrossing

using conventional breeding methods. Progeny of such crosses maintain the transgene expression characteristics of the original transformant. This strategy is used to ensure reliable gene expression in a number of varieties that are well adapted to local growing conditions.

*Id*., 1:52-2:13. To this end, the inventors of the '434 patent invented a novel DNA construct that, when expressed in plant cells (*i.e.*, corn), confers resistance to insects.

59. Corteva deposited a representative biological sample comprising seeds that incorporate the claimed invention, *i.e.*, the transgenic event DP-4114, with ATCC. Seeds of the novel DP-4114 event were given an ATCC accession number: PTA-11506. *See id*., 6:34-41.

## CORTEVA'S U.S. PATENT NO. 7,956,246

60. Pioneer and Corteva Agriscience are the co-owners of all right, title and interest in and to U.S. Patent No. 7,956,246 (the "'246 patent"), entitled "Corn event DAS-59122-7 and methods for detection thereof," which was duly and legally issued by the United States Patent and Trademark Office on June 7, 2011. A true and correct copy of the '246 patent is attached hereto as Exhibit D. The '246 patent issued as assigned to Plaintiff Pioneer, Dow Agrosciences LLC ("DAS"), now known as Corteva Agriscience, and du Pont, from U.S. Patent Application No. 11/938,359, filed November 12, 2007, which is a divisional of application No. 11/237,222 filed on September 28, 2005. The '246 patent claims priority to U.S. Provisional Application No. 60/614,225, filed on September 29, 2004. Pursuant to an assignment effective January 1, 2021, and recorded with the USPTO, all of DAS's interest was assigned to Corteva Agriscience through a change of name conveyance. Pursuant to an assignment effective October 1, 2021, and recorded with the USPTO, all of du Pont's interest was assigned to Corteva Agriscience. At all times relevant herein, the '246 patent was, and remains, in full force and effect.

61. The '246 patent is directed to the field of plant molecular biology, and more specifically, to DNA constructs for conferring insect resistance to a plant. As explained in the '246

19

patent, "[c]orn is an important crop and is a primary food source in many areas of the world. Damage caused by insect pests is a major factor in the loss of the world's corn crops, despite the use of protective measures such as chemical pesticides. In view of this, insect resistance has been genetically engineered into crops such as corn in order to control insect damage and to reduce the need for traditional chemical pesticides." Ex. D at 1:31-37.

62.     The '246 patent discloses and claims corn seeds, plants, and tissues that include corn plant event DAS-59122, which confers insect resistance to the corn. DAS-59122 identifies a transgenic event. Transgenic "events" are defined by the DNA sequence that has been incorporated into the target genome (here, of a corn plant) and the specific point(s) of insertion. The '246 patent explains that a "transgenic event is produced by transformation of plant cells with a heterologous DNA construct(s), including a nucleic acid expression cassette that comprises a transgene of interest, the regeneration of a population of plants resulting from the insertion of the transgene into the genome of the plant, and selection of a particular plant characterized by insertion into a particular genome location." *Id*., 10:44-50. In the context of the '246 patent, specific corn (maize) strains were engineered by the inventors to express agriculturally desirable traits, such as resistance to insects or herbicides.

63.     More specifically, in the '246 patent, a DNA construct is provided that, when expressed in plant cells and plants, confers resistance to insects. According to one aspect of the invention, a DNA construct, capable of introduction into and replication in a host cell, is provided that when expressed in plant cells and plants confers insect resistance to the plant cells and plants. Maize event DAS-59122 was produced by *Agrobacterium*-mediated transformation with plasmid PHP17662. This event contains the cry34Ab1, cry35Ab1, and pat gene cassettes, which confer

20

resistance to certain coleopteran (*e.g.*, beetle) pests, as well as tolerance to phosphinothricin (also known as glufosinate, an herbicide).

64.    Corteva expended substantial money, resources, and time to support the development of the inventions relating to the novel transgenic event claimed in the '246 patent. This is neither an easy nor inexpensive task. The '246 patent explains:

> The expression of foreign genes in plants is known to be influenced by their location in the plant genome, perhaps due to chromatin structure (e.g., heterochromatin) or the proximity of transcriptional regulatory elements (e.g., enhancers) close to the integration site (Weising et al., Ann. Rev. Genet 22:421-477, 1988). At the same time the presence of the transgene at different locations in the genome will influence the overall phenotype of the plant in different ways. For this reason, it is often necessary to screen a large number of events in order to identify an event characterized by optimal expression of an introduced gene of interest. For example, it has been observed in plants and in other organisms that there may be a wide variation in levels of expression of an introduced gene among events. There may also be differences in spatial or temporal patterns of expression, for example, differences in the relative expression of a transgene in various plant tissues, that may not correspond to the patterns expected from transcriptional regulatory elements present in the introduced gene construct. For this reason, it is common to produce hundreds to thousands of different events and screen those events for a single event that has desired transgene expression levels and patterns for commercial purposes. An event that has desired levels or patterns of transgene expression is useful for introgressing the transgene into other genetic backgrounds by sexual outcrossing using conventional breeding methods. Progeny of such crosses maintain the transgene expression characteristics of the original transformant. This strategy is used to ensure reliable gene expression in a number of varieties that are well adapted to local growing conditions.

*Id.*, 1:51-2:13. To this end, the inventors of the '246 patent invented a novel DNA construct that, when expressed in plant cells (*i.e.*, corn), confers resistance to insects.

65.    Corteva deposited a representative biological sample comprising seeds that incorporate the claimed invention, *i.e.*, the transgenic event DAS-59122, with ATCC. Seeds of the novel DAS-59122 event were given an ATCC accession number: PTA-11384. *See id.*, 18:58-62.

21

## CORTEVA'S U.S. PATENT NO. 8,283,522

66.    Pioneer, a wholly-owned subsidiary of Corteva, Inc., is the owner of all right, title and interest in and to U.S. Patent No. 8,283,522 (the "'522 patent"), entitled "Herbicide resistance gene," which was duly and legally issued by the United States Patent and Trademark Office on October 9, 2012. A true and correct copy of the '522 patent is attached hereto as Exhibit E. The '522 patent issued as assigned to DAS, now known as Corteva Agriscience, from PCT Application No. PCT/US2006/042133, filed October 27, 2006, and claims priority to U.S. Provisional Application No. 60/731,044 filed October 28, 2005. Pursuant to an assignment executed on January 1, 2021, and recorded with the USPTO, all of DAS's interest was assigned to Corteva Agriscience through a change of name conveyance. Pursuant to an assignment effective September 26, 2024, and recorded with the USPTO, all of Corteva Agriscience's interest was assigned to Pioneer such that Pioneer fully owns the '522 patent.  At all times relevant herein, the '522 patent was, and remains, in full force and effect.

67.    The '522 patent is directed to the field of plant molecular biology, and more specifically, to plant cells for conferring herbicide tolerance to a plant. As explained in the '522 patent, "[i]n areas where growers are faced with glyphosate resistant weeds or a shift to more difficult-to-control weed species, growers can compensate for glyphosate's weaknesses by tank mixing or alternating with other herbicides that will control the missed weeds" such as 2,4-D herbicides. Ex. E at 2:18-22.

68.    The '522 patent discloses and claims seeds, plants, and tissues that include the AAD-12 gene, which confers herbicide resistance to crops, including soybeans. More specifically, in the '522 patent, a polynucleotide is provided that, when expressed in plant cells and plants, confers resistance to 2,4-D herbicide. According to one aspect of the invention, a polynucleotide,

22

capable of introduction into and replication in a host cell, is provided that when expressed in plant cells and plants confers insect resistance to the plant cells and plants.

69.     The AAD-12 gene is present in event DAS-44406.[3] Corteva deposited a representative biological sample comprising seeds that incorporate DAS-44406 and the claimed invention, *i.e.*, the AAD-12 gene, with ATCC at ATCC accession number: PTA-11336.

### CORTEVA'S U.S. PATENT NO. 8,680,363

70.     Pioneer, a wholly-owned subsidiary of Corteva, Inc., is the owner of all right, title and interest in and to U.S. Patent No. 8,680,363 (the "'363 patent"), entitled "Insect resistant and herbicide tolerant soybean event 9582.814.19.1," which was duly and legally issued by the United States Patent and Trademark Office on March 25, 2014. A true and correct copy of the '363 patent is attached hereto as Exhibit F. The '363 patent issued as assigned to DAS, now known as Corteva Agriscience, from U.S. Application No. 13/559,177, filed July 26, 2012, and claims priority to U.S. Provisional Application Nos. 61/511,664, filed July 26, 2011, and 61/521,798, filed August 10, 2011. Pursuant to an assignment executed on January 1, 2021, and recorded with the USPTO, all of DAS's interest was assigned to Corteva Agriscience through a change of name conveyance. Pursuant to an assignment effective September 26, 2024, and recorded with the USPTO, all of Corteva Agriscience's interest was assigned to Pioneer such that Pioneer fully owns the '363 patent. At all times relevant herein, the '363 patent was, and remains, in full force and effect.

71.     The '363 patent is directed to the field of plant molecular biology, and more specifically, to DNA sequences for conferring herbicide tolerance to a plant. The '363 patent discloses and claims soybean seeds and plants that include soybean plant event DAS-81419,[4]

---

[3] "DAS-44406" is also known as "pDAB8264.44.06.1," "DAS44406," and "DAS44406-6."
[4] "DAS-81419" is also known as "9582.814.19.1" and "DAS81419."

which confers insect resistance and herbicide tolerance to the soybeans. DAS-81419 identifies a transgenic event. Transgenic "events" are defined by the DNA sequence that has been incorporated into the target genome (here, of a soybean plant) and the specific point(s) of insertion. The '363 patent explains that a "transgenic 'event' is produced by transformation of plant cells with heterologous DNA, i.e., a nucleic acid construct that includes the transgenes of interest, regeneration of a population of plants resulting from the insertion of the transgene into the genome of the plant, and selection of a particular plant characterized by insertion into a particular genome location." Ex. F, 6:20-26. In the context of the '363 patent, specific soybean strains were engineered by the inventors to express agriculturally desirable traits, such as resistance to insects or herbicides.

72.     More specifically, in the '363 patent, a DNA sequence is provided that, when expressed in plant cells and plants, confers resistance to lepidopteran (*e.g.*, moth) pests as well as tolerance to glufosinate herbicide. According to one aspect of the invention, a DNA sequence, capable of introduction into and replication in a host cell, is provided that when expressed in plant cells and plants confers insect resistance to the plant cells and plants. Soybean event DAS-81419 was produced by *Agrobacterium*-mediated transformation with plasmid pDAB9582. This event contains the cry1Ac, cry1F, and pat genes, which confer resistance to lepidopteran (*e.g.*, moth) pests as well as tolerance to glufosinate herbicide. *See id.*, 1:15-24.

73.     Corteva expended substantial money, resources, and time to support the development of the inventions relating to the novel transgenic event claimed in the '363 patent. This is neither an easy nor inexpensive task. The '363 patent explains:

> The expression of foreign genes in plants is known to be influenced by their location in the plant genome, perhaps due to chromatin structure (e.g., heterochromatin) or the proximity of transcriptional regulatory elements (e.g., enhancers) close to the integration site

24

> (Weising et al., *Ann. Rev. Genet* 22:421-477, 1988). At the same time the presence of the transgene at different locations in the genome will influence the overall phenotype of the plant in different ways. For this reason, it is often necessary to screen a large number of events in order to identify an event characterized by optimal expression of an introduced gene of interest. For example, it has been observed in plants and in other organisms that there may be a wide variation in levels of expression of an introduced gene among events. There may also be differences in spatial or temporal patterns of expression, for example, differences in the relative expression of a transgene in various plant tissues, that may not correspond to the patterns expected from transcriptional regulatory elements present in the introduced gene construct. For this reason, it is common to produce hundreds to thousands of different events and screen those events for a single event that has desired transgene expression levels and patterns for commercial purposes. An event that has desired levels or patterns of transgene expression is useful for introgressing the transgene into other genetic backgrounds by sexual outcrossing using conventional breeding methods. Progeny of such crosses maintain the transgene expression characteristics of the original transformant. This strategy is used to ensure reliable gene expression in a number of varieties that are well adapted to local growing conditions.

*Id*., 1:25-53. To this end, the inventors of the '363 patent invented a novel DNA sequence that, when expressed in plant cells (*i.e.*, soybean), confers resistance to lepidopteran (*e.g.*, moth) pests as well as tolerance to glufosinate herbicide.

74. Corteva deposited a representative biological sample comprising seeds that incorporate the claimed invention, *i.e.*, the transgenic event DAS-81419, with ATCC. Seeds of the novel DAS-81419 event were given an ATCC accession number: PTA-12006. *See id*., 4:62-66.

### CORTEVA'S U.S. PATENT NO. 9,695,441

75. Pioneer, a wholly-owned subsidiary of Corteva, Inc., is the owner of all right, title and interest in and to U.S. Patent No. 9,695,441 (the "'441 patent"), entitled "Insect resistant and herbicide tolerant soybean event 9582.814.19.1," which was duly and legally issued by the United States Patent and Trademark Office on July 4, 2017. A true and correct copy of the '441 patent is attached hereto as Exhibit G. The '441 patent issued as assigned to DAS, now known as Corteva

25

Agriscience, from U.S. Application No. 14/223,249, filed March 24, 2014, which is a continuation of application No. 13/559,177, filed on July 26, 2012. The '441 patent claims priority to U.S. Provisional Application Nos. 61/511,664, filed July 26, 2011, and 61/521,798, filed August 10, 2011. Pursuant to an assignment executed on January 1, 2021, and recorded with the USPTO, all of DAS's interest was assigned to Corteva Agriscience through a change of name conveyance. Pursuant to an assignment effective September 26, 2024, and recorded with the USPTO, all of Corteva Agriscience's interest was assigned to Pioneer such that Pioneer fully owns the '441 patent. At all times relevant herein, the '441 patent was, and remains, in full force and effect.

76.     The '441 patent is directed to the field of plant molecular biology, and more specifically, to polynucleotides for conferring herbicide tolerance to a plant. The '441 patent discloses and claims soybean seeds, plants, and tissues that include soybean plant event DAS-81419, which confers insect resistance and herbicide tolerance to the soybeans. DAS-81419 identifies a transgenic event. Transgenic "events" are defined by the DNA sequence that has been incorporated into the target genome (here, of a soybean plant) and the specific point(s) of insertion. The '441 patent explains that a "transgenic 'event' is produced by transformation of plant cells with heterologous DNA, i.e., a nucleic acid construct that includes the transgenes of interest, regeneration of a population of plants resulting from the insertion of the transgene into the genome of the plant, and selection of a particular plant characterized by insertion into a particular genome location." Ex. G, 6:26-32. In the context of the '441 patent, specific soybean strains were engineered by the inventors to express agriculturally desirable traits, such as resistance to insects or herbicides.

77.     More specifically, in the '441 patent, a polynucleotide is provided that, when expressed in plant cells and plants, confers resistance to lepidopteran (*e.g.*, moth) pests as well as

26

tolerance to glufosinate herbicide. According to one aspect of the invention, a polynucleotide, capable of introduction into and replication in a host cell, is provided that when expressed in plant cells and plants confers insect resistance to the plant cells and plants. Soybean event DAS-81419 was produced by *Agrobacterium*-mediated transformation with plasmid pDAB9582. This event contains the cry1Ac, cry1F, and pat genes, which confer resistance to lepidopteran (*e.g.*, moth) pests as well as tolerance to glufosinate herbicide. *See id.*, 1:16-26.

78.     Corteva expended substantial money, resources, and time to support the development of the inventions relating to the novel transgenic event claimed in the '441 patent. This is neither an easy nor inexpensive task. The '441 patent explains:

> The expression of foreign genes in plants is known to be influenced by their location in the plant genome, perhaps due to chromatin structure (e.g., heterochromatin) or the proximity of transcriptional regulatory elements (e.g., enhancers) close to the integration site (Weising et al., *Ann. Rev. Genet* 22:421-477, 1988). At the same time the presence of the transgene at different locations in the genome will influence the overall phenotype of the plant in different ways. For this reason, it is often necessary to screen a large number of events in order to identify an event characterized by optimal expression of an introduced gene of interest. For example, it has been observed in plants and in other organisms that there may be a wide variation in levels of expression of an introduced gene among events. There may also be differences in spatial or temporal patterns of expression, for example, differences in the relative expression of a transgene in various plant tissues, that may not correspond to the patterns expected from transcriptional regulatory elements present in the introduced gene construct. For this reason, it is common to produce hundreds to thousands of different events and screen those events for a single event that has desired transgene expression levels and patterns for commercial purposes. An event that has desired levels or patterns of transgene expression is useful for introgressing the transgene into other genetic backgrounds by sexual outcrossing using conventional breeding methods. Progeny of such crosses maintain the transgene expression characteristics of the original transformant. This strategy is used to ensure reliable gene expression in a number of varieties that are well adapted to local growing conditions.

*Id.*, 1:27-56. To this end, the inventors of the '441 patent invented a novel polynucleotide that, when expressed in plant cells (*i.e.*, soybean), confers resistance to lepidopteran (*e.g.*, moth) pests as well as tolerance to glufosinate herbicide.

79.    Corteva deposited a representative biological sample comprising seeds that incorporate the claimed invention, *i.e.*, the transgenic event DAS-81419, with ATCC. Seeds of the novel DAS-81419 event were given an ATCC accession number: PTA-12006. *See id.*, 4:66-5:4.

## AVAILABILITY OF CORTEVA'S PROTECTED SEED DEPOSITS

80.    An applicant for a patent involving plants may bolster the patent's disclosure by depositing plant material, including seeds, that are covered by the patent's claims into a depository. ATCC is one such depository. Corteva has deposited large quantities of seeds containing its intellectual property with ATCC, in addition to the seeds described above. In each instance, these deposits were made for the purpose of *protecting* Corteva's patent rights.

