**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| CORTEVA AGRISCIENCE LLC, PIONEER HI-BRED INTERNATIONAL, INC., and AGRIGENETICS, INC., Plaintiffs,<br><br>v.<br><br>INARI AGRICULTURE, INC. and INARI AGRICULTURE NV,<br><br>Defendants. | C.A. No. 23-1059 (JFM)<br><br>**REDACTED VERSION** |

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT AND MOTION TO EXCLUDE EXPERT TESTIMONY**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..............................................................................................iii

I.     INTRODUCTION AND SUMMARY OF THE ARGUMENT ...................................... 1

II.    ARGUMENT ON MOTION FOR PARTIAL SUMMARY JUDGMENT ...................... 2

       A.     Corteva's breach of contract claims (counts 18 and 19)...................................... 2

              1.     Corteva is a third-party beneficiary of the MTAs entitled to enforce
                     them against Inari. ................................................................................... 4

              2.     Inari breached two independent provisions of the MTAs........................ 6

       B.     Inari's Lanham Act claim (counterclaim 14)..................................................... 12

       C.     Inari's claim for abuse of process (counterclaim 16).......................................... 16

       D.     No invalidity under § 102 (counterclaims 1, 2, 4, 5, and 7; second, fifth,
              eighth, and eleventh affirmative defenses). ....................................................... 18

              1.     Corteva's regulated field trials were not accessible to the public............ 19

              2.     Inari cannot create a genuine dispute based on speculation and
                     inadmissible evidence. ........................................................................... 21

       E.     No PVP invalidity under § 2402 (eighteenth affirmative defense)...................... 23

              1.     Inari cannot produce evidence that any variety was not distinct at
                     the time of applying for protection. ......................................................... 24

              2.     Inari is responsible for its evidentiary failures........................................ 27

III.   ARGUMENT ON MOTION TO EXCLUDE EXPERT TESTIMONY ........................ 27

       A.     Dr. Silverstone's opinions on alleged public use................................................ 28

              1.     Opinions based on Exhibit C to Dr. Silverstone's report......................... 28

              2.     "Public use" opinions based on Corteva's confidential information. ....... 29

       B.     Dr. Silverstone's opinions failing to apply the Court's claim construction
              of "aryloxyalkanoate dioxygenase activity." .................................................... 30

       C.     Dr. Riley's opinions on invalidity of the asserted PVP certificates for
              improper selection of MSV................................................................................. 31

       D.     Dr. Goodwin's opinions on reasonable royalty damages. ................................... 33

              1.     Failure to consider Corteva's position at the hypothetical
                     negotiation.............................................................................................. 34

              2.     Failure to consider Inari's actual conduct............................................... 35

       E.     Dr. Zenner's opinions on Lanham Act and abuse of process damages. .............. 37

       F.     Inari's experts' opinions about applicable law. ................................................. 39

IV.    CONCLUSION.......................................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Fox Hill Vill. Homeowners Corp.*,
424 Mass. 365 (1997) ................................................................................................4

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................................................................................................2

*Apple, Inc. v. Motorola Mobility, Inc.*,
886 F. Supp. 2d 1061 (W.D. Wis. 2012) ...................................................................5

*Arrowood Indem. Co. v. Hartford Fire Ins. Co.*,
774 F. Supp. 2d 636 (D. Del. 2011).........................................................................4

*BASF Corp. v. SNF Holding Co.*,
955 F.3d 958 (Fed. Cir. 2020)................................................................................29

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
455 F.3d 195 (3d Cir. 2006)...................................................................................39

*Biolase, Inc. v. Fotona Proizvodnja Optoelektronskih Naprav D. D.*,
No. SACV 14-0248, 2014 WL 12579802 (C.D. Cal. June 4, 2014) .......................15

*Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*,
249 F.3d 1341 (Fed. Cir. 2001)...............................................................................24

*Brumfield v. IBG LLC*,
97 F.4th 854 (Fed. Cir. 2024) ................................................................................36

*Cantatore v. Univ. of Delaware*,
No. CV N20C-06-241, 2021 WL 2135120 (Del. Super. Ct. May 21, 2021)............16

*Carr v. Town of Dewey Beach*,
730 F. Supp. 591 (D. Del. 1990).............................................................................16

*Crispo v. Musk*,
304 A.3d 567 (Del. Ch. 2023)..................................................................................4

*Datacore Software Corp. v. Scale Computing, Inc.*,
No. CV 22-535, 2024 WL 6945983 (D. Del. Aug. 21, 2024) .................................29

*Delano Farms Co. v. California Table Grape Commission*,
778 F.3d 1243 (Fed. Cir. 2015)..............................................................................21

*Dey, L.P. v. Sunovian Pharmas., Inc.*,
   715 F.3d 1351 (Fed. Cir. 2013)..................................................................................19, 20, 23

*Doe v. Haverford School*,
   No. 24-cv-618, 2025 WL 3008138 (E.D. Pa. Oct. 27, 2025) .................................................38

*EcoFactor, Inc. v. Google LLC*,
   137 F.4th 1333 (Fed. Cir. 2025) .........................................................................................36

*Egbert v. Lippmann*,
   104 U.S. 333 (1881).............................................................................................................19

*Elec. Storage Battery Co. v. Shimadzu*,
   307 U.S. 5 (1939)................................................................................................................18

*Exela Pharma Sciences, LLC v. Eton Pharm., Inc.*,
   No. CV 20-365, 2022 WL 806524 (D. Del. Feb. 8, 2022) .......................................................35

*Fraternal Order of Police, Lodge 1 v. City of Camden*,
   842 F.3d 231 (3d Cir. 2016)..................................................................................................22

*Gaylord v. United States*,
   678 F.3d 1339 (Fed. Cir. 2012).............................................................................................34

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)........................................................................................................38, 39

*Genderm Corp. v. Biozone Lab'ys*,
   No. 92-cv-2533, 1992 WL 220638 (N.D. Ill. Sept. 3, 1992)....................................................15

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970).......................................................................................34

*Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*,
   859 F. Supp. 1521 (S.D.N.Y. 1994)..................................................................................13, 14

*Hoefling v. U.S. Smokeless Tobacco Co., LLC*,
   576 F. Supp. 3d 262 (E.D. Pa. 2021) .....................................................................................32

*Incarcerated Ent., LLC v. CNBC LLC*,
   331 F. Supp. 3d 352 (D. Del. 2018)..................................................................................13, 15

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
   424 F.3d 1374 (Fed. Cir. 2005).....................................................................................18, 19, 20

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
   534 U.S. 124 (2001).............................................................................................................26

*Levine v. Selective Ins. Co. of Am.*,
   250 Va. 282 (1995) ...................................................................................................4

*Lucent Tech., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 ........................................................................................................36

*Mall Chevrolet, Inc. v. Gen. Motors LLC*,
   99 F.4th 622 (3d Cir. 2024) ..................................................................................13

*Martinez v. Agway Energy Servs., LLC*,
   88 F.4th 401 (2d Cir. 2023) ....................................................................................3

*MBIA Ins. Corp. v. Royal Indem. Co.*,
   294 F. Supp. 2d 606 (D. Del. 2003).........................................................................3

*Medicines Co. v. Hospira, Inc.*,
   827 F.3d 1363 (Fed. Cir. 2016)..............................................................................19

*Microsoft Corp. v. i4i Ltd. P'ship*,
   564 U.S. 91 (2011)..................................................................................................24

*Microsoft Corp. v. Motorola, Inc.*,
   864 F. Supp. 2d 1023 (W.D. Wash. 2012)...............................................................5

*Minco, Inc. v. Combustion Eng'g, Inc.*,
   95 F.3d 1109 (Fed. Cir. 1996)................................................................................36

*Mirror Worlds Techs., LLC v. Meta Platforms, Inc.*,
   122 F.4th 860 (Fed. Cir. 2024) ..............................................................................29

*Moyer v. Patenaude & Felix, A.P.C.*,
   991 F.3d 466 (3d Cir. 2021).....................................................................................2

*Netscape Comm'cns Corp. v. Konrad*,
   295 F.3d 1315 (Fed. Cir. 2002)..............................................................................19

*Nix v. Sawyer*,
   466 A.2d 407 (Del. Super. Ct. 1983) .....................................................................16

*Novartis Corp. v. Ben Venue Labs., Inc.*,
   271 F.3d 1043 (Fed. Cir. 2001)..............................................................................25

*Nuance Commc'ns, Inc. v. MModal LLC*,
   No. CV 17-1484, 2018 WL 6804488 (D. Del. Dec. 27, 2018)..............................17

*Oddi v. Ford Motor Co.*,
   234 F.3d 136 (3d Cir. 2000)...................................................................................38

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994)....................................................................................................32

*Pennsylvania Emp., Benefit Tr. Fund v. Zeneca, Inc.*,
    710 F. Supp. 2d 458 (D. Del. 2010).........................................................................................3

*Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*,
    653 F.3d 241 (3d Cir. 2011).............................................................................................12, 15

*PhishMe, Inc. v. Wombat Sec. Techs., Inc.*,
    No. CV 16-403, 2017 WL 3821107 (D. Del. Aug. 31, 2017) ...........................................16, 18

*Phoenix Ancient Art, S.A. v. J. Paul Getty Tr.*,
    No. 17-cv-241, 2018 WL 1605985 (S.D.N.Y. Mar. 29, 2018).............................................5

*Pineda v. Ford Motor Co.*,
    520 F.3d 237 (3d Cir. 2008)...................................................................................................28

*Plough, Inc. v. Johnson & Johnson Baby Prods. Co.*,
    532 F. Supp. 714 (D. Del. 1982).............................................................................................15

*Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*,
    No. CV 5886VCP, 2013 WL 3934992 (Del. Ch. July 24, 2013) ...........................................16

*Prime Victor Int'l Ltd. v. Simulacra Corp.*,
    682 F. Supp. 3d 428 (D. Del. 2023).........................................................................................3

*Rose v. Bartle*,
    871 F.2d 331 (3d Cir. 1989)...................................................................................................16

*Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*,
    289 U.S. 689 (1933)...............................................................................................................36

*Sunrise Pharm., Inc. v. Vision Pharma, LLC*,
    No. 17-CV-04074, 2018 WL 11476075 (D.N.J. June 20, 2018)...........................................17

*In re Teleglobe Commc'ns Corp.*,
    493 F.3d 345 (3d Cir. 2007).....................................................................................................3

*Toll Bros., Inc. v. Gen. Acc. Ins. Co.*,
    No. C.A. 98C-08-203, 1999 WL 744426 (Del. Super. Ct. Aug. 4, 1999) ..............................16

*Tone Bros., Inc. v. Sysco Corp.*,
    28 F.3d 1192 (Fed. Cir. 1994)................................................................................................19

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,
    925 F.2d 566 (2d Cir. 1991)..................................................................................................4, 5

*Trudell Med. Int'l Inc. v. D R Burton Healthcare, LLC,*
    127 F.4th 1340 (Fed. Cir. 2025) ............................................................................31

*UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres,*
    949 F.3d 825 (3d Cir. 2020)...................................................................................37

*Uniloc USA, Inc. v. Microsoft Corp.,*
    632 F.3d 1292 (Fed. Cir. 2011)...............................................................................33

*United States v. Edge Broad. Co.,*
    509 U.S. 418 (1993)................................................................................................14

*Walton v. Comfort Sys. USA (Syracuse), Inc.,*
    155 F.4th 144 (2d Cir. 2025) ................................................................................3, 4

*Willis v. UPMC Children's Hosp. of Pittsburgh,*
    808 F.3d 638 (3d Cir. 2015)......................................................................................2

*VirnetX, Inc. v. Cisco Sys., Inc.,*
    767 F.3d 1308 (Fed. Cir. 2014)...............................................................................33

*XMTT, Inc. v. Intel Corp.,*
    657 F. Supp. 3d 591 (D. Del. 2023)........................................................................26