81.    Seeds are often deposited with the ATCC before the applicable patents are issued. When the patent issues, ATCC makes those seeds available to the public. Requestors in the United States can obtain available seeds by obtaining them directly from ATCC, whereas requestors in Europe and Africa must make such requests through LGC Standards, which is ATCC's exclusive distributor for Europe. *See https://www.atcc.org/about-us/who-we-are/our-partnerships/atcc-and-lgc-partnership*. ATCC's website explains that "ATCC products can be found on both the LGC and ATCC websites, but purchasing ATCC products occurs through LGC for our customers in Europe and Africa." *Id.*

82.    Although ATCC does not place any restriction on who may purchase patented seeds available from its depository, ATCC makes clear that the seeds may be used *for research purposes only*. ATCC's website discloses certain "Product Use Policies" that state unequivocally that

28

"ATCC products may only be used for noncommercial and non-clinical research." *See atcc.org/policies/product-use-policies*. The policies further specify that any commercial use "extends beyond the scope" of permitted use and is not allowed without a "commercial use license from ATCC." *Id*. To date, Corteva has never authorized ATCC to provide a commercial use license to anyone.

83.     To ensure that purchasers will abide by these policies, upon information and belief, ATCC requires all purchasers to execute a material transfer agreement ("MTA"), in which they agree that the purchased seeds will be used for research purposes only and that any commercial use of the purchased seeds is expressly forbidden. A sample MTA is available on ATCC's website. *https://www.atcc.org/policies/product-use-policies/material-transfer-agreement*.

84.     The express limitation that purchased seeds can be used for research purposes only is consistent with ATCC's assertion in the sample MTA that "ATCC has a nonprofit mission to accept biological materials, maintain them with best practices developed over decades of service as the world's leading biological resource center, *and make them available to the <u>research</u> community*." *See id.* (emphasis added).

85.     On information and belief, the prohibition on commercial use is intended for the exclusive benefit of companies, like Corteva, who contribute their seeds to ATCC's depository. ATCC explains on its website that "[t]he MTA protects the rights of all parties involved in the exchange of biomaterials from the original contributor and distribution of the material to the end-user." *See https://www.atcc.org/support/technical-support/faqs/material-transfer-agreement-mta*. ATCC further states that the MTA "protects the right of the contributor." *See https://www.atcc.org/support/technical-support/faqs/importance-of-material-transfer-agreement*.

29

**INARI BELGIUM AGREED NOT TO USE**
**CORTEVA'S PROTECTED SEEDS FOR ANY COMMERCIAL PURPOSE**

86.     On or around July 14, 2019, Inari Belgium executed an MTA with the ATCC (the "2019 MTA"). The 2019 MTA is attached as Exhibit H.

87.     The 2019 MTA identifies Inari Belgium as a "for profit" organization that is the "Purchaser" under the terms of the agreement. Ex. H at 1.

88.     The 2019 MTA "governs the purchase and use of all Biological Materials."  The term "Biological Materials" includes, but is not limited to, any materials that Inari Belgium acquired from ATCC, referred to as "ATCC Material," as well as any progeny or unmodified derivatives. *Id*.

89.     Under the heading "Scope of Use," Inari Belgium expressly agreed in the 2019 MTA that "ATCC Material and Progeny **may only be used by** Purchaser's Investigator for research purposes and only in Investigator's laboratory." *Id*. (emphasis in original). The referenced "Investigator" is defined as "the individual principal scientist or researcher, who is referenced on the applicable ATCC Sales Order," as well as any "individual assistants" to the Investigator. *Id*.

90.     The 2019 MTA further states, in bold typesetting, "**Any Commercial Use of the Biological Material is strictly prohibited without ATCC's prior written consent**." *Id*. at 2 (emphasis in original). The prohibited "Commercial Uses" include "the sale, license, lease, export, transfer or other distribution of the Biological Materials to a person or entity not party to this MTA for financial gain or other commercial purposes." *Id*. at 1. The prohibited Commercial Uses also include using the Biological Material "to provide a service to a person or entity not party to this MTA for financial gain" or "to produce or manufacture products for general sale or products for use in the manufacture of products ultimately intended for general sale." *Id*.

91.     Pursuant to the 2019 MTA, Inari Belgium "acknowledge[d] and agree[d] that Purchaser's use of certain Biological Material may require a license from a person or entity not party to this MTA, or be subject to restrictions that may be imposed by a person or entity not party to this MTA ("Third Party Terms"). . . . Purchaser shall have the sole responsibility for obtaining any intellectual property licenses necessitated by its possession and use of the Biological Materials." *Id*. at 2.

92.     Inari Belgium also agreed that "ATCC and/or its Contributors shall retain right, title and interest in the Biological Materials." *Id*. at 3. Although Inari Belgium would retain ownership of certain modifications (except to the extent the modifications incorporated ATCC Material) and certain "substances created through the use of Biological Material," Inari Belgium expressly "acknowledge[d] and agree[d]" that "the Biological Material is subject to the restrictions noted in the 'Scope of Use' section," which included the restriction that the material would be used for research purposes only. *Id*. at 3.

93.     In addition to expressly agreeing that Inari Belgium would not use any material obtained from ATCC for any commercial purpose, Inari Belgium also agreed to explicit prohibitions on the transfer of the materials it received. Specifically, except for two enumerated exceptions, Inari Belgium agreed that it "shall not distribute, sell, lend or otherwise make available or transfer to a person other than the Purchaser's Investigator or an entity not party to this MTA, the Biological Material . . . for any reason, without ATCC's prior written agreement." *Id*. at 2.

94.     The only two exceptions to this prohibition on transfers included transfers related to a research project conducted by the Investigator or a collaborative research project involving the Investigator. *Id*. at 2. In both instances, the 2019 MTA makes clear the research projects cannot

31

be for any commercial purpose. *Id*. If such transfers were to occur, Inari Belgium agreed to provide written notice to ATCC informing it that such a transfer had occurred. *Id*.

95.    Inari Belgium further agreed that "any breach of this Agreement, including but not limited to any breach of the scope of use provisions of this Agreement, . . . may create such irreparable injury as to entitle ATCC to seek temporary restraining orders and other preliminary or permanent injunctive relief." *Id*. at 4.

96.    The 2019 MTA is not the only MTA that Inari Belgium has signed with ATCC. Inari signed a revised MTA with ATCC on behalf of Inari Belgium and Inari USA on April 22, 2022 (the "2022 MTA"). The 2022 MTA is attached as Exhibit I.

97.    By its own terms, the 2022 MTA "supersedes all previous agreements between ATCC and [Inari Belgium] relating to the ATCC Material." Ex. I at 4. Due to a change in definitions, the phrase "ATCC Material" in the 2022 MTA has the same meaning as the term "Biological Material" in the 2019 MTA. *Id*. at 1.

98.    Like the 2019 MTA, the 2022 MTA also prohibits Inari Belgium from using seeds acquired from ATCC for commercial purposes. Under the heading "Scope of Use," the 2022 MTA states that "ATCC Materials may only be used by Recipient for research purposes and shall not be used for any Commercial Use without first obtaining a Commercial Use license from ATCC." *Id*. The "Scope of Use" also warns the Recipient that the purchased materials "may also be subject to restrictions from a Contributor, a patent owner, or a governmental entity" and "ATCC Materials shall not be used in any manner that infringes a valid patent in force." *Id*. The 2022 MTA states that the "Recipient shall have the sole responsibility for identifying and obtaining any third-party licenses required." *Id*.

99. Like the 2019 MTA, the 2022 MTA defines "Commercial Use" to include using the materials "for sale, license, lease, export, transfer or other distribution for financial purposes or other commercial purposes." *Id*. This includes "produc[ing] or manufactur[ing] products for general sale or ultimately intended for general sale, including use in a commercial manufacturing process such as fermentation, bioproduction or isolation processes" among other actions. *Id*.

100. The 2022 MTA also places strict limitations on the Recipient's ability to transfer the materials it purchased. Under the section titled "Transfers," the Recipient is permitted to transfer the materials *only* within the Recipient's "organization" and only "for the purposes of the research project." *Id*. at 2. The 2022 MTA forbids the materials from being transferred "for unrelated projects within Recipient's organization." *Id*. The 2022 MTA also forbids the Recipient from transferring the materials outside of the Recipient's organization without ATCC's "prior written approval." *Id*.

101. Under "Property Rights," the 2022 MTA states that "ATCC and/or its Contributors shall retain ownership of all right, title and interest in the [requested materials]." *Id*. at 3. "Contributor" is a defined term that means "the entity depositing materials with ATCC," like Corteva. *Id*. at 1.

102. The 2022 MTA also states that "any breach of this MTA, including but not limited to any breach of the Scope of Use provisions . . . may create such irreparable injury as to entitle ATCC to seek preliminary or permanent injunctive relief." *Id*. at 3.

103. Under both the 2019 and 2022 MTA, Inari Belgium unequivocally agreed that it would not use any of Corteva's seeds that Inari Belgium purchased from ATCC for any commercial purpose.

33

## <u>INARI USA AGREED NOT TO USE<br>CORTEVA'S PROTECTED SEEDS FOR ANY COMMERCIAL PURPOSE</u>

104.    On or around May 4, 2017, Inari USA executed an MTA with ATCC (the "2017 MTA"). The 2017 MTA is attached as Exhibit J.

105.    The 2017 MTA identifies Inari USA as a "for profit" organization that is the "Purchaser" under the terms of the agreement. Ex. J at 1.

106.    The 2017 MTA "governs the purchase and use of all Biological Materials." *Id*. The term "Biological Materials" includes, but is not limited to, any materials that Inari USA acquired from ATCC, referred to as "ATCC Material," as well as any progeny or unmodified derivatives. *Id*.

107.    Under the heading "Scope of Use," Inari USA expressly agreed in the 2017 MTA that "ATCC Material and Progeny **may only be used by** Purchaser's Investigator for research purposes and only in Investigator's laboratory." *Id*. (emphasis in original). The referenced "Investigator" is defined as "the individual principal scientist or researcher, who is referenced on the applicable ATCC Sales Order," as well as any "individual assistants" to the Investigator. *Id.*

108.    The 2017 MTA further states, in bold typesetting, "**Any Commercial Use of the Biological Material is strictly prohibited without ATCC's prior written consent**." *Id*. at 2 (emphasis in original). The prohibited "Commercial Uses" include "the sale, license, lease, export, transfer or other distribution of the Biological Materials to a person or entity not party to this MTA for financial gain or other commercial purposes." *Id*. at 1. The prohibited Commercial Uses also include using the Biological Material "to provide a service to a person or entity not party to this MTA for financial gain" or "to produce or manufacture products for general sale or products for use in the manufacture of products ultimately intended for general sale." *Id*.

34

109.    Pursuant to the 2017 MTA, Inari USA "acknowledge[d] and agree[d] that Purchaser's use of certain Biological Material may require a license from a person or entity not party to this MTA, or be subject to restrictions that may be imposed by a person or entity not party to this MTA ("Third Party Terms") . . . . Purchaser shall have the sole responsibility for obtaining any intellectual property licenses necessitated by its possession and use of the Biological Materials." *Id*. at 2.

110.    Inari USA also agreed that "ATCC and/or its Contributors shall retain right, title and interest in the Biological Materials." *Id*. at 3. Although Inari USA would retain ownership of certain modifications (except to the extent the modifications incorporated ATCC Material) and certain "substances created through the use of Biological Material," Inari USA expressly "acknowledge[d] and agree[d]" that "the Biological Material is subject to the restrictions noted in the 'Scope of Use' section," which included the restriction that the material would be used for research purposes only. *Id*.

111.    In addition to expressly agreeing that Inari USA would not use any material obtained from ATCC for any commercial purpose, Inari USA also agreed to explicit prohibitions on the transfer of the materials it received. Specifically, except for two enumerated exceptions, Inari USA agreed that it "shall not distribute, sell, lend or otherwise make available or transfer to a person other than the Purchaser's Investigator or an entity not party to this MTA, the Biological Material . . . for any reason, without ATCC's prior written agreement." *Id*. at 2.

112.    The only two exceptions to this prohibition on transfers included transfers related to a research project conducted by the Investigator or a collaborative research project involving the Investigator. *Id*. at 2. In both instances, the 2017 MTA makes clear the research projects cannot

35

be for any commercial purpose. *Id*. If such transfers were to occur, Inari USA agreed to provide written notice to ATCC informing it that such a transfer had occurred. *Id*.

113.    Inari USA further agreed that "any breach of this Agreement, including but not limited to any breach of the scope of use provisions of this Agreement, . . . may create such irreparable injury as to entitle ATCC to seek temporary restraining orders and other preliminary or permanent injunctive relief." *Id*. at 4.

114.    The 2017 MTA is not the only MTA that Inari has signed with ATCC. Inari signed the 2022 MTA on April 22, 2022 on behalf of Inari USA and Inari Belgium.

115.    By its own terms, the 2022 MTA "supersedes all previous agreements between ATCC and [Inari USA] relating to the ATCC Material." Ex. I at 4. Due to a change in definitions, the phrase "ATCC Material" in the 2022 MTA has the same meaning as the term "Biological Material" in the 2017 MTA. *Id.* at 1.

116.    Like the 2017 MTA, the 2022 MTA also prohibits Inari USA from using seeds acquired from ATCC for commercial purposes. Under the heading "Scope of Use," the 2022 MTA states that "ATCC Materials may only be used by Recipient for research purposes and shall not be used for any Commercial Use without first obtaining a Commercial Use license from ATCC." *Id*. The "Scope of Use" also warns the Recipient that the purchased materials "may also be subject to restrictions from a Contributor, a patent owner, or a governmental entity" and "ATCC Materials shall not be used in any manner that infringes a valid patent in force." *Id*. The 2022 MTA states that the "Recipient shall have the sole responsibility for identifying and obtaining any third-party licenses required." *Id*.

117.    Like the 2017 MTA, the 2022 MTA defines "Commercial Use" to include using the materials "for sale, license, lease, export, transfer or other distribution for financial purposes

36

or other commercial purposes." *Id*. This includes "produc[ing] or manufactur[ing] products for general sale or ultimately intended for general sale, including use in a commercial manufacturing process such as fermentation, bioproduction or isolation processes" among other actions. *Id*.

118.     The 2022 MTA also places strict limitations on the Recipient's ability to transfer the materials it purchased. Under the section titled "Transfers," the Recipient is permitted to transfer the materials *only* within the Recipient's "organization" and only "for the purposes of the research project." *Id*. at 2. The 2022 MTA forbids the materials from being transferred "for unrelated projects within Recipient's organization." *Id*. The 2022 MTA also forbids the Recipient from transferring the materials outside of the Recipient's organization without ATCC's "prior written approval." *Id*.

119.     Under "Property Rights," the 2022 MTA states that "ATCC and/or its Contributors shall retain ownership of all right, title and interest in the [requested materials]." *Id*. at 3. "Contributor" is a defined term that means "the entity depositing materials with ATCC," like Corteva. *Id*. at 1.

120.     The 2022 MTA also states that "any breach of this MTA, including but not limited to any breach of the Scope of Use provisions . . . may create such irreparable injury as to entitle ATCC to seek preliminary or permanent injunctive relief." *Id*. at 3.

121.     Under both the 2017 and 2022 MTA, Inari USA unequivocally agreed that it would not use any of Corteva's seeds that Inari USA purchased from ATCC for any commercial purpose.

**INARI IMPROPERLY PROCURED CORTEVA'S PROTECTED SEEDS FOR PROHIBITED COMMERCIAL USE**

122.     On information and belief, Inari devised, coordinated, and executed a premeditated scheme to improperly obtain Corteva's protected seeds for Inari's commercial use.

37

123.    Starting in February 2020, after expressly agreeing in the 2017 and 2019 MTAs that it would not use any materials obtained from ATCC for any commercial purpose, Inari placed several orders with ATCC to acquire Corteva's protected seeds. Without notifying Corteva as required, ATCC fulfilled those orders and delivered them, at Inari's request, to Inari's facility in West Lafayette, Indiana.

124.    Then, starting in May 2020, Inari placed several additional orders with LGC Standards to acquire Corteva's protected seeds from ATCC. LGC Standards transmitted Inari's orders to ATCC, which—without notifying Corteva as required—fulfilled those orders and delivered them, at Inari's request, to Infinite-Eversole Specialty Crop Services LLC ("IE-SCS"). IE-SCS is a consulting firm based in Arlington, Massachusetts that acted as Inari's agent for the purposes of acquiring and exporting Corteva's protected seeds.

125.    An example of a purchase order from ATCC by Inari with instructions to ship the seeds to IE-SCS is its October 20, 2021 invoice, reproduced below:



38

126.    According to IE-SCS's website, IE-SCS "provide[s] *contract* research and services related to regulatory aspects of agricultural crops, including all aspects of work *required for commercialization* and production of plants of importance for agriculture, silviculture, horticulture, or nursery purposes." *See http://www.eversoleassociates.com/IE-SCS* (emphasis added).

127.    On information and belief, at all times relevant herein, Defendants had actual notice and knowledge that these seeds were protected by Corteva's intellectual property rights, including patents and PVP certificates. However, Defendants and IE-SCS never obtained a license for the commercial use of any of Corteva's protected seed lines.

128.    Inari is run by former employees of some of the largest agricultural companies in the country, including Syngenta and Bayer CropScience. On information and belief, such employees are plainly aware that plant breeders, including Corteva, protect their seeds through patents, PVP certificates, and contracts like the TUA. Indeed, Inari's business is predicated on attempting to evade the intellectual property rights of innovators like Corteva. On information and belief, one of Inari's goals has been, and will be, to infringe the intellectual property rights of competitors like Corteva by misappropriating their protected seeds, transporting the seeds outside the United States, and then genome-editing or otherwise using those seeds for commercial use. Inari had and currently has knowledge of the intellectual property it is attempting to evade. In correspondence with Corteva dated October 12, 2021, Inari acknowledged that, in the course of its attempt to develop its own competing seed, it was aware of "the scope of Corteva's patents." Indeed, industry analysts have noted that they fully expect Inari to face freedom-to-operate legal challenges from Corteva.

129.    Further, breeders deposit their germplasm with depositories (like ATCC) to, *e.g.*, bolster patent disclosures. However, deposited seeds are generally not available publicly until after the patent covering those seeds issues. On information and belief, Defendants knew that one reason Corteva deposited its seeds with ATCC was to bolster its patent disclosures in connection with obtaining patent protection. On information and belief, Defendants knew that Corteva's seeds were covered by patents because ATCC generally only made Corteva's seeds available to the public when a patent covering the seeds had issued.