*In re Zoloft (Sertraline Hydrocloride) Prods. Liab. Litig.,*
    26 F. Supp. 3d 466 (E.D. Pa. 2014) .......................................................................32

**Statutes**

5 U.S.C. § 522(b)(4) .....................................................................................................30

7 U.S.C. § 2401(b)(5) ...................................................................................................25

7 U.S.C. § 2402................................................................................................2, 23, 40

7 U.S.C. § 2402(a)(1)....................................................................................................23

7 U.S.C. § 2402(a)(2)................................................................................23, 24, 27, 31

7 U.S.C. § 2402(a)(3)....................................................................................................23

7 U.S.C. § 2402(a)(4)....................................................................................................23

7 U.S.C. § 2544.............................................................................................................39

7 U.S.C. § 2562(a) ........................................................................................................24

15 U.S.C. § 1125(a)(1)(B) ..............................................................................12, 13, 14

28 U.S.C. § 1292(b) ........................................................................................................13

35 U.S.C. § 102 ...........................................................................................2, 18, 19, 22, 29

35 U.S.C. § 102(b) ........................................................................................................19

35 U.S.C. § 103 ...........................................................................................................26

35 U.S.C. § 112 ...........................................................................................................40

35 U.S.C. § 271(f)(2) ...............................................................................................36, 40

35 U.S.C. § 282 ...........................................................................................................24

35 U.S.C. § 282(a) .......................................................................................................24

35 U.S.C. § 284 ...........................................................................................................36

**Rules and Regulations**

7 C.F.R. § 340.0(a)(1) ..................................................................................................18

7 C.F.R. § 340.1 ...........................................................................................................18

7 C.F.R. § 340.3(c)(6) ..................................................................................................18

7 C.F.R. § 340.4(b)(12) ................................................................................................18

37 C.F.R. § 1.802 ...........................................................................................................4

Fed. R. Civ. P. 56(a) ......................................................................................................2

Fed. R. Civ. P. 56(c)(1)(B) ...........................................................................................

Fed. R. Civ. P. 56(c)(2)............................................................................................13,

Fed. R. Evid. 702 .................................................................................................. *passim*

Fed. R. Evid. 702(b)......................................................................................................29

Fed. R. Evid. 703 .........................................................................................................22

Fed. R. Evid. 704 .........................................................................................................39

Fed. R. Evid. 801 .........................................................................................................22

Fed. R. Evid. 802 .........................................................................................................22

Fed. R. Evid. 901 .........................................................................................................22

Fed. R. Evid. 1006 ............................................................................................................22

Fed. R. Evid. 1006(b)........................................................................................................28

**Other Authorities**

Anita Balakrishnan, *Alphabet's self-driving car company just sued Uber—and it all stemmed from an email fail*, CNBC (Feb. 24, 2017), https://tinyurl.com/ytkbskb7 ...........................................................................................14

Pat Ferrier, *Fort Collins aerospace company sues Boeing for fraud*, yahoo!finance (June 7, 2023), https://tinyurl.com/559f7cm6............................................................14

Prosser, Law of Torts, § 121 (4th ed. 1971) .....................................................................16

Restatement (Second) of Contracts § 302...........................................................................4

Restatement (Second) of Contracts § 302 cmt. d, ill.10 ....................................................6

USDA, *Biotechnology Permits and Notifications*, https://www.aphis.usda.gov/biotechnology/biotechnology-permits-notifications.........................................................................................................................28

## I.      <u>INTRODUCTION AND SUMMARY OF THE ARGUMENT</u>

Plaintiffs (collectively, Corteva) are agricultural innovators who have developed many novel seed varieties protected by patents and Plant Variety Protection (PVP) certificates. There is no genuine dispute that Defendants (collectively, Inari) acquired, exported, and commercially exploited Corteva's protected seeds. Inari's principal defense is a legal one: It claims an affirmative right to commercially exploit Corteva's intellectual property. The Court has rejected that legal argument. D.I. 100; D.I. 139. And the evidence developed during discovery forecloses most of Inari's claims for relief. Although some fact issues remain, Corteva moves for partial summary judgment to simplify the case for trial.

First, Corteva is entitled to summary judgment on liability for its breach of contract claims. To acquire Corteva's seeds, Inari had to execute "Material Transfer Agreements" (MTAs) in which it agreed not to transfer or commercially exploit those seeds. Corteva is a third-party beneficiary entitled to enforce those MTAs and the undisputed evidence shows Inari's brazen and repeated breaches of its contractual obligations: Not only did Inari transfer seeds and other protected materials to a wide variety of third parties, but it openly admits that it used Corteva's seeds to develop its own commercial products. As a result, Corteva is entitled to summary judgment as to liability, with damages to be decided at trial.

Second, Corteva is entitled to summary judgment on many of Inari's counterclaims and affirmative defenses, as it simply has no evidence to prove required elements. Inari's Lanham Act claim fails because the undisputed facts show (1) no commercial advertising subject to the Lanham Act; (2) no false statement; (3) no deception; and (4) no injury. Inari's abuse of process claim cannot survive because the evidence does not show that Corteva used this lawsuit to extort any improper advantage; simply filing this lawsuit, issuing a press release, and notifying others about this litigation are legally insufficient to prove Inari's claim. Inari has also failed to create a genuine

- 1 -

dispute as to invalidity under pre-AIA 35 U.S.C. § 102 for the '378, '434, '246, '363, and '441 patents, as it has not shown that Corteva's regulated, confidential field trials disclosed the patented inventions to the public as required to establish anticipation based on public use. And it cannot carry its burden of showing that Corteva's PVP certificates are invalid under 7 U.S.C. § 2402, as it failed to demonstrate that any of Corteva's varieties were not distinct. Because Inari cannot meet its burdens at trial, summary judgment is appropriate.

Although summary judgment may be granted on the foregoing grounds even with Inari's expert testimony, certain opinions of Inari's experts Dr. Riley, Dr. Goodwin, Dr. Silverstone, Dr. de Leon Gatti, and Dr. Zenner are inadmissible under Federal Rule of Evidence 702. The exclusion of this testimony independently requires summary judgment as to Inari's Lanham Act, abuse of process, § 102 patent invalidity, and PVP invalidity claims.

## II.    ARGUMENT ON MOTION FOR PARTIAL SUMMARY JUDGMENT

A party is entitled to summary judgment "if, after drawing all reasonable inferences in favor of the non-moving party," *Moyer v. Patenaude & Felix, A.P.C.*, 991 F.3d 466, 469 (3d Cir. 2021), "there is no genuine dispute as to any material fact" such that "the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "The moving party has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015). If no "reasonable jury could return a verdict for the nonmoving party," then there is no "genuine factual dispute" and summary judgment is required. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court should grant summary judgment as to the following claims, counterclaims, and defenses:

### A.    Corteva's breach of contract claims (counts 18 and 19).

Corteva deposited seeds with the American Type Culture Collection (ATCC) patent depository, SOF ¶¶ 2, 4-10, 209-13, and Inari acquired more than 200 varieties of those seeds (the

- 2 -

Corteva Seeds) from ATCC in 2020, SOF ¶¶ 84, 100. In order to obtain the seeds, Inari had to sign ATCC's MTAs agreeing to various conditions. SOF ¶¶ 3, 10. Inari signed MTAs in 2017, 2019, and 2022, SOF ¶¶ 12, 39, 177; JA5218-21, JA16294-97, JA16298-301, agreeing to two key provisions: (1) a provision restricting transfer of materials obtained from ATCC; and (2) a provision prohibiting commercial use of materials obtained from ATCC. Counts 18 and 19 arise from Inari's repeated breaches of both provisions.[1]

The elements of breach of contract are "(1) the existence of a contract, express or implied; (2) breach of an obligation imposed by the contract; and (3) damages." *Prime Victor Int'l Ltd. v. Simulacra Corp.*, 682 F. Supp. 3d 428, 437 (D. Del. 2023) (citing Delaware law); *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 409 (2d Cir. 2023) (citing analogous New York law).[2] Where, as here, a plaintiff is not a party to the contract whose terms have been breached, it must further show that it is entitled to enforce the contract as a third-party beneficiary thereof. *See Walton v. Comfort Sys. USA (Syracuse), Inc.*, 155 F.4th 144, 157 (2d Cir. 2025); *MBIA Ins. Corp. v. Royal Indem. Co.*, 294 F. Supp. 2d 606, 611 (D. Del. 2003). Corteva is entitled to partial summary judgment as to Inari's liability for Corteva's breach of contract claims because the undisputed facts show that Corteva is a third-party beneficiary of the MTAs and that Inari

---

[1] Although the 2022 MTA uses slightly different language than the 2017 and 2019 MTAs, the substance of the transfer and commercial-use prohibitions is common to all versions of the MTA.

[2] The 2022 MTA is governed by New York law. JA16296. The 2017 and 2019 MTAs do not contain a choice-of-law provision. Under Delaware's choice-of-law principles, courts will not conduct a choice-of-law analysis unless there is "an actual conflict" between potentially applicable laws. *Pennsylvania Emp., Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 466 (D. Del. 2010); *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 358 (3d Cir. 2007). There is no such conflict here, because the relevant breach of contract principles are the same in all arguably relevant jurisdictions, including Virginia (where ATCC is located, SOF ¶ 2) and Massachusetts (where Inari's agents received certain of the Corteva Seeds, SOF ¶¶ 74, 104, 171). *See infra* 4 & n.3. The Court should apply Delaware law to the 2017 and 2019 MTAs as the law of the forum.

repeatedly breached the MTAs. Damages and other remedies must be determined at trial.

### 1. Corteva is a third-party beneficiary of the MTAs entitled to enforce them against Inari.

Generally, "third parties may sue as beneficiaries on contracts made for their benefit." *Walton*, 155 F.4th at 157; *see* Restatement (Second) of Contracts § 302.[3] The third party must establish "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for the third party's benefit and (3) that the benefit to the third party is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate the third party if the benefit is lost." *Walton*, 155 F.4th at 158 (brackets omitted); *Arrowood Indem. Co. v. Hartford Fire Ins. Co.*, 774 F. Supp. 2d 636, 658 (D. Del. 2011).

There is no dispute about the existence of valid and binding contracts between ATCC and Inari—specifically, the 2017, 2019, and 2022 MTAs. SOF ¶¶ 12, 39, 177; JA5218-21, JA16294-301. And all three MTAs include anti-transfer and anti-commercial-use provisions that are intended for the direct benefit of ATCC contributors, like Corteva. *Infra* 6. The obvious reason why the MTAs bar transfer and commercial use of deposited materials is to protect the rights of such contributors. ATCC is an independent nonprofit organization that serves as, among other things, a patent depository for biological materials. SOF ¶ 2. Contributors seeking patent protection deposit seeds with ATCC to protect their intellectual property rights (*e.g.*, by meeting patent disclosure requirements). *See, e.g.*, 37 C.F.R. § 1.802. Contributors thus have a significant interest in ensuring their intellectual property is not transferred and exploited for others'

---

[3] The Second Restatement is the widely accepted approach to third-party beneficiaries. *E.g.*, *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir. 1991); *Crispo v. Musk*, 304 A.3d 567, 573-74 nn.31-35 (Del. Ch. 2023); *Anderson v. Fox Hill Vill. Homeowners Corp.*, 424 Mass. 365, 366 (1997); *Levine v. Selective Ins. Co. of Am.*, 250 Va. 282, 285-86 (1995).

commercial gain. ATCC, by contrast, does not acquire intellectual property rights in the materials deposited with it, *see, e.g.*, SOF ¶ 213, and therefore has little interest in whether seeds are transferred or used commercially. It should come as no surprise, then, that ATCC has repeatedly and specifically confirmed that the MTAs are intended specifically to protect contributors' intellectual property rights. ATCC's website clearly states that the MTAs "protect[] the rights of the contributor who may have put restrictions on the use of the material they deposited with ATCC." SOF ¶ 208. And ATCC's corporate designee reiterated during discovery that the MTAs are for the benefit of Corteva and other seed depositors. SOF ¶ 199.