130.    Despite such knowledge, Inari obtained and exported Corteva's seeds set forth in Exhibit B outside of the United States (specifically, to Chile) and retained IE-SCS to act as Inari's agent to receive and export Corteva's protected seeds set forth in Exhibit A outside of the United States (specifically, to Belgium). IE-SCS then accepted delivery of Corteva's protected seeds and, acting as Inari's agent, exported them to Inari Belgium's headquarters in Belgium, where Inari began work to commercialize the germplasm of Corteva's protected seeds (or modifications thereof). As Inari has admitted, IE-SCS acted as Inari Belgium's agent to process the seeds for the required USDA phytosanitary certificate, package and ship the seeds to Inari Belgium.

131.    On information and belief, ATCC only provided the protected seeds to Inari Belgium because Inari Belgium had executed the 2019 MTA, in which Inari Belgium agreed to use the seeds for research purposes only. On information and belief, ATCC would not have provided the seeds to Inari Belgium if Inari Belgium had disclosed its intention to use the seeds for commercial purposes because any commercial use of the seeds would violate the 2019 MTA.

132.    Additionally, on information and belief, ATCC only provided the protected seeds to Inari USA because Inari USA had executed the 2017 MTA, in which Inari USA agreed to use the seeds for research purposes only. On information and belief, ATCC would not have provided

the seeds to Inari USA if Inari USA had disclosed its intention to use the seeds for commercial purposes because any commercial use of the seeds would violate the 2017 MTA.

133. On information and belief, Inari did not first obtain, and has failed to subsequently obtain, a commercial use license for Corteva's protected seeds from ATCC, nor did ATCC have any authority to grant such a license in the first place. Inari also has not obtained any license from Corteva with respect to Corteva's patent and PVP rights. On information and belief, Inari procured Corteva's protected seeds with an intent to use the germplasm of Corteva's protected seeds in connection with commercializing one or more future Inari commercial products.

**CORTEVA DISCOVERS INARI'S MISAPPROPRIATION**

134. Corteva did not discover that Inari had misappropriated hundreds of Corteva's protected inbred seeds until December 2022. There were, however, many opportunities for Inari to disclose this information to Corteva since Corteva began asking questions about Inari's modifications and use of Corteva's patented seeds more than a year earlier.

135. On September 14, 2021, Corteva representatives participated in a videoconference that included the Chief Executive Officer of Inari USA. The meeting was arranged at the request of Inari USA. During the meeting, Inari USA revealed that Inari had already performed development activities to commercialize two of Corteva's protected transgenic events. Specifically, Inari detailed a "product launch plan" intended to occur over the next "1-4 Years" (meaning between 2022 and 2025). The "product" to be launched included corn seeds containing the DP-4114 event described above, as well as another of Corteva's proprietary events, referred to as TC-1507. Inari represented that it had made certain genetic modifications to DP-4114 but that it intended to use TC-1507 without any modification at all. At the time, Inari had no business relationship with Corteva that would have allowed Inari to use either of these events. However,

41

despite the mention of these two transgenic events, Inari failed to disclose its elaborate scheme of accessing hundreds of Corteva's protected seeds and having an agent export them outside the United States.

136.   At no point during this videoconference did Inari explain how it had acquired seeds containing TC-1507 or DP-4114, nor did Inari mention that it had already acquired *hundreds* of Corteva's protected seeds through ATCC.

137.   During the same videoconference on September 14, 2021, Inari proposed a *quid pro quo*: Inari would not sell corn seeds containing these two proprietary events without a license if Corteva would collaborate with Inari regarding the use of Inari's soybean products. Corteva rejected that demand.

138.   In a letter to Inari USA dated October 1, 2021, Corteva requested that Inari USA explain, *inter alia*, (1) how it obtained Corteva's seeds or plant materials, including when, where, and from whom all such material was obtained; (2) the geographical location where Inari USA used, stored, or otherwise possessed such material; and (3) the germplasm background of such material. In this same letter, Corteva reiterated that its protected seeds were covered by patent and PVP certificates.

139.   Inari USA responded in a letter dated October 12, 2021. In the letter, after first conceding knowledge of Corteva's intellectual property rights, Inari USA revealed that its "Belgian affiliate" had accessed Corteva's protected seeds relating to the DP-4114 event from ATCC. Inari USA spoke on behalf of both itself and its "Belgian affiliate." Inari USA further explained that those seeds were used at its Ghent, Belgium location and that "for event DP4114 ("Qrome®") . . . [it] used [its] proprietary genome editing technology to develop a modified event outside the scope of Corteva's patents." Inari further represented that "[g]enetic materials

42

containing DP4114 are used by Inari Belgium in its laboratory in Ghent for gene editing under the applicable experimental use exemption," confirming that Inari had used genetic material derived from DP-4114 for gene editing in Belgium. Inari USA did not identify the hundreds of protected seeds that it acquired from ATCC, nor the means by which that material arrived in Belgium. Again, Inari was silent regarding the full extent of its misappropriation of Corteva's protected inbred seeds.

140.    Inari's letter of October 12, 2021, also indicated that Inari's "Belgian affiliate" had "legitimately accessed" TC-1507 "from publicly available grain not subject to any contractual restrictions" and that this Belgian affiliate had incorporated TC-1507 into Inari's seeds in a facility in Chile. Inari did not identify the source of this supposedly "publicly available grain," nor did Inari explain its basis for concluding that this source was not subject to any contractual restrictions like the TUA.

141.    Corteva responded on December 16, 2021, and explained, *inter alia*, that Inari USA's October 12, 2021, letter did not adequately answer Corteva's inquiries regarding Inari USA's activities with Corteva's protected seeds. Corteva further stated that it has no record of Inari Belgium accessing Corteva's protected seeds from ATCC. Inari USA did not respond to Corteva's December 16, 2021, letter.

142.    On February 9, 2022, Inari issued a press release, stating "Inari has created a unique opportunity to deliver proven GM [genetically modified] traits in combination with novel gene edits to plants' natural DNA." *See inari.com/inari-to-bring-growers-proprietary-gm-traits-in-tandem-with-novel-gene-edits/.* Those "GM Traits" include traits that Corteva has developed through its painstaking research and development, at great time and cost, and which are subject to Corteva's patents and other intellectual property rights and ownership interests, including PVP

43

Certificates. This press release highlights that Inari had successfully obtained a patent over certain "corn plants comprising an edited DP-004114-3 corn trait," which is a trait developed and patented by Corteva that was contained in protected seeds stored at ATCC, and, according to Inari, "[t]he grant of [this patent] . . . makes [Corteva's variety] *proprietary to Inari*." *Id.* (emphasis added)

143.    During a conversation on April 1, 2022, Inari's General Counsel represented to Corteva that Inari had made a single genome modification to the DP-4114 event and directed Corteva to the publication of Inari's patent filing for more information concerning what Inari had done with Corteva's trait. Upon information and belief, the patent filing referenced by Inari was U.S. Patent No. 11,214,811 (the "'811 patent"). Inari's General Counsel further represented that any additional information about Inari's acquisition and modification of the DP-4114 event, beyond what was provided in that patent filing, would need to be obtained through discovery in litigation.

144.    Even before this conversation on April 1, 2022, and based on Inari's prior inadequate response, among other things, on March 29, 2022, Corteva contacted ATCC and requested a comprehensive report containing, *inter alia*, all requests made by any party for Corteva's protected seeds relating to the DP-4114 event deposited as ATCC Accension No. PTA-11506, as well as all requests made by any entity with Inari in its name for seed deposits owned by Corteva or its predecessor companies. On the same day, ATCC responded and provided Corteva with a report indicating that ATCC shipped Corteva's protected seeds relating to the DP-4114 event to Kellye Eversole at IE-SCS. However, ATCC claimed that it did not have the capabilities to respond regarding all requests made by any entity with Inari in its name for seed deposits owned by Corteva or its predecessor companies.

145.    In a series of communications that occurred between April and July 2022 involving Corteva and Ms. Eversole of IE-SCS, Ms. Eversole explained that a client, which she did not name, had an agreement with ATCC, and that it was that unnamed client that accessed Corteva's protected seeds. Ms. Eversole stated that her client ordered Corteva's protected seeds and instructed that the shipment of those seeds arrive at IE-SCS for the purpose of IE-SCS sending the seeds to her client. Ms. Eversole claimed that IE-SCS acted on behalf of another entity to obtain Corteva's protected seeds from ATCC. Specifically, IE-SCS was acting as an agent for its unnamed client to receive and ship Corteva's protected seeds to the client, and IE-SCS did not use any of Corteva's protected seeds for any internal research purpose. Ms. Eversole maintained that IE-SCS' actions were in full compliance with the law, and ATCC knew that IE-SCS was transferring the seeds to their unnamed client.

146.    Corteva reached out to ATCC again on July 26, 2022, explaining that it was Corteva's understanding that ATCC shipped Corteva's protected seeds to Ms. Eversole. Corteva asked for clarification regarding whether Ms. Eversole was the signatory on the applicable MTAs related to those shipments, and if she was not, identification of the signatory. ATCC refused to identify the signatory or signatories to the applicable MTAs.

147.    Corteva continued to pursue information regarding the identity of the signatory to the applicable MTAs from August to November 2022. To this point, ATCC had failed to notify Corteva that it had shipped Corteva's protected seeds to an entity, IE-SCS, that did not itself request the seeds. ATCC allowed that practice to continue for at least two years, even though it is contrary to ATCC policy and procedures to ship seeds to anyone other than the party requesting the seeds.

148.    Finally, on or around December 1, 2022, ATCC provided to Corteva two quotations from LGC Standards dated May 18, 2020, and September 8, 2020, respectively. The quotations make clear that Inari directed ATCC to send the protected seeds to IE-SCS, instead of to Inari directly. The quotations included a "Document Address": Inari Agriculture SA, Industriepark 7A, BE-9052 ZWIJNAARDE, BELGIUM, which is the address identified on Inari USA's website for its Belgian facility but recited a different "Delivery Address": Infinite-Eversole Strategic Crop Services, 1337 Massachusetts Avenue #311, Arlington, MA 02476, UNITED STATES.

149.    Additionally, on or around December 1, 2022, ATCC provided to Corteva copies of three purchase orders dated May 20, 2020, September 8, 2020, and October 20, 2021, corresponding to three shipments of Corteva's protected seeds that were requested by Inari and shipped to Ms. Eversole or IE-SCS.

150.    The signatory to each of these purchase orders was the Managing Director of Inari Belgium. The May 20, 2020, September 8, 2020, and October 20, 2021, purchase orders list 110 seed lines, 274 seed lines, and 12 seed lines, respectively. The October 20, 2021, purchase order listed a shipping address for: "Kellye Eversole, Infinite Eversole Strategic Crop Services (IESCS), 1337 Massachusetts Avenue # 311, Arlington, MA 02476, USA."

151.    Neither Inari nor ATCC provided Corteva any notice of these shipments of Corteva's seed lines in 2020 or 2021. When Corteva received copies of these quotations and purchase orders in December 2022, Corteva learned, for the first time, that Inari had induced ATCC to sell and ship *hundreds* of Corteva's protected seed lines to IE-SCS in Massachusetts. Inari did this so that they could then export the protected seed lines to their Belgian facility, where they would be used primarily (if not exclusively) for commercial purposes, in contravention of

Corteva's patents, PVP certificates, and ATCC's MTAs. Each of the PVP certificates asserted in Count 1 *infra* corresponds to one of these protected seed lines.

## DISCOVERY REVEALS THE FULL SCOPE OF INARI'S SCHEME

152.    Discovery in this lawsuit has further revealed that, in addition to Inari's genetic editing of DP-4114 and acquisition of TC-1507, Inari has also used genetic material derived from other Corteva events, including DAS-59122, DAS-44406, and DAS-81419, for genetic editing in Belgium. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████

153.    Discovery in this lawsuit has also revealed that Inari USA acquired Corteva's protected seeds set forth in Exhibit B from ATCC and exported those seeds to Chile.

## HARM RESULTING FROM INARI'S PROCUREMENT OF CORTEVA'S PROTECTED SEEDS

154.    On information and belief, Inari improperly acquired Corteva's protected seeds and already has used those seeds in connection with Inari's commercial ambitions. In doing so, Inari is improperly attempting to leverage nearly a hundred years and hundreds of millions of dollars of Corteva's research and development for its own commercial gain. Essentially, Inari seeks to short-cut one hundred years of plant breeding by using Corteva's seeds as its own. Corteva acquired patents and PVP certificates covering its protected seeds to prevent this very situation from occurring. Corteva's protected seeds are not available from ATCC for commercial purposes.

155.    On information and belief, one of Inari's goals has been, and will be, to infringe the intellectual property rights of companies like Corteva by misappropriating these companies' protected seeds, transporting the seeds outside the United States, and then genome editing or otherwise using those seeds for commercial use.

47

156.    Inari acquired at least the seeds comprising the DP-4114, DAS-59122, DAS-44406, and DAS-81419 events for commercial use and to further its commercial interests to bring seed products to the market in less time and with less expense. For example, Inari has stated its intent to modify existing protected plant events, such as Corteva's branded Qrome® and Herculex® hybrid corn seed products and Enlist® soybean products that utilize the DP-4114, DAS-59122, DAS-44406, and DAS-81419 events, to sell competing seeds and attempt to avoid paying royalty costs for the use of Corteva's intellectual property, including the '434, '246, '522, '363, and '441 patents, that protect such branded products. ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ Industry analysts reported that Inari had developed modified versions of existing biotech events, such as Qrome® and Enlist®, and that they expect Inari to face freedom-to-operate legal challenges from Corteva. On its "Trait Stewardship" website, Corteva posts a non-exhaustive list of patents that cover its products. *See https://www.corteva.us/Resources/trait-stewardship.html*. The '434 patent appears on this list in connection with Qrome®. The '246 patent appears on this list in connection with Herculex® XTRA, and the '522 patent appears on this list in connection with Enlist E3®.[5]

157.    Indeed, Inari has publicly admitted that it "creat[ed] revolutionary seed that reduces the footprint of agriculture while increasing yield" with an intent to "bring these advanced products to market in less time and with less expense than the industry norm." *See https://inari.com/wp-content/uploads/2023/04/Inari-Fact-Sheet_04-2023.pdf*.

---

[5] The '363 and '441 patents are not associated with Corteva products sold within the U.S. and do not appear on the trait stewardship list.

48

158.    Inari misappropriated Corteva's protected seeds so that Inari could modify them genetically abroad and subsequently seek patent protection on and eventually sell the modified variety in the United States and elsewhere. Recent reporting confirms that Inari has already begun efforts to sell modified seeds in the United States. Inari has already partnered with at least one "test customer," called 1st Choice Seeds, which is offering "proof of concept" seeds to "at least 1,000 farms in Indiana and seven Eastern states." *See https://www.ibj.com/articles/2023-innovation-issue-inari-aims-to-boost-crop-yields-through-unique-gene-editing-technology*. Indeed, Inari has stated that the reason it established its facility in Indiana was to "allow us to ramp up our product development efforts." *See https://www.prnewswire.com/news-releases/inari-introduces-the-worlds-first-seed-foundry-and-strategic-expansion-to-the-us-midwest-at-purdue-research-park-300746301.html*.

159.    In July 2020, Inari submitted U.S. Provisional Application Nos. 63/059,813, 63/059,860, 63/059,916, and 63/059,963 claiming a method of modifying transgenic plant events. These applications identified target events including DP-4114, DAS-59122, DAS-44406, and DAS-81419 by their corresponding patents and associated ATCC accession numbers. Inari was aware of at least the '434, '246, '363, and '441 patents as early as July of 2020.

160.    With knowledge of Corteva's '434, '246, '522, '363, and '441 patents and knowledge of the prohibited commercial use of the patented deposited seeds relating to Corteva's events DP-4114, DAS-59122, DAS-44406, and DAS-81419, on information and belief, Inari nevertheless used the patented seeds acquired from ATCC for an unauthorized and improper commercial use. Inari then pursued patents on certain genetic modifications of Corteva's events.

161.    For example, using the patented DP-4114 event seeds, Inari obtained at least two issued patents and filed other patent applications purporting to claim an invention based on Inari's

49

alteration of Corteva's seeds containing the DP-4114 event. Specifically, Inari obtained the '811 patent, entitled "INIR6 Transgenic Maize," which issued on January 4, 2022. The '811 patent issued from U.S. Patent Application No. 17/249,640, filed March 8, 2021, and claims priority to U.S. provisional applications dated as early as July 31, 2020. The '811 patent expressly admits that its purported invention comprises "modifications of the DP-004114-3 maize locus"—*i.e.*, modifications of the patented DP-4114 transgenic event described and claimed in Corteva's '434 patent. More recently, Inari obtained U.S. Patent No. 11,753,648 (the "'648 patent"), which issued on September 12, 2023. The '648 patent issued from U.S. Patent Application No. 17/680,647, filed February 25, 2022, and claims priority to U.S. provisional applications dated as early as February 3, 2021. Similar to the '811 patent, the '648 patent also expressly admits that its purported invention also comprises "modifications of the DP-4114 maize locus"—*i.e.*, modifications of the patented DP-4114 transgenic event described and claimed in Corteva's '434 patent.

162.  As another example, using the patented DAS-59122 seeds, Inari obtained at least one issued patent purporting to claim an invention based on Inari's alteration of Corteva's seeds containing the DAS-59122 event. Specifically, Inari obtained U.S. Patent No. 11,773,397 (the "'397 patent"), entitled "Modified excisable DAS59122-7 maize transgenic locus," which issued on October 3, 2023. The '397 patent issued from U.S. Patent Application No. 18/058,081, filed on November 22, 2022, and claims priority to U.S. provisional applications dated as early as July 31, 2020. The '397 expressly admits that its purported invention comprises "modifications of the DAS59122-7 maize locus"—*i.e.*, modifications of the patented DAS-59122 transgenic event described and claimed in Corteva's '246 patent.

163.   As another example, using the patented DAS-44406 event seeds, Inari filed four patent applications purporting to claim an invention based on Inari's alteration of Corteva's seeds

containing the DAS-44406 event. Specifically, Inari filed U.S. Patent Application No. 17/302,110 (the "'110 application") entitled "INHT26 Transgenic Soybean" on filed on April 23, 2021, which claims priority to U.S. provisional applications dated as early as July 31, 2020. The '110 application was published on February 3, 2022 as U.S. Publication No. 2022/0030822 (the "'822 publication") and expressly admits that its purported invention comprises "modifications of the DAS44406-6 soybean locus"—*i.e.*, modifications of the DAS-44406 transgenic event, which contains the patented AAD-12 gene as described in the '522 patent. *See also* U.S. Patent Application No. 18/162,681, No. 18/040,110, and No. 18/162,134.