The text and "surrounding circumstances" of the MTAs reinforce this intent. *Trans-Orient*, 925 F.2d at 573. All relevant versions of the MTA include "Contributor" as a defined term referring to the entity that "deposit[ed]" materials with ATCC—Corteva in this case. SOF ¶¶ 53, 194; JA5218, JA16294, JA16298. And the Contributor's rights are referenced repeatedly throughout the MTAs. *E.g.,* SOF ¶¶ 18, 21, 62, 65, 185, 193-94; JA5219, JA16294, JA16299. Although a third party does not need to be mentioned in a contract to be a third-party beneficiary, *see Trans-Orient*, 925 F.2d at 573, the repeated and explicit references to "Contributors" in the MTAs make clear that this category of third parties was top of mind to the contracting parties.

Courts have repeatedly found in analogous circumstances that third parties are entitled to enforce contractual provisions granting a significant benefit to third parties but little benefit to the contracting parties. *See, e.g., Microsoft Corp. v. Motorola, Inc*., 864 F. Supp. 2d 1023, 1032-33 (W.D. Wash. 2012) (finding, at summary judgment, that a contractual commitment "to license … essential patents" on particular terms was intended for the benefit of future licensees, who could enforce that commitment as third-party beneficiaries); *Apple, Inc. v. Motorola Mobility, Inc*., 886 F. Supp. 2d 1061, 1085 (W.D. Wis. 2012) (similar); *Phoenix Ancient Art, S.A. v. J. Paul Getty Tr*.,

No. 17-cv-241, 2018 WL 1605985, at \*11 (S.D.N.Y. Mar. 29, 2018) (concluding, on motion to dismiss, that "a third-party provider of confidential information" was a third-party beneficiary of a non-disclosure agreement). The Restatement is in accord. *See* Restatement (Second) of Contracts § 302 cmt. d, ill.10 (where a city contract required an industrial facility to "remove specified types of waste" from its "downstream runoff" to "prevent[] harm to landowners downstream from [the city's] system," those downstream landowners are third-party beneficiaries entitled to enforce the contract's waste-removal terms). And here, the MTAs' anti-transfer and anti-commercial-use provisions only make sense if they are intended to benefit third-party contributors. As a result, Corteva is a third-party beneficiary of those provisions and may enforce them against Inari.

**2.      Inari breached two independent provisions of the MTAs.**

**a. Prohibition on commercial use:** The MTAs applicable here strictly prohibit "Commercial Use" of any "Biological Material(s)" (in the 2017 and 2019 MTAs) or "ATCC Materials" (in the 2022 MTA) without ATCC's prior written consent.[4] The 2017 and 2019 MTAs state in bold that "**Any Commercial Use of the Biological Material is strictly prohibited without ATCC's prior written consent**." SOF ¶ 48; JA5219, JA16299. The 2022 MTA has comparable language: "ATCC Materials … shall not be used for any Commercial Use without first obtaining a Commercial Use license from ATCC." SOF ¶ 184; JA16294. The MTAs broadly define "Commercial Use" to include "the sale, license, lease, export, transfer or other distribution of [Biological/ATCC Materials] to a person or entity not party to this MTA for financial gain or other commercial purposes." SOF ¶¶ 49, 187; JA5218, JA16294, JA16298. The MTAs provide

---

[4] The 2017 and 2019 MTAs define "Biological Material(s)" as any materials acquired from ATCC as well as any Progeny and any Unmodified Derivatives thereof (which includes substances, such as proteins, expressed by material acquired from ATCC). SOF ¶¶ 24, 45; JA5218, JA16298. The definition of "ATCC Material" in the 2022 MTA is substantially similar. SOF ¶¶ 181-82; JA16294.

further non-exhaustive examples of Commercial Use, including using Biological/ATCC Materials "to produce or manufacture products … ultimately intended for general sale," SOF ¶¶ 51, 188, and "collect[ing] and commercially exploit[ing] data regarding sequences of nucleic acids" and other "biological substances or biological activities," SOF ¶ 189; *see also* JA5218, JA16294, JA16298.

The record shows without doubt that Inari made "Commercial Use" of the Corteva Seeds. Inari is a for-profit company that develops commercial products and aims to make money from the products it commercializes. SOF ¶¶ 218-37. ███████████████████████████████

███████████████████████████████████████████████████████████████████

███████████ And here, ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

Particularly relevant here is Inari's █████████████████████████████ SOF ¶ 237. Inari sequenced the Corteva Seeds. SOF ¶¶114-17, 127-40. Inari then gene edited the events from certain Corteva Seeds ████████████████████████████████ SOF ¶¶ 144-55, 241-61. That constitutes impermissible use of the Corteva Seeds to develop commercial products.

Inari's development of its INHT-26 event is illustrative. INHT-26 is a "transgenic event" (referring to the insertion of a particular transgene into a particular location in a plant chromosome) for soybeans. SOF ¶¶ 153, 254, 382; D.I. 100 at 4. Using Corteva Seeds obtained from ATCC, Inari conducted DNA sequencing to identify Corteva's event DAS-44406 present in those seeds and then gene edited samples of the seeds to create INHT-26. SOF ¶¶ 5, 135-37, 153-55, 243. As Inari candidly put it, "Inari Belgium gene edited DAS-44406 to create INHT-26." SOF ¶ 154 Resp. Inari has stated that its objective for INHT-26 is to "████████████" SOF ¶ 248. Unsurprisingly,

███████████████████████████████████████████████████████████████████

████████████ The same is true of Inari's event INIR-6, which Inari similarly derived from the

- 7 -

Corteva Seeds (specifically, seeds containing Corteva's event DP-4114) and ███████████ ███████ SOF ¶¶ 144-46, 245, 257-58, 261.[5] █████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████████████ The foregoing demonstrates that Inari's acquisition of ATCC Materials was, from beginning to end, intended ██████████████████████████████████████ in breach of its obligations under the MTA. SOF ¶¶ 51, 188; JA5218, JA16294, JA16298.

Moreover, Inari accomplished these impermissible commercial ends by "export[ing] and transfer[ring]" ATCC Materials for "commercial purposes," in breach of the MTAs. SOF ¶¶ 49, 187; JA5218, JA16294, JA16298. Part of Inari's strategy ████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████ *See* D.I. 137 (addressing Inari's legal theories). Thus, one of the first things Inari did after acquiring the Corteva Seeds in the United States was arrange the export of those seeds to Belgium through Inari's intermediary Eversole. SOF ¶¶ 73-79, 86-88. Exportation of the Corteva Seeds to Belgium was a key step in Inari's commercialization efforts.

Because Inari did not obtain approval from ATCC for any Commercial Use, *see* SOF ¶ 141 Resp., Inari's systemic and ongoing attempts to commercially exploit the Corteva Seeds breached the MTAs' Commercial Use prohibition.

**b. Prohibition on transfer:** Inari breached another independent provision of the MTAs strictly limiting a party's ability to transfer seeds acquired from ATCC (or their progeny or

---

[5] Inari disputes that it intends to commercialize INHT-26 and INIR-6 *in the United States*, SOF ¶¶ 254-55, 258 Resp., but that is a red herring because the MTA's anti-commercial-use restriction does not contain any such geographical limitation. *See supra* 6-7.

derivatives). All versions of the MTA barred "distribut[ing], sell[ing], lend[ing] or otherwise mak[ing] available or transfer[ring]" any materials subject to the MTAs "for any reason," "[e]xcept as specifically provided" in the MTAs themselves. SOF ¶¶ 16, 41; JA5219, JA16295, JA16299. The 2017 and 2019 MTAs did not articulate any exceptions for seeds and their "[p]rogeny" (*i.e.*, plants grown from seeds acquired from ATCC, or subsequent generations of such seeds or plants). Instead, the 2017 and 2019 MTAs provided: "ATCC Material and Progeny may only be used by Purchaser's Investigator" (that is, the specific researcher named in an ATCC purchase application and his or her assistants) "for research purposes and only in Investigator's laboratory." SOF ¶¶ 25, 46; JA5218, JA16298 (emphasis omitted). Similarly, under the 2022 MTA, the "Recipient" could "make the ATCC Materials available" within its organization to its employees, but only "for the purposes of the research project" identified in the purchase application. JA16295; SOF ¶ 190. Although the 2022 MTA contemplated potential collaboration with other researchers, the MTA signatory was not permitted to transfer original seeds or progeny directly to those researchers; rather, the MTA required that other researchers independently obtain those materials directly from ATCC, subjecting each researcher to his or her own MTA obligations. JA16295; SOF ¶¶ 190-92.

The MTAs imposed different limitations on transfers of "Modifications and Unmodified Derivatives" of the original seeds (*e.g.*, a seed modified through molecular biological technology, or extracted DNA). All three MTAs provide that "Modifications and Unmodified Derivatives may only be made and used by Recipient in its facility." JA16295; *see* SOF ¶¶ 20, 64; JA5219, JA16299 (similar language). The MTAs contained two discrete exceptions under which Modifications and Unmodified Derivatives, once made, could be transferred. First, purchasers could transfer Modifications and Unmodified Derivatives to a "CRO" ("a third party entity performing research under contract for the [p]urchaser") "for purposes related to [the purchaser's] research project."

SOF ¶¶ 18-19, 62-63; JA5218-19, JA16298-99 (2017 and 2019 MTAs); JA16294-95 (2022 MTA with similar language). Second, purchasers could transfer Modifications and Unmodified Derivatives to participants in a "collaborative research project" so long as the "collaborative research project(s) [do] not include any Commercial Use." SOF ¶¶ 21-22, 65-66; JA5219, JA16299 (2017 and 2019 MTAs); JA16295 (2022 MTA with similar language). Critically, however, both of those exceptions required the transferee to agree to be bound by the terms of the MTAs. SOF ¶¶ 18-21, 62-65; JA5219, JA16295, JA16299. Transferring Modifications and Unmodified Derivatives in any other scenario required "ATCC's prior written agreement" or "prior written approval." SOF ¶¶ 16, 41, 60, 192; JA5219, JA16295, JA16299.

Inari repeatedly violated the express transfer provisions to which it agreed in the MTAs:

*Transfers of seeds:* On several occasions in 2020 and again in 2022, Inari USA obtained Corteva Seeds at its West Lafayette, Indiana facility, then transferred those seeds and/or their progeny to a third party in Chile. SOF ¶¶ 84-85, 240. Inari did not obtain ATCC's authorization for these transfers. SOF ¶¶ 86, 88-90. Transfer of the Corteva Seeds and Progeny from Inari USA to an entity outside of the Inari USA organization is a clear violation of the terms of the MTAs, which categorically prohibit such transfers without ATCC's authorization. *Supra* 8-9 (citing SOF ¶¶ 16, 25, 41, 46). Inari's contention that the third party in Chile was a CRO, SOF ¶¶ 84-85, 240 Resp., is immaterial; while the MTAs allowed transfers of Modifications and Unmodified Derivatives to CROs in limited circumstances, no such transfers were permitted for "ATCC Material and Progeny." *See supra* 9 (discussing, *e.g.*, SOF ¶¶ 25, 46). As a result, Inari's seed transfers to the Chilean entity breached the MTA.