164.    As a further example, using the patented DAS-81419 event seeds, Inari obtained at least one U.S. patent and filed other patent applications purporting to claim an invention based on Inari's alteration of Corteva's seeds containing the DAS-81419 event. Specifically, Inari obtained U.S. Patent No. 11,814,630 (the "'630 patent"), entitled "Modified excisable DAS81419-2 soybean transgenic insect resistance locus," which issued on November 14, 2023. The '630 patent issued from U.S. Application No. 18/057,867, filed November 22, 2022, which is a continuation of a PCT application that was filed on July 30, 2021, and claims priority to U.S. provisional applications dating as far back as July 31, 2020. The '630 expressly admits that its purported invention comprises "modifications of the DAS81419 soybean locus"—*i.e.*, modifications of the patented DAS-81419 transgenic event described and claimed in Corteva's '363 and '441 patents.

165.    Ultimately, Corteva and its predecessors spent billions of dollars—and nearly one hundred years—researching, developing, and protecting its seeds. Inari chose to ignore Corteva's intellectual property rights in its protected seeds and now, through its infringement, is damaging and irreparably harming Corteva's core business by preparing for sale Inari-branded versions of

Corteva's protected seed lines that Inari accessed through a scheme designed to misappropriate Corteva's seeds.

## COUNT I

### Infringement of U.S. Plant Variety Protection Certificates

### (Asserted Against All Defendants)

166. Corteva incorporates herein by reference paragraphs 1 through 165 above as if fully set forth herein.

167. Defendants have violated, and on information and belief are continuing to violate, under 7 U.S.C. §§ 2402, 2483, and 2541, Corteva's rights under the PVP certificates listed in Exhibit A by delivering, shipping, consigning, and/or exchanging, and/or exporting from the United States, Corteva's seeds for its protected variety as identified in Exhibit A, and/or by instigating or actively inducing such conduct. Each of the PVP certificates listed in Exhibit A corresponds to a single protected seed line misappropriated by Inari.

168. For example, Defendants purchased and then exported, or instigated or actively induced the purchase and exportation of, the following inbred seeds from ATCC:

| 38 | ATCC-PTA-11340 Inbred corn (maize) seed: PH128Z | ea | 1 | 249.00 | 249.00 |

169. This example, ATCC-PTA-11340, relates to a Corteva proprietary inbred corn seed PH128Z, which is covered by PVP certificate no. 200900369. Defendants were not authorized to, and did not have a license allowing them to, engage in this wrongful infringing conduct.

170. In like or nearly identical fashion, Defendants purchased and then exported, or instigated, or actively induced, the purchase and exportation of the protected seeds listed in Exhibit A.

171.    This infringing conduct was not undertaken by Defendants with authorization from Corteva or for the purpose of plant breeding or bona fide research. Instead, Defendants misappropriated Corteva's protected seeds, and transported the seeds outside the United States, with the intent to genome-edit or otherwise use those seeds for commercial use.

172.    This infringing conduct was done with notice that the seeds listed in Exhibit A were protected by the corresponding PVP certificates. Inari is run by former employees of some of the largest agricultural companies in the country, including Syngenta and Bayer CropScience. On information and belief, such employees are plainly aware that seed developers, including Corteva, protect their seeds through both patents and PVP certificates. Indeed, Inari has stated publicly that "plant varieties and seeds . . . need IP protection," including "patents" and "plant breeders rights," "for a sustainable business" because they are "high-tech products in an easy-to-copy form." *See upov.int/edocs/mdocs/upov/en/upov_sem_ge_23/upov_sem_ge_23_ppt_12.pdf*.

173.    Inari's business is predicated on attempting to evade the intellectual property rights of competitors like Corteva. On information and belief, one of Inari's goals has been, and will be, to seek to evade the intellectual property rights of competitors like Corteva by misappropriating their protected seeds, transporting the seeds outside the United States, genome-editing or otherwise using those seeds for commercial use, and claiming ownership of the resulting, genome-edited seeds. On information and belief, Inari had and has knowledge of the intellectual property, including PVP certificates, it is attempting to evade. Industry analysts have in fact noted that they fully expect Inari to face freedom-to-operate legal challenges from Corteva." . Indeed, Corteva's October 1, 2021, letter reiterated that its protected seeds were covered by both patents and PVP certificates and Inari's October 12, 2021, letter conceded knowledge of such rights.

53

174.    Additionally, Inari has violated under 7 U.S.C. §§ 2402, 2483, and 2541, Corteva's rights under one or more PVP certificates listed in Exhibit A by instigating or actively inducing ATCC to sell Corteva seeds as identified in Exhibit A. On information and belief, Inari was aware of the PVP certificates listed in Exhibit A at least as of May 2020, the month during which it first ordered Corteva's protected seeds. Notwithstanding its knowledge of these PVP certificates, on information and belief, Inari induced ATCC to sell Corteva's protected seeds to Inari's exportation agent with the knowledge and specific intent to cause them to be exported in violation of Corteva's PVP Certificates. *See* 7 U.S.C. § 2541(a)(1)&(2) (listing "sell[ing] . . . the protected variety" and "export[ing] it from the United States" as an infringing acts).

175.    IE-SCS, acting as Inari's agent, delivered, shipped, consigned, exchanged, transferred possession of, and/or exported from the United States, Corteva's protected seeds as identified in Exhibit A. Inari instigated or actively induced such conduct as principal. On information and belief, Inari was aware of the PVP certificates listed in Exhibit A at least as of May 2020, the month during which it first ordered Corteva's protected seeds. Notwithstanding its knowledge of these PVP certificates, Inari induced IE-SCS to export from the United States Corteva's protected seeds with the knowledge and specific intent to encourage and facilitate infringing exportation of Corteva's protected seeds by IE-SCS.

176.    Alternatively, Inari delivered, shipped, consigned, exchanged, and/or exported from the United States, Corteva seeds as identified in Exhibit A through IE-SCS.

177.    On information and belief, Defendants' infringing conduct will continue unless enjoined by this Court, as to Corteva's protected seeds and/or seeds within the scope of 7 U.S.C. § 2541(c).

178. As a direct and proximate consequence of Defendants' infringing conduct, Corteva has suffered and will continue to suffer irreparable injury and damages in an amount not yet determined for which Corteva is entitled to relief.

## COUNT II

### Infringement of U.S. Plant Variety Protection Certificates

### (Asserted Against Inari USA)

179. Corteva incorporates herein by reference paragraphs 1 through 178 above as if fully set forth herein.

180. Inari USA has violated, under 7 U.S.C. §§ 2402, 2483, and 2541, Corteva's rights under the PVP certificates listed in Exhibit B by delivering, shipping, consigning, and/or exchanging, and/or exporting from the United States, Corteva's seeds for its protected variety as identified in Exhibit B, and/or by instigating or actively inducing such conduct. Each of the PVP certificates listed in Exhibit B corresponds to a single protected seed line misappropriated by Inari USA.

181. For example, Inari USA purchased and then exported, or instigated or actively induced the purchase and exportation of, the following inbred seeds from ATCC:

| LINE# | BSL | ITEM NUMBER | UNIT | QTY SHIP | QTY B O | DESCRIPTION | BATCH NUMBER |
|---|---|---|---|---|---|---|---|
| 4.00 | 1 | PTA-1610 | ea | 1.00 | 0.00 | Inbred corn (maize) seed PH2VK Donaldon, Laura Informing Report No number required Prof. Services. Retained at ATCC. Exp. 12/31/2155 Authorization Letter No number required | 100005 |

182. This example, PTA-1610, relates to a Corteva proprietary inbred corn seed PH2VK, which is covered by PVP certificate no. 009900363. Inari USA was not authorized to, and did not have a license allowing them to, engage in this wrongful infringing conduct.

183. In like or nearly identical fashion, Inari USA purchased and then exported, or instigated, or actively induced, the purchase and exportation of the protected seeds listed in Exhibit B.

184. This infringing conduct was not undertaken by Inari USA with authorization from Corteva or for the purpose of plant breeding or bona fide research. Instead, Inari USA misappropriated Corteva's protected seeds, and transported the seeds outside the United States, with the intent to genome-edit or otherwise use those seeds for commercial use.

185. This infringing conduct was done with notice that the seeds listed in Exhibit B were protected by the corresponding PVP certificates. Inari is run by former employees of some of the largest agricultural companies in the country, including Syngenta and Bayer CropScience. On information and belief, such employees are plainly aware that seed developers, including Corteva, protect their seeds through both patents and PVP certificates. Indeed, Inari has stated publicly that "plant varieties and seeds . . . need IP protection," including "patents" and "plant breeders rights," "for a sustainable business" because they are "high-tech products in an easy-to-copy form." *See upov.int/edocs/mdocs/upov/en/upov_sem_ge_23/upov_sem_ge_23_ppt_12.pdf*.

186. Inari's business is predicated on attempting to evade the intellectual property rights of competitors like Corteva. On information and belief, one of Inari's goals has been, and will be, to seek to evade the intellectual property rights of competitors like Corteva by misappropriating their protected seeds, transporting the seeds outside the United States, genome-editing or otherwise using those seeds for commercial use, and claiming ownership of the resulting, genome-edited seeds. On information and belief, Inari had and has knowledge of the intellectual property, including PVP certificates, it is attempting to evade. Industry analysts have in fact noted that they fully expect Inari to face freedom-to-operate legal challenges from Corteva. Indeed, Corteva's

October 1, 2021, letter reiterated that its protected seeds were covered by both patents and PVP certificates and Inari's October 12, 2021, letter conceded knowledge of such rights.

187.    Additionally, Inari USA has violated under 7 U.S.C. §§ 2402, 2483, and 2541, Corteva's rights under one or more PVP certificates listed in Exhibit B by instigating or actively inducing ATCC to sell Corteva seeds as identified in Exhibit B. On information and belief, Inari was aware of the PVP certificates listed in Exhibit B at least as of February 2020, the month during which it first ordered Corteva's protected seeds. Notwithstanding its knowledge of these PVP certificates, on information and belief, Inari USA induced ATCC to sell Corteva's protected seeds with the knowledge and specific intent to cause them to be exported in violation of Corteva's PVP Certificates. *See* 7 U.S.C. § 2541(a)(1)&(2) (listing "sell[ing] . . . the protected variety" and "export[ing] it from the United States" as an infringing acts).

188.    On information and belief, Inari USA's infringing conduct will continue unless enjoined by this Court, as to Corteva's protected seeds and/or seeds within the scope of 7 U.S.C. § 2541(c).

189.    As a direct and proximate consequence of Inari USA's infringing conduct, Corteva has suffered and will continue to suffer irreparable injury and damages in an amount not yet determined for which Corteva is entitled to relief.

## COUNT III

### Infringement Of U.S. Patent No. 8,575,434 Under 35 U.S.C. § 271(a)

### (Asserted Against All Defendants)

190.    Corteva incorporates herein by reference paragraphs 1 through 189 above as if fully set forth herein.

57

191.    The '434 patent discloses and claims corn seeds, plants, and tissues that include corn plant event DP-4114. A biological sample comprising seeds that incorporate the invention, i.e., the transgenic event DP-4114, was deposited with ATCC and given an ATCC accession number: PTA-11506.

192.    On information and belief, Defendants have infringed one or more claims of the '434 patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by using within the United States without authority corn seed comprising corn event DP-4114 for which a representative sample is deposited under Accession No. PTA-11506 with ATCC.

193.    IE-SCS, acting as Defendants' agent, processed, packaged, and prepared to ship corn seeds comprising corn event DP-4114 to Inari Belgium. IE-SCS processed seeds comprising corn event DP-4114 for a USDA phytosanitary certificate before exporting these seeds to Belgium. The phytosanitary certificate provides phytosanitary certification of various U.S. agricultural seeds, crops, or plant products. A phytosanitary certificate was and is required to meet the phytosanitary requirements of the country of import.

194.    On information and belief, now and at the time IE-SCS exported the corn event DP-004114-3 seeds, Belgium required that the phytosanitary certificate confirm the absence of certain bacterial pathogens in corn seeds being imported into the country. One or more laboratory tests are necessary for IE-SCS to have confirmed the absence of such bacterial pathogens. IE-SCS, as agent of Inari Belgium, used the patented seeds in the United States to conduct, or have conducted, the required testing and inspection to obtain a USDA phytosanitary certificate.

195.    Specifically, through at least the foregoing acts, Inari infringed at least claim 8 of the '434 patent by conducting phytosanitary testing on the PTA-11506 seeds comprising corn event DP-4114. Claim 8 of the '434 patent recites:

8. A seed comprising corn event DP-004114-3, wherein said seed comprises the DNA construct of claim 1, wherein a representative sample of corn event DP-004114-3 seed has been deposited with American Type Culture Collection (ATCC) with Accession No. PTA-11506.

196.    As a direct and proximate consequence of Defendants' infringing conduct, Corteva has suffered and will continue to suffer irreparable injury and damages in an amount not yet determined for which Corteva is entitled to relief.

## COUNT IV

**Infringement Of U.S. Patent No. 8,575,434 Under 35 U.S.C. § 271(f)(2)**

**(Asserted Against All Defendants)**

197.    Corteva repeats and incorporates by reference paragraphs 1 through 196 above as if fully set forth herein.

198.    As discussed above, the '434 patent discloses and claims corn seeds, plants, and tissues that include corn plant event DP-4114. A biological sample comprising seeds that incorporate the invention, *i.e.*, the transgenic event DP-4114, was deposited with ATCC and given an ATCC accession number: PTA-11506. For example, claims 1, 8, and 9 of the '434 patent recite:

Claim 1:

A DNA construct comprising: a first, second, third and fourth expression cassette, wherein said first expression cassette in operable linkage comprises:
(a) a maize ubiquitin promoter;
(b) a 5′ untranslated exon of a maize ubiquitin gene;
(c) a maize ubiquitin first intron;
(d) a Cry1F encoding DNA molecule; and
(e) a poly(A) addition signal from ORF 25 terminator;
said second expression cassette in operable linkage comprises:
    (1) a maize ubiquitin promoter;
    (2) a 5′ untranslated exon of a maize ubiquitin gene;
    (3) a maize ubiquitin first intron;
    (4) a Cry34Ab1 encoding DNA molecule; and
    (5) a PinII transcriptional terminator;
    said third expression cassette in operable linkage comprises;
        (i) a wheat peroxidase promoter;

(ii) a Cry35Ab1 encoding DNA molecule; and
(iii) a PinII transcriptional terminator; and
said fourth expression cassette in operable linkage comprises;
    (a) a CaMV 35S promoter;
    (b) a pat encoding DNA molecule; and
    (c) a 3′ transcriptional terminator from CaMV 35S; wherein the four cassettes are flanked by SEQ ID NO: 27 at the 5′ end and SEQ ID NO: 28 at the 3′ end.

Claim 8:

A seed comprising corn event DP-004114-3, wherein said seed comprises the DNA construct of claim 1, wherein a representative sample of corn event DP-004114-3 seed has been deposited with American Type Culture Collection (ATCC) with Accession No. PTA-11506.

Claim 9:

A corn plant, or part thereof, grown from the seed of claim 8.

199. Inari obtained samples from ATCC of the corn seed comprising corn event DP-4114 deposited under Accession No. PTA-11506 and exported those samples from the United States to Inari Belgium, including by directing IE-SCS to arrange for this exportation at least in or about May 2020 and again in October 2021.

200. This exportation was for commercial purposes.

201. The exported seed comprising corn event DP-4114 falls within at least claims 1 and 8 of the '434 patent.

202. The plants grown in Inari Belgium's facilities comprising corn event DP-4114 would have fallen within at least claim 9 of the '434 patent if they were grown in the United States.

203. Defendants and IE-SCS never possessed a license to the '434 patent for commercial use, either expressly or implicitly.

204. None of these entities or their agents has any right to use any seeds, corn event, or DNA construct claimed by the '434 patent beyond the right to access.

60

205.    Inari, with knowledge of the '434 patent, but without authority, via IE-SCS, supplied or caused to be supplied from the United States to Belgium corn seed comprising corn event DP-04114 for which a representative sample is deposited under Accession No. PTA-11506 with ATCC.

206.    Components of Corteva's patented inventions that Inari exported include, at least, the claimed DNA construct, DP-4114 corn event, and/or the corn seed for which a representative sample was deposited under Accession No. PTA-11506 with ATCC. When the claimed DNA construct, DP-4114 corn event, and/or seed is combined with at least water, nutrients, light, air, and physical support it produces a plant as claimed in, *e.g.*, claim 9. Each of these components are especially made and adapted to be combined in a manner that would infringe the '434 patent, *e.g.*, growing, manipulating, and/or transforming a corn plant or part thereof from the exported DNA construct, DP-4114 corn event, and/or seed, producing further seed from plants grown from the seed, deriving biological samples from said DNA construct, DP-4114 corn event, and/or seed, and producing further corn varieties resistant to certain lepidopteran and coleopteran pests.

207.    The corn seed for which a representative sample was deposited under Accession No. PTA-11506 with ATCC, including the DNA construct, cells and tissues comprising each seed, and corn event DP-4114 that the genomes of each seed comprise, all of which Inari has exported from the United States and imported into Belgium, are not staple articles of commerce suitable for substantial non-infringing use.

208.    Inari has admitted that it exported seeds containing corn event DP-4114 to Belgium and used the exported seeds to then purportedly modify event DP-4114, confirming an actual combination of claimed components and/or intent that such components be combined.

209.    Upon information and belief, for Inari to attempt to modify corn event DP-4114, Inari at least directly practices claim 9 of the '434 patent in a manner that would infringe if done in the United States. Upon information and belief, Inari cannot introduce its genome engineering technology into cells comprising corn event DP-4114 without obtaining a "plant" as broadly defined in the '434 patent from the exported seeds. Upon information and belief, Inari combines the exported seed or cells or tissue therefrom with, *inter alia*, sufficient water, nutrients, light, air, and physical support to obtain a "plant" compatible with methods by which Inari can then introduce any genome engineering technology component or components.

210.    Inari has directly infringed at least claim 9 of the '434 patent in violation of 35 U.S.C. § 271(f)(2). Inari knew that the components it exported and/or caused to be exported from the United States were adapted for the purpose of growing a claimed plant, or part thereof, and intended this export to allow Inari to make the required combinations outside the U.S. in a manner that would infringe at least claim 9 of the '434 patent if done in the United States. Additionally, Inari intended to use and did use the exported components for the commercial purpose of growing a plant and then using the plant tissue and/or cells to develop a modified DP-4114 event and seeds containing the modified event.