*Transfers of plants:* Inari Belgium repeatedly grew plants from the Corteva Seeds, then transferred those plants outside of its facilities to a greenhouse ███████████████ SOF

¶¶ 126, 128-29, 132-33, 136, 139. Plants grown from ATCC seeds are "Progeny" of ATCC Materials under the MTAs and are subject to the same strict transfer prohibition as the seeds themselves. JA5218, JA16294, JA16298. The MTAs thus bar transfer of plants grown from ATCC seeds outside of the recipient's organization without ATCC's authorization, regardless of the transferee's identity. *Supra* 9 (citing SOF ¶¶ 16, 25, 41, 46, 190- 92). Inari did not obtain ATCC's authorization for any of these transfers. SOF ¶¶ 86, 88-90. As a result, these transfers breached the MTA. That Inari had ██████████████████████████████, SOF ¶ 35, does not change this result. The MTA bars transfers of seeds and their progeny outside of the recipient organization; research collaborators, like any other transferee, are required to obtain seeds directly from ATCC, subject to their own MTA obligations. *Supra* 9; JA5219, JA16295, JA16299. As for Inari's suggestion that ████████████████████████████████ *e.g.*, SOF ¶ 128 Resp., the MTAs are clear: ATCC materials and their progeny cannot be transferred outside of a receiving organization and, even within the organization, may be used "only in Investigator's laboratory." SOF ¶¶ 25, 46; *supra* 9. Interpreting the MTAs' transfer provisions to allow Inari to redesignate ████████████████████████████████████████ ████████ SOF ¶ 128 Resp., without any of the other protections required by the MTAs for transfers of ATCC materials to third-party sites, would render those provisions toothless.

*Transfers of derivatives:* On several occasions in 2020 and 2021, Inari Belgium impermissibly transferred derivatives of Corteva Seeds to a third party. Specifically, it planted seeds obtained from ATCC, harvested leaf material from the resulting plants for DNA extraction, then transferred the extracted DNA to another company ████████ for DNA sequencing. SOF ¶¶ 112-14, 130, 134, 137, 140. The extracted DNA constitutes an "Unmodified Derivative" of the seeds obtained from ATCC. *See* JA5218, JA16294, JA16298 (defining "Unmodified Derivative"

- 11 -

to include "subunits" of ATCC/Biological Materials). The MTA prohibits transfer of Unmodified Derivatives, absent limited exceptions that do not apply here. *Supra* 9-10. As a result, these transfers breached the MTA.

**Transfers of Modifications:** On many occasions in 2022, 2023, and 2024, Inari Belgium shipped seeds derived from the Corteva Seeds to third parties in Argentina and Chile. SOF ¶¶ 214, 241-44. These derivative seeds constitute "Modifications" under the MTA. *See* JA5218, JA16294, JA16298 (defining "Modifications" as materials that contain or incorporate a substantial portion of ATCC/Biological materials). As with Unmodified Derivatives, Modifications cannot be transferred outside of the party of the MTA, absent limited exceptions not applicable here. *Supra* 9-10. As a result, these transfers too breached the MTA and Corteva is entitled to summary judgment.

### B.      Inari's Lanham Act claim (counterclaim 14).

The Lanham Act prohibits "commercial advertising or promotion" containing any "false or misleading representation of fact" regarding "the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B). As relevant here, a Lanham Act plaintiff must show (1) "a false or misleading statement[]"; (2) "actual deception" or "a tendency to deceive a substantial portion of [the statement's] intended audience"; (3) "that the deception is material," meaning "likely to influence purchasing decisions"; and (4) injury. *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011) (citation omitted). The total absence of proof with respect to each of these independent elements requires summary judgment in favor of Corteva.

**No false or misleading statement:** As this Court has recognized, "[g]ood-faith (even if ultimately incorrect) marketplace statements accompanying patent litigation generally do not support a false advertising claim," in part due to the *Noerr-Pennington* doctrine. D.I. 250 at 18.

Thus, Inari must rest its Lanham Act claim on either statements made in bad faith or something "beyond ordinary marketplace statements" about litigation. *Id.* at 19. This Court's repeated rejection of Inari's legal argument that it is entitled to exploit Corteva's protected intellectual property, *see* D.I. 100 (denying Inari's motion to dismiss); D.I. 139 (denying Inari's request for § 1292(b) certification), makes plain that, at minimum, Corteva's litigation and related press release describing the allegations made in its complaint about Inari's theft of intellectual property do not rise to the level of bad faith.

So Inari is left to try to identify some *other* false statement, which it cannot do. Indeed, it cannot identify anything other than ordinary marketplace statements. Beyond Corteva's complaint and press release describing its complaint, all Inari offers is testimony from an Inari executive purporting to recount conversations with representatives from ███████████ who purportedly told him that they had engaged in conversations with Corteva about this litigation. JA1658-61 (Tr. 21:15-36:23). This double hearsay is inadmissible and so does not create a triable fact issue at summary judgment. *See* Fed. R. Civ. P. 56(c)(2); *Mall Chevrolet, Inc. v. Gen. Motors LLC*, 99 F.4th 622, 634 (3d Cir. 2024). But even if considered, Inari has presented no specifics about what Corteva supposedly said in its alleged conversations with these third parties and so cannot demonstrate falsity.

***No commercial advertising or promotion***: Inari also cannot prove any "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). That term refers to "(1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy the defendants goods or services ... [that] (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Incarcerated Ent., LLC v. CNBC LLC*, 331 F. Supp. 3d 352, 358 (D. Del. 2018) (quoting *Gordon*

- 13 -

*& Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1536 (S.D.N.Y. 1994)). "Commercial speech," in turn, generally refers to "speech proposing a commercial transaction." *Gordon & Breach*, 859 F. Supp. at 1537 (quoting *United States v. Edge Broad. Co.*, 509 U.S. 418, 426 (1993)). The undisputed facts show that Corteva did not engage in commercial advertising or promotion. As explained above, Inari's Lanham Act claim is largely rooted in ordinary "marketplace statements accompanying patent litigation" like Corteva's press release. D.I. 250 at 18; *see* SOF ¶¶ 313-36 Resp. (Inari citing press release as sole basis for claiming that Corteva engaged in false advertising). That press release is plainly not "proposing a commercial transaction." *Gordon & Breach*, 859 F. Supp. at 1537. Treating such a statement as actionable under the Lanham Act would radically expand the Lanham Act's scope, given the frequency with which public companies like Corteva make such statements.[6] Beyond the press release, Inari has no admissible evidence of any specific Corteva statements to Inari's prospective commercial partners or competitors, *see supra* 13, notwithstanding the allegations in its counterclaim*, see* D.I. 160 CC ¶¶ 68-77. There is accordingly no evidence that Corteva made any statements to anyone that "propos[ed] a commercial transaction," much less were intended to "influenc[e] consumers to buy [Corteva's] goods or services" as required under § 1125(a)(1)(B). *Gordon & Breach*, 859 F. Supp. at 153. To the extent Inari contends that Corteva acted to dissuade other companies from investing in or collaborating with Inari or colluded with others "to exclude Inari from the market," *e.g.*, D.I. 160 CC ¶¶ 74, 77, such contentions are not only wholly without evidentiary support but

---

[6] *See, e.g.*, Pat Ferrier, *Fort Collins aerospace company sues Boeing for fraud*, yahoo!finance (June 7, 2023), https://tinyurl.com/559f7cm6 (quoting plaintiff's press release statement that "Boeing has not only stolen our intellectual property … but has used the technology incorrectly and at the expense of astronauts' safety, which is beyond despicable"); Anita Balakrishnan, *Alphabet's self-driving car company just sued Uber—and it all stemmed from an email fail*, CNBC (Feb. 24, 2017), https://tinyurl.com/ytkbskb7 (quoting Google's press release describing Uber's conduct as "akin to stealing a secret recipe").

also are not actionable under the Lanham Act. Section 1125(a)(1)(B) does not encompass every disparaging statement that might negatively impact a competitor; it governs only **false advertising** designed to induce **customers** to purchase one company's products instead of another company's products. *See Incarcerated Ent.*, 331 F. Supp. 3d at 358-61.

**No deception:** Inari cannot prove that Corteva made any statements involving any "actual deception" or "tendency to deceive." *Pernod Ricard*, 653 F.3d at 248. Even assuming Inari could prove the existence of the statements alleged in its counterclaim, Inari focuses not on any communication between Corteva and consumers, but on Corteva's communication with sophisticated companies Bayer and Syngenta. D.I. 160 CC ¶¶ 73-77. There is no evidence whatsoever that these sophisticated companies actually were deceived by Corteva's statements concerning the **allegations** in this lawsuit, nor is there any evidence that such statements have any "tendency to deceive." SOF ¶¶ 317-23 & Resp.; *see Biolase, Inc. v. Fotona Proizvodnja Optoelektronskih Naprav D. D.*, No. SACV 14-0248, 2014 WL 12579802, at *5 (C.D. Cal. June 4, 2014) (tendency-to-deceive analysis taking into account the statement's "sophisticated audience"). *Genderm Corp. v. Biozone Lab'ys*, No. 92-cv2533, 1992 WL 220638, at *13 (N.D. Ill. Sept. 3, 1992) (similar); *Plough, Inc. v. Johnson & Johnson Baby Prods. Co.*, 532 F. Supp. 714, 716, 718 (D. Del. 1982) (similar).

**No injury:** Finally, Inari cannot prove any injury arising from the alleged Lanham Act violation. As the Court recognized in its March 2, 2026 order striking much of Dr. Zenner's expert report, "Corteva took exhaustive measures … to nail down exactly what Inari's damages theory was" on its counterclaims. D.I. 519 at 5. Inari's position throughout fact discovery was that four specific investors (███████████████████████████████████████████████████) declined to participate in Inari's Series F Fundraising round due to Corteva's conduct. D.I. 472 at

- 15 -

3-4. But in discovery, all four investors disclaimed that theory and explained that they had other reasons for declining to invest. SOF ¶¶ 283-307. And this Court rejected Inari's attempt to offer a new damages theory after the close of fact discovery. D.I. 519 at 3-9. There is accordingly no admissible evidence that any purported Lanham Act violation caused Inari any injury.

Corteva is entitled to summary judgment as to Inari's Lanham Act claim.

### C. Inari's claim for abuse of process (counterclaim 16).

In Delaware, "[t]he elements of a claim for abuse of process are: (1) an ulterior motive; and (2) a willful act in the use of the legal process that is not proper in the regular conduct of the proceedings." *Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, No. CV 5886VCP, 2013 WL 3934992, at *23 (Del. Ch. July 24, 2013) (citing *Nix v. Sawyer*, 466 A.2d 407, 412 (Del. Super. Ct. 1983)). Unlike malicious prosecution, "which focuses on the initiation of [legal] process," *id.*, abuse of process addresses the "perversion of the process after it has been issued." *Cantatore v. Univ. of Delaware*, No. CV N20C-06-241, 2021 WL 2135120, at *2 & n.36 (Del. Super. Ct. May 21, 2021); *Carr v. Town of Dewey Beach*, 730 F. Supp. 591, 599 (D. Del. 1990) (abuse of process reaches "misusing, or misapplying, process justified in itself for an end other than that which it was designed to accomplish"); *Rose v. Bartle*, 871 F.2d 331, 350 n.17 (3d Cir. 1989) (similar).

Thus, to pursue a claim for abuse of process, Inari must prove some ***improper affirmative act*** beyond Corteva initiating this lawsuit; it is not enough to show that the lawsuit itself had some negative effect. *See Nix*, 466 A.2d at 412 ("Merely carrying out the process to its authorized conclusion, even though with bad intentions, does not result in liability. ***Some form of coercion*** to obtain a collateral advantage, not properly involved in the proceeding itself, must be shown." quoting Prosser, Law of Torts, § 121 (4th ed. 1971) (emphasis added)). In other words, a claim for abuse of process will lie when a litigant "trie[s] to use the fact of [its] suit to cause extra-litigation or extra-judicial injury to another party." *PhishMe, Inc. v. Wombat Sec. Techs., Inc.*, No. CV 16-

403, 2017 WL 3821107, at *9 (D. Del. Aug. 31, 2017) (collecting cases); *Toll Bros, Inc.. v. Gen. Acc. Ins. Co.,* No. C.A. 98C-08-203, 1999 WL 744426, at *5 (Del. Super. Ct. Aug. 4, 1999) (describing "an offer to terminate … litigation upon payment of [an] unrelated debt" as "[t]he quintessential case of abuse of process"). .