211.    For example, a mode by which Inari purportedly modified corn event DP-4114 was disclosed in Inari's patents directed to modifying corn event DP-4114—the '811 patent—which expressly discusses modifying Corteva's DP-4114 event. The abstract of the '811 patent states that "[t]ransgenic INIR6 maize plants comprising modifications of the DP-4114 maize locus which provide for facile excision of the modified DP-4114 transgenic locus or portions thereof, methods of making such plants, and use of such plants to facilitate breeding are disclosed." The disclosure of the '811 patent also refers directly to Corteva's '434 patent protecting DP-4114 no fewer than

62

six times.[6] A second, more recently issued patent, the '648 patent, includes a similar disclosure plus additional details and examples of Inari's purported modifications to corn event DP-4114.[7]

212.    During the September 14, 2021, videoconference between Inari and Corteva, Inari represented that it had genome edited the DP-4114 event and was taking affirmative steps to commercially market corn seeds expressing that trait.

213.    Likewise, as further quoted above, in a letter from Ponsi Trivisvavet, Chief Executive Officer of Inari USA, dated October 12, 2021, Inari represented that (i) Inari used its laboratory in Ghent to perform its genome editing on event DP-4114 and (ii) Inari obtained corn event DP-4114 from the ATCC depository in the United States.

214.    Further, on or around April 1, 2022, Inari told Corteva that it had made a genome modification to the DP-4114 event, which was described in the patent filings for the '811 patent and the '648 patent.

215.    Inari's infringement of the '434 patent was, and continues to be, willful and deliberate. At the time of export, Inari knew the seed deposited under Accession No. PTA-11506 was patented. Further, Inari has known that the DP-4114 event was patented since March 8, 2021, at the latest, which is when Inari filed the '811 patent disclosing, *inter alia*, the '434 patent as an

---

[6]    *See   e.g.,*   the   '811   patent,   available   at https://patentcenter.uspto.gov/applications/17249640?application=, 5:22-26 ("As used herein, the term 'DP-004114-3' is used to refer to any of a transgenic maize locus, transgenic maize plants and parts thereof including seed set forth in U.S. Pat. No. 8,575,434, which is incorporated herein by reference in its entirety"); *see also id.*, 12:12-18 ("Sequences of the junction polynucleotides as well as the transgenic insert(s) of the DP-004114-3 transgenic locus which can be improved by the methods provided herein are set forth or otherwise provided in SEQ ID NO: 1, U.S. Pat. No. 8,575,434, the sequence of the DP-004114-3 locus in the deposited seed of ATCC accession No. PTA-11506, and elsewhere in this disclosure.").

[7]    *See   e.g.,*   the   '648   patent,   available   at https://patentcenter.uspto.gov/applications/17680647/ifw/docs?application=, 5:48-59; *see also id.*, 11:35-12-24; *see also id.*, 13:5-54; *see also id.*, 21:30-22:18; *see also id.*, 31:44-52; *see also id.*, 33:7-30; *see also id.*, 38:57-67; *see also id.*, 39: 9-12.

"example[] of a selected transgenic corn event which confers lepidopteran and coleopteran insect pest tolerance [through] the DP-4114 transgenic maize event." .

216.    Corteva has been and continues to be damaged by Inari's infringement of the '434 patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

217.    Inari's conduct in infringing the '434 patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## COUNT V

**Induced Infringement Of U.S. Patent No. 8,575,434 Under 35 U.S.C. § 271(b)**

**(Asserted Against All Defendants)**

218.    Corteva incorporates herein by reference paragraphs 1 through 217 above as if fully set forth herein.

219.    A biological sample comprising seeds reflecting the invention of the '434 patent, *i.e.*, the transgenic event DP-4114, was deposited with ATCC. Specifically, seeds of the novel DP-4114 event were deposited with ATCC and given an ATCC accession number: PTA-11506. *See id*., 6:34-41. Such seed deposits are governed by ATCC's policies, terms of use, and agreements, including an MTA. *See https://www.atcc.org/policies/product-use-policies/material-transfer-agreement.*

220.    Inari obtained, without authorization and for a commercial use, seeds relating to the DP-4114 event of the '434 patent from ATCC. Inari did so by inducing ATCC, on at least three occasions—June 25, 2020, July 24, 2020, and November 18, 2021—to sell seeds deposited with the ATCC under PTA-11506 and reflecting the patented DP-4114 transgenic event and ship them to Kellye Eversole, Infinite Eversole Strategic Crop Services, Arlington, Massachusetts. Neither ATCC nor LGC Standards was authorized to sell or transfer seeds for commercial use. Indeed, as

64

discussed above, ATCC's standard MTA expressly prohibits a Recipient from using seeds for commercial purposes. On information and belief, Inari never intended to abide by these restrictions at the time it sought and obtained the seeds.

221.    IE-SCS was acting as an agent for Inari to acquire the patented DP-4114 event seeds and transferred the patented seeds to Inari.

222.    On information and belief, at the time that Inari obtained the seeds comprising corn event DP-4114 from ATCC, Inari had knowledge of the '434 patent covering the protected seeds for the DP-4114 event. On its "Trait Stewardship" website, Corteva posts a non-exhaustive list of patents that cover its products. The '434 patent appears on this list in connection with Qrome®. *See https://www.corteva.us/Resources/trait-stewardship.html.* Furthermore, in its October 12, 2021, letter to Corteva, Inari USA admitted that "for event DP4114 ("Qrome®") . . . [it] used [its] proprietary genome editing technology to develop a modified event outside the scope of Corteva's patents," indicating that Inari had actual knowledge of at least the '434 patent.

223.    At the time that Inari obtained the seeds comprising corn event DP-4114 from ATCC, Inari had, on information and belief, a specific intent to induce infringement of the '434 patent by having ATCC sell and/or transfer the protected seeds to Inari's agent who then further transferred such seeds to Inari.

224.    With knowledge of the '434 patent and knowledge that no commercial use of the patented deposited seeds relating to the DP-4114 event was permitted, Inari at all relevant times intended to use, and did use, the patented seeds acquired from ATCC for unauthorized and improper commercial use. Inari acquired at least the seeds comprising the DP-4114 event for commercial use and to further its commercial interests.

65

225.    Indeed, Inari has publicly admitted that it acted with an intent to "bring these advanced products to market in less time and with less expense than the industry norm." *See https://inari.com/wp-content/uploads/2023/04/Inari-Fact-Sheet_04-2023.pdf.*

226.    Specifically, through at least the foregoing acts, Inari induced infringement of at least claim 8 of the '434 patent by inducing ATCC to sell, without authorization, the seed comprising corn event DP-4114 to Inari. Claim 8 of the '434 patent recites:

> 8. A seed comprising corn event DP-004114-3, wherein said seed comprises the DNA construct of claim 1, wherein a representative sample of corn event DP-004114-3 seed has been deposited with American Type Culture Collection (ATCC) with Accession No. PTA-11506.

227.    Through its infringement, Inari acquired an unfair commercial advantage, thereby damaging and causing irreparable harm to Corteva.

228.    Inari's inducement of infringement of the '434 patent was done intentionally and willfully. Inari had knowledge of the '434 patent covering the corn event comprising DP-4114. Inari had knowledge that ATCC would not (and could not) sell the patented deposited seeds relating to the corn event comprising DP-4114 for any commercial use, particularly in view of the claims of the '434 patent. With knowledge of the '434 patent and knowledge of the prohibited commercial use of the patented deposited seeds relating to the DP-4114 event, Inari willfully and intentionally induced ATCC to sell or otherwise transfer patented seeds comprising the corn event DP-4114, with knowledge and/or willful blindness to the fact that such sale or transfer by ATCC of the patented seeds to Inari for its commercial use was unauthorized and would, and did, infringe the '434 patent.

66

## COUNT VI

### Infringement Of U.S. Patent No. 7,956,246 Under 35 U.S.C. § 271(a)

### (Asserted Against All Defendants)

229.    Corteva incorporates herein by reference paragraphs 1 through 228 above as if fully set forth herein.

230.    The '246 patent discloses and claims corn seeds, plants, and tissues that include corn plant event DAS-59122. A biological sample comprising seeds that incorporate the invention, i.e., the transgenic event DAS-59122, was deposited with ATCC and given an ATCC accession number: PTA-11384.

231.    On information and belief, Defendants have infringed one or more claims of the '246 patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by using within the United States without authority corn seed comprising corn event DAS-59122 for which a representative sample is deposited under Accession No. PTA-11384 with ATCC.

232.    IE-SCS, acting as Defendants' agent, processed, packaged, and prepared to ship corn seeds comprising corn event DAS-59122 to Inari Belgium. IE-SCS processed seeds comprising corn event DAS-59122 for a USDA phytosanitary certificate before exporting these seeds to Belgium. The phytosanitary certificate provides phytosanitary certification of various U.S. agricultural seeds, crops, or plant products. A phytosanitary certificate was and is required to meet the phytosanitary requirements of the country of import.

233.    On information and belief, now and at the time IE-SCS exported the corn event DAS-59122 seeds, Belgium required that the phytosanitary certificate confirm the absence of certain bacterial pathogens in corn seeds being imported into the country. One or more laboratory tests are necessary for IE-SCS to have confirmed the absence of such bacterial pathogens. IE-SCS,

67

as agent of Inari Belgium, used the patented seeds in the United States to conduct, or have conducted, the required testing and inspection to obtain a USDA phytosanitary certificate.

234. Specifically, through at least the foregoing acts, Inari infringed at least claim 12 of the '246 patent through the phytosanitary testing it conducted on PTA-11384 seeds acquired from the ATCC. Claim 12 of the '246 patent is recited below:

12. A seed comprising in its genome the nucleotide sequence set forth in SEQ ID NO: 23.

235. As a direct and proximate consequence of Defendants' infringing conduct, Corteva has suffered and will continue to suffer irreparable injury and damages in an amount not yet determined for which Corteva is entitled to relief.

## COUNT VII

### Infringement Of U.S. Patent No. 7,956,246 Under 35 U.S.C. § 271(f)(2)

### (Asserted Against All Defendants)

236. Corteva repeats and incorporates by reference paragraphs 1 through 235 above as if fully set forth herein.

237. As discussed above, the '246 patent discloses and claims corn seeds, plants, and tissues that include corn plant event DAS-59122. A biological sample comprising seeds that incorporate the invention, i.e., the transgenic event DAS-59122, was deposited with ATCC and given an ATCC accession number: PTA-11384. For example, claim 10 of the '246 patent recites:

10. A plant comprising in its genome the nucleotide sequence set forth in SEQ ID NO: 23

238. Inari obtained samples from ATCC of the corn seed comprising corn event DAS-59122 deposited under Accession No. PTA-11384 and exported those samples from the United States to Inari Belgium, including by directing IE-SCS to arrange for this exportation at least in or about May 2020.

68

239.    This exportation was for commercial purposes.

240.    The plants grown in Inari Belgium's facilities comprising corn event DAS-59122 would have fallen within at least claim 10 of the '246 patent if they were grown in the United States.

241.    Defendants and IE-SCS never possessed a license to the '246 patent for commercial use, either expressly or implicitly.

242.    None of these entities or their agents has any right to use any seeds, corn event, or DNA construct claimed by the '246 patent beyond the right to access.

243.    Inari, with knowledge of the '246 patent, but without authority, via IE-SCS, supplied or caused to be supplied from the United States to Belgium corn seed comprising corn event DAS-59122 for which a representative sample is deposited under Accession No. PTA-11384 with ATCC.

244.    Components of Corteva's patented inventions that Inari exported include, at least, the claimed DNA construct, DAS-59122 corn event, and/or the corn seed for which a representative sample was deposited under Accession No. PTA-11384 with ATCC. When the claimed DNA construct, DAS-59122 corn event, and/or seed is combined with at least water, nutrients, light, air, and physical support it produces a plant as claimed in, *e.g.*, claim 10. Each of these components are especially made and adapted to be combined in a manner that would infringe the '246 patent, *e.g.*, growing, manipulating, and/or transforming a corn plant or part thereof from the exported DNA construct, DAS-59122 corn event, and/or seed, producing further seed from plants grown from the seed, deriving biological samples from said DNA construct, DAS-59122 corn event, and/or seed, and producing further corn varieties resistant to certain lepidopteran and coleopteran pests.

69

245.    The corn seed for which a representative sample was deposited under Accession No. PTA-11384 with ATCC, including the DNA construct, cells and tissues comprising each seed, and corn event DAS-59122 that the genomes of each seed comprise, all of which Inari has exported from the United States and imported into Belgium, are not staple articles of commerce suitable for substantial non-infringing use.

246.    Inari exported seeds containing corn event DAS-59122 to Belgium and used the exported seeds to then purportedly modify event DAS-59122, confirming an actual combination of claimed components and/or intent that such components be combined.

247.    Upon information and belief, for Inari to attempt to modify corn event DAS-59122, Inari at least directly practices claim 10 of the '246 patent in a manner that would infringe if done in the United States. Upon information and belief, Inari cannot introduce its genome engineering technology into cells comprising corn event DAS-59122 without obtaining a "plant" as broadly defined in the '246 patent from the exported seeds. Upon information and belief, Inari combines the exported seed or cells or tissue therefrom with, *inter alia*, sufficient water, nutrients, light, air, and physical support to obtain a "plant" compatible with methods by which Inari can then introduce any genome engineering technology component or components.

248.    Inari has directly infringed at least claim 10 of the '246 patent in violation of 35 U.S.C. § 271(f)(2). Inari knew that the components it exported and/or caused to be exported from the United States were adapted for the purpose of growing a claimed plant, or part thereof, and intended this export to allow Inari to make the required combinations outside the U.S. in a manner that would infringe at least claim 10 of the '246 patent if done in the United States. Additionally, Inari intended to use and did use the exported components for the commercial purpose of growing

70

a plant and then using the plant tissue and/or cells to develop a modified DAS-59122 event and seeds containing the modified event.

249. For example, a mode by which Inari purportedly modified corn event DAS-59122 was disclosed in Inari's patent directed to modifying corn event DAS-59122—the '397 patent—which expressly discusses modifying Corteva's DAS-59122 event. The abstract of the '397 patent states that "[t]ransgenic INIR4 maize plants comprising modifications of the DAS59122-7 maize locus which provide for facile excision of the modified DAS59122-7 transgenic locus or portions thereof, methods of making such plants, and use of such plants to facilitate breeding are disclosed." The disclosure of the '397 patent also refers directly to Corteva's '246 patent protecting DAS-59122 no fewer than six times.[8]

250. Inari's infringement of the '246 patent was, and continues to be, willful. At the time of export, Inari knew the seed deposited under Accession No. PTA-11384 was patented. Further, Inari has known that the DAS-59122 event was patented since November 22, 2022, at the latest, which is when Inari filed the '397 patent disclosing, *inter alia*, the '246 patent as an "example of a selected transgenic corn event which confers coleopteran insect pest tolerance [through] the DAS59122-7 transgenic maize event."

251. Corteva has been and continues to be damaged by Inari's infringement of the '246 patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

---

[8] *See e.g.*, the '397 patent, available at *https://patentcenter.uspto.gov/applications/18058081/ifw/docs? application=*, 5:61-65 ("As used herein, the term 'DAS59122-7' is used to refer to any of a transgenic maize locus, transgenic maize plants and parts thereof including seed set forth in U.S. Pat. No. 7,956,246, which is incorporated herein by reference in its entirety."); *see also id.*, 14:37-43 ("Sequences of the junction polynucleotides as well as the transgenic insert(s) of the DAS59122-7 transgenic locus which can be improved by the methods provided herein are set forth or otherwise provided in SEQ ID NO: 1, U.S. Pat. No. 7,956,246, the sequence of the DAS59122-7 locus in the deposited seed of ATCC accession No. PTA-11384, and elsewhere in this disclosure.")

252.    Inari's conduct in infringing the '246 patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## COUNT VIII

**Induced Infringement Of U.S. Patent No. 7,956,246 Under 35 U.S.C. § 271(b)**

**(Asserted Against All Defendants)**

253.    Corteva incorporates herein by reference paragraphs 1 through 252 above as if fully set forth herein.

254.    A biological sample comprising seeds reflecting the invention of the '246 patent, *i.e.*, the transgenic event DAS-59122, was deposited with ATCC. Specifically, seeds of the novel DAS-59122 event were deposited with ATCC and given an ATCC accession number: PTA-11384. '246 patent at 18:58-62. Such seed deposits are governed by ATCC's policies, terms of use, and agreements, including an MTA. *See https://www.atcc.org/policies/product-use-policies/material-transfer-agreement*.

255.    Inari obtained, without authorization and for a commercial use, seeds relating to the DAS-59122 event of the '246 patent from ATCC. Inari did so by inducing ATCC, on at least one occasion—June 25, 2020—to sell seeds deposited with the ATCC under PTA-11384 and reflecting the patented DAS-59122 transgenic event and ship them to Kellye Eversole, Infinite Eversole Strategic Crop Services, Arlington, Massachusetts. Neither ATCC nor LGC Standards was authorized to sell or transfer seeds for commercial use. Indeed, as discussed above, ATCC's standard MTA expressly prohibits a Recipient from using seeds for commercial purposes. On information and belief, Inari never intended to abide by these restrictions at the time it sought and obtained the seeds.

256. IE-SCS was acting as an agent for Inari to acquire the patented DAS-59122 event seeds and transferred the patented seeds to Inari.

257. On information and belief, at the time that Inari obtained the seeds comprising corn event DAS-59122 from ATCC, Inari had knowledge of the '246 patent covering the protected seeds for the DAS-59122 event. On its "Trait Stewardship" website, Corteva posts a non-exhaustive list of patents that cover its products. *See https://www.corteva.us/Resources/trait-stewardship.html*. The '246 patent appears on this list in connection with Herculex®.

258. At the time that Inari obtained the seeds comprising corn event DAS-59122 from ATCC, Inari had, on information and belief, a specific intent to induce infringement of the '246 patent by having ATCC sell and/or transfer the protected seeds to Inari's agent who then further transferred such seeds to Inari.

259. With knowledge of the '246 patent and knowledge that no commercial use of the patented deposited seeds relating to the DAS-59122 event was permitted, Inari at all relevant times intended to use, and did use, the patented seeds acquired from ATCC for unauthorized and improper commercial use. Inari acquired at least the seeds comprising the DAS-59122 event for commercial use and to further its commercial interests.