Inari has wholly failed to offer any evidence that Corteva used this lawsuit as leverage to coerce any improper collateral advantage. SOF ¶¶ 266-341 & Resp. There is no evidence that Corteva pressured any customer not to purchase Inari products because of this litigation. SOF ¶¶ 326, 341. Insofar as Inari may seek to rely on Corteva notifying various government officials about this litigation, those communications are protected by the *Noerr-Pennington* doctrine. *See* D.I. 250 at 18; *Sunrise Pharm., Inc. v. Vision Pharma, LLC*, No. 2:17-CV-04074, 2018 WL 11476075, at *2-3 (D.N.J. June 20, 2018). Moreover, there is no evidence that Corteva requested, or that government officials took, any adverse action against Inari based on this lawsuit. SOF ¶¶ 277-81. To the extent Inari invokes supposed investor or partner concerns about this litigation, Inari has presented no admissible evidence that Corteva made any statements to any Inari investors or partners about this litigation. *Supra* 13. There is certainly no evidence that Corteva used this lawsuit to pressure existing or potential Inari investors to withdraw investments or decline to invest or to seek to damage its partnership negotiations. SOF ¶¶ 282-312. With respect to Corteva's supposed collusion with Bayer and Syngenta to exclude Inari from the marketplace, D.I. 160 CC ¶¶ 74-77, that allegation is not only unsupported by any evidence; it has nothing to do with the tort of abuse of process because there is no evidence whatsoever that Corteva used **this lawsuit** as **leverage** to **coerce** Bayer and Syngenta (or anyone else) in any way. SOF ¶¶ 266-81. In sum, Corteva's issuance of a press release and subsequent communication with government officials and others do not come close to the kind of affirmative **coercive** acts constituting abuse of process.

- 17 -

*Cf. Nuance Commc'ns, Inc. v. MModal LLC*, No. CV 17-1484-MN-SRF, 2018 WL 6804488, at *4 (D. Del. Dec. 27, 2018) (permitting abuse of process claim where litigation-related press release was used as leverage in customer negotiations); *PhishMe, Inc*, 2017 WL 3821107, at *9 (similar).

**D.    No invalidity under § 102 (counterclaims 1, 2, 4, 5, and 7; second, fifth, eighth, and eleventh affirmative defenses).**

Inari's sole anticipation argument for the '378, '434, '246, '363, and '441 patents (collectively, the "Utility Patents") is that Corteva's regulated field trials put the claimed inventions into public use before the patents' respective critical dates, rendering the patents invalid under pre-AIA 35 U.S.C. § 102. JA26392, JA26399-40, JA26413-14, JA26418-19, JA26423.[7] The field trials relevant to Inari's patent invalidity claims were a prerequisite to Corteva's eventual petition for deregulation of (*i.e.*, approval to sell) the asserted varieties. *See* 7 C.F.R. §§ 340.0(a)(1), 340.1 (defining "regulated article"), 340.6(c)(5) (requiring "[f]ield test reports" analyzing "deleterious effects on plants, nontarget organisms, or the environment" before selling regulated articles); *see also* SOF ¶ 389. Field trials are themselves regulated, particularly to prevent dissemination of a variety. *Id.* §§ 340.3(c)(5)-(6), 340.4(b)(12).

Corteva's regulated field trials did not trigger § 102's public-use bar, which applies only if a claimed invention "(1) was accessible to the public; or (2) was commercially exploited" prior to the critical date. *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1380 (Fed. Cir. 2005). Inari does not contend that the seeds and plants produced in regulatory field trials were

---

[7] Inari did not plead invalidity of the '378 patent under § 102 as a counterclaim or affirmative defense, *see* D.I. 160, but Inari's expert nonetheless opines that the '378 patent is invalid under § 102. The Court should preclude Inari from raising § 102 arguments as to the '378 patent and strike the corresponding portions of Inari's expert report for that reason alone.

commercially exploited. SOF ¶¶ 406-07.[8] And Inari has no admissible evidence that the public could access (or even locate) Corteva's field trials, much less that the trials disclosed the patented inventions to the public. Corteva is entitled to summary judgment of no anticipation.

### 1.    Corteva's regulated field trials were not accessible to the public.

The public use bar "discourage[s] the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available." *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1198 (Fed. Cir. 1994). The public use bar "requires public availability," and turns on whether "the 'claimed features of the patents were placed in the public's possession.'" *Dey, L.P. v. Sunovian Pharmas., Inc.*, 715 F.3d 1351, 1355 (Fed. Cir. 2013) (brackets omitted) (quoting *Netscape Comm'cns Corp. v. Konrad*, 295 F.3d 1315, 1323 (Fed. Cir. 2002)). "[T]o qualify as 'public,' a use must occur without any 'limitation or restriction, or injunction of secrecy.'" *Invitrogen*, 424 F.3d at 1381 (quoting *Egbert v. Lippmann,* 104 U.S. 333, 336 (1881)). Any "secret or confidential third-party uses do not invalidate later-filed patents." *Dey*, 715 F.3d at 1355.

Merely growing plants somewhere within a county is not enough to constitute a § 102 public use of the patented invention, as Corteva's regulated field trials were thoroughly confidential, as is common practice in the industry. SOF ¶¶ 390, 401-03. ████████

████████████████████████████████████████

████████████████████████████████████████

---

[8] Commercial exploitation requires the use of an invention to produce other offerings for sale. *E.g.*, *Elec. Storage Battery Co. v. Shimadzu*, 307 U.S. 5, 20 (1939) (public use where invention was "employed … for the production of lead oxide powder used in the manufacture of [products] which have been sold in quantity"). Merely conducting regulated field trials—which never result in a saleable product, as all material is destroyed, SOF ¶¶ 404, 406-07—is non-invalidating pre-commercial activity. *See Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1377 (Fed. Cir. 2016) (explaining that § 102(b) "preclude[s] attempts by the inventor or his assignee to *profit from commercial use* of an invention" before the critical date, but does not take aim at "commercial benefit generally" (cleaned up)).

SOF ¶¶ 395-98. ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ Inari has failed to identify any instance

in which Corteva's regulated field trials were carried out without a confidentiality agreement, and

so cannot meet its burden on invalidity.

Confidentiality is not just enforced by contract. ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ SOF ¶ 401; ¶¶ 416-18, 424

('378); ¶¶ 432-33, 439 ('434); ¶¶ 446-47, 453 ('246); ¶¶ 466-68, 474 ('363 & '441). Although

Inari purports to dispute confidentiality by reference to "[p]rotocols or test plans associated with

cooperator agreements or CROs" that "identify events … by name," those protocols and plans do

not disclose the events' DNA make-up. SOF ¶ 401 & Resp. Even if they had, any such disclosure

was made under "injunction of secrecy," *Invitrogen*, 424 F.3d at 1381 (cleaned up), as protocols

and test plans were themselves confidential, SOF ¶ 408. Ultimately, Inari has identified no

evidence that cooperators or CROs acquired any knowledge of the inventions' claimed features,

*see Dey*, 715 F.3d at 1359 (endorsing analysis that "if members of the public are not informed of,

and cannot readily discern, the claimed features of the invention … the public has not been put in

possession of those features"), much less knowledge that could permissibly be shared. And it has

identified no basis for concluding that cooperators or CROs, much less "the public," could

"reasonably ha[ve] come to believe" that Corteva's inventions became "freely available" through

the field trials. *Id.* at 1360 (cleaned up).

Lacking evidence of actual public disclosure, Inari's invalidity defense cannot survive the

Federal Circuit's holding that the mere accessibility of a field growing an unreleased plant variety

does not establish public use. In *Delano Farms Co. v. California Table Grape Commission*, the Federal Circuit rejected the argument that "the lack of secrecy with which [a party had] cultivated … unreleased varieties mandate[d] a finding of public use." 778 F.3d 1243, 1249 (Fed. Cir. 2015). Although that cultivation had taken place "in locations that were visible from public roads," the court credited findings that "[t]he unreleased varieties were not labeled in any way" and could not "be reliably identified simply by viewing the growing [plants]," that "[t]he plantings of the unreleased varieties were extremely limited in comparison to the total cultivation of the … farms" at issue, and that there was no evidence that a member of the public "had ever recognized the unreleased varieties." *Id.*

Inari cannot distinguish the facts of this case, as none of the events as claimed could be identified by visual observation, and Inari has adduced no evidence suggesting that the public could identify the claimed events in any other manner. SOF ¶¶ 424, 439, 453, 474. In fact, its argument is even weaker than the one *Delano Farms* rejected, as it has no evidence that the fields in which Corteva's trials were conducted were publicly visible—or even that they could be located from publicly available information at the relevant time. SOF ¶ 409. If no member of the public could access (or even find) Corteva's field trials, much less appreciate the patented inventions, there was no public use as a matter of law.

### 2. Inari cannot create a genuine dispute based on speculation and inadmissible evidence.

Inari's technical expert Dr. Aron Silverstone contends that Corteva's field trials placed the claimed inventions in public use. Dr. Silverstone's opinion is based on the information in Exhibit C to his report—an undated, unauthenticated spreadsheet purporting to set out certain information about Corteva's field trials. SOF ¶¶ 408, 476-79. Dr. Silverstone's opinions based on Exhibit C should be excluded, *infra* 28-29, as should the exhibit itself. Exclusion of Exhibit C leaves Inari

without sufficient evidence to proceed to trial; but even if Exhibit C were considered, it fails to create a dispute of fact. *See* Fed. R. Civ. P. 56(c)(1)(B); (c)(2).

First, Exhibit C cannot create a triable issue of fact because it is not admissible evidence. *See Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016). As explained below (at 28-29), Dr. Silverstone cannot authenticate the exhibit. Fed. R. Evid. 901. He does not know how it was created, nor did he make any effort to verify its accuracy. SOF ¶¶ 478, 480. And even if he could authenticate it, both the spreadsheet and its contents are inadmissible hearsay. Fed. R. Evid. 801, 802. The spreadsheet is therefore not a proper summary under Fed. R. Evid. 1006, both because there is no foundation provided by any witness and because the underlying documents were not produced in discovery. And although an expert opinion may take into account inadmissible evidence, that evidence must be of the sort that "experts in the particular field would reasonably rely on." Fed. R. Evid. 703. It is not reasonable for a plant physiologist to evaluate whether an invention comprising particular DNA components and sequences had been disclosed to the public by relying on an unauthenticated spreadsheet prepared by attorneys that "excerpts" unspecified information (which became public at an unspecified time) and that contains sparse (or in many cases, *no*) information on the DNA components, and no sequence information.

Second, Exhibit C fails to offer evidence of public use. Even if mere public knowledge that field trials were taking place in a particular location made those trials a § 102 public disclosure—which it does not—the exhibit lists only the state and county where field trials were allegedly conducted, rather than disclosing their location with any specificity. SOF ¶ 490. More important, Exhibit C does not disclose Corteva's claimed inventions, as it does not contain the sequence, DNA components, or component orientation for any event—information that would be required to meet the claims of Corteva's Utility Patents. SOF ¶¶ 486-89. And even if the exhibit did include

this information, Inari has not adduced any evidence that the information contained in the spreadsheet was publicly available before the patents' respective critical dates. SOF ¶ 482-83. All Inari can muster to identify a supposed factual dispute is Dr. Silverstone's suggestion that "a POSA viewing the available information would recognize or identify *certain genes* based on their knowledge of the art." *E.g.*, SOF ¶ 485 Resp. That is a far cry from evidence that an artisan viewing the available information—assuming it *was* available—would have been able to "know, understand, and easily demonstrate the invention to others," such that "the invention was … in public use." *Dey*, 715 F.3d at 1355-56.

Third, even when Inari directly invokes Corteva's permit applications instead of relying on Exhibit C, it still cannot identify evidence that a corresponding "invention was … in public use." *Dey*, 715 F.3d 1356. Inari contends that Corteva's permit applications—which were not themselves public—"*suggest* that Corteva did not always redact all of the transgenes and regulators in a given construct," such that "*at least some* of the DNA construct *may* be ascertainable." SOF ¶ 416-18, 420, 432-33, 435, 446-47, 449, 466-68, 470 Resp. (emphasis added). But Inari has to prove that "the claimed features of the patents were placed in the public's possession," *Dey*, 715 F.3d at 1355 (cleaned up), and at summary judgment, it must demonstrate a genuine dispute of fact rather than resting on speculative suggestion.