260. Indeed, Inari has publicly admitted that it acted with an intent to "bring these advanced products to market in less time and with less expense than the industry norm." *See https://inari.com/wp-content/uploads/2023/04/Inari-Fact-Sheet_04-2023.pdf*.

261. Specifically, through at least the foregoing acts, Inari induced infringement of at least claim 12 of the '246 patent by inducing ATCC to sell, without authorization, the seed comprising corn event DAS-59122 to Inari. Claim 12 of the '246 patent recites:

> 12. A seed comprising in its genome the nucleotide sequence set forth in SEQ ID NO: 23.

262. Through its infringement, Inari acquired an unfair commercial advantage, thereby damaging and causing irreparable harm to Corteva.

263. Inari's inducement of infringement of the '246 patent was done intentionally and willfully. Inari had knowledge of the '246 patent covering the corn event comprising DAS-59122. Inari had knowledge that ATCC would not (and could not) sell the patented deposited seeds relating to the corn event comprising DAS-59122 for any commercial use, particularly in view of the claims of the '246 patent. With knowledge of the '246 patent and knowledge of the prohibited commercial use of the patented deposited seeds relating to the DAS-59122 event, Inari willfully and intentionally induced ATCC to sell or otherwise transfer patented seeds comprising the corn event DAS-59122, with knowledge and/or willful blindness to the fact that such sale or transfer by ATCC of the patented seeds to Inari for its commercial use was unauthorized and would, and did, infringe the '246 patent.

## COUNT VIV

### Infringement Of U.S. Patent No. 8,283,522 Under 35 U.S.C. § 271(a)

### (Asserted Against All Defendants)

264. Corteva incorporates herein by reference paragraphs 1 through 263 above as if fully set forth herein.

265. The '522 patent discloses and claims soy seeds, plants, and tissues that include the gene coding for the AAD-12 protein. This gene is present in the DAS-44406 soy event. A biological sample comprising seeds that incorporate the invention, i.e., the transgenic event DAS-44406, was deposited with ATCC and given an ATCC accession number: PTA-11336.

266. On information and belief, Defendants have infringed one or more claims of the '522 patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by using

74

within the United States without authority soy seed comprising soy event DAS-44406 for which a representative sample is deposited under Accession No. PTA-11336 with ATCC.

267. On information and belief, IE-SCS, acting as Defendants' agent, processed, packaged, and prepared to ship soy seeds comprising soy event DAS-44406 to Inari Belgium. On information and belief, IE-SCS processed seeds comprising soy event DAS-44406 for a USDA phytosanitary certificate before exporting these seeds to Belgium. The phytosanitary certificate provides phytosanitary certification of various U.S. agricultural seeds, crops, or plant products. A phytosanitary certificate was and is required to meet the phytosanitary requirements of the country of import.

268. On information and belief, now and at the time IE-SCS exported the soy event DAS-44406 seeds, Belgium required that the phytosanitary certificate confirm the absence of certain bacterial pathogens in soy seeds being imported into the country. One or more laboratory tests are necessary for IE-SCS to have confirmed the absence of such bacterial pathogens. IE-SCS, as agent of Inari Belgium, used the patented seeds in the United States to conduct, or have conducted, the required testing and inspection to obtain a USDA phytosanitary certificate.

269. Specifically, through at least the foregoing acts, Inari infringed at least claim 13 of the '522 patent through the phytosanitary testing it conducted on PTA-11336 seeds acquired from the ATCC. For example, claim 13 of the '522 patent recites:

13. A seed comprising a plant cell of claim 1.

270. As a direct and proximate consequence of Defendants' infringing conduct, Corteva has suffered and will continue to suffer irreparable injury and damages in an amount not yet determined for which Corteva is entitled to relief.

75

## COUNT X

### Infringement Of U.S. Patent No. 8,283,522 Under 35 U.S.C. § 271(f)(2)

### (Asserted Against All Defendants)

271.    Corteva repeats and incorporates by reference paragraphs 1 through 270 above as if fully set forth herein.

272.    As discussed above, the '522 patent discloses and claims soy seeds, plants, and tissues that include the gene coding for the AAD-12 gene. This gene is present in the DAS-44406 soy event. A biological sample comprising seeds that incorporate the DAS-44406 soy event and the invention, *i.e.*, the AAD-12 gene, was deposited with ATCC and given an ATCC accession number: PTA-11336. For example, claim 2 of the '522 patent recites:

2. A plant comprising a plurality of cells of claim 1.

273.    Claim 1 of the '522 patent recites:

1. A plant cell comprising a polynucleotide that encodes a protein having aryloxyalkanoate dioxygenase activity, wherein said protein has at least 95% amino acid sequence identity with a sequence selected from the group consisting of SEQ ID NO:2 and SEQ ID NO:4.

274.    Inari obtained samples from ATCC of the soy seed comprising soy event DAS-44406 and the AAD-12 gene deposited under Accession No. PTA-11336 and exported those samples from the United States to Inari Belgium, including by directing IE-SCS to arrange for this exportation at least in or about September 2020 and again in October 2021.

275.    This exportation was for commercial purposes.

276.    The exported seed comprising the AAD-12 gene falls within at least claim 13 of the '522 patent.

277.    The plants grown in Inari Belgium's facilities comprising the AAD-12 gene would have fallen within at least claim 2 of the '522 patent if they were grown in the United States.

278.    Defendants and IE-SCS never possessed a license to the '522 patent for commercial use, either expressly or implicitly.

279.    None of these entities or their agents has any right to use any plant cell or seed claimed by the '522 patent beyond the right to access.

280.    Inari, with knowledge of the '522 patent, but without authority, via IE-SCS, supplied or caused to be supplied from the United States to Belgium soy seed comprising the AAD-12 gene and soy event DAS-44406 for which a representative sample is deposited under Accession No. PTA-11336 with ATCC.

281.    Components of Corteva's patented inventions that Inari exported include, at least, the claimed plant cell and/or the soy seed. When the claimed plant cell and/or seed is combined with at least water, nutrients, light, air, and physical support it produces a plant as claimed in, *e.g.*, claim 2. Each of these components are especially made and adapted to be combined in a manner that would infringe the '522 patent, *e.g.*, growing, manipulating, and/or transforming a soy plant or part thereof from the exported plant cell and/or seed, producing further seed from plants grown from the seed, deriving biological samples from said plant cell and/or seed, and producing further soy varieties.

282.    The plant cell and/or soy seed, all of which Inari has exported from the United States and imported into Belgium, are not staple articles of commerce suitable for substantial non-infringing use.

283.    Inari exported seeds containing the AAD-12 gene within soy event DAS-44406 to Belgium and used the exported seeds to then purportedly modify event DAS-44406, confirming an actual combination of claimed components and/or intent that such components be combined.

77

284. Upon information and belief, for Inari to attempt to modify soy event DAS-44406, Inari at least directly practices claim 2 of the '522 patent in a manner that would infringe if done in the United States. Upon information and belief, Inari cannot introduce its genome engineering technology into cells comprising the AAD-12 gene and/or soy event DAS-44406 without obtaining a "plant" as broadly defined in the '522 patent from the exported seeds. Upon information and belief, Inari combines the exported seed or cells or tissue therefrom with, *inter alia*, sufficient water, nutrients, light, air, and physical support to obtain a "plant" compatible with methods by which Inari can then introduce any genome engineering technology component or components.

285. Inari has directly infringed at least claim 2 of the '522 patent in violation of 35 U.S.C. § 271(f)(2). Inari knew that the components it exported and/or caused to be exported from the United States were adapted for the purpose of growing a claimed plant, or part thereof, and intended this export to allow Inari to make the required combinations outside the U.S. in a manner that would infringe at least claim 2 of the '522 patent if done in the United States. Additionally, Inari intended to use and did use the exported components for the commercial purpose of growing a plant and then using the plant tissue and/or cells to develop a modified DAS-44406 soy event and seeds containing the modified event.

286. For example, a mode by which Inari purportedly modified soy event DAS-44406 was disclosed in Inari's patent application directed to modifying soy event DAS-44406—the '822 publication—which expressly discusses modifying Corteva's DAS-44406 event. The abstract of the '822 publication states that "[t]ransgenic INHT26 soybean plants comprising modifications of the DAS44406-6 soybean locus which provide for facile excision of the modified DAS44406-6 transgenic locus or portions thereof, methods of making such plants, and use of such plants to facilitate breeding are disclosed."

78

287. Inari's infringement of the '522 patent was, and continues to be, willful and deliberate. At the time of export, Inari knew the seed deposited under Accession No. PTA-11336 was patented.

288. Corteva has been and continues to be damaged by Inari's infringement of the '522 patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

289. Inari's conduct in infringing the '522 patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## COUNT XI

### Induced Infringement Of U.S. Patent No. 8,283,522 Under 35 U.S.C. § 271(b)

### (Asserted Against All Defendants)

290. Corteva incorporates herein by reference paragraphs 1 through 289 above as if fully set forth herein.

291. The '522 patent discloses and claims soy seeds, plants, and tissues that include the gene coding for the AAD-12 gene. This gene is present in the DAS-44406 soy event. A biological sample comprising seeds that incorporate the DAS-44406 soy event and the invention, i.e., the AAD-12 gene, was deposited with ATCC and given an ATCC accession number: PTA-11336. Such seed deposits are governed by ATCC's policies, terms of use, and agreements, including an MTA. *See https://www.atcc.org/policies/product-use-policies/material-transfer-agreement*.

292. Inari obtained, without authorization and for a commercial use, seeds relating to the AAD-12 gene and DAS-44406 event from ATCC. Inari did so by inducing ATCC, on at least two occasions—October 7, 2020 and November 18, 2021—to sell seeds deposited with ATCC under PTA-11336 and reflecting the patented AAD-12 gene and ship them to Kellye Eversole, Infinite Eversole Strategic Crop Services, Arlington, Massachusetts. Neither ATCC nor LGC Standards

79

was authorized to sell or transfer seeds for commercial use. Indeed, as discussed above, ATCC's standard MTA expressly prohibits a Recipient from using seeds for commercial purposes. On information and belief, Inari never intended to abide by these restrictions at the time it sought and obtained the seeds.

293.    IE-SCS was acting as an agent for Inari to acquire the patented AAD-12 gene within the DAS-44406 soy event seeds and transferred the patented seeds to Inari.

294.    On information and belief, at the time that Inari obtained the seeds comprising the AAD-12 gene from ATCC, Inari had knowledge of the '522 patent covering the AAD-12 gene that is present in the DAS-44406 event.

295.    At the time that Inari obtained the seeds comprising the AAD-12 gene and soy event DAS-44406 from ATCC, Inari had, on information and belief, a specific intent to induce infringement of the '522 patent by having ATCC sell and/or transfer the protected seeds to Inari's agent who then further transferred such seeds to Inari.

296.    With knowledge of the '522 patent and knowledge that no commercial use of the patented deposited seeds relating to the AAD-12 gene was permitted, Inari at all relevant times intended to use, and did use, the patented seeds acquired from ATCC for unauthorized and improper commercial use. Inari acquired at least the seeds comprising the AAD-12 gene for commercial use and to further its commercial interests.

297.    Indeed, Inari has publicly admitted that it acted with an intent to "bring these advanced products to market in less time and with less expense than the industry norm." *See https://inari.com/wp-content/uploads/2023/04/Inari-Fact-Sheet_04-2023.pdf*.

298.    Specifically, through at least the foregoing acts, Inari induced infringement of at least claim 13 of the '522 patent by inducing ATCC to sell, without authorization, the seed

comprising the AAD-12 gene present in the DAS-44406 event to Inari. Claim 13 of the '522 patent recites:

> 13. A seed comprising a plant cell of claim 1.

299. Through its infringement, Inari acquired an unfair commercial advantage, thereby damaging and causing irreparable harm to Corteva.

300. Inari's inducement of infringement of the '522 patent was done intentionally and willfully. Inari had knowledge that the AAD-12 gene of the '522 patent was present in soy seeds containing the DAS-44406 event. Inari had knowledge that ATCC would not (and could not) sell the deposited seeds relating to the soy event comprising DAS-44406 and the patented AAD-12 gene for any commercial use. With knowledge of the prohibited commercial use of the patented deposited seeds, Inari willfully and intentionally induced ATCC to sell or otherwise transfer patented seeds comprising the AAD-12 gene, with knowledge and/or willful blindness to the fact that such sale or transfer by ATCC of the patented seeds to Inari for its commercial use was unauthorized and would, and did, infringe the '522 patent.

## COUNT XII

### Infringement Of U.S. Patent No. 8,680,363 Under 35 U.S.C. § 271(a)

### (Asserted Against All Defendants)

301. Corteva incorporates herein by reference paragraphs 1 through 300 above as if fully set forth herein.

302. The '363 patent discloses and claims soy seeds, plants, and tissues that include the soybean event DAS-81419. A biological sample comprising seeds that incorporate the invention, i.e., the transgenic event DAS-81419, was deposited with ATCC and given an ATCC accession number: PTA-12006.

81

303.    On information and belief, Defendants have infringed one or more claims of the '363 patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by using within the United States without authority soy seed comprising soy event DAS-81419 for which a representative sample is deposited under Accession No. PTA-12006 with ATCC.

304.    IE-SCS, acting as Defendants' agent, processed, packaged, and prepared to ship soy seeds comprising soy event DAS-81419 to Inari Belgium. IE-SCS processed seeds comprising soy event DAS-81419 for a USDA phytosanitary certificate before exporting these seeds to Belgium. The phytosanitary certificate provides phytosanitary certification of various U.S. agricultural seeds, crops, or plant products. A phytosanitary certificate was and is required to meet the phytosanitary requirements of the country of import.

305.    On information and belief, now and at the time IE-SCS exported the soy event DAS-81419 seeds, Belgium required that the phytosanitary certificate confirm the absence of certain bacterial pathogens in soy seeds being imported into the country. One or more laboratory tests are necessary for IE-SCS to have confirmed the absence of such bacterial pathogens. IE-SCS, as agent of Inari Belgium, used the patented seeds in the United States to conduct, or have conducted, the required testing and inspection to obtain a USDA phytosanitary certificate.

306.    Specifically, through at least the foregoing acts, Inari infringed at least claim 8 of the '363 patent through the phytosanitary testing it conducted on PTA-12006 seeds acquired from the ATCC. For example, claim 8 of the '363 patent recites:

> 8. A seed or a part of the plant of claim 7, wherein said seed or part comprises SEQ ID NO:14.

307.    As a direct and proximate consequence of Defendants' infringing conduct, Corteva has suffered and will continue to suffer irreparable injury and damages in an amount not yet determined for which Corteva is entitled to relief.

82

## COUNT XIII

### Infringement Of U.S. Patent No. 8,680,363 Under 35 U.S.C. § 271(f)(2)

### (Asserted Against All Defendants)

308.    Corteva repeats and incorporates by reference paragraphs 1 through 307 above as if fully set forth herein.

309.    As discussed above, the '363 patent discloses and claims soy seeds, plants, and tissues that include soy plant event DAS-81419. A biological sample comprising seeds that incorporate the invention, *i.e.*, the transgenic event DAS-81419, was deposited with ATCC and given an ATCC accession number: PTA-12006. For example, claim 7 of the '363 patent recites:

> 7. A soybean plant, wherein representative seed of said soybean plant has been deposited with the American Type Culture Collection under Accession No. PTA-12006.

310.    Inari obtained samples from ATCC of the soy seed comprising soy event DAS-81419 deposited under Accession No. PTA-12006 and exported those samples from the United States to Inari Belgium, including by directing IE-SCS to arrange for this exportation at least in or about September 2020 and again in October 2021.

311.    This exportation was for commercial purposes.

312.    The plants grown in Inari Belgium's facilities comprising corn event DAS-81419 would have fallen within at least claim 7 of the '363 patent if they were grown in the United States.

313.    Defendants and IE-SCS never possessed a license to the '363 patent for commercial use, either expressly or implicitly.

314.    None of these entities or their agents has any right to use any seed or soy event claimed by the '363 patent beyond the right to access.

315.    Inari, with knowledge of the '363 patent, but without authority, via IE-SCS, supplied or caused to be supplied from the United States to Belgium soy seed comprising soy event

DAS-81419 for which a representative sample is deposited under Accession No. PTA-12006 with ATCC.

316.    Components of Corteva's patented inventions that Inari exported include, at least, the DAS-81419 soy event, and/or the claimed soy seed for which a representative sample was deposited under Accession No. PTA-12006 with ATCC. When the DAS-81419 soy event and/or the claimed seed is combined with at least water, nutrients, light, air, and physical support it produces a plant as claimed in, *e.g.*, claim 7. Each of these components are especially made and adapted to be combined in a manner that would infringe the '363 patent, *e.g.*, growing, manipulating, and/or transforming a soy plant or part thereof from the exported DAS-81419 soy event and/or seed, producing further seed from plants grown from the seed, deriving biological samples from said DAS-81419 soy event and/or seed, and producing further soy varieties resistant to certain lepidopteran and coleopteran pests.

317.    The soy seed for which a representative sample was deposited under Accession No. PTA-12006 with ATCC, including the cells and tissues comprising each seed, and soy event DAS-81419 that the genomes of each seed comprise, all of which Inari has exported from the United States and imported into Belgium, are not staple articles of commerce suitable for substantial non-infringing use.

318.    Inari exported seeds containing soy event DAS-81419 to Belgium and used the exported seeds to then purportedly modify event DAS-81419, confirming an actual combination of claimed components and/or intent that such components be combined.

319.    Upon information and belief, for Inari to attempt to modify soy DAS-81419, Inari at least directly practices claim 7 of the '363 patent in a manner that would infringe if done in the United States. Upon information and belief, Inari cannot introduce its genome engineering

84

technology into cells comprising soy event DAS-81419 without obtaining a "plant" as broadly defined in the '363 patent from the exported seeds. Upon information and belief, Inari combines the exported seed or cells or tissue therefrom with, *inter alia*, sufficient water, nutrients, light, air, and physical support to obtain a "plant" compatible with methods by which Inari can then introduce any genome engineering technology component or components.