### E.    No PVP invalidity under § 2402 (eighteenth affirmative defense).

Inari contends that the Asserted PVP Certificates are invalid for failure to meet the PVPA's requirement that a variety be distinct, 7 U.S.C. § 2402(a)(2). *See* D.I. 160 at 78; JA26427-29.[9] But

---

[9] Inari has made no invalidity allegation as to the requirements of uniformity, § 2402(a)(3), or stability, § 2402(a)(4). Inari's contentions regarding newness, § 2402(a)(1), are irrelevant in light of this Court's ruling excluding that theory of invalidity, Dkt. 519. Accordingly, granting this motion would fully resolve this affirmative defense.

"[c]ertificates of plant variety protection shall be presumed valid," and the "burden of establishing invalidity of plant variety protection shall rest on the party asserting invalidity." 7 U.S.C. § 2562(a).[10] Because Inari cannot show by clear and convincing evidence that the asserted varieties were not distinct, summary judgment is proper. *See Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1353-55 (Fed. Cir. 2001) (affirming summary judgment of no invalidity where defendant failed to put forth evidence that could meet its burden).

### 1.    Inari cannot produce evidence that any variety was not distinct at the time of applying for protection.

Inari cannot carry its burden of demonstrating that any asserted variety was not "clearly distinguishable from any other variety" whose "existence … [was] publicly known or a matter of common knowledge at the time of the filing of the application." 7 U.S.C. § 2402(a)(2). Showing that two varieties were not "clearly distinguishable" would require comparing them—but Dr. Raymond Riley, whose opinion is the sole support for Inari's PVP invalidity defense, made no such comparisons. SOF ¶ 379. That should end the matter. Dr. Riley instead opines that Corteva utilized a "flawed" process to select comparator varieties for evaluating whether the asserted variety is clearly distinguishable—but he stops short of identifying any better comparators, and he acknowledged at deposition that he did not identify a single instance in which the selection of a proper comparator "did not happen." SOF ¶ 380. Even if Dr. Riley had identified a more appropriate (*i.e.*, closer) comparator, that would still be insufficient to show that an asserted variety was not distinct. Dr. Riley's abstract and speculative criticisms therefore offer no evidentiary basis by which Inari could establish a lack of distinctness—the statutory criterion on which Inari seeks

---

[10] Inari must meet this burden with clear and convincing evidence, as 7 U.S.C. § 2562(a) adopts the language of 35 U.S.C. § 282(a). *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 101-02 (2011) (Congress's use of "presumed valid" in § 282 incorporates a "settled meaning in the common law," "requiring proof of [invalidity] by clear and convincing evidence").

to invalidate the Asserted PVP Certificates. *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001) ("[M]ere 'theoretical speculations' lacking a basis in the record will not create a genuine issue of fact.").

PVPO guidelines instruct that distinctness "is demonstrated and accomplished through field trials, where the subject variety (SV) is grown side by side with a Most Similar Variety (MSV) under the same set of environmental conditions where morphological characteristics are observed, measured, and recorded." SOF ¶ 353. It is undisputed that for each of the 248 asserted varieties, Corteva identified a comparator MSV and conducted the required field trials. SOF ¶ 361. The Guidelines do not identify any particular process for selecting an MSV, SOF ¶ 355, or any particular phenotypic characteristics for which an applicant variety must be distinct from an MSV, SOF ¶ 358. It also is undisputed that for each variety, the PVPO accepted Corteva's MSV selection and field trial data and granted Corteva a PVP Certificate. *See* D.I. 148 (SAC) Exs. A & B (listing PVP Certificates). Dr. Riley has identified no instance in which Corteva's MSV selection was improper, much less one in which an asserted variety was not distinct. SOF ¶ 381.

Lacking any expert opinion demonstrating that any subject variety was not distinct, Inari insinuates that a different MSV *might* have been identified through a different selection process. ████████████████████████████████████████████████████████████

████████████████████ SOF ¶¶ 368, 370-71 Resp. This ignores the PVPA's express statement that distinctness may be "based on one or more identifiable morphological, physiological, *or other characteristics* with respect to which a difference in genealogy may contribute," 7 U.S.C. § 2401(b)(5), and it treats the PVPO's non-binding guidance that an MSV is "usually" the variety that is "most similar morphologically," JA2214, as though it were a statutory command, *see* JA2223-24 (referring to a "morphological comparison" supposedly "*required* to obtain PVP

- 25 -

certification" (emphasis added)). Further, even accepting that "looking at morphological and phenotypic data can result in the identification of different varieties for the purposes of MSV," SOF ¶¶ 374-75 Resp., Inari does not offer any evidence that consideration of additional or different data would have led to a different MSV selection for any of the subject varieties.

To the extent Dr. Riley identifies other potential comparators, rather than merely criticizing Corteva's process in the abstract, his hypotheticals also fail to support Inari's case. Dr. Riley refers to supposed closest prior art, as identified by the USPTO during prosecution of related utility patents. SOF ¶¶ 374-75 Resp. But "there are differences in the requirements for, and coverage of, utility patents and PVP certificates issued pursuant to the PVPA." *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 142 (2001). And, even if the question of obviousness under 35 U.S.C. § 103 (in which a comparison to the closest prior art may be relevant) had any relation to the PVPA's requirement of distinctness, Inari concedes that Dr. Riley did not consider the prior-art varieties to be "alternative" MSVs, SOF ¶¶ 374-75 Resp., much less more appropriate MSVs than those Corteva selected.

On the sole occasion where Dr. Riley purportedly opined that a particular protected variety was not distinct, his analysis was entirely conclusory, *infra* 32-33, and he offered no basis for extrapolating from that one, unanalyzed instance to any other PVP certificates, JA2223-25. Worse, although Dr. Riley opined that the varieties at issue were not distinguishable, he later opined that "it is not valid to compare" the two varieties at all without growing them under identical conditions. SOF ¶ 379 Resp. According to this latter opinion, Inari cannot possibly carry its burden, as Dr. Riley did not make the comparisons he considered necessary for evaluating distinctness. At the very least, Dr. Riley's self-contradictory and conclusory opinions fail to create a genuine factual dispute on invalidity. *See XMTT, Inc. v. Intel Corp.*, 657 F. Supp. 3d 591, 603 n.11 (D. Del. 2023).

- 26 -

## 2.     Inari is responsible for its evidentiary failures.

Although Inari admits that Dr. Riley did not perform the comparisons that would be required to demonstrate a lack of distinctness, it attempts to excuse its failures by alleging that "Corteva did not produce the necessary information to allow Dr. Riley to meaningfully compare the selected MSVs, subject varieties, and other varieties." SOF ¶¶ 379-81 Resp. Inari's assertions are neither justified nor justifiable. Critically, neither Inari nor Dr. Riley has identified specific facts or documents within Corteva's possession, custody, and control that were not produced and that were purportedly necessary for Dr. Riley to conduct the requisite analysis. *See id.*

Inari does not identify any relevant facts that Dr. Riley did not have access to because there are none. Distinctness turns on whether the PVP variety is clearly distinguishable from other varieties, "the existence of which is ***publicly known or a matter of common knowledge***" at the time of filing. 7 U.S.C. §2402(a)(2) (emphasis added). Phenotypic data for thousands of inbred corn varieties is publicly reported and available in PVP Certificates and U.S. utility patents. Both parties have equal access to information about "publicly known" varieties and neither Inari nor Dr. Riley explain what more could be needed from Corteva. And in any event, Corteva also produced phenotypic information stored within its systems to Inari. SOF ¶¶ 379-81. Dr. Riley could have analyzed or reviewed the foregoing information. He simply chose not to. Summary judgment should be granted, which would fully resolve this affirmative defense. *Supra* n.9.

## III.     <u>ARGUMENT ON MOTION TO EXCLUDE EXPERT TESTIMONY</u>

Inari must show that its proffered expert testimony meets the requirements of Federal Rule of Evidence 702. The Court "acts as a gatekeeper to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). The Court should exclude the following expert testimony under Rule 702:

- 27 -

### A.    Dr. Silverstone's opinions on alleged public use.

As discussed above (at 18-21), Dr. Silverstone opines that Corteva's field trials placed the inventions claimed in the Utility Patents in public use. Dr. Silverstone's opinions are not based on sufficient facts or data and should be excluded.

### 1.    Opinions based on Exhibit C to Dr. Silverstone's report.

Dr. Silverstone's purported basis for opining that the claimed inventions are invalid as anticipated through public use is a list of "notification[s] to conduct field trials" in Exhibit C to his opening report (JA3279). *See* JA3148 (¶ 80), JA3178 (¶ 145), JA3199-200 (¶ 200), JA3224 (¶ 257). Exhibit C is not admissible evidence; it is an unverified, undated chart with no indication of where it came from, who made it, how it was created, or who created it.[11] Dr. Silverstone's report states only that Exhibit C is "[a]n excerpt from the USDA APHIS website of the publicly available list of permits Corteva sought to conduct regulatory field trials for the events claimed in the Asserted Patents." *Id.* Dr. Silverstone admitted that he had no idea how the "excerpt" was prepared, let alone if it was accurate or available before the relevant critical dates for the Asserted Patents. For example, Dr. Silverstone testified that he (1) does not know when Exhibit C was created, other than it was created by Inari's litigation counsel, likely sometime in 2025, JA3885-86 (Tr. 79:25-80:3, 82:7-21); (2) could not recall how Exhibit C was created and does not know if it is a printout of something that independently exists or if it is a compilation, JA3886 (Tr. 81:17-24); (3) does not know if the information in Exhibit C is available by searching a publicly available

---

[11] Inari's counsel stated—for the first time on March 20, 2026, in its response to Corteva's SOF ¶¶ 476-81—that Exhibit C purportedly is "excerpted" from https://www.aphis.usda.gov/biotechnology/biotechnology-permits-notifications by clicking "Download all BRS Permit and Notification data from ePermits in csv file." Beyond being untimely, unsworn, inadmissible, and plainly not something Dr. Silverstone knew, this statement is also untrue. At minimum, the csv file available at this link does not include the name of any event as suggested in the "Seed" column of Exhibit C.

database or whether one would need to fill out a Freedom of Information Act (FOIA) Request, JA3886 (Tr. 83:22-84:5); and (4) did not independently verify the accuracy of the information in Exhibit C, JA3886 (Tr. 81:25-82:3). *See also* SOF ¶¶ 478-83.[12] Dr. Silverstone should be precluded from relying on Exhibit C or offering opinions that depend on Exhibit C. *See Mirror Worlds Techs., LLC v. Meta Platforms, Inc.*, 122 F.4th 860, 870 (Fed. Cir. 2024) (affirming exclusion of expert testimony because it is "'plainly unreasonable for a technical expert to rely on unauthenticated, undated screenshots in forming an opinion'"); *Datacore Software Corp. v. Scale Computing, Inc.*, No. CV 22-535-GBW, 2024 WL 6945983, at *1 (D. Del. Aug. 21, 2024) ("[A]n expert may run afoul of Rule 702 by adopting data without any understanding of what the data represents, how it was compiled, or how it was evaluated or chosen." (cleaned up)).

### 2.  "Public use" opinions based on Corteva's confidential information.

Apart from Exhibit C, Dr. Silverstone's only attempt to show "public use" is by reference to Corteva's *confidential* information produced during this litigation. JA3147-48, JA3177-78, JA3198-200, JA3224-25, JA3276, JA3418. Confidential information cannot be the basis of a claim of "public use." *See BASF Corp. v. SNF Holding Co.*, 955 F.3d 958, 964 (Fed. Cir. 2020) (The Federal Circuit has "uniformly interpreted" pre-AIA § 102 to apply to "knowledge or use which is accessible to the public."); *id.* at 966 (The "public-use bar applies to uses of the invention 'not purposely hidden.'"); *supra* 18-21. Dr. Silverstone's reliance on legally insufficient "facts or data" is grounds to exclude his opinions. Fed. R. Evid. 702(b).