320.   Inari has directly infringed at least claim 7 of the '363 patent in violation of 35 U.S.C. § 271(f)(2). Inari knew that the components it exported and/or caused to be exported from the United States were adapted for the purpose of growing a claimed plant, or part thereof, and intended this export to allow Inari to make the required combinations outside the U.S. in a manner that would infringe at least claim 7 of the '363 patent if done in the United States. Additionally, Inari intended to use and did use the exported components for the commercial purpose of growing a plant and then using the plant tissue and/or cells to develop a modified DAS-81419 event and seeds containing the modified event.

321.   For example, a mode by which Inari purportedly modified soy event DAS-81419 was disclosed in Inari's patent directed to modifying soy event DAS-81419— the '630 patent— which expressly discusses modifying Corteva's DAS-81419 event. The abstract of the '630 patent states that "[t]ransgenic INIR19 soybean plants comprising modifications of the DAS81419 soybean locus which provide for facile excision of the modified DAS81419 transgenic locus or portions thereof, methods of making such plants, and use of such plants to facilitate breeding are disclosed." The disclosure of the '630 patent also refers directly to Corteva's '363 patent protecting DAS-81419 no fewer than six times.[9]

---

[9] *See e.g.*, the '630 patent, available at https://patentcenter.uspto.gov/applications/18057867, 5:61-64 ("As used herein, the term 'DAS81419' is used to refer to any of a transgenic soybean locus,

322.    Inari's infringement of the '363 patent was, and continues to be, willful and deliberate. At the time of export, Inari knew the seed deposited under Accession No. PTA-12006 was patented. Further on November 22, 2022, Inari filed the '630 patent disclosing, *inter alia*, the '363 patent as an "example[] of a selected transgenic soybean event which confers lepidopteran insect pest tolerance and herbicide tolerance [through] the DAS81419 transgenic soybean event."

323.    Corteva has been and continues to be damaged by Inari's infringement of the '363 patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

324.    Inari's conduct in infringing the '363 patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## COUNT XIV

### Induced Infringement Of U.S. Patent No. 8,680,363 Under 35 U.S.C. § 271(b)

### (Asserted Against All Defendants)

325.    Corteva incorporates herein by reference paragraphs 1 through 324 above as if fully set forth herein.

326.    A biological sample comprising seeds reflecting the invention of the '363 patent, *i.e.*, the transgenic event DAS-81419, was deposited with ATCC. Specifically, seeds of the novel DAS-81419 event were deposited with ATCC and given an ATCC accession number: PTA-12006. '363 patent at 4:62-67. Such seed deposits are governed by ATCC's policies, terms of use, and

---

transgenic soybean plants and parts thereof including seed set forth in U.S. Pat. No. 8,680,363, which is incorporated herein by reference in its entirety."); *see also id.*, 13:66-14:5 ("Sequences of the junction polynucleotides as well as the transgenic insert(s) of the DAS81419 transgenic locus which can be improved by the methods provided herein are set forth or otherwise provided in SEQ ID NO: 1, US 8,680,363, the sequence of the DAS81419 locus in the deposited seed of ATCC accession No. PTA-12006, and elsewhere in this disclosure.").

agreements, including an MTA. *See https://www.atcc.org/policies/product-use-policies/material-transfer-agreement*.

327.    Inari obtained, without authorization and for a commercial use, seeds relating to the DAS-81419 event of the '363 patent from ATCC. Inari did so by inducing ATCC, on at least two occasions—October 7, 2020 and November 18, 2021—to sell seeds deposited with the ATCC under PTA-12006 and reflecting the patented DAS-81419 transgenic event and ship them to Kellye Eversole, Infinite Eversole Strategic Crop Services, Arlington, Massachusetts. Neither ATCC nor LGC Standards was authorized to sell or transfer seeds for commercial use. Indeed, as discussed above, ATCC's standard MTA expressly prohibits a Recipient from using seeds for commercial purposes. On information and belief, Inari never intended to abide by these restrictions at the time it sought and obtained the seeds.

328.    IE-SCS was acting as an agent for Inari to acquire the patented DAS-81419 event seeds and transferred the patented seeds to Inari.

329.    On information and belief, at the time that Inari obtained the seeds comprising soy event DAS-81419 from ATCC, Inari had knowledge of the '363 patent covering the protected seeds for the DAS-81419 event.

330.    At the time that Inari obtained the seeds comprising soy event DAS-81419 from ATCC, Inari had, on information and belief, a specific intent to induce infringement of the '363 patent by having ATCC sell and/or transfer the protected seeds to Inari's agent who then further transferred such seeds to Inari.

331.    With knowledge of the '363 patent and knowledge that no commercial use of the patented deposited seeds relating to the DAS-81419 event was permitted, Inari at all relevant times intended to use, and did use, the patented seeds acquired from ATCC for unauthorized and

87

improper commercial use. Inari acquired at least the seeds comprising the DAS-81419 event for commercial use and to further its commercial interests.

332.    Indeed, Inari has publicly admitted that it acted with an intent to "bring these advanced products to market in less time and with less expense than the industry norm." *See https://inari.com/wp-content/uploads/2023/04/Inari-Fact-Sheet_04-2023.pdf*.

333.    Specifically, through at least the foregoing acts, Inari induced infringement of at least claim 8 of the '363 patent by inducing ATCC to sell, without authorization, the seed comprising corn event DAS-81419 to Inari. Claim 8 of the '363 patent recites:

> 8. A seed or a part of the plant of claim 7, wherein said seed or part comprises SEQ ID NO:14.

334.    Through its infringement, Inari acquired an unfair commercial advantage, thereby damaging and causing irreparable harm to Corteva.

335.    Inari's inducement of infringement of the '363 patent was done intentionally and willfully. Inari had knowledge of the '363 patent covering the soy event comprising DAS-81419. Inari had knowledge that ATCC would not (and could not) sell the patented deposited seeds relating to the soy event comprising DAS-81419 for any commercial use, particularly in view of the claims of the '363 patent. With knowledge of the '363 patent and knowledge of the prohibited commercial use of the patented deposited seeds relating to the DAS-81419 event, Inari willfully and intentionally induced ATCC to sell or otherwise transfer patented seeds comprising the soy event DAS-81419, with knowledge and/or willful blindness to the fact that such sale or transfer by ATCC of the patented seeds to Inari for its commercial use was unauthorized and would, and did, infringe the '363 patent.

88

## COUNT XV

### Infringement Of U.S. Patent No. 9,695,441 Under 35 U.S.C. § 271(a)

### (Asserted Against All Defendants)

336.    Corteva incorporates herein by reference paragraphs 1 through 335 above as if fully set forth herein.

337.    The '441 patent discloses and claims soy seeds, plants, and tissues that include soy plant event DAS-81419. A biological sample comprising seeds that incorporate the invention, i.e., the transgenic event DAS-81419, was deposited with ATCC and given an ATCC accession number: PTA-12006.

338.    On information and belief, Defendants have infringed one or more claims of the '441 patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by using within the United States without authority soy seed comprising soy event DAS-81419 for which a representative sample is deposited under Accession No. PTA-12006 with ATCC.

339.    IE-SCS, acting as Defendants' agent, processed, packaged, and prepared to ship soy seeds comprising soy event DAS-81419 to Inari Belgium. IE-SCS processed seeds comprising soy event DAS-81419 for a USDA phytosanitary certificate before exporting these seeds to Belgium. The phytosanitary certificate provides phytosanitary certification of various U.S. agricultural seeds, crops, or plant products. A phytosanitary certificate was and is required to meet the phytosanitary requirements of the country of import.

340.    On information and belief, now and at the time IE-SCS exported the soy event DAS-81419 seeds, Belgium required that the phytosanitary certificate confirm the absence of certain bacterial pathogens in soy seeds being imported into the country. One or more laboratory tests are necessary for IE-SCS to have confirmed the absence of such bacterial pathogens. IE-SCS,

89

as agent of Inari Belgium, used the patented seeds in the United States to conduct, or have conducted, the required testing and inspection to obtain a USDA phytosanitary certificate.

341.    Specifically, through at least the foregoing acts, Inari infringed at least claim 2 of the '441 patent through the phytosanitary testing it conducted on PTA-12006 seeds acquired from ATCC. For example, claim 2 of the '441 patent recites:

> 2. A soybean plant, seed, or other part of said plant comprising the polynucleotide of claim 1.

342.    Claim 1 of the '441 patent recites:

> 1. A polynucleotide comprising SEQ ID NO:14.

343.    As a direct and proximate consequence of Defendants' infringing conduct, Corteva has suffered and will continue to suffer irreparable injury and damages in an amount not yet determined for which Corteva is entitled to relief.

## COUNT XVI

### Infringement Of U.S. Patent No. 9,695,441 Under 35 U.S.C. § 271(f)(2)

### (Asserted Against All Defendants)

344.    Corteva repeats and incorporates by reference paragraphs 1 through 343 above as if fully set forth herein.

345.    As discussed above, the '441 patent discloses and claims soy seeds, plants, and tissues that include soy plant event DAS-81419. A biological sample comprising seeds that incorporate the invention, *i.e.*, the transgenic event DAS-81419, was deposited with ATCC and given an ATCC accession number: PTA-12006. For example, claim 2 of the '441 patent recites:

> 2. A soybean plant, seed, or other part of said plant comprising the polynucleotide of claim 1.

346.    Inari obtained samples from ATCC of the soy seed comprising soy event DAS-81419 deposited under Accession No. PTA-12006 and exported those samples from the United

90

States to Inari Belgium, including by directing IE-SCS to arrange for this exportation at least in or about September 2020 and again in October 2021.

347. This exportation was for commercial purposes.

348. The plants grown in Inari Belgium's facilities comprising corn event DAS-81419 would have fallen within at least claim 2 of the '441 patent if they were grown in the United States.

349. Defendants and IE-SCS never possessed a license to the '441 patent for commercial use, either expressly or implicitly. None of these entities or their agents has any right to use any seeds, soy event, or polynucleotide claimed by the '441 patent beyond the right to access.

350. Inari, with knowledge of the '441 patent, but without authority, via IE-SCS, supplied or caused to be supplied from the United States to Belgium soy seed comprising soy event DAS-81419 for which a representative sample is deposited under Accession No. PTA-12006 with ATCC.

351. Components of Corteva's patented inventions that Inari exported include, at least, the claimed polynucleotide, DAS-81419 soy event, and/or the soy seed for which a representative sample was deposited under Accession No. PTA-12006 with ATCC. When the claimed polynucleotide, DAS-81419 soy event, and/or seed is combined with at least water, nutrients, light, air, and physical support it produces a plant as claimed in, *e.g.*, claim 2. Each of these components are especially made and adapted to be combined in a manner that would infringe the '441 patent, *e.g.*, growing, manipulating, and/or transforming a soy plant or part thereof from the exported polynucleotide, DAS-81419 soy event, and/or seed, producing further seed from plants grown from the seed, deriving biological samples from said polynucleotide, DAS-81419 soy event, and/or seed, and producing further soy varieties resistant to certain lepidopteran and coleopteran pests.

352.    The soy seed for which a representative sample was deposited under Accession No. PTA-12006 with ATCC, including the polynucleotide, cells and tissues comprising each seed, and soy event DAS-81419 that the genomes of each seed comprise, all of which Inari has exported from the United States and imported into Belgium, are not staple articles of commerce suitable for substantial non-infringing use.

353.    Inari exported seeds containing soy event DAS-81419 to Belgium and used the exported seeds to then purportedly modify event DAS-81419, confirming an actual combination of claimed components and/or intent that such components be combined.

354.    Upon information and belief, for Inari to attempt to modify soy DAS-81419, Inari at least directly practices claim 2 of the '441 patent in a manner that would infringe if done in the United States. Upon information and belief, Inari cannot introduce its genome engineering technology into cells comprising soy event DAS-81419 without obtaining a "plant" as broadly defined in the '441 patent from the exported seeds. Upon information and belief, Inari combines the exported seed or cells or tissue therefrom with, *inter alia*, sufficient water, nutrients, light, air, and physical support to obtain a "plant" compatible with methods by which Inari can then introduce any genome engineering technology component or components.

355.    Inari has directly infringed at least claim 2 of the '441 patent in violation of 35 U.S.C. § 271(f)(2). Inari knew that the components it exported and/or caused to be exported from the United States were adapted for the purpose of growing a claimed plant, or part thereof, and intended this export to allow Inari to make the required combinations outside the U.S. in a manner that would infringe at least claim 2 of the '441 patent if done in the United States. Additionally, Inari intended to use and did use the exported components for the commercial purpose of growing

92

a plant and then using the plant tissue and/or cells to develop a modified DAS-81419 event and seeds containing the modified event.

356.    For example, a mode by which Inari purportedly modified soy event DAS-81419 was disclosed in Inari's patent directed to modifying soy event DAS-81419—the '630 patent—which expressly discusses modifying Corteva's DAS-81419 event. The abstract of the '630 patent states that "[t]ransgenic INIR19 soybean plants comprising modifications of the DAS81419 soybean locus which provide for facile excision of the modified DAS81419 transgenic locus or portions thereof, methods of making such plants, and use of such plants to facilitate breeding are disclosed."

357.    Inari's infringement of the '441 patent was, and continues to be, willful and deliberate. At the time of export, Inari knew the seed deposited under Accession No. PTA-12006 was patented.

358.    Corteva has been and continues to be damaged by Inari's infringement of the '441 patent and will suffer irreparable injury unless the infringement is enjoined by this Court.

359.    Inari's conduct in infringing the '441 patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

**COUNT XVII**

**Induced Infringement Of U.S. Patent No. 9,695,441 Under 35 U.S.C. § 271(b)**

**(Asserted Against All Defendants)**

360.    Corteva incorporates herein by reference paragraphs 1 through 359 above as if fully set forth herein.

361.    A biological sample comprising seeds reflecting the invention of the '441 patent, *i.e.*, the transgenic event DAS-81419, was deposited with ATCC. Specifically, seeds of the novel

93

DAS-81419 event were deposited with ATCC and given an ATCC accession number: PTA-12006. '441 patent at 4:62-66. Such seed deposits are governed by ATCC's policies, terms of use, and agreements, including an MTA. *See https://www.atcc.org/policies/product-use-policies/material-transfer-agreement.*

362. Inari obtained, without authorization and for a commercial use, seeds relating to the DAS-81419 event of the '441 patent from ATCC. Inari did so by inducing ATCC, on at least two occasions—October 7, 2020 and November 18, 2021—to sell seeds deposited with the ATCC under PTA-12006 and reflecting the patented DAS-81419 transgenic event and ship them to Kellye Eversole, Infinite Eversole Strategic Crop Services, Arlington, Massachusetts. Neither ATCC nor LGC Standards was authorized to sell or transfer seeds for commercial use. Indeed, as discussed above, ATCC's standard MTA expressly prohibits a Recipient from using seeds for commercial purposes. On information and belief, Inari never intended to abide by these restrictions at the time it sought and obtained the seeds.

363. IE-SCS was acting as an agent for Inari to acquire the patented DAS-81419 event seeds and transferred the patented seeds to Inari.

364. On information and belief, at the time that Inari obtained the seeds comprising soy event DAS-81419 from ATCC, Inari had knowledge of the '441 patent covering the protected seeds for the DAS-81419 event.

365. At the time that Inari obtained the seeds comprising soy event DAS-81419 from ATCC, Inari had, on information and belief, a specific intent to induce infringement of the '441 patent by having ATCC sell and/or transfer the protected seeds to Inari's agent who then further transferred such seeds to Inari.

94

366.    With knowledge of the '441 patent and knowledge that no commercial use of the patented deposited seeds relating to the DAS-81419 event was permitted, Inari at all relevant times intended to use, and did use, the patented seeds acquired from ATCC for unauthorized and improper commercial use. Inari acquired at least the seeds comprising the DAS-81419 event for commercial use and to further its commercial interests.

367.    Indeed, Inari has publicly admitted that it acted with an intent to "bring these advanced products to market in less time and with less expense than the industry norm." *See https://inari.com/wp-content/uploads/2023/04/Inari-Fact-Sheet_04-2023.pdf*.

368.    Specifically, through at least the foregoing acts, Inari induced infringement of at least claim 2 of the '441 patent by inducing ATCC to sell, without authorization, the seed comprising corn event DAS-81419 to Inari. For example, claim 2 of the '441 patent recites:

> 2. A soybean plant, seed, or other part of said plant comprising the polynucleotide of claim 1.

369.    Through its infringement, Inari acquired an unfair commercial advantage, thereby damaging and causing irreparable harm to Corteva.

370.    Inari's inducement of infringement of the '441 patent was done intentionally and willfully. Inari had knowledge of the '441 patent covering the soy event comprising DAS-81419. Inari had knowledge that ATCC would not (and could not) sell the patented deposited seeds relating to the soy event comprising DAS-81419 for any commercial use, particularly in view of the claims of the '441 patent. With knowledge of the '441 patent and knowledge of the prohibited commercial use of the patented deposited seeds relating to the DAS-81419 event, Inari willfully and intentionally induced ATCC to sell or otherwise transfer patented seeds comprising the soy event DAS-81419, with knowledge and/or willful blindness to the fact that such sale or transfer by

95

ATCC of the patented seeds to Inari for its commercial use was unauthorized and would, and did, infringe the '441 patent.

## COUNT XVIII

### Breach Of Material Transfer Agreements

### (Asserted Against Inari Belgium)

371.    Corteva incorporates herein by reference paragraphs 1 through 370 as if fully set forth herein.

372.    Upon information and belief, each provision of Corteva's protected seeds by ATCC to Inari is subject to either the 2019 MTA or 2022 MTA, described above. *See supra* Paragraphs 86 through 103. Those agreements prohibit Inari Belgium from exporting, transferring, or otherwise distributing the seeds for financial or commercial purposes.

373.    The 2019 MTA and 2022 MTA also prohibit Inari Belgium from transferring Corteva's protected seeds, or their progeny, to any other entity (including Inari USA) that might violate the use restrictions contained in these agreements.

374.    On information and belief, the 2019 MTA and 2022 MTA were each intended to protect the interests of "Contributors" like Corteva, who deposit seeds containing highly valuable germplasm with ATCC. ATCC explains on its website that "[t]he MTA protects the rights of all parties involved in the exchange of biomaterials from the original contributor and distribution of the material." *See https://www.atcc.org/support/technical-support/faqs/material-transfer-agreement-mta*. ATCC further states that the MTA "protects the right of the contributor." *See https://www.atcc.org/support/technical-support/faqs/importance-of-material-transfer-agreement*.