For example, Dr. Silverstone cites Corteva's USDA permit applications. JA3148. But Inari and Dr. Silverstone obtained these applications *only* through discovery in this litigation. *See, e.g.*,

---

[12] Because Inari did not make the permits or data underlying Exhibit C available during discovery, it cannot be a proper summary under Fed. R. Rule 1006(b).

SOF ¶ 408 Resp. (referring to documents "identified in Corteva's production documents"). The applications and related study protocols—respectively produced as "Outside Counsel Eyes Only" and "Confidential" pursuant to the Stipulated Protective Order, D.I. 48—explicitly identify DNA components of the events as Corteva's confidential business information (CBI). *See, e.g.*, SOF ¶ 391. Neither Inari nor Dr. Silverstone has shown that such CBI is publicly available even today, much less that it could have been obtained by the public prior to the relevant critical dates.

Although Dr. Silverstone suggests that certain information perhaps could be obtained through FOIA requests, JA3148, JA3178, JA3199-200, JA3224-25, he concedes he is not a FOIA expert, JA3874 (Tr. 36:12-24), and tellingly, neither Inari nor Dr. Silverstone actually obtained any information through FOIA, SOF ¶ 484. Even if they had, Dr. Silverstone admitted that information relating to events is often maintained as CBI and is not available through FOIA. JA3875 (Tr. 38:4-16), JA3885 (Tr. 78:15-18); SOF ¶ 392; *see also* 5 U.S.C. 522(b)(4) (FOIA exempts federal agencies from releasing trade secret and commercially sensitive confidential information). Dr. Silverstone's statements regarding the alleged public accessibility of Corteva's USDA permit applications and what they disclosed should be excluded.

* * *

Dr. Silverstone's opinions and testimony regarding alleged "public use" of the inventions of the Utility Patents, including for example as set forth in his Opening Report at ¶¶ 76-82 (JA3146-49), ¶¶ 141-146 (JA3176-79), ¶¶ 196-200 (JA3198-200), ¶¶ 257-258 (JA3224-25), and ¶¶ 370-372 (JA3276), and in his Reply Report at ¶¶ 6-7 (JA3398-99), ¶ 14 (JA3402), ¶¶ 36-37 (JA3417-18), and ¶¶ 58-62 (JA3429-31), should be excluded.

**B.    Dr. Silverstone's opinions failing to apply the Court's claim construction of "aryloxyalkanoate dioxygenase activity."**

Expert testimony that conflicts with the Court's claim construction must be excluded.

- 30 -

*Trudell Med. Int'l Inc. v. D R Burton Healthcare, LLC*, 127 F.4th 1340, 1349-50 (Fed. Cir. 2025) (holding a "noninfringement declaration … untethered from the district court's claim constructions" unreliable under Rule 702). Dr. Silverstone should be precluded from testifying to application of the claim term "a polynucleotide that encodes a protein having aryloxyalkanoate dioxygenase activity," as his opinions are based on an incorrect claim construction.

In construing the term "a polynucleotide that encodes a protein having aryloxyalkanoate dioxygenase activity" (AAD activity), the Court considered whether "AAD activity require[s] degrading *both* phenoxy or pyridyloxy herbicides—or either one?" D.I. 443 at 9. The Court determined that the answer was "either one" and construed AAD activity as "the ability to degrade or diminish the activity of an aryloxyalkanoate herbicide." *Id.* Dr. Silverstone, however, testified that AAD activity required the ability to degrade or diminish the activity of *both* phenoxy and pyridyloxy herbicides. Dr. Silverstone was unequivocal about his use of the incorrect construction: "Q. OK. So reaching your opinions in this case, it was your understanding that for a protein to have AAD activity, it had to have the ability to degrade or diminish both a pyridyloxyacetate auxin and a phenoxyacetate auxin herbicide? A. Yes." JA3892 (Tr. 107:16-108:12). Dr. Silverstone then testified that the AAD activity referred to in claim 1 of the '522 patent "requires activity against both a phenoxyacetate herbicide and a pyridyloxyacetate auxin herbicide." JA3894-95 (Tr. 114:14-115:1, 116:10-117:6). Because Dr. Silverstone applied the wrong claim construction, the opinions set forth in his Opening Report at ¶¶ 300-06 (JA3243-47) and his Reply Report at ¶¶ 135-45 (JA3472-77) must be excluded. *Trudell*, 127 F.4th at 1349-50.

### C.    Dr. Riley's opinions on invalidity of the asserted PVP certificates for improper selection of MSV.

As discussed above (at 24-26), neither the PVPA itself nor the guidelines issued by the PVPO require a specific process for selecting an MSV. *See* 7 U.S.C. § 2402(a)(2); SOF ¶¶ 352-

53, 358. Dr. Riley thus has no benchmark upon which to evaluate Corteva's selection process.[13] Moreover, he provides no evidence that a different process actually would yield a different MSV— let alone that different MSVs would render any of the Asserted PVP Certificates invalid as not distinct. *See supra* 25-26. Dr. Riley's opinions that the Asserted PVP Certificates do not comply with the distinctness requirement thus amounts to an untested hypothesis. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 764 (3d Cir. 1994) (affirming exclusion of expert opinion amounting to "a hypothesis which [the expert] had yet to attempt to verify or disprove"); *Hoefling v. U.S. Smokeless Tobacco Co., LLC*, 576 F. Supp. 3d 262, 280 (E.D. Pa. 2021) (excluding expert opinion amounting to "an untested hypothesis"); *In re Zoloft (Sertraline Hydrocloride) Prods. Liab. Litig.*, 26 F. Supp. 3d 466, 472-73 (E.D. Pa. 2014) (same).

Dr. Riley's reliance on USPTO rejections of certain proposed claims during prosecution is no better. With one exception, Dr. Riley does not even attempt to demonstrate that such citations would render the Asserted PVP Certificates invalid as not distinct. For the one exception—variety PH17JT, the Subject Variety of Asserted PVP Certificate 201000353—Dr. Riley notes that the examiner for the corresponding utility patent initially "rejected the claims to PH17JT as anticipated by a Monsanto variety, 91NH2," then states "[i]t is my opinion that PH17JT is not distinct from 91INH2 based on the disclosed common morphology." JA2223-24. But Dr. Riley provides no analysis to support his one-sentence conclusion. He does not explain what the "disclosed common morphology" is, nor does he attempt to show how the "disclosed common morphology" renders the two varieties not distinct. Even assuming a USPTO rejection was "relevant material" on which

---

[13] Dr. Riley also has no experience with or expertise in the process of filing for PVP Certificates. *See* JA3837 (Tr. 119:14-22), JA3845-46 (Tr. 152:19-153:8, 153:20-155:17). Dr. Riley only recently learned, as part of being retained in this litigation, how MSVs may be selected "[b]y reviewing the USDA PVP procedure document" and through Google searches. JA3841-42 (Tr. 136:3-12, 138:1-4).

to base his opinion, Dr. Riley's "fail[ure] to … explain[] how that material leads to his conclusion" leaves "too great an analytical gap" to create a jury issue. *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1333 (Fed. Cir. 2014) (cleaned up). Indeed, when Corteva's expert, Dr. Mikel, actually compared over forty morphological features of variety PH17JT with variety 91NH2 he found notable differences between the two (*e.g.*, plant height, ear height, length of top ear internode, leaf color, leaf sheath pubescence, tassel length, ear weight) and concluded that "PH17JT is morphologically distinct from 91NH2." JA2141-45. Notably, Dr. Riley did not offer his own comparison in reply, instead opining that "it is not valid to compare" the varieties at all, as the data for the varieties were collected under different conditions. JA2279-80. This only proves the conclusory nature of Dr. Riley's opinion.

Because the opinions in Dr. Riley's Opening Report at ¶¶ 69-89 (JA2214-25) and Reply Report at ¶¶ 6-31 (JA2267-81) are not directed to distinctness and amount only to untested hypotheses, they must be excluded.

### D.      Dr. Goodwin's opinions on reasonable royalty damages.

Expert testimony untethered to the "facts of the case … must be excluded." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011). Inari offers Dr. Goodwin's opinions to counter the reasonable royalty damages estimate put forward by Corteva's expert, Dr. Chris Vellturo.[14] But Dr. Goodwin grounds his opinions entirely in a counterfactual: in stark contrast to the undisputed record of what Inari actually did (and intended to do) with the Corteva seeds it exported, Dr. Goodwin posits that the parties would have agreed to a hypothetical license that allowed Inari to export Corteva seeds but ***not*** to subsequently edit them or commercialize the

---

[14] Dr. Goodwin has no opinion on what an appropriate reasonable royalty amount would be. JA3707 (Tr. 48:4-49:9) ▮▮▮▮▮▮▮▮▮

results. Dr. Goodwin then compounds his error by admitting that in constructing his hypothetical negotiation he considered only what would have been acceptable to Inari and disregarded Corteva's position at the bargaining table. Each of those errors is an independent basis to exclude his opinions, including at ¶¶ 9 (JA1961-64), 25-36 (JA1972-77), 37-92 (JA1978-2011), 102-07 (JA2017-19), and Exhibits 1-8 (JA2020-38).

### 1.     Failure to consider Corteva's position at the hypothetical negotiation.

Dr. Goodwin's opinion should be excluded as unreliable because he concedes that he failed to account for Corteva's economic interests at the hypothetical negotiation. The hypothetical negotiation framework asks what "amount [] a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement." *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971). Thus, "[i]t is incorrect in a hypothetical negotiation inquiry for a [fact finder] to limit its analysis to only one side of the negotiating table because the … task is to determine the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer." *Gaylord v. United States*, 678 F.3d 1339, 1343 (Fed. Cir. 2012) (internal quotation marks omitted). Dr. Goodwin did not evaluate Corteva's position or analyze Corteva's willingness to accept the terms of his proposed hypothetical license. JA3711-12 (Tr. 66:4-67:4).

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████. Dr. Goodwin thus improperly considers only the perspective of the accused infringer and does not reliably model the hypothetical negotiation required for a reasonable royalty analysis.

Given the unreliable and unsupported nature of his analysis, Dr. Goodwin should be excluded from offering his opinion about the licensing fee Inari would have contemplated or from commenting on Dr. Vellturo's reasonable royalty analysis. Allowing him to present Inari's side of the negotiation as though it represented a bargain both parties would have reached would serve only to confuse the jury and would not aid the trier of fact. *See, e.g.*, *Exela Pharma Sciences, LLC v. Eton Pharm., Inc.*, 2022 WL 806524, at *3 (D. Del. Feb. 8, 2022).

### 2.    Failure to consider Inari's actual conduct.

Dr. Goodwin's testimony must also be excluded as unreliable because his "hypothetical license" is premised on a fictional version of events rather than the facts of Inari's infringing use. Dr. Goodwin opines that Inari would bargain for a hypothetical license between Corteva and Inari that would allow Inari to phytosanitary test and export Corteva's patented events and genes but would "prohibit modification of the patented events." JA1992 ("[T]he only right relevant to the hypothetical negotiation is limited event access which would include the right to export, not the broad editing and commercialization rights that Dr. Vellturo assumes.").

Dr. Goodwin's core premise—that a simple test-and-export license would be sufficient for Inari or acceptable to Corteva—disregards the facts. ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████    In particular, Inari acquired Corteva's seeds ████████████████

████████████████████████████████████████████████████

████████████████████████████████    JA1239 (Tr. at 21:21-23:7); *see also*

JA1244-45 (Tr. 43:13-45:20) (████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

- 35 -

███████████████████████████████████████████ )).