375.    The 2019 MTA and 2022 MTA each contain "Scope of Use" sections that broadly prohibit purchasers, like Inari Belgium, from using the acquired seeds for any commercial purpose,

96

which can only be understood as a benefit intended for the Contributor because ATCC has no commercial interest in the seeds and is a non-profit international depository association.

376. The 2019 MTA and 2022 MTA each acknowledge that the protected seeds may contain intellectual property belonging to third parties and that it was Inari Belgium's obligation to obtain any necessary licenses from those third parties. Inari Belgium has never acquired any license from Corteva.

377. The 2019 MTA and 2022 MTA each affirm that "ATCC and/or its Contributors shall retain ownership of all right, title and interest" in the protected seeds.

378. Neither the 2019 MTA nor 2022 MTA contain any disclaimer of third-party beneficiaries, as is common in commercial contracts where such an exclusion is intended.

379. In clear disregard of their own agreement not to use the protected seeds for commercial purposes—without which they would not have been able to acquire the seeds—Inari Belgium obtained and used Corteva's protected seeds for the express purpose of developing their own commercial products, which Inari intends to sell for its own commercial benefit. Indeed, Inari's February 9, 2022, press release brags that "Inari has created a unique opportunity to deliver proven GM [genetically modified] traits in combination with novel gene edits to plants' natural DNA." *See inari.com/inari-to-bring-growers-proprietary-gm-traits-in-tandem-with-novel-gene-edits/.* Those "GM Traits" include traits that Corteva has developed through its painstaking research and development, at great time and cost, and which are subject to Corteva's patents and other intellectual property rights and ownership interests, including PVP Certificates. This press release highlights that Inari had successfully obtained a patent over certain "corn plants comprising an edited DP-004114-3 corn trait," which is a trait developed and patented by Corteva that was

97

contained in protected seeds stored at ATCC, and, according to Inari, "[t]he grant of [this patent] . . . makes [Corteva's variety] *proprietary to Inari*." *Id.* (emphasis added).

380.    In other words, Inari, with the help of their agent IE-SCS, took Corteva's protected seeds from ATCC, exported them out of the country in a transparent attempt to avoid the reach of patent and PVP protection laws within the United States, genetically modified them abroad, and now seeks to bring these genetic modifications to market in the United States. Inari's February 9, 2022, press release *admits* that its purpose for acquiring and using Corteva's protected seed lines was always commercial in nature: "We aim to commercialize our products in the coming years." *Id.* Such blatantly commercial activity violates the MTAs' express prohibition on using the seeds Inari acquired from ATCC for any commercial purpose.

381.    The 2019 MTA and 2022 MTA each state that "any breach may create . . . irreparable injury" and authorizes ATCC to seek preliminary and permanent injunctive relief. Although ATCC has not yet chosen to seek such relief, Corteva is suffering irreparable injury by Inari's actions. As an intended beneficiary of the MTA, Corteva is also entitled to seek equitable relief.

382.    Although the 2019 MTA and 2022 MTA contain facially conflicting forum selection clauses, with the former requiring claims to be resolved in Virginia and latter requiring claims to be resolved in New York, these conflicting clauses should be disregarded because duplicative and parallel litigation in multiple forums would be an unnecessary waste of judicial resources. Corteva's claims under the 2019 MTA and 2022 MTA arise from the same operative facts that give rise to Corteva's other claims asserted herein since all asserted claims arise from Inari's same improper acquisition and use of Corteva's protected seeds from ATCC. Accordingly, this claim should be tried alongside each of the other claims asserted herein.

383.    Defendants have injured Corteva by misappropriating Corteva's protected seeds and using them for commercial purposes that are expressly prohibited by the MTAs, which prohibitions exist primarily for Corteva's benefit. As an intended third-party beneficiary of the MTAs, Corteva seeks all appropriate equitable relief, which may include specific performance of the MTAs, an injunction requiring the return of Corteva's protected seeds, and any progeny or derivatives thereof, and/or an injunction prohibiting Inari from further pursuing any commercial endeavor based on the materials it obtained pursuant to the MTAs. Corteva further seeks compensatory damages in an amount to be proven at trial.

## COUNT XVIV

### Breach Of Material Transfer Agreement

### (Asserted Against Inari USA)

384.    Corteva incorporates herein by reference paragraphs 1 through 383 as if fully set forth herein.

385.    Upon information and belief, each provision of Corteva's protected seeds by ATCC to Inari is subject to either the 2017 MTA or 2022 MTA, described above. *See supra* Paragraphs 104 through 121. Those agreements prohibit Inari USA from exporting, transferring, or otherwise distributing the seeds for financial or commercial purposes.

386.    The 2017 MTA and 2022 MTA also prohibit Inari USA from transferring Corteva's protected seeds, or their progeny, to any other entity that might violate the use restrictions contained in these agreements.

387.    On information and belief, the 2017 MTA and 2022 MTA were each intended to protect the interests of "Contributors" like Corteva, who deposit seeds containing highly valuable germplasm with ATCC. ATCC explains on its website that "[t]he MTA protects the rights of all

99

parties involved in the exchange of biomaterials from the original contributor and distribution of the material." *See https://www.atcc.org/support/technical-support/faqs/material-transfer-agreement-mta*. ATCC further states that the MTA "protects the right of the contributor." *See https://www.atcc.org/support/technical-support/faqs/importance-of-material-transfer-agreement*.

388.    The 2017 MTA and 2022 MTA each contain "Scope of Use" sections that broadly prohibit purchasers, like Inari USA, from using the acquired seeds for any commercial purpose, which can only be understood as a benefit intended for the Contributor because ATCC has no commercial interest in the seeds and is a non-profit international depository association.

389.    The 2017 MTA and 2022 MTA each acknowledge that the protected seeds may contain intellectual property belonging to third parties and that it was Inari USA's obligation to obtain any necessary licenses from those third parties. Inari USA has never acquired any license from Corteva.

390.    The 2017 MTA and 2022 MTA each affirm that "ATCC and/or its Contributors shall retain ownership of all right, title and interest" in the protected seeds.

391.    Neither the 2017 MTA nor 2022 MTA contain any disclaimer of third-party beneficiaries, as is common in commercial contracts where such an exclusion is intended.

392.    In clear disregard of their own agreement not to use the protected seeds for commercial purposes—without which they would not have been able to acquire the seeds—Inari USA obtained and used Corteva's protected seeds for the express purpose of developing their own commercial products, which Inari intends to sell for its own commercial benefit. Indeed, Inari's February 9, 2022, press release brags that "Inari has created a unique opportunity to deliver proven GM [genetically modified] traits in combination with novel gene edits to plants' natural DNA." *See inari.com/inari-to-bring-growers-proprietary-gm-traits-in-tandem-with-novel-gene-edits/*.

Those "GM Traits" include traits that Corteva has developed through its painstaking research and development, at great time and cost, and which are subject to Corteva's patents and other intellectual property rights and ownership interests, including PVP Certificates.

393.    The 2017 MTA and 2022 MTA each state that "any breach may create . . . irreparable injury" and authorizes ATCC to seek preliminary and permanent injunctive relief. Although ATCC has not yet chosen to seek such relief, Corteva is suffering irreparable injury by Inari's actions. As an intended beneficiary of the MTA, Corteva is also entitled to seek equitable relief.

394.    Although the 2017 MTA and 2022 MTA contain facially conflicting forum selection clauses, with the former requiring claims to be resolved in Virginia and latter requiring claims to be resolved in New York, these conflicting clauses should be disregarded because duplicative and parallel litigation in multiple forums would be an unnecessary waste of judicial resources. Corteva's claims under the 2017 MTA and 2022 MTA arise from the same operative facts that give rise to Corteva's other claims asserted herein since all asserted claims arise from Inari's same improper acquisition and use of Corteva's protected seeds from ATCC. Accordingly, this claim should be tried alongside each of the other claims asserted herein.

395.    Defendants have injured Corteva by misappropriating Corteva's protected seeds and using them for commercial purposes that are expressly prohibited by the MTAs, which prohibitions exist primarily for Corteva's benefit. As an intended third-party beneficiary of the MTAs, Corteva seeks all appropriate equitable relief, which may include specific performance of the MTAs, an injunction requiring the return of Corteva's protected seeds, and any progeny or derivatives thereof, and/or an injunction prohibiting Inari from further pursuing any commercial

101

endeavor based on the materials it obtained pursuant to the MTAs. Corteva further seeks compensatory damages in an amount to be proven at trial.

## COUNT XX

### Violation of Massachusetts General Law Chapter 93A

### (Asserted against Inari USA)

396.    Corteva incorporates herein by reference paragraphs 1 through 395 above as if fully set forth herein.

397.    Inari USA maintains its principal place of business in Massachusetts and, accordingly, is subject to the laws of Massachusetts, including Chapter 93A of Massachusetts' General Laws ("Chapter 93A"), which prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

398.    Inari USA participated in unfair and deceptive acts that violate Chapter 93A. As set forth above, Inari USA knowingly violated its own contractual obligations under the MTA in an effort to obtain an unauthorized commercial benefit from the use of Corteva's patent-protected and PVP-protected seeds. Upon information and belief, ATCC would not have provided the protected seeds to Inari if Inari had disclosed its commercial intentions.

399.    After misappropriating the protected seeds for its own financial gain, Inari USA carefully avoided disclosing to Corteva the full extent to which Inari was impermissibly exploiting Corteva's property. When Inari first disclosed to Corteva, in September 2021, that it had acquired two of Corteva's proprietary events and would seek to monetize them, Inari sought to pressure Corteva into a *quid pro quo* agreement under which Inari offered to not sell corn seeds containing these two proprietary events that Corteva had developed only if Corteva would provide Inari financial incentive in the form of an agreement to use Inari's soybean products.

102

400.    After September 2021, Corteva began to inquire how Inari USA had obtained Corteva's protected seed lines, but Inari USA still withheld essential information about the full extent of its actions. It was not until late 2022, after a lengthy communication effort with ATCC, that Corteva learned for the first time that Inari USA had obtained literally hundreds of Corteva's protected seed lines, for Inari's exclusive financial benefit, without Corteva's knowledge or approval.

401.    Upon information and belief, Inari USA took these unscrupulous actions because it hoped, and still hopes, to commercialize a product built on the foundation of Corteva's protected seed lines. Inari USA has made this intention clear in its own press releases.

402.    Inari USA also has and, upon information and belief, will continue to seek to use its unlawful actions in an attempt to extort from Corteva a business arrangement with favorable terms for Inari USA. Moreover, Inari USA has and will pursue intellectual property rights to exclude others, including Corteva, in the United States based on activities that would not be possible but for Inari USA's false and deceptive practices.

403.    Inari USA's deceptive and unfair actions have already resulted in damages to Corteva and, if allowed to continue, could cause additional damages.

404.    Upon information and belief, the actions and transactions constituting these unfair business practices occurred primarily or substantially within Massachusetts, which is where Inari USA and IE-SCS both maintain their principal places of business. Massachusetts also is where Defendants directed ATCC to ship Corteva's protected seeds so that they could then be exported from Massachusetts to Belgium.

405.    Pursuant to Mass Gen. Law c. 93A § 11, Corteva seeks equitable relief and monetary damages as a result of Inari USA's deceptive trade practices. Moreover, because this

deceptive and unfair conduct was committed willfully, Corteva seeks treble damages "on all claims arising out of the same and underlying transaction or occurrence." Mass Gen. Law c. 93A § 11.

## COUNT XXI

### Conversion

### (Asserted Against All Defendants)

406.    Corteva incorporates herein by reference paragraphs 1 through 47 and 80 through 165 above as if fully set forth herein.

407.    Corteva retained ownership and possessory interests in the protected seeds that had been deposited with ATCC. Indeed, the MTAs (which, upon information and belief, were signed either by or on behalf of Inari USA) state explicitly that "ATCC and/or its Contributors shall retain ownership of all right, title and interest in the ATCC Materials." These agreements also made clear that the seeds were subject to strict use limitations, which existed exclusively for Corteva's continuing benefit.

408.    By acquiring Corteva's protected seeds and using them for impermissible and unauthorized commercial uses, including outside the United States, Inari has wrongfully exerted dominion and control over Corteva's valuable property, which seriously interferes with the property rights that Corteva has diligently sought to protect. Indeed, Corteva ensured that its seeds would be held in a depository that expressly prohibited any commercial use of the seeds. This prohibition was stated explicitly in the MTAs that Inari signed, as well as in ATCC's policies and procedures. Inari could only have accessed Corteva's protected seeds from the ATCC by agreeing to the commercial use prohibition set forth in that contract. As is set forth in detail above, Inari has wholly disregarded that prohibition.

409. Corteva first learned of Inari's conversion of seeds containing the DP-004114-3 and TC-1507 events in September 2021, but did not learn that Inari had converted hundreds of Corteva's protected seeds until December 2022, which is when ATCC first informed Corteva of Inari's actions.

410. Inari converted Corteva's property willfully and with full knowledge that its actions would violate Corteva's property rights and the MTA.

411. Because Inari has not acquired the protected seeds in good faith, no pre-suit demand for the return of the seeds is required. Accordingly, Corteva seeks damages in an amount to be proven at trial and further seeks equitable and injunctive relief requiring Inari to return Corteva's protected seeds and prohibiting Inari from taking any further action to commercialize Corteva's protected seeds, or any modified seeds that Inari has derived therefrom.

## PRAYER FOR RELIEF

Through the actions described above, Inari has willfully and intentionally violated Corteva's patent rights, Corteva's PVP certificates, and Inari's own contractual obligations, all as part of a scheme to steal fruits of Corteva's decades and decades of groundbreaking research and innovation. WHEREFORE, Corteva respectfully requests that this Court enter judgment in its favor and against Defendants and grant the following relief:

A. Judgment that Defendants have infringed the '434, '246, '522, '363, and/or '411 patents under 35 U.S.C. §§ 271(a), 271(b) and 271(f)(2);

B. Judgment that Defendants have directly infringed and continue to infringe the PVP certificates listed in Exhibits A and B under 7 U.S.C. §§ 2402, 2483, and 2541;

C. Judgment that Defendants have instigated or actively induced conduct by ATCC and/or IE-SCS that directly infringed and continues to infringe one or more of the

105

PVP certificates listed in Exhibits A and B under 7 U.S.C. §§ 2402, 2483, and 2541;

D.      Judgment that Defendants have materially breached the MTA;

E.      Judgment that Defendant Inari USA has violated the Massachusetts Deceptive Trade Practices Act;

F.      Judgment that Defendant Inari USA is liable for conversion;

G.      Judgment that Defendants' infringement was willful and enhancement of any monetary damages pursuant to 35 U.S.C. § 284 and 7 U.S.C. § 2564(b);

H.      Monetary damages adequate to compensate for Defendants' infringement of the '434, '246, '522, '363, and/or '411 patents in accordance with 35 U.S.C. § 284, and the PVP certificates listed in Exhibits A and B in accordance with 7 U.S.C. § 2564, in an amount to be determined at trial, including without limitation lost profits and/or a reasonable royalty, and an accounting and/or ongoing royalty for any post-judgment infringement if the equitable relief below for an injunction under 7 U.S.C. § 2563 and/or 35 U.S.C. § 283 is not granted;

I.      Monetary damages in an amount to be determined at trial for breach of the MTA and for violation of the Massachusetts Deceptive Trade Practices Act, and conversion;

J.      Permanent injunction for Defendants' infringement of one or more of the PVP certificates listed in Exhibits A and B in accordance with 7 U.S.C. § 2563;

K.      Permanent injunction for Defendants' infringement of the '434, '246, '522, '363, and/or '411 patents in accordance with 35 U.S.C. § 283;

L.      All appropriate equitable and injunctive relief including, without limitation (a) relief requiring Defendants to disclose all of Corteva's protected seeds that

106

Defendants have acquired and the manner in which Defendants have acquired them, (b) relief requiring Defendants to return Corteva's protected seeds and any derivatives, and (c) specific performance of the MTA's prohibition on the use of Corteva's protected seeds (including any progeny or information derived therefrom) for commercial purposes;

M.      Compensatory damages in an amount to be determined at trial;

N.      Treble damages, attorneys' fees, and costs;

O.      A declaration that this is an exceptional case under 35 U.S.C. § 285 and 7 U.S.C. § 2565 and an award of attorneys' fees, costs, and expenses to Corteva; and

P.      All other relief deemed appropriate by this Court.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Corteva respectfully demands a jury trial as to all issues so triable.

Dated: October 1, 2024

**Redacted Version filed on October 15, 2024**

**BARNES & THORNBURG LLP**

*/s/ Chad S.C. Stover*
Chad S.C. Stover (No. 4919)
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801
Tel. (302) 300-3474
Email: Chad.Stover@btlaw.com

OF COUNSEL:
Peter Bicks (*Pro hac vice*)
Brian Raphel (*Pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Tel: +1 212 506 5000
Fax: +1 212 506 5151
pbicks@orrick.com
braphel@orrick.com

David Gindler (*Pro hac vice*)
Lauren Drake (*Pro hac vice*)
Christopher Lynch (*Pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
355 South Grand Avenue
Suite 2700
Los Angeles, CA 90071-1596
Tel: +1 213 629 2020
Fax: +1 213 612 2499
dgindler@orrick.com
ldrake@orrick.com

Gary Frischling (*Pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
631 Wilshire Blvd.
Suite 2-C
Santa Monica, CA 90401
Tel: +1 310 633 2800
Fax: +1 310 633 2849
gfrischling@orrick.com

108

Carly Romanowicz (*Pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
222 Berkeley Street, Suite 2000
Boston, MA 02116
Tel: +1 617 880 1818
Fax: +1 617 880 1801
cromanowicz@orrick.com

Todd Vare (*Pro hac vice*)
BARNES & THORNBURG LLP
11 S. Meridian St.
Indianapolis, IN 46204
Tel: (317) 231-7735
Todd.Vare@btlaw.com

Ronald Cahill (*Pro hac vice*)
Heather B. Repicky *(Pro Hac Vice)*
BARNES & THORNBURG LLP
One Marina Park Drive, Suite 1530
Boston, MA 02210
Tel: (617) 316-5312
Ronald.Cahill@btlaw.com
hrepicky@btlaw.com

Lauren Baker (*Pro hac vice*)
BARNES & THORNBURG LLP
3340 Peachtree Road N.E., Suite 2900
Atlanta, GA 30326
Tel: (404) 264-4036
Lauren.Baker@btlaw.com

*Attorneys for Plaintiffs*

109