This makes Dr. Goodwin's damages opinions inadmissible, because the *value* of the hypothetical license must take into account the downstream effects of Inari's known and expected actions. *Sinclair Ref. Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 697 (1933) ("The use that has been made of the patented device is a legitimate aid to the appraisal of the value of the patent at the time of the breach…. Here is a book of wisdom that courts may not neglect."); *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333-34 (applying the book of wisdom under *Georgia-Pacific* Factor 11). The Federal Circuit has explained that "the patent holder may recover for an injury caused by the infringement if it was or should have been reasonably foreseeable by an infringing competitor in the relevant market, broadly defined." *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1118 (Fed. Cir. 1996) (cleaned up). That is no less true where, as here, the domestic acts of infringement include unlawful export under 271(f)(2). *See Brumfield v. IBG LLC,* 97 F.4th 854, 878 (Fed. Cir. 2024) (explaining that reasonable royalty damages could include "foreign conduct [that] increases the value of the domestic infringement itself" if the evidence establishes proximate cause). It certainly would have been "reasonably foreseeable" to Corteva and Inari that Inari planned to use Corteva's events and genes to develop competing products, and that "use" of Corteva's products would have to be adequately compensated. Here, Dr. Goodwin expressly *did not* compensate Corteva for "the use made of the invention by the infringer," 35 U.S.C. § 284, because he assumed a fictional world in which Inari would agree not to do what it actually did, ████████████████████████████████████

Allowing Dr. Goodwin to offer opinions grounded in his counterfactual assumptions would violate the Court's gatekeeping function. *See EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1346 (Fed. Cir. 2025) ("Where, as here, the relevant evidence is contrary to a critical fact upon

which the expert relied, the district court fails to fulfill its responsibility as gatekeeper by allowing the expert to testify at trial.").

### E.    Dr. Zenner's opinions on Lanham Act and abuse of process damages.

"Rule 702's reliability threshold requires expert testimony to be 'based on the methods and procedures of science, not on subjective belief and unsupported speculation.'" *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 833-34 (3d Cir. 2020) (citation omitted). Inari has not carried its burden to show that Dr. Zenner's opinions on Inari's damages for the non-patent counterclaims are reliable. In particular, Dr. Zenner fails to link his alleged harm to any conduct relevant to Inari's surviving counterclaims or to provide supporting facts—let alone the "good grounds" required to admit his opinions. *Id*. at 834. The Court should strike the entirety of Dr. Zenner's Opening Report, JA3495-3549, and Reply Report, JA28709-33.

Dr. Zenner admits that his assessment is based on "intuiti[on]," *UGI*, 949 F.3d at 834; *see, e.g.*, JA3941 (Tr. 83:8-84:19) (regulatory impacts), JA3963 (Tr. 171:13-172:17) (investor impacts), not any specific facts tying Corteva's alleged misconduct to the damages he posits. Even if some portion of Inari's Lanham Act and abuse-of-process claims survived summary judgment, *but see supra* 12-18, Dr. Zenner admits having no methodology to disaggregate harm from actionable conduct as compared to harm attributable to conduct that is *not* actionable—like the fact of the lawsuit itself. JA3937 (Tr. 68:15-69:17), JA3942-43 (Tr. 88:13-92:21). For example, he was unable to isolate harm from Corteva's press release from harm caused by the filing of the complaint the same day, calling it " ████████████████████████████████████ ████████████████████████████ " JA3935-36 (Tr. 60:10-62:1). Nor can he tie any particular damage to ███████████████████████████████████ , JA3938 (Tr. 70:14-72:12); attribute harm to ████████████████████████████ , JA3941 (Tr. 82:6-85:4); or distinguish harm from supposed calls to ████████████████ from harm caused

- 37 -

by the *Noerr-Pennington* protected filing of the complaint, JA3942 (Tr. 88:13-89:24). Given the lack of disaggregation, "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). As in *UGI*, Dr. Zenner's analysis should be excluded because it is a "haphazard, intuitive inquiry" lacking a reliable methodology. 949 F.3d at 834; *see also Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000) (excluding expert who "used little, if any, methodology beyond his own intuition"); *Doe v. Haverford School*, 2025 WL 3008138, at *9 (E.D. Pa. Oct. 27, 2025) ("It is simply not enough to say, 'I reviewed the relevant documents, based upon my experience in this space, and reached my conclusions by focusing on the things I was asked to assess.'").

Dr. Zenner's opinions are unreliable for the additional reason that they are contrary to, or not founded in, the evidence. Dr. Zenner's opinions relying on late-disclosed assertions of harm to ten potential investor relationships were correctly stricken. D.I. 519. His remaining opinions about supposed impacts on investments by four potential investors are unreliable, because they run contrary to sworn testimony from those four entities denying that Corteva's lawsuit was the reason for their investment decisions. SOF ¶¶ 283-307. Dr. Zenner did not interview these investors or obtain other data on their analyses, yet he discredits their sworn testimony. JA3971 (Tr. 202:1-203:24) (█████), JA3971-72 (Tr. 205:10-208:3) (█████████████), JA3973 (Tr. 210:4-212:9) (█████), JA3973-74 (Tr. 212:22-214:12) (██████████); *see also* JA3945 (Tr. 98:4-6, 99:3-8) (████████████████████████████████), JA3976 (Tr. 222:4-225:7) (████████████████████████████████████), JA3980 (Tr. 240:3-22) (same), JA3982-83 (Tr. 249:19-250:6) ██████████████████████████). Dr. Zenner admitted he was "██████████████████████████████████████████████████████████████████████████████████████████████████████████████████" JA3980-81

- 38 -

(Tr. 239:12-242:22). Indeed, he has no opinion on "███████████████████████

████████████████████████" JA3964 (Tr. 177:1-13). "[N]othing in either *Daubert*

or the Federal Rules of Evidence requires a district court to admit opinion evidence that is

connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.

### F.    Inari's experts' opinions about applicable law.

While technical experts may opine on legal conclusions (*e.g.*, validity or infringement) by

applying their scientific or technical expertise to the law as it has been explained to them, Inari's

experts purport to opine on what the law is. Those opinions should be precluded. *Berckeley Inv.*

*Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) ("Although Federal Rule of Evidence 704

permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided

by the trier of fact,' an expert witness is prohibited from rendering a legal opinion … because it

would usurp the District Court's pivotal role in explaining the law to the jury.").

**Dr. de Leon Gatti**: Dr. de Leon Gatti is an expert in plant breeding and genetics, not law.

JA3601 (Tr. 63:8-24). She should be precluded from testifying on the following:

- How to "read and interpret" 7 U.S.C. § 2544 as it relates to infringement of a PVP certificate. *See, e.g.*, *id.*; JA3077-78 (Rebuttal Rpt. ¶¶ 21-22).

- Legislative intent underlying the PVPA based on her review of the legislative history. *See, e.g.*, JA3081 (Rebuttal Rpt. ¶ 33), JA3100-04 (¶¶ 73-79, 81-82).

- What activities are permissible with respect to patent deposits. *See, e.g.*, JA3088-90 (Rebuttal Rpt. ¶¶ 46, 50).

**Dr. Silverstone:** Dr. Silverstone is an expert in plant physiology and development, plant

biochemistry, molecular biology, and genetics. JA3873-74 (Tr. 32:20-33:25). He has no expertise

in the law or interpretation of contracts or other legal agreements. JA3874-75 (*id.* at 34:1-37:20).

Dr. Silverstone should be precluded from testifying on the following:

- ATCC had express authorization from Corteva to provide seeds to members of the public and Inari was permitted to export seeds obtained from ATCC. *See, e.g.*,

JA3313-15 (Rebuttal Rpt. ¶¶ 57-60), JA3339-41 (¶¶ 128-31), JA3356-58 (¶¶ 170-73), JA3364-65 (¶¶ 191-94), JA3378-79 (¶¶ 217-20).

- The Asserted Patents do not comply with 35 U.S.C. § 112 based on Corteva restricting access to patent deposits. *See, e.g.*, JA3146 (Opening Rpt. ¶ 75), JA3176 (¶ 140), JA3197 (¶ 195), JA3224 (¶ 256), JA3274-75 (¶ 366); JA3401 (Reply Rpt. ¶¶ 12-13), JA3416-17 (¶¶ 34-35), JA3428-29 (¶¶ 55-57).

- Infringement under § 271(f)(2) requires the combination of "components" that are each recited in the claims, *see, e.g.*, JA3316-17 (Rebuttal Rpt. ¶¶ 63-65), JA3342-43 (¶¶ 134-35), JA3358-59 (¶¶ 176-77), JA3366-67 (¶¶ 196-98), JA3380-81 (¶¶ 223-26), which also contradicts a prior ruling of this Court, D.I. 100 at 21.

***Dr. Riley:*** Dr. Riley is an expert in the field of plant breeding and genetics. JA2191. He is not a lawyer, JA3836 (Tr. 117:4), and has had no involvement in selecting a most similar variety for PVP applications since the late 1980s, JA3846 (Tr. 155:18-156:3). He has never worked as a USDA examiner and has no expertise in how USDA examiners evaluate the selection of most similar varieties. JA3850 (Tr. 172:19-173:1). Dr. Riley should be precluded from testifying on the following:

- The requirements of 7 U.S.C. § 2402 during the application and examination process. *See, e.g.*, JA2214 (Opening Rpt. ¶ 69); *see also* JA2223-25 (¶¶ 84-89).

- The USDA's PVP examination process. *See, e.g.*, JA3850 (Tr. 171:2-173:1).

- The Unasserted Variety Patents do not comply with 35 U.S.C. § 112 based on Corteva restricting access to patent deposits. *See, e.g.*, JA2237-47 (Opening Rpt. ¶¶ 108-131); JA2296-97 (¶¶ 62-63).

- The patent system as a "societal trade-off" where the patentee "give[s] up" certain things in exchange for "protection for a period of time." *See, e.g.*, JA3843 (Tr. 144:5-145:4).

## IV.    CONCLUSION

Corteva respectfully requests the Court grant the motion for partial summary judgment and motion to strike, as detailed above.

Dated:  April 3, 2026
**Redacted Version filed on**
**April 22, 2026**

**BARNES & THORNBURG LLP**

*/s/   Chad S.C. Stover*
Chad S.C. Stover (No. 4919)
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801
Tel. (302) 300-3474
Email: Chad.Stover@btlaw.com

OF COUNSEL:

Peter Bicks (*Pro hac vice*)
Kim B. Goldberg (*Pro hac vice*)
Jordan B. Fernandes (*Pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Tel: +1 212 506 5000
Fax: +1 212 506 5151
pbicks@orrick.com
kgoldberg@orrick.com
jfernandes@orrick.com

David Gindler (*Pro hac vice*)
Lauren Drake (*Pro hac vice*)
Christopher Lynch (*Pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
355 South Grand Avenue
Suite 2700
Los Angeles, CA 90071-1596
Tel: +1 213 629 2020
Fax: +1 213 612 2499
dgindler@orrick.com
ldrake@orrick.com
christopher.lynch@orrick.com

Gary Frischling (*Pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
631 Wilshire Blvd., Suite 2-C
Santa Monica, CA 90401
Tel: +1 310 633 2800
Fax: +1 310 633 2849
gfrischling@orrick.com

- 41 -

Carly Romanowicz (*Pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
222 Berkeley St.
Suite 2000
Boston, MA 02116
Tel: +1 617 880 1800
Fax: +1 617 880 1801
cromanowicz@orrick.com

Todd Vare (*Pro hac vice*)
BARNES & THORNBURG LLP
11 S. Meridian St.
Indianapolis, IN 46204
Tel: (317) 231-7735

Ronald Cahill (*Pro hac vice*)
Heather B. Repicky (*Pro hac vice*)
BARNES & THORNBURG LLP
One Marina Park Drive, Suite 1530
Boston, MA 02210
Tel: (617) 316-5312
Ronald.Cahill@btlaw.com
hrepicky@btlaw.com

Lauren Baker (*Pro hac vice*)
BARNES & THORNBURG LLP
3340 Peachtree Road N.E., Suite 2900
Atlanta, GA 30326
Tel: (404) 264-4036
Lauren.Baker@btlaw.com

*Attorneys for Plaintiffs*