**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CORTEVA AGRISCIENCE LLC, PIONEER HI-BRED INTERNATIONAL, INC., and AGRIGENETICS, INC., <br> Plaintiffs, <br><br> v. <br><br> INARI AGRICULTURE, INC. and INARI AGRICULTURE NV, <br><br> Defendants. | C.A. No. 23-1059 (JFM) <br><br> **REDACTED VERSION** |

**BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT
AND MOTION TO EXCLUDE UNDER *DAUBERT* AND RULE 702**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................... iii

I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT ..................................... 1

II.   ARGUMENT ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ........... 2

      A.   The fact that Corteva's patent deposits must be available to the public does
           not authorize violations of the PVPA or Patent Act, and thus does not
           entitle Inari to summary judgment on Corteva's PVPA and patent claims. .......... 2

      B.   Inari is not entitled to summary judgment on Corteva's PVPA claims. ................ 6

           1.   Inari has not demonstrated that 7 U.S.C. § 2541(d) applies. ..................... 6

           2.   Inari has not demonstrated that 7 U.S.C. § 2544 applies. .......................... 9

      C.   Inari's infringement under § 271(b) is a jury question. ....................................... 11

      D.   Inari's infringement under § 271(a) is a jury question. ....................................... 12

           1.   Inari's direction and control over the phytosanitary testing of
                Corteva's seeds is a disputed question of fact (Counts III & VI). ........... 12

           2.   The domestic use of Corteva's patented seeds is infringement
                under § 271(a). ......................................................................................... 13

           3.   Corteva does not maintain Counts VIV, XII, or XV. .............................. 15

      E.   Inari's infringement under § 271(f)(2) is a jury question. ................................... 15

      F.   Corteva is not estopped from enforcing the PVPA and Patent Act. .................... 20

III.  ARGUMENT ON DEFENDANTS' MOTION TO EXCLUDE .................................... 21

      A.   Dr. Vellturo's reasonable royalty opinions are admissible. ................................. 21

           1.   Dr. Vellturo determines the value of Inari's infringement. ..................... 23

           2.   Dr. Vellturo reasonably relied on Inari's internal projections in
                estimating a reasonable royalty. .............................................................. 26

      B.   Dr. Vellturo's opinions on damages under Mass. Gen. Law Ch. 93A § 11
           are admissible. ..................................................................................................... 29

      C.   Dr. Vellturo's opinions on breach of contract damages are admissible. ............. 31

      D.   Drs. Wessler, Dellaporta, and Mikel are entitled to testify to their opinions
           and the evidentiary basis for them. ..................................................................... 33

           1.   Inari conflates permissible opinions about its documented plans
                with testimony about state of mind. ......................................................... 33

           2.   Inari disregards the necessity of expertise in plant breeding or
                genetics for understanding Inari's intent. ................................................ 35

           3.   Inari's cited authority is inapposite. ........................................................ 39

IV.   CONCLUSION ............................................................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abitron Austria GmbH v. Hetronic Int'l, Inc.,*
600 U.S. 412 (2023)................................................................................................4

*AGSouth Genetics, LLC v. Georgia Farm Servs., LLC,*
22 F. Supp. 3d 1342 (M.D. Ga. 2014) ...............................................................7, 8

*Akamai Techs., Inc. v. Limelight Networks, Inc.,*
797 F.3d 1020 (Fed. Cir. 2015) ............................................................................12

*Aqua Shield v. Inter Pool Cover Team,*
774 F.3d 766 (Fed. Cir. 2014)..........................................................................27, 28

*Ariz. Grain Inc. v. Barkley Ag Enters. LLC,*
No. CV-18-03371, 2021 WL 3144896 (D. Ariz. July 23, 2021)............................11

*Aro Mfg. Co. v. Convertible Top Replacement Co.,*
377 U.S. 476 (1964)..............................................................................................24

*AstraZeneca LP v. TAP Pharm. Prods., Inc.,*
444 F. Supp. 2d 278 (D. Del. 2006)......................................................................40

*Awards.com, LLC v. Kinko's, Inc.,*
42 A.D.3d 178 (N.Y. App. Div. 2007) ..................................................................32

*Boggs v. Duncan,*
202 Va. 877 (1961) ................................................................................................32

*Brumfield v. IBG LLC,*
97 F.4th 854 (Fed. Cir. 2024) .........................................................................25, 26

*Centillion Data Sys., LLC v. Qwest Comm'cns Int'l, Inc.,*
631 F.3d 1279 (Fed. Cir. 2011).............................................................................14

*Diaz v. United States,*
602 U.S. 526 (2024)...............................................................................................35

*Digital Broad. Corp. v. Ladenburg, Thalmann & Co.,*
63 A.D.3d 647 (N.Y. App. Div. 2009) ..................................................................32

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.,*
845 F.3d 1357 (Fed. Cir. 2017)........................................................................12, 13

*Env't Prot. Agency v. Calumet Shreveport Refin., L.L.C.,*
605 U.S. 627 (2025)...............................................................................................10

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009)......37

*Exxon Co., U.S.A. v. Sofec, Inc.*,
517 U.S. 830 (1996)......26

*Fromson v. W. Litho Plate & Supply Co.*,
853 F.2d 1568 (Fed. Cir. 1988)......28

*General Motors Corp. v. Devex Corp.*,
461 U.S. 648 (1983)......24

*Grecia v. McDonald's Corp.*,
724 F. App'x 942 (Fed. Cir. 2018)......14

*Hop-In Food Stores, Inc. v. Serv-N-Save, Inc.*,
247 Va. 187 (1994)......32

*Hughes v. Nationwide Mut. Ins. Co.*,
414 N.Y.S.2d 493 (N.Y. Super. Ct. 1979)......33

*I-Mab Biopharma v. Inhibrx, Inc.*,
No. CV 22-276, 2024 WL 4581539 (D. Del. Oct. 21, 2024)......39, 40

*ITT Hartford Grp., Inc. v. Virginia Fin. Assocs., Inc.*,
258 Va. 193 (1999)......32, 33

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
534 U.S. 124 (2001)......5, 7, 20

*Kenford Co. v. Erie Cnty.*,
67 N.Y.2d 257 (1986)......32

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
383 F.3d 1337 (Fed. Cir. 2004)......28

*Life Techs. Corp. v. Promega Corp.*,
580 U.S. 140 (2017)......19

*Lifetime Indus., Inc. v. Trim-Lok, Inc.*,
869 F.3d 1372 (Fed. Cir. 2017)......13

*Littlejohn v. Bic Corp.*,
851 F.2d 673 (3d Cir. 1988)......3

*Microsoft v. AT&T Corp.*,
550 U.S. 437 (2007)......18, 20

*Midwest Energy Emissions Corp. v. Arthur J. Gallagher & Co.,*
  No. CV 19-1334, 2023 WL 7411710 (D. Del. Nov. 3, 2023) ......................................19, 39, 40

*Monolithic Power Sys. v. Reed Semiconductor Corp.,*
  No. 23-cv-1155, 2026 WL 995299 (D. Del. Apr. 13, 2026) ......................................................29

*Mullen v. Brantley,*
  213 Va. 765 (1973) .................................................................................................................32

*Nken v. Holder,*
  556 U.S. 418 (2009).................................................................................................................9

*NTP, Inc. v. Rsch. In Motion, Ltd.,*
  418 F.3d 1282 (Fed. Cir. 2005).........................................................................................13, 14

*Opticurrent, LLC v. Power Integrations, Inc.,*
  No. 17-cv-03597, 2018 WL 6727826 (N.D. Cal. Dec. 21, 2018)..............................................29

*Oxford Gene Tech. Ltd. v. Mergen Ltd.,*
  345 F. Supp. 2d 431 (D. Del. 2004).........................................................................................40

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,*
  711 F.3d 1348 (Fed. Cir. 2013)................................................................................................24

*Regents of the U. of Cal. v. Cal. Berry Cultivar,*
  No. 16-cv-02477, 2017 WL 9531948 (N.D. Cal. Apr. 27, 2017)..............................................17

*Roche Prods., Inc. v. Bolar Pharma. Co.,*
  733 F.2d 858 (Fed. Cir. 1984).............................................................................................13, 14

*Sea Trade Mar. Corp. v. Coutsodontis,*
  No. 09-cv-488, 2012 WL 6097726 (S.D.N.Y. Dec. 4, 2012) ....................................................8

*Shire Viropharma Inc. v. CSL Behring LLC,*
  No. 17-414, 2021 WL 1227097 (D. Del. March 31, 2021) .......................................................40

*Sinclair Ref. Co. v. Jenkins Petroleum Co.,*
  289 U.S. 689 (1933)................................................................................................................29

*Syneron Med. Ltd. v. Invasix, Inc.,*
  No. 16-cv-00143, 2018 WL 4696969 (C.D. Cal. Aug. 27, 2018) ............................................29

*Trademark Rsch. Corp. v. Maxwell Online, Inc.,*
  995 F.2d 326 (2d Cir. 1993).....................................................................................................32

*United States v. McQuilkin,*
  78 F.3d 105 (3d Cir. 1996)........................................................................................................9

*Vicarious Surgical Inc. v. Tragakis,*
No. 2284CV02321, 2023 WL 3304305 (Mass. Super. Ct. Apr. 27, 2023) ...........................30

*Waymark Corp. v. Porta Sys. Corp.,*
245 F.3d 1364 (Fed. Cir. 2001)..............................................................................................14

*WesternGeco LLC v. ION Geophysical Corp.,*
585 U.S. 407 (2018)...............................................................................................19, 24, 25

*Zimmer Surgical, Inc. v. Stryker Corp.,*
365 F. Supp. 3d 466 (D. Del. 2019)..................................................................................35, 39

*Zink v. Mark Goodson Prods., Inc.,*
261 A.D.2d 105 (N.Y. App. Div. 1999) ...............................................................................32

**Statutes and Regulations**

7 U.S.C. § 2451...........................................................................................................9, 38

7 U.S.C. § 2541(a) ................................................................................................2, 10, 38

7 U.S.C. § 2541(a)(2)...................................................................................................3, 9

7 U.S.C. § 2541(a)(4)......................................................................................................9

7 U.S.C. § 2541(d) .............................................................................................1, 6, 7, 8, 9

7 U.S.C. § 2541(e) ......................................................................................................9, 38

7 U.S.C. § 2544.................................................................................................1, 9, 10, 11, 38

35 U.S.C. § 112..........................................................................................................16, 17

35 U.S.C. § 161..............................................................................................................17

35 U.S.C. § 162..............................................................................................................17

35 U.S.C. § 271(a) ..........................................................................1, 2, 12, 13, 14, 15, 24, 38

35 U.S.C. § 271(b) ....................................................................................1, 11, 24, 35, 37

35 U.S.C. § 271(c) ..........................................................................................................19

35 U.S.C. § 271(e) ..........................................................................................................13

35 U.S.C. § 271(e)(1).......................................................................................................14

35 U.S.C. § 271(f)......................................................................................................18, 20

35 U.S.C. § 271(f)(1).................................................................................................17, 19

35 U.S.C. § 271(f)(2) ...............................................................................1, 2, 15, 16, 35

35 U.S.C. § 284..........................................................................................23, 24, 26, 29

37 C.F.R. § 1.808 ............................................................................2, 3, 4, 6, 7, 11, 12, 20

37 C.F.R. § 1.808(a)(2)...........................................................................................3

Mass. Gen. Law Ch. 93A § 11...........................................................................29, 30

**Other Authorities**

Black's Law Dictionary (12 ed. 2024).....................................................................7

Budapest Treaty on the Int'l Recognition of the Deposit of Microorganisms for
the Purpose of Patent Proc., art. 5, Apr. 28, 1977, 32 U.S.T. 1241, *as amended*, Sept. 26, 1980 .........................................................................................4

Deposit of Biological Materials for Patent Purposes,
53 Fed. Reg. 39420 (Oct. 6, 1988)........................................................................12

Deposit of Biological Materials for Patent Purposes,
54 Fed. Reg. 34864 (Aug. 22, 1989)......................................................................12

Fed. R. Civ. P. 41(a)(2)..........................................................................................16

Fed. R. Evid. 702 ..................................................................31, 34, 35, 36, 39, 40

Fed. R. Evid. 704(a)...............................................................................................35

Jim Chen, *The Parable of the Seeds: Interpreting the Plant Variety Protection Act
in Furtherance of Innovation Policy*, 81 Notre Dame L. Rev. 105, 137 (2005)................10, 11

McCormick on Evid. 80 (7th ed. 2013) ..................................................................35

Merriam-Webster Online Thesaurus, *Sell*, https://tinyurl.com/yztvdzpn ........................................6

U.S. Dep't of Agric., *National Farm Security Action Plan* § 4 (2025),
https://tinyurl.com/bypb73bf ..................................................................................4

U.S. Pat. & Trademark Off., Manual of Patent Examining Procedure...........................................17

## I.    **<u>INTRODUCTION AND SUMMARY OF THE ARGUMENT</u>**

Inari distorts both the law and Corteva's claims in trying to show its entitlement to summary judgment, but its arguments fall short at every turn. Inari's lead argument is a reprise of a legal argument the Court already rejected at the motion-to-dismiss stage: that Corteva authorized violations of the Patent Variety Protection Act (PVPA) and the Patent Act when it sought patent protection for its seeds and made deposits governed by 37 C.F.R. § 1.808. That argument is just as flawed today as it was before, both as a matter of statutory interpretation and as a matter of common sense. Inari's claim-specific arguments are also untethered from the statutory language applicable to Corteva's infringement allegations. For infringement under the PVPA, Inari misapprehends the scope of both 7 U.S.C. §§ 2541(d) and 2544, and its cursory arguments do not come close to demonstrating the absence of any disputed material facts bearing on Corteva's claim. For example, Inari has not shown that its export of protected seeds for purposes of commercial exploitation is immunized from liability as "bona fide research" as a matter of law. For each basis for patent infringement—35 U.S.C. §§ 271(a), 271(b), and 271(f)(2)—Corteva identifies disputed questions of material fact that preclude summary judgment, including whether Inari directed and controlled the phytosanitary testing of Corteva's seeds, whether Inari induced ATCC to transfer seeds for unauthorized commercial purposes, and whether Inari exported seeds with the intent to combine them abroad in a manner that would infringe Corteva's patents.

Inari's motion to exclude Corteva's expert testimony fares no better. Inari does not identify any methodological flaw in any of Corteva's experts' analyses and thus fails to identify a basis for excluding these opinions. With respect to Dr. Vellturo, Inari does not challenge his use of the well-established hypothetical negotiation framework or his application of the *Georgia-Pacific* factors to determine a reasonable royalty. Instead, Inari disagrees with his conclusions about what information the parties would have considered relevant to the negotiation. Inari likewise does not

- 1 -

challenge Dr. Vellturo's methodology in determining non-patent damages, and instead misunderstands his opinions about the present harm to Corteva from Inari's actions. With respect to Drs. Wessler, Dellaporta, and Mikel, Inari's criticism that these experts invade the province of the jury by impermissibly testifying about Inari's state of mind has no basis in reality; these witnesses appropriately deploy their expertise in genetically modifying, breeding, and developing plants to explain to the jury what exactly Inari was doing and how it violated the PVPA and Patent Act. Because Inari's challenges go at most to the weight the jury should give these opinions, not to their admissibility, the motion to exclude should be denied.

## II.    ARGUMENT ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.    The fact that Corteva's patent deposits must be available to the public does not authorize violations of the PVPA or Patent Act, and thus does not entitle Inari to summary judgment on Corteva's PVPA and patent claims.

Inari contends that Corteva's PVPA and patent claims fail because Corteva "authorized public access to [its] patent deposits." *See* D.I. 540 at 2-3, 6-8. Inari argues that (1) Corteva agreed to the terms imposed by 37 C.F.R. § 1.808 as a condition of seeking utility patent protection for its seeds; and (2) § 1.808 guarantees a right of "access to the deposit by the public" that encompasses a right to export protected seeds abroad so that the foreign public can also enjoy access to the deposits. D.I. 540 at 3, 6-8. As a result of Corteva's supposed "authoriz[ation]" to public access of its seeds, Inari thus contends that its exports were not undertaken "without authority," 7 U.S.C. § 2541(a); 35 U.S.C. § 271(a), (f)(2), such that there was no infringement of the PVPA or Patent Act as a matter of law. D.I. 540 at 8.

This argument is a reprise of Inari's argument at the motion-to-dismiss stage about the scope of § 1.808. This claim to "sweeping immunity from [PVP and patent] infringement" fails for the reasons the Court has already explained. *See* D.I. 100 at 14-18. It also fails for the further reasons Corteva explained in response to Inari's motion for § 1292(b) certification, *see* D.I. 137,

- 2 -

to which Inari's summary judgment brief offers no response.

To start, § 1.808 is not a freestanding public-access provision. It provides: "Subject to paragraph (b) of this section, all restrictions imposed *by the depositor* on the availability to the public of the deposited material will be irrevocably removed upon the granting of the patent." 37 C.F.R. § 1.808(a)(2) (emphasis added). The depositor here is Corteva, but the relevant "restriction[s]" are those imposed *by Congress* in the PVPA and Patent Act—for example, the explicit export restriction in 7 U.S.C. § 2541(a)(2). On its face, § 1.808 does not displace these statutes. Nor could it, since a regulation like § 1.808 plainly cannot repeal a statute.

Inari cannot overcome this problem by reframing its argument around Corteva's supposed authorization. Corteva's patents state that Corteva's seed deposits "do[] not waive" its rights under the PVPA and Patent Act. *E.g.*, JA18 (19:10-14), JA56-57 (6:67-7:6); Inari SOF ¶ 5 Resp. That leaves Inari with just the text of § 1.808 as the basis for Corteva's purported authorization. *See, e.g.*, D.I. 540 at 2-3, 6-8; Inari SOF p. 2 (unnumbered) & ¶ 5 Resp. But § 1.808 does not (and cannot) bar enforcing the requirements of the PVPA and Patent Act, so there is no basis whatsoever for deeming Corteva to have authorized what those statutes forbid as a condition of patent protection under § 1.808.

Contrary to Inari's suggestion, Corteva's construction of 37 C.F.R. § 1.808 as consistent with statutory law does not frustrate the public's access to patent deposits. By way of analogy, "the public[]" has a "common law right of access to judicial proceedings and records." *Littlejohn v. Bic Corp.*, 851 F.2d 673, 677-78 (3d Cir. 1988). This does not mean courts are legally obligated to allow the public to livestream court proceedings so others can view them. If people located far from the courthouse are not able to attend judicial proceedings, that is not due to any unlawful restriction on access imposed by the courts, but the reality of geography. So too here. Corteva's deposits are available to the public; the fact that members of the foreign public may not want to go

through the trouble of traveling to the United States (or using U.S.-based agents) to access and inspect these deposits does not give them a right to violate the PVPA or Patent Act.

Moreover, "the vast majority of patent deposits Corteva made with the ATCC … were *not* deposits made under the Budapest Treaty." Inari SOF ¶ 24 Resp. Inari does not explain why the right to access and inspect patent deposits applies to the *foreign public* at all, much less for non-Budapest deposits for which Corteva has not sought foreign patent protection. The "public" to whom patent deposits must be "availab[le]" under § 1.808 is presumptively the *American* public, since Congress is presumed to legislate domestically, not extraterritorially. *See, e.g., Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 417 (2023). Moreover, the Budapest Treaty does not establish an unfettered right to export deposits; it recognizes that export restrictions may be "necessary in view of national security or the dangers for health or the environment," Budapest Treaty on the Int'l Recognition of the Deposit of Microorganisms for the Purpose of Patent Proc., art. 5, Apr. 28, 1977, 32 U.S.T. 1241, *as amended*, Sept. 26, 1980. "[I]ntellectual property theft" related to agricultural technology is a recognized threat to national security. Ex. A (U.S. Dep't of Agric., *National Farm Security Action Plan* § 4 (2025), https://tinyurl.com/bypb73bf).

Inari's argument is untethered from reality in another way, too. Even assuming § 1.808 contemplates a right to export deposits "to effectuate access to patent deposits" for inspection by people located abroad, D.I. 540 at 2-3, Inari is not alleged to have exported Corteva's seeds for that purpose. Instead, there is at least a triable dispute as to whether Inari exported Corteva's seeds *for commercial exploitation*, or with the intent to combine certain seeds to create infringing plants. D.I. 535 at 6-8; *infra* 15-20. And it would be absurd to construe § 1.808 to authorize export of protected seeds for either the purpose of commercial exploitation or for the purpose of violating § 271(f)(2) as a condition for patent protection. Put more simply, a right of *access* to deposited seeds does not provide an unfettered right to *exploit* deposited seeds.

- 4 -

Inari's argument that "[t]he public must be able to inspect and 'read' the deposited biological material that is necessary to describe and understand the invention," D.I. 540 at 7, fails for a similar reason. Corteva does not accuse Inari of simply inspecting its seeds to understand the invention. Corteva instead alleges (and discovery has shown) that Inari commercially exploited Corteva's seeds, and in so doing violated the PVPA and Patent Act. *See, e.g.*, Corteva SOF ¶¶ 144-55, 218-37, 241-61; D.I. 535 at 7-8. In any event, Inari's claim that its supposed need to "inspect" Corteva's invention excuses the violation of any laws standing in the way fails because Inari does not **need** to violate the law to inspect Corteva's invention. To start, the claimed DNA sequences are already spelled out in the specification. *E.g.*, JA2-6. Given that, Inari does not, and cannot, explain why it needs to **export Corteva's seeds** to understand the claimed invention. Nor can Inari explain why, once the seeds arrived abroad, it needed to combine the seeds with water, nutrients, etc. to grow plants, Corteva SOF ¶¶ 127, 131, 135, 138, in order to "read" the DNA sequence of the seeds, when the seeds can themselves be sequenced, Inari SOF ¶ 57.[1] Moreover, the purpose of a patent's written description is to "enable others to 'make and use' the invention **after the patent term expires**," not to allow people to knock off the invention while it remains protected. *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 142 (2001) (emphasis added). The right to access and inspect that Inari invokes simply cannot support the weight Inari tries to put on it to justify its **exporting** and **combining** Corteva's protected seeds abroad.

---

[1] To be clear, Inari needed to grow Corteva's seeds into plants not to "read" the DNA (which it could do from the seeds or the specification) but because Inari's editing techniques require growing Corteva's seeds into mature plants. Inari performs its edits by either: (i) growing Corteva event-containing plants (which Inari often refers to in its documents as ▮▮▮▮▮▮▮▮▮▮▮) and then ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; or (ii) directly editing Corteva event-containing plants by introducing ▮▮▮▮▮▮. *See, e.g.*, JA2679-81 (Dellaporta Op. Rpt. ¶¶ 183-86); JA2369-72 (Wessler Op. Rpt. ¶¶ 173-77); and figures at JA16986-89; JA17026-29.

At bottom, Inari argues that § 1.808 ***requires*** allowing export of patented biological materials abroad for foreign "access" and "inspection"—where, conveniently, Inari believes such materials may be freely exploited commercially. That radical argument should be rejected because it effectively nullifies protections that Congress expressly provided under the PVPA and the Patent Act. Inari is not entitled to summary judgment on this basis as to any claims.[2]

**B.    Inari is not entitled to summary judgment on Corteva's PVPA claims.**

**1.    Inari has not demonstrated that 7 U.S.C. § 2541(d) applies.**

Inari's argument that 7 U.S.C. § 2541(d) insulates its conduct from liability under the PVPA fundamentally misunderstands that provision, which states:

> It shall not be an infringement of the rights of the owner of a variety to perform any act concerning propagating material of any kind, or harvested material, including entire plants and parts of plants, of a protected variety that is sold or otherwise marketed with the consent of the owner in the United States, unless the act involves further propagation of the variety or involves an export of material of the variety, that enables the propagation of the variety, into a country that does not protect varieties of the plant genus or species to which the variety belongs, unless the exported material is for final consumption purposes.

This provision does not apply to Inari's conduct for three reasons. ***First***, Inari has not demonstrated that the relevant Corteva protected varieties are "sold or otherwise marketed … in the United States." 7 U.S.C. § 2541(d). Inari contends that this requirement is satisfied by Inari's acquisition of patent deposit materials from ATCC. D.I. 540 at 9. That is wrong. "Sold" and "marketed" are synonyms, both meaning "to offer for sale to the public." Ex. B (*Sell*, Merriam-Webster Online Thesaurus, https://tinyurl.com/yztvdzpn (last visited May 1, 2026)). As the only court to have interpreted § 2541(d) put it, this provision applies when a protected variety is "placed

---

[2] Inari refers at times to induced PVP infringement. *E.g.*, D.I. 540 at 8. The infringement contentions make clear Corteva's claim is not that Inari induced ATCC's PVP infringement; it is that Inari directly infringed the asserted PVP certificates by exporting the protected seed varieties outside of the United States, either personally or through its agent Eversole. JA4184-86.

into the stream of commerce." *AGSouth Genetics, LLC v. Georgia Farm Servs., LLC*, 22 F. Supp. 3d 1342, 1348 (M.D. Ga. 2014) (discussing legislative history).

Inari does not even try to show that Corteva's patent deposit seeds that it acquired from the ATCC are "sold or otherwise marketed" in this sense. It relies solely on the fact that these seeds were deposited with ATCC as a requirement for patent protection, *e.g.*, Corteva SOF ¶ 9 Resp., and that Corteva and ATCC are required to make those deposits available under 37 C.F.R. § 1.808. But the patent deposit seeds are not commercially available, Inari SOF ¶¶ 89-92, 94-95, 97 Resp., and the ATCC's restrictions on further transfers of patent deposit seeds obtained for non-commercial research purposes through the MTAs, *see* D.I 535 at 8-12, preclude these protected varieties from ever entering "the stream of commerce." *AGSouth Genetics*, 22 F. Supp. 3d at 1348; *see also Commerce*, Black's Law Dictionary (12th ed. 2024) (defining "commerce" to mean "[t]he exchange of goods and services, esp[ecially] on a large scale").

Inari argues that because ATCC charges a fee for access to protected patent deposits, deposited seeds are "sold or otherwise marketed" within the meaning of § 2541(d). But that capacious construction of § 2541(d) would severely limit PVPA protection when a depositor also seeks patent protection. As the Supreme Court has made clear, the PVPA and Patent Act do not conflict and should be construed so that each retains effect. *J.E.M. Ag Supply, Inc.*, 534 U.S. at 143-44. Contorting the phrase "sold or otherwise marketed" to reach non-commercial acquisitions of ATCC patent deposits made as a condition of patent protection would contradict this command, as it would treat the requirements of patent protection as inherently diminishing PVPA protection. The Court should instead give the phrase "sold or otherwise marketed" its plain, common-sense construction as reaching varieties placed in the stream of commerce, which are not the patent deposits required to be made available to the public for limited non-commercial purposes.

***Second,*** even if the Court adopted Inari's construction of "sold or marketed in the United

- 7 -

States," Inari still cannot show that § 2541(d) immunizes its conduct from liability. An act undertaken after a protected variety has been "sold or otherwise marketed" is still infringing if "the act involves further propagation of the variety." 7 U.S.C. § 2541(d); *AGSouth Genetics*, 22 F. Supp. 3d at 1348 (explaining that § 2541(d) "exempts acts taken in relation to that variety [from infringement liability] to the extent the acts ***do not involve propagation***" (emphasis altered)). Although Inari, as the moving party, bears the burden of showing the absence of a triable fact issue, Inari has not established that its conduct did not involve propagation. If anything, the record shows the opposite. For example, ██████████████████████████████████

████████████████████████████████████████████████

██████████████ Corteva SOF ¶¶ 84-85, 240 Resp. Given Inari's failure to demonstrate that its conduct does not "involve[] … propagation" to take it outside the scope of the § 2541(d) exception, it is not entitled to summary judgment under § 2541(d).

***Third***, regardless of whether Inari's conduct "involve[d] … propagation," it is still infringement to engage in an act that "involves an export of material of the variety, that enables the propagation of the variety, into a country that does not protect varieties of the plant genus or species to which the variety belongs, unless the exported material is for final consumption purposes." 7 U.S.C. § 2541(d). Inari claims, in cursory fashion, that Belgium and Chile (the countries into which Corteva's protected seeds were exported) protect new corn and soybean varieties. D.I. 540 at 9 (citing Inari SOF ¶¶ 65-66, 84-85). But Inari's cursory submission regarding foreign law does not discharge its burden, as the moving party, to demonstrate its entitlement to summary judgment. *See Sea Trade Mar. Corp. v. Coutsodontis*, No. 09-cv-488, 2012 WL 6097726, at *3 (S.D.N.Y. Dec. 4, 2012) (denying summary judgment because the moving party's papers were "insufficient" to evaluate "the content of the applicable [foreign] law").

### 2.    Inari has not demonstrated that 7 U.S.C. § 2544 applies.

Inari's argument on the PVPA's research exemption also misapprehends the relevant statutory text. Under this exemption, "[t]he use and reproduction of a protected variety for plant breeding or other bona fide research shall not constitute an infringement of the protection provided under this chapter." 7 U.S.C. § 2544. The statute is inapplicable because it applies to only "use and reproduction of a protected variety"—not to the *export* of a protected variety. This omission is significant because the PVPA's definition of acts constituting infringement lists *exporting* a protected variety separately from *using* a protected variety. *Compare* 7 U.S.C. § 2541(a)(2) (making it unlawful to "import [a] variety into, or export it from, the United States"), *with id.* § 2541(a)(4) (making it unlawful to "use the variety in producing (as distinguished from developing) a hybrid or different variety therefrom"). Congress's choice not to list the export of protected varieties in § 2544 as protected by the research exemption despite distinguishing between "use" and "export" of protected varieties elsewhere in the PVPA must be given effect. *See Nken v. Holder*, 556 U.S. 418, 430 (2009) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). The fact that other carve-outs from PVPA liability under § 2541 apply broadly to "any act," *see* 7 U.S.C. § 2541(d), (e), while § 2544 applies only to "use and reproduction," but not export, reinforces the need to give meaning to Congress's narrower language in § 2544. Because Inari exported Corteva's protected varieties abroad, *e.g.*, Corteva SOF ¶¶ 75, 84-86, 106, 109, 118-24, 172, 240; D.I. 540 at 9-10 (admitting export to Belgium and Chile), its conduct does not fall within the scope of the research exemption as a matter of law.

Even setting aside that § 2544 does not exempt exports, there is a genuine fact dispute as to whether Inari's conduct is the kind of "plant breeding" and "research" protected by § 2544. This

exception must be carefully construed lest it "swallow the rule" Congress set out in § 2541(a). *Env't Prot. Agency v. Calumet Shreveport Refin., L.L.C.*, 605 U.S. 627, 644 (2025). Case law interpreting this provision is sparse, but the academic literature explains that it encompasses the development of genuinely novel and innovative plant varieties. *See* Jim Chen, *The Parable of the Seeds: Interpreting the Plant Variety Protection Act in Furtherance of Innovation Policy*, 81 Notre Dame L. Rev. 105, 137 (2005). By contrast, the exemption does not cover what the PVPA calls "essentially derived varieties," which are basically "knock-offs of proprietary varieties" that "add[] nothing" innovative and make only "slight cosmetic changes" to what came before. *Id.* at 138-39. Inari claims in cursory fashion to have used Corteva's seeds for "breeding research" and "to create new inbred varieties." D.I. 540 at 10-11. But Inari's superficial argument, *see* Inari SOF ¶¶ 56-64, 71, 83 Resp., does not establish as a matter of law that *all* of its conduct was directed at developing novel plant varieties rather than knock offs that do not fall under § 2544. For example, Inari does not cite *anything* for its claim that "DNA sequence information was used in breeding research" and "[n]o other use was made of the Exhibit A [Corteva] seeds." D.I. 540 at 10. Inari simply has not shown that there is no triable dispute as to whether Inari engaged in innovative research protected by § 2544, or whether it was impermissibly knocking off Corteva's protected seeds.[3]

There is also an independent factual dispute as to whether Inari's conduct, even if "research" under § 2544, was "bona fide." "[B]ona fide" research must be done in good faith, and "the use of unlawfully secured samples of proprietary seed to develop a competing plant variety would violate the PVPA." Chen, 81 Notre Dame L. Rev. at 134-36; *see also Ariz. Grain Inc. v.*

---

[3] It also makes little sense for a statute to require a *post hoc* evaluation of the propriety of Inari's export of the Corteva seeds based on what happened *after* the export, namely, whether Inari performed research to develop a sufficiently novel variety to justify the export. This awkwardness reinforces that § 2544 does not apply to exports at all. *See supra* 9.

*Barkley Ag Enters. LLC*, No. CV-18-03371, 2021 WL 3144896, at \*4 (D. Ariz. July 23, 2021) (ruling that the research exemption under § 2544 could not apply in connection with a breeding program because the biological materials "were not properly, nor legally obtained"). Here, of course, Inari exported and used Corteva's protected seeds in violation of the ATCC's MTAs. *See* D.I. 535 at 6-12. There is at least a genuine factual dispute as to whether those wrongful acts preclude a finding that Inari engaged in good faith, "bona fide" research.

C.    **Inari's infringement under § 271(b) is a jury question.**

Corteva's claims for induced infringement are not "based on a patent depository furnishing samples of a patent deposit." D.I. 540 at 13. Corteva contends that Inari willfully and intentionally induced ATCC to transfer Corteva's patented seeds to Inari *for commercial purposes*, knowing that ATCC was not authorized to do so. D.I. 148 ¶¶ 218-28, 253-63, 290-300, 325-35, 360-70. Inari's argument does not claim any deficiency in the evidence supporting Corteva's allegations. The sole contention is that "Corteva expressly authorized ATCC to make the patent deposits available to the public," and indeed was required to provide such authorization under the Budapest Treaty and 37 C.F.R. § 1.808. *See* D.I. 540 at 12. Because ATCC's transfer to Inari was authorized, Inari argues, ATCC did not directly infringe and Inari cannot be liable for inducing infringement. This ignores the central point of Corteva's § 271(b) claims: ATCC was *not authorized* to distribute Corteva's seeds to Inari *for commercial use*. Corteva SOF ¶ 143. Inari does not even attempt to respond to Corteva's actual claims (by, for example, contesting that ATCC was so authorized, or arguing that Inari is not liable even assuming ATCC was not authorized). Because Inari instead erects a strawman, it has not shown its entitlement to summary judgment.[4]

---

[4] Inari's mudslinging at Corteva, D.I. 540 at 13, is baseless; Corteva does not exploit ATCC patent deposits for commercial purposes. Inari also claims, as an aside, that "export and use restrictions [on patent deposits] were proposed when the patent deposit rules were amended and rejected by

D.     **Inari's infringement under § 271(a) is a jury question.**

Through its agent IE-SCS, Inari requested that ATCC ship seeds protected by the '434 and '246 patents to Iowa State University, and directed ISU to use those seeds in phytosanitary testing. Inari's attempt to disclaim responsibility for this use may not be resolved at summary judgment.

1.     **Inari's direction and control over the phytosanitary testing of Corteva's seeds is a disputed question of fact (Counts III & VI).**

The Federal Circuit has "expressly held that § 271(a) infringement 'is not limited solely to principal-agent relationships, contractual arrangements, and joint enterprise,'" and that "'principles of attribution are to be considered in the context of the particular facts presented.'" *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1367 (Fed. Cir. 2017) (quoting *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1023 (Fed. Cir. 2015) (en banc)). Inari's preferred characterization of its relationships and contractual arrangements does not entitle it to summary judgment.

Inari's motion asserts in conclusory fashion that "[n]either Inari nor IE-SCS directed or controlled ISU's performance" of phytosanitary testing. D.I. 540 at 14. But Inari contracted for exactly that use of Corteva's seeds. As Inari acknowledges, it "entered into a services agreement with IE-SCS … which provided that IE-SCS would receive the patent deposit samples[,] … apply for the required phytosanitary certificates, and export the seeds." Inari SOF ¶ 32. IE-SCS did just that, "receiv[ing] the patent deposit seeds from ATCC, coordinat[ing] with the USDA," and

the USPTO in promulgating 37 C.F.R. § 1.808." D.I. 540 at 12 (citing Inari SOF ¶ 28). That is also beside the point. The PTO rejected invitations to impose various restrictions on public access to deposited materials, explaining that "there would be no need for the requester to undertake not to do anything other than that which is permitted by law, for the requester would already be bound by the law." Deposit of Biological Materials for Patent Purposes, 53 Fed. Reg. 39420, 39423 (Oct. 6, 1988). The fact that the PTO declined to add *additional* export restrictions in § 1.808, *see* Deposit of Biological Materials for Patent Purposes, 54 Fed. Reg. 34864 (Aug. 22, 1989), does not change the fact or scope of export restrictions that exist independently elsewhere in the law.

- 12 -

"shipp[ing] the official sample to ISU," Inari SOF ¶ 41, which "performed the test" as requested, Inari SOF ¶ 43. Further, IE-SCS directed ISU to deviate from its standard testing protocol. Inari SOF ¶ 51 Resp.[5] By contracting others to infringe through use of Corteva's patented seeds, Inari itself is a direct infringer. *See Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1378 (Fed. Cir. 2017) (holding complaint adequately alleged direct infringement of device claim where agents of defendants completed infringing act through assembly of patented device).

### 2. The domestic use of Corteva's patented seeds is infringement under § 271(a).

Despite specifically contracting for Corteva's seeds to be acquired and tested in the United States, Inari argues that it did not thereby "obtain[] … *any benefit* related to … the asserted claims of the '246 and '434 patents" and so did not "use" the seeds under § 271(a). D.I. 540 at 15 (emphasis added). Inari is wrong on both the law and the facts.

Section 271(a) "prohibits, on its face, any and all uses of a patented invention." *Roche Prods., Inc. v. Bolar Pharma. Co.*, 733 F.2d 858, 861 (Fed. Cir. 1984), *superseded in part by* 35 U.S.C. § 271(e). Courts "address[ing] the meaning of 'use' have consistently followed the Supreme Court's lead in giving the term a broad interpretation." *NTP, Inc. v. Rsch. In Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005), *distinguished by Zoltek Corp. v. United States*, 672 F.3d 1309, 1323 (Fed. Cir. 2012) (en banc). While "'use' … has never been taken to its utmost possible scope," *Roche Prods.*, 733 F.2d at 861, "testing is a use of the invention that may infringe under § 271(a)," *Waymark Corp. v. Porta Sys. Corp.*, 245 F.3d 1364, 1366 (Fed. Cir. 2001) (citing *Roche Prods.*, 733 F.2d at 863). Tellingly, when Congress responded to *Roche Products*'s rejection of an "exception to the use prohibition" for "unlicensed experiments conducted with a view to the

---

[5] Inari's assertion that "IE-SCS was an independent contractor and not Inari's agent," D.I. 540 at 14, is both disputed, *see* Inari SOF ¶ 35 Resp., and irrelevant, as vicarious liability may rest on "contractual arrangements," not just "principal-agent relationships." *Eli Lilly*, 845 F.3d at 1367.

adaptation of the patented invention to the experimentor's business," 733 F.2d at 863, it created an exception "*solely* for uses reasonably related to the development and submission of information under a Federal law which regulates … drugs or veterinary biological products," 35 U.S.C. § 271(e)(1) (emphasis added). Otherwise, as this Court has explained, "[t]here is nothing special about testing as a use." D.I. 100 at 18.

Inari erroneously asserts that "[a]n infringing 'use' under … § 271(a) must be a beneficial use of the invention." D.I. 540 at 15. But Inari's cited authorities address issues this Court has ruled are "distinctly different" from the question of Inari's domestic testing, D.I. 100 at 18-19, and none stands for the proposition that § 271(a) incorporates a general requirement of beneficial use. Instead, they address multi-component system claims that may be "used" domestically even if "a component of a patented system is located outside the United States," *NTP*, 418 F.3d at 1316, or even if the claim "includes elements in the possession of more than one actor," *Centillion Data Sys., LLC v. Qwest Comm'cns Int'l, Inc.*, 631 F.3d 1279, 1283 (Fed. Cir. 2011). In those contexts, determining "[t]he situs of the infringement" requires identifying "the place where control of the system is exercised and beneficial use of the system obtained." *NTP*, 418 F.3d at 1316-17. Relatedly, to "use" a system claim, the infringer must benefit "from each and every element of the claimed system," not only certain components. *Grecia v. McDonald's Corp.*, 724 F. App'x 942, 945-47 (Fed. Cir. 2018) (cleaned up). *Grecia*'s holding that an infringer does not benefit from the system as a whole simply by deriving a benefit from a single component of the system is not applicable here.

Even if "use" under § 271(a) required that a benefit accrue to the infringer, Inari acknowledges that it received one. Inari concedes that the test fulfilled the "sole purpose" for which it was sought: "to confirm that the seeds were not contaminated" and thus could be exported to Belguim. D.I. 540 at 15. It is irrelevant that "[t]he test destroyed all the seeds"—any number of

infringing uses would—and equally irrelevant that Inari did not commit other infringing acts by "grow[ing] the seeds into plants, us[ing] them as food, process[ing] them into some other item or sell[ing] them." *Id.* At a minimum, the question of benefit (were it relevant) would be one for the jury to resolve.

Finally, Inari conflates the act of exporting a patented invention with the accused infringing act of using the invention in the United States. If one reads a patent's written description, makes the invention in violation of § 271(a), and then exports it, it is no excuse that making the invention "was required to effectuate the export." D.I. 540 at 15-16.[6] Inari offers no legal authority for its suggestion that its infringing use of Corteva's seeds is any different. Inari's insinuation that its domestic infringement should be excused because "Belgium required that the corn seeds be certified" after phytosanitary testing, D.I. 540 at 14, is a red herring: Belgium did not require Inari to import any seeds at all, so its importation requirements (which are generally applicable, *see* Inari SOF ¶ 67) did not lead to the domestic use of Corteva's seeds—Inari's voluntary actions did.

### 3.    Corteva does not maintain Counts VIV, XII, or XV.

Corteva communicated to Inari on September 25, 2025 that it was "not contending that Inari infringed 35 U.S.C. § 271(a) for" the '522, '363, and '441 patents. Stover Decl. at 2. The Court may dismiss Counts VIV, XII, and XV pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure.

### E.    Inari's infringement under § 271(f)(2) is a jury question.

Corteva's infringement claim is a straightforward application of § 271(f)(2): Corteva alleges that the unauthorized export of certain seeds infringes claims to a plant or biological

---

[6] Similarly, as discussed below (at 17-18), while mere export may be permissible (putting aside contract and PVPA concerns), exporting with intent to combine in an infringing manner is not permissible under 35 U.S.C. 271(f)(2).

sample. Inari's arguments otherwise add extra-statutory glosses to § 271(f)(2) that are not supported by the statute's text or purpose. Inari cannot show that Corteva's infringement claims are barred as a matter of law or that there are no material facts in dispute.

*First*, Inari argues that Corteva authorized access to its seeds. D.I. 540 at 17. Even if Inari was authorized to access Corteva's seeds for purposes of ensuring Corteva's patents comply with written description and enablement requirements, *see supra* 2-6, Corteva did not authorize Inari to "suppl[y] or cause[] to be supplied" seeds that were then "combined outside of the United States in a manner that would infringe." 35 U.S.C. § 271(f)(2). Corteva's deposits to ATCC were for purposes of meeting § 112 requirements for patentability. The deposits did not give anyone, let alone Inari, authority to export seeds from the United States with the intent to grow the seeds into infringing plants and then use those plants to create knock-off versions of Corteva's patented events. *See supra* 5 n.1. As this Court explained, depositing seeds with ATCC does not "give the world a blanket license to its invention just because it deposited the seeds. The public is entitled to availability of the deposits—not to exploit them in any way." D.I. 100 at 22.

*Second*, a reasonable jury could find that a seed is a component of a plant or that seeds contain components that are components of a plant.[7] This Court already found that a "plant … is manifestly a multi-component invention," D.I. 100 at 21, and Inari does not even attempt to address that cells, organelles, DNA, and events from the seed are components of the plant grown from the seed. Inari SOF ¶¶ 86-88 Resp.

Inari repeats arguments already rejected at the motion-to-dismiss stage and fails to

---

[7] Inari's argument misunderstands—or misstates—Corteva's § 271(f)(2) allegations. Corteva alleges not just that a seed is a component of a plant grown therefrom but that components of seeds—e.g., cells, organelles, DNA, and events—are also components of a plant grown from the seed. Inari SOF ¶¶ 86-88 Resp.

- 16 -

demonstrate an absence of disputes of fact. Inari contends that a seed that "self-replicates" into a plant cannot be a component. D.I. 540 at 17. But there is no dispute that a seed cannot become a plant without other materials, including water, light, and nutrients. Inari itself admits that a seed needs "appropriate conditions" to grow into a mature plant. *Id.*; Inari SOF ¶¶ 84-87 Resp., Reply. Those "conditions" include a supply of water, light, and nutrients that must be combined with the seed. The plain meaning of a "component," as used in § 271(f)(2), thus includes a seed, because the seed may be "combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States."[8] The jury will decide whether growing seeds into plants is a combination of the exported seeds with other materials or whether a seed itself contains components that are combined abroad.

Inari's arguments to the contrary are attempts to distract from the plain language of § 271(f)(2). D.I. 540 at 18. Nothing in § 271(f)(2) requires that the patent describe how to combine the particular component the infringer exports into the patented invention. Of course, the patents *do* describe how to grow the seeds into plants, including for example that "One seed was planted per pot, and the pot was uniquely identified. All plants were grown with light, temperature, and water regulated for healthy plant growth." JA69 (32:23-26). Nor is Corteva alleging infringement through practicing the process of combining the seed with other materials to make the plant:

---

[8] Inari's citations to *Regents of the University of California v. California Berry Cultivar*, No. 16-cv-02477, 2017 WL 9531948 (N.D. Cal. Apr. 27, 2017), are inapposite. The patents at issue in that case were plant patents (35 U.S.C § 161), not utility patents. *See id.* at *6. "A plant patent is granted only on the entire plant." U.S. Pat. & Trademark Off., Manual of Patent Examining Procedure § 1605 (9th ed. 2024); *see also* 35 U.S.C. § 162. In *Regents*, the accused infringer exported plants, created new plants abroad, and imported the newly created seeds of those plants. *Id.* The court there evaluated potential infringement under § 271(f)(1) and simply concluded that a claimed strawberry plant does not have "components" that can be combined into a claimed plant. 2017 WL 9531948 at *6. The court offered no further analysis and, particularly given the requirement that plant patents claim only the entire plant, the *Regents* decision offers no guidance relevant to the present case.

Corteva's allegation of infringement is based on the act of *exporting* the *seed* with the intent to combine. Section 271(f)(2) does not require that the infringing combination come into existence. And Inari's argument that the written description of the patents equates plants and seeds at best raises a fact dispute for the jury over whether a seed is a component. *But see* Inari SOF ¶ 86-88 Resp. Because there are material disputes of fact on that point, summary judgment is not warranted.

*Third*, the exported seeds are not commodities and have no substantial noninfringing use. There is no dispute that Inari exported seeds it obtained from ATCC. Corteva SOF ¶ 106; Inari SOF ¶¶ 89-97 Resp. Those seeds are not suitable for use as food, given their costs, limited numbers and restrictions on use, and are not commodities. *E.g.*, Corteva SOF ¶¶ 94, 95; Inari SOF ¶¶ 90, 92 Resp. Recognizing this, Inari does not contend the ATCC seeds are commodities. Inari instead points to other seeds containing the patented events that Inari contends are commodities (*e.g.*, seeds produced from Corteva's Qrome®, Herculex XTRA®, and Optimum AcreMax® products). D.I. 540 at 20; Inari SOF ¶¶ 89-97. But Inari did not export those seeds (nor could it have done so under the license restrictions applicable to buyers of those seeds). Inari's argument ignores that it is the specific component exported that is considered under § 271(f)(2). D.I. 540 at 19-20. The plain language of § 271(f)(2) refers to the component supplied from the United States and that "such component" is then combined into the accused invention. As the Supreme Court explained in *Microsoft v. AT&T Corp.*, it is "the very components supplied from the United States" which can "trigger § 271(f) liability when combined abroad to form the patented invention at issue." 550 U.S. 437, 453 (2007).[9]

---

[9] Inari also suggests that export of a single component is not an infringement under § 271(f)(2). D.I. 540 at 20. The Supreme Court expressly rejected that argument in *Life Technologies Corp. v. Promega Corp.*, noting "[w]hereas § 271(f)(1) refers to 'components,' plural, § 271(f)(2) refers to 'any component,' singular." 580 U.S. 140, 150 (2017).

That focus on the particular components exported is consistent with how courts interpret § 271(c), which prohibits contributory infringement through selling, offering to sell, or importing "a component," "knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use." 35 U.S.C. § 271(c). Under § 271(c), courts "look not to whether [the component], as a general matter, has any substantial noninfringing uses. Rather, we must focus on whether the accused [component], as it was sold and delivered by Defendants to their … customers, could practically be used for purposes other than infringement." *Midwest Energy Emissions Corp. v. Arthur J. Gallagher & Co.*, No. CV 19-1334, 2023 WL 7411710, at *3 (D. Del. Nov. 3, 2023). Corteva contends there is no dispute of fact that the ATCC seeds—the specific accused component here—have no substantial noninfringing use and are not commodities. *See* Inari SOF ¶¶ 90, 92, 93, 95, 97 Resp. At most, however, there is a dispute of fact that prevents summary judgment in favor of Inari.

*Fourth*, application of § 271(f)(2) here does not amount to an extraterritorial application of U.S. patent law. The Supreme Court has already analyzed § 271(f)(2) and determined that the "focus" of § 271(f)(2) is the domestic act of exporting. *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 414-15 (2018). And this Court likewise analyzed and rejected Inari's argument that § 271(f)(2) "forbids the component [accused under § 271(f)(2)] from being claimed in some other claim of the patent." D.I. 100 at 20 n.11. Inari's argument that Corteva cannot allege the same acts infringe under both § 271(a)/(b) and § 271(f), D.I. 540 at 21, is also based on a false premise. Corteva alleges that specific acts (export with intent to combine) of specific seeds (those obtained from ATCC) infringe specific claims to plants and biological samples. Those same acts and seeds are not also alleged to infringe those claims under §§ 271(a) and (b).

Inari also makes a passing argument that Corteva should sue Inari under European patents.

- 19 -

D.I. 540 at 21. Potential liability under a foreign law does not make application of a separate U.S. law impermissibly extraterritorial. Congress enacted § 271(f) specifically to "expand[] the definition of infringement to include supplying from the United States a patented invention's components." *AT&T*, 550 U.S. at 444-45. That is what Corteva asserts here.

> **F.    Corteva is not estopped from enforcing the PVPA and Patent Act.**

Inari's estoppel argument, D.I. 540 at 22-23, is a repackaged version of the argument already addressed above: that having sought patent protection for its plant varieties, Corteva cannot restrict "access by the public to the patent deposit [that] is mandated by the Patent Law." D.I. 540 at 23. This right of access, according to Inari, "permits foreign members of the public to export from the U.S. samples of the patent deposit to effectuate mandatory access to the patent deposit, exactly what Inari did here." *Id*. This argument is contrary to the plain text of 37 C.F.R. § 1.808, the PVPA, and the Patent Act. *Supra* 3. It ignores that export of protected seeds abroad is not necessary for the foreign public to access and inspect patented technology (for example, by reviewing patent filings and/or traveling to the United States). *Supra* 3-5. And it ignores that Inari stands accused not of simply accessing patent deposits, but of commercially exploiting Corteva's protected seeds to develop its own competing commercial products in a way that violated both the PVPA and the Patent Act. *Supra* 4. The Supreme Court in *J.E.M. Ag Supply* instructed that PVPA and patent protections are complementary systems that must be construed to coexist, 534 U.S. at 143-44, and Corteva's patents themselves state that they "do[] not waive any infringement of their rights granted under this patent or under the [PVPA]" by depositing seeds, *e.g.*, JA18 (19:10-14), JA56-57 (6:67-7:6). In light of all the foregoing, it would be perverse to hold that applying for patent protection amounts to an authorization for violations of the PVPA and the Patent Act that estops Corteva from enforcing those protections.

## III.   ARGUMENT ON DEFENDANTS' MOTION TO EXCLUDE

### A.   Dr. Vellturo's reasonable royalty opinions are admissible.

Dr. Vellturo opines that Corteva and Inari would agree to a one-time, lump sum payment ███████████ as a reasonable royalty for Inari's domestic infringement of Corteva's patents. JA3036-37 (Vellturo Op. Rpt. ¶ 222). That amount takes account of both the value to Inari of accelerating its product development timeline without having to wait for patent expiration and the expected harm to Corteva from enabling Inari to compete sooner than it would otherwise. JA2994–3004 (Vellturo Op. Rpt. ¶¶ 115, 121-139); D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶¶ 20-21, 24-26, 35-40, 66-69). Dr. Vellturo arrived at his opinion through the well-established hypothetical negotiation approach and careful application of the *Georgia-Pacific* factors to determine a reasonable royalty for Inari's infringement of Corteva's patents. Under that approach, the hypothetical negotiation is assumed to have taken place at the time of the first alleged infringement—here, May 2020. JA2993-94 (Vellturo Op. Rpt. ¶ 114). By that time, Inari had commenced a strategy it referred to as ███████████ through which it sought to edit Corteva's existing GM events, create "me-too" versions of those events, and even seek its own patents for those modified versions. JA2983-84 (Vellturo Op. Rpt. ¶¶ 94-95); D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶¶ 29-30, 59); *see also* JA19366 (███████████████. Doing so would allow Inari to shortcut the time and cost of developing new events by editing Corteva's patented events. JA2997-3001, JA3031-32 (Vellturo Op. Rpt. ¶¶ 124-133, 206); D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶¶ 38, 40, 59-63). ██████████████████████████████

██████████████████████████████████████

██████ JA2987-88 (Vellturo Op. Rpt ¶ 100); D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶ 38). But Inari could only develop its edited versions of Corteva's events by infringing Corteva's IP rights either by editing in the United States or by exporting seeds to grow plants in order to edit them

- 21 -

abroad. JA2992 (Vellturo Op. Rpt. ¶ 109) (citing Dellaporta Rpt. and Wessler Rpt.); D.I. 541, Ex. 3 (Vellturo Reply ¶¶ 22, 24, 37, 63); *see also supra* 5 n.1.

The hypothetical negotiation proceeds on the assumption that Corteva would have been aware of Inari's intent to use Corteva's patented events, edit them, and sell products containing the edited events in the United States in competition with Corteva. JA2995 (Vellturo Op. Rpt ¶¶ 118-19); D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶ 43). Because delaying product development until after patent expiration would reduce Inari's expected financial gains, Inari would be willing to pay an amount up to that delay cost to obtain a license for pre-expiration rights to edit and commercially exploit the patented events. JA2997-98 (Vellturo Op. Rpt. ¶¶ 126-28); D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶¶ 24, 26). In other words, Inari's commercialization "head start" through infringing is a benefit for which it would be willing to pay at the hypothetical negotiation. D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶ 68). To estimate that benefit, Dr. Vellturo relied on Inari's own internal projections (which Inari shared with actual and potential investors in order to obtain funding). JA2998-99 (Vellturo Op. Rpt. ¶¶ 128-30); D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶¶ 29-30); ███████████████████████████. Dr. Vellturo also estimated the expected financial harm to Corteva associated with licensing a competitor, which would inform Corteva's willingness to accept any license terms, by relying on economic data from both parties. JA3001-04 (Vellturo Op. Rpt. ¶¶ 134-38). He explained that Inari's willingness to pay and Corteva's willingness to accept define the bargaining range within which the parties could have agreed to a royalty. JA3004 (Vellturo Op. Rpt. ¶ 139); D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶¶ 66-69).

Dr. Vellturo then went on to consider, in detail, the *Georgia-Pacific* factors, including the terms (financial and otherwise) of previous ████████████████████████ both Corteva and Inari had entered into with other parties; the significant existential threat that would be posed to Corteva's events, regulatory relationships, and business if Inari were granted rights to edit and

- 22 -

market "me-too" copies of the patented events; the critical nature of the patented inventions to Corteva's business; and the benefits provided by the asserted patents. *See* JA3004-36 (Vellturo Op. Rpt. ¶¶ 140-220). Based on his overall assessment of those factors, Dr. Vellturo concludes that a royalty of ███████████████████████████████████████████████ would be appropriate. JA3036-37 (Vellturo Op. Rpt. ¶ 222). That estimate is consistent with Inari's own assessment, from a June 2021 proposal to Corteva, of the value to Inari ████████ and risks to Corteva ███████████ of Inari's plans. D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶ 37).

Inari's motion does not challenge Dr. Vellturo's use of the hypothetical negotiation framework or his application of any of the *Georgia-Pacific* factors. Instead, Inari disagrees with Dr. Vellturo's opinions about what information the parties would have considered relevant to the hypothetical negotiation. At best, these challenges go to the weight the jury should give Dr. Vellturo's opinions, not their admissibility.

### 1.    Dr. Vellturo determines the value of Inari's infringement.

As Inari admits, "Corteva's infringement claims are based on alleged acts that occurred in the U.S." D.I. 540 at 29. Dr. Vellturo is required to assume that infringement occurred and then to opine on the amount of "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. Dr. Vellturo's damages opinions are based on the value of Inari's "use made of the invention." Inari contends that Dr. Vellturo is improperly valuing Inari's "foreign use" of Corteva's inventions. D.I. 540 at 28-31. But Inari's arguments ignore the direct causal link between Inari's domestic acts of infringement and the harm such infringement caused to Corteva.

As the Supreme Court has explained, the "overriding purpose" of § 284 is to "affor[d] patent owners complete compensation" for infringement. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 (1983). "Complete compensation" includes "the difference between [the

- 23 -

patentee's] pecuniary condition after the infringement, and what [its] condition would have been if the infringement had not occurred." *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 417 (2018) (quoting *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964)). Here, the difference in Corteva's position before and after Inari's domestic infringement is the entirely foreseeable—and intended—result of Inari's domestic infringement (testing seeds in violation of § 271(a), acquiring seeds for commercial use in violation of § 271(b), and exporting them to be combined to create plants in violation of § 271(f)(2)). Inari undertook its domestic infringement in order to develop purported design-arounds to Corteva's patents. *See* JA2979-81 (Vellturo Op. Rpt. ¶¶ 86-87); D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶ 42). By mid-2020, Inari

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

JA2979 (Vellturo Op. Rpt. ¶ 86); D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶ 29). The evidence confirms that Inari's goal was to commercialize seeds containing its "me-too" versions of Corteva's events. JA2979-91 (Vellturo Op. Rpt. ¶¶ 86-88, 92-106); D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶¶ 22, 29). To embark on that endeavor, Inari had to exploit Corteva's intellectual property, which required committing acts of infringement in the United States. JA2992 (Vellturo Op. Rpt. ¶ 109) (citing JA2689 (Dellaporta Op. Rpt. at 88) and JA2375 (Wessler Op. Rpt. at 72)).

Inari's motion, *see* D.I. 540 at 29-31 (citing *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371-72 (Fed. Cir. 2013)), ignores that "a determination whether patent damages are properly awarded in a particular case based partly on conduct abroad" is governed by the Supreme Court's analysis in *WesternGeco*, which "supersedes" the Federal Circuit's analysis in *Power Integrations*. *Brumfield v. IBG LLC*, 97 F.4th 854, 871 (Fed. Cir. 2024). Under *WesternGeco* and *Brumfield*, Corteva is entitled to show that Inari's "foreign conduct increases the value of the domestic infringement itself—because, e.g., the domestic infringement

- 24 -

enables and is needed to enable otherwise-unavailable profits from conduct abroad." *Id.* at 877. And that is exactly the basis of Dr. Vellturo's damages opinions: he explains (supported by the opinions of Corteva's technical experts) that "without infringing Corteva's IP rights, either by exporting Corteva's protected seeds (in violation of both U.S. IP law and the terms of the MTAs) or by conducting infringing gene editing activities in the United States, Inari would not have the ability to create its edited versions of Corteva events." JA2992, JA2997-98 (Vellturo Op. Rpt. ¶¶ 109, 126-27) (citing JA2689 (Dellaporta Op. Rpt. at 88) and JA2375 (Wessler Op. Rpt. at 72)). At the hypothetical negotiation, Corteva would have known that Inari's infringement created "the potential for significant lost sales in the future" and would have demanded compensation for that harm. JA2992 (Vellturo Op. Rpt. ¶ 110). At the same time, Inari would have understood that commercial use of Corteva's seeds came with large potential upsides and would thus have been willing to pay for that use. JA2997 (Vellturo Op. Rpt. ¶ 124). Indeed, Inari's own expert opines that "delays in commercialization reduce the present value of future cash flows." JA28726 (Zenner Reply Rpt. ¶ 36). The value of a license to Inari includes avoiding the cost of waiting for expiration of the Asserted Patents to begin development of its versions of Corteva's events and related products. JA2997-98 (Vellturo Op. Rpt. ¶¶ 126-27). Stated another way, both Corteva and Inari would recognize that Inari stood to gain substantial profits as the result of its infringement by accelerating its planned business operations rather than waiting for expiration of the Asserted Patents. D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶¶ 20, 24). All of Inari's activity in service of that acceleration is properly considered at the hypothetical negotiation because Inari's ability to use and export Corteva's seeds while the patents are still in force "enable[d] and [was] needed to enable otherwise-unavailable profits from conduct abroad." *Brumfield*, 97 F.4th at 877.

Perhaps recognizing that its position that foreign acts can never be considered under § 284 is untenable, Inari contends that its "extraterritorial use of Corteva's seeds to develop modified

- 25 -

versions of Corteva's patented inventions is an independent, intervening noninfringing act that cuts off the chain of causation between any domestic acts of infringement and any future sale of products incorporating gene-edited versions of Corteva's GM traits." D.I. 540 at 31. But Inari's acts were the entirely foreseeable and intended result of Inari's domestic infringement. *Supra* 15, 24. Indeed, Inari's own witnesses admit that ███████████████████████

███████████████████████████████████████████████

██████████ JA2978-79 (Vellturo Op. Rpt. ¶ 85 & n.229). In any event, whether or not Inari's actions are an intervening cause is a question for the jury, not a reason to exclude Dr. Vellturo's opinions. *See Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 840-41 (1996) ("The issues of proximate causation and superseding cause involve application of law to fact, which is left to the fact finder, subject to limited review.").

### 2. Dr. Vellturo reasonably relied on Inari's internal projections in estimating a reasonable royalty.

The hypothetical negotiation would have taken place in May 2020. JA2993-94 (Vellturo Op. Rpt. ¶ 114). Dr. Vellturo looked to Inari's 2022 and 2023 projections of operating income as part of his analysis in arriving at his reasonable royalty opinion. JA2998-99 (Vellturo Op. Rpt. ¶ 129-130). He chose those projections because they "clearly associate a subset of Inari's projected unit sales with [Inari] products containing either Corteva's protected events or Inari's edited version of Corteva's events"—specificity missing from Inari's earlier projections. JA2998-99 (Vellturo Op. Rpt. ¶ 129). As Dr. Vellturo explained, these projections are "a proxy for Inari's expectations regarding the scope of its planned infringement at the time of the 2020 Hypothetical Negotiation." *Id.*; D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶ 30). Inari argues that use of the 2022/2023 projections is "speculative" and a basis to exclude Dr. Vellturo's opinions. D.I. 540 at 31-32. Inari's argument boils down to the assertion that it is unreliable to use *its own* economic projections

about revenues it expected to earn from its infringement to arrive at a reasonable royalty. Inari is wrong for several reasons.

*First*, Inari witnesses testified that these projections were provided to investors with the intention that those investors would rely upon the projections in determining whether to invest in Inari. JA299-99 (Vellturo Op. Rpt. ¶¶ 129-30 & n.333); *see also, e.g.*, JA843, JA848, JA886-99 (Graham Depo. Tr. 110:5-19, 127:5-128:15, 281:21-293:12, 299:15-315:11, 325:5-334:13). Inari thus cannot seriously claim its projections are too "speculative" to rely upon. In any case, the quality of Inari's own projections is at most a matter for cross-examination, as it goes to weight—not admissibility.

*Second*, Inari has not shown that the 2022/2023 projections are not probative of what the parties would have expected at the time of the hypothetical negotiation. Specifically, Inari has identified no reason why, if Inari had created projections specific to the Corteva-derived products in 2020, they would have been materially different. For example, Dr. Goodwin does not identify any material changes to the corn or soybean market or regulations between 2020 and 2022/2023 that would have affected Inari's projections. D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶¶ 29-34). Because the 2022/2023 projections are reflective of the information the parties to the hypothetical negotiation would have used, it was not speculative or unreliable for Dr. Vellturo to use those projections in his analysis. *See Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014).

In an attempt to manufacture a ground for exclusion, Inari asserts that ████████████ ████████████████████ D.I. 540 at 32. For example, Inari says that ████████████ ████████████████████. *Id.* That is yet another issue for cross-examination, ████████████████████████████ ████████████████████. *See supra* 24; D.I. 541, Ex.

3 (Vellturo Reply Rpt. ¶¶ 29-30); ███████████████████████

████████████████████████████████████████████

███████████████████████████████████████ Moreover, even

assuming ███████████████████████████████████, it does

not follow that if Inari had engaged in negotiations with Corteva in 2020, the GM soybean

projections in 2020 would have differed materially from the 2022/2023 projections. Similarly,

Inari says ████████████████████████████████. D.I.

540 at 32. Again, this provides no reason why Inari's 2020 projections would have been different

had it analyzed sales and profits specifically attributable to products created as a result of its

infringing export of Corteva seeds, as it eventually did in 2022/2023. Inari is free to question Dr.

Vellturo about the weight to give the 2022/2023 projections, but Dr. Vellturo's use of those

projections is not a basis to exclude his opinions.

   *Finally*, even if for some reason the 2022/2023 projections contained information the

parties could not have estimated in 2020—a proposition for which Inari offers no support—that

still does not run counter to Dr. Vellturo's use of the 2022/2023 projections as reflective of how

the parties would have approached the hypothetical negotiation. The Federal Circuit expressly

permits courts "to look to events and facts that occurred thereafter and that could not have been

known to or predicted by the hypothesized negotiators." *Fromson v. W. Litho Plate & Supply Co.*,

853 F.2d 1568, 1575 (Fed. Cir. 1988), *overruled on other grounds by Knorr–Bremse Systeme Fuer*

*Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004) (en banc). That is because

"a reasonable-royalty damages analysis may incorporate evidence from after the date of first

infringement, because the statutory mandate is to assess a reasonable royalty 'for the use made of

the invention by the infringer,'" and is "consistent with *Georgia-Pacific* factor 11." *Monolithic*

*Power Sys. v. Reed Semiconductor Corp.*, No. 23-cv-1155, 2026 WL 995299, at *10 (D. Del. Apr.

- 28 -

13, 2026) (quoting § 284). Evidence about what actually happened after infringement began can be relevant to showing the parties' expectations at the time of the hypothetical negotiation, as it tends to show what a reasonable licensee and licensor would have agreed to. Thus, the Supreme Court explained that events post-dating first infringement constitute "a book of wisdom that courts may not neglect." *Sinclair Ref. Co. v. Jenkins Petroleum Co.*, 289 U.S. 689, 698 (1933).[10]

### B.    Dr. Vellturo's opinions on damages under Mass. Gen. Law Ch. 93A § 11 are admissible.

Dr. Vellturo evaluates harm to Corteva from Inari's violation of Chapter 93A through reference to present harm to Corteva and Inari's unjust enrichment. JA3037-39 (Vellturo Op. Rpt. ¶¶ 223-28). Inari engaged in asserted wrongful conduct—including making misrepresentations to ATCC to obtain Corteva seed deposits and proposing a *quid pro quo* arrangement to Corteva—in service of its attempt to use Corteva's seeds to accelerate its commercialization plans. By taking Corteva's intellectual property without paying for it, Inari realized the benefit of being able to accelerate its commercialization timeline and therefore increase its expected profitability and secure a higher valuation from investors. D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶ 97). Inari's "head start" in developing products and earning expected profits is a measure of the unjust enrichment it took for itself (at Corteva's expense). Dr. Vellturo assesses Inari's unjust enrichment to be ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ JA3039 (Vellturo Op. Rpt. ¶ 228).

Inari contends that Dr. Vellturo's opinions are inadmissible because they are based on "future potential gains" rather than present harm. D.I. 540 at 34. Dr. Vellturo explains that Corteva

---

[10] Inari's cited cases are in accord; none excluded evidence that was probative of the parties' expectations at the time of the hypothetical negotiation. *Opticurrent, LLC v. Power Integrations, Inc.* excluded "a jury verdict from an unrelated case in 2015 [as] far from a meaningful data point to predict a party's expectations surrounding a hypothetical negotiation in 2006." No. 17-cv-03597, 2018 WL 6727826, at *9 (N.D. Cal. Dec. 21, 2018). And *Syneron Med. Ltd. v. Invasix, Inc.* merely required the damages expert to use the correct parties and patents in the hypothetical negotiation. No. 16-cv-00143, 2018 WL 4696969, at *9-11 (C.D. Cal. Aug. 27, 2018).

is *presently* harmed by Inari's wrongful conduct and has suffered economic loss, some quantifiable and some not. Dr. Vellturo quantified some amount of that harm—Inari's head start—through reference to unjust enrichment, as noted above. He also pointed to unquantifiable (or harder to quantify) harms that also suffice as economic loss under § 11 of Chapter 93A, including Corteva's loss of control of its germplasm, the creation of competing versions of Corteva's events, and the additional events Inari acquired via the ATCC seeds but has not yet formally incorporated into its commercialization plans. JA3037-38 (Vellturo Op. Rpt. ¶ 224); *see also* JA3025-26 (*id.* ¶¶ 192-93). Those present harms are sufficient to show economic harm, as Inari's own cases confirm: even "[p]roof of unquantifiable monetary loss satisfies the § 11 requirement that the plaintiff suffered a loss of money or property," and "disgorgement of profits unfairly earned" is recoverable even if "is difficult to quantify." *Vicarious Surgical Inc. v. Tragakis*, No. 2284CV02321, 2023 WL 3304305, at *6 (Mass. Super. Ct. Apr. 27, 2023) (cleaned up).

Moreover, there is no requirement that Corteva prove lost profits to recover under § 11 because other forms of harm are recoverable, including unjust enrichment. Here, Inari was unjustly enriched because it obtained benefits that it never paid Corteva to receive, including the ability to accelerate its commercialization timelines for, and thus increase the expected profitability of, the Inari Edited GM Product Lines. D.I. 541, Ex. 3 (Vellturo Reply Rpt. ¶ 97). Finally, Inari disregards that proof of current economic harm to Corteva can also come from fact witnesses who will testify at trial. *See, e.g.*, JA3026, JA3037-38 (Vellturo Op. Rpt. ¶¶ 193, 224 n.534). Whether Corteva has proven the factual predicate of current economic harm is a question for the jury at trial, not a matter of admissibility of an expert opinion.[11] Likewise, any disagreements Inari has with Dr. Vellturo's quantification of harm (as to which its motion raises no real issue), or the amount of unjust

---

[11] Notably Inari does not move for summary judgment on this issue.

enrichment, should be taken up through cross-examination, and are not a basis for exclusion.

## C.    Dr. Vellturo's opinions on breach of contract damages are admissible.

Dr. Vellturo estimates that Inari's breaches of the MTAs devalued Corteva's product lines by ███████████████████████████████████████████████ JA3040-41 (Vellturo Op. Rpt. ¶ 232). These damages reflect the difference in the position in which Corteva finds itself following Inari's breach of the MTAs compared to Corteva's position had Inari not violated those agreements. As Dr. Vellturo explains, ████████████████████████████████ ███████████████████████████ such that the harm to Corteva from Inari's breach can be measured by the impact of Inari's commercialization plans on Corteva's product lines using the patented events. JA3040 (Vellturo Op. Rpt. ¶¶ 230-31).

Inari contends that these damages are "impermissibly speculative and remote and not reasonably certain" because of the uncertainty of regulatory approvals and commercial success, such that Dr. Vellturo's damages opinion must be excluded. D.I. 540 at 35-37. Here again, Inari does not dispute Dr. Vellturo's methodology for estimating breach of contract damages but rather his conclusions. In particular, Inari questions the reliability of its own economic projections (which it shared with investors in the hopes that they would rely on them) and whether it will be able to execute on its commercialization plans. Inari is free to raise those challenges to the jury, but none is a basis for exclusion under Rule 702.

Inari cites several New York and Virginia cases rejecting damages as speculative. D.I. 540 at 35-37. These cases make plain that Dr. Vellturo's opinions are far from inadmissible speculation. Take Inari's first cited case: *Boggs v. Duncan*, 202 Va. 877, 884 (1961). In *Boggs*, the defendant/counterclaimant offered "merely the opinion of the defendant himself, supported by that of another witness, that the defendant would or should have made a profit of $6,000 had he been permitted to complete the contract." *Id.* The court found that evidence "unsupported by any data,

facts or figures upon which they are based, [was] insufficient to prove with the required certainty the alleged loss of profits." *Id.* Notably, the court did not *exclude* any of the testimony, it merely found it insufficient to sustain the jury's damages award. Another of Inari's cases involved testimony from an unqualified expert who "performed no statistical studies, … consulted no actuaries regarding premium calculations, and … performed no market analysis," making the opinions inadmissible. *ITT Hartford Grp., Inc. v. Virginia Fin. Assocs., Inc.*, 258 Va. 193, 202 (1999).[12] Here, in contrast, Dr. Vellturo relied on economic data from both parties to calculate the effect of Inari's breach of contract on Corteva's expected future cash flows. JA3040-41 (Vellturo Op. Rpt. ¶¶ 230-32). That is not "speculation" but rather well-founded expert analysis. And while Inari asserts that its own future profits (███████████████████████████████████ ███████████████████████) are speculative because it is not an "established business," D.I. 540 at 36, it cannot say the same about Corteva's expectations of the performance of its own product lines given Corteva's century-old business and sales history. While Corteva's theory is not a "lost profits" model, even if it were, Virginia and New York courts allow testimony about lost profits from "an established business, with a proven earning capacity." *ITT Hartford*, 258 Va.

---

[12] Corteva's damages from Inari's breach of the MTAs are based on ████████████ ████████████████████████—not "lost profits." Inari's cases referencing lost profits are thus inapposite and in any event do not even address exclusion of expert testimony on that theory. *See Hop-In Food Stores, Inc. v. Serv-N-Save, Inc.*, 247 Va. 187, 192 (1994) (reviewing jury award and not reaching speculativeness issue); *Mullen v. Brantley*, 213 Va. 765, 770 (1973) (damages not supported by sufficient evidence); *Kenford Co. v. Erie Cnty.*, 67 N.Y.2d 257, 262 (1986) (lost profits not contemplated by contracting parties and not supported by sufficient evidence); *Trademark Rsch. Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 332 (2d Cir. 1993) (same); *Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 183 (N.Y. App. Div. 2007) (lost profits not contemplated by contracting parties); *Digital Broad. Corp. v. Ladenburg, Thalmann & Co.*, 63 A.D.3d 647, 647-48 (N.Y. App. Div. 2009) (same); *Zink v. Mark Goodson Prods., Inc.*, 261 A.D.2d 105, 106 (N.Y. App. Div. 1999) (dismissing claim for lost profits for "proposed television game show [that] had never been broadcast and was to feature a host not well known to American audiences who had never previously hosted a game show").

at 202; *see also Hughes v. Nationwide Mut. Ins. Co.*, 414 N.Y.S.2d 493, 498 (N.Y. Super. Ct. 1979) (permitting recovery of lost profits "where a business has been in operation for a period of time and the business is firmly established").

> **D.** **Drs. Wessler, Dellaporta, and Mikel are entitled to testify to their opinions and the evidentiary basis for them.**

Inari improperly seeks to exclude certain opinions of Drs. Wessler, Dellaporta, and Mikel on the grounds that they speak to Inari's "intent, motive, or state of mind" in acquiring, using, and exporting Corteva's protected seeds. *See* D.I. 540 at 37-39. Inari's motion is both overbroad and unsupported by precedential authority.

> **1.** **Inari conflates permissible opinions about its documented plans with testimony about state of mind.**

Many of the opinions Inari seeks to exclude refer not to Inari's mental state but rather to its *business* "plans" as set out in its own documents or testified to by its own witnesses. Inari offers no argument to justify this conflation, and the technical nature of the relevant evidence makes expert testimony entirely proper.

Dr. Wessler's opinion that Inari "plan[ned] to acquire PTA-11384 and PTA-11506 corn seeds from ATCC so it could modify the event contained within them," JA2342 (Wessler Op. Rpt. ¶ 110); *see also* JA2416, JA2418, JA2423 (*id.* ¶¶ 359, 367, 384), speaks not to psychology, but to facts conveyed by Inari's witnesses and public communications—such as its ███████████ ████████████████████████████████████████████████ that, among others, describes aspects of Inari's █████████████████████████, JA19239, provides data from field trials, JA19248-49, and equates the "Transgene Locus" DAS59122-7 (the Corteva event contained in PTA-11384 corn seeds) with ██████████, JA19244. *See* JA2357 (Wessler Op. Rpt. ¶ 143) (citing ASTA presentation as Exhibit 64); *see also* JA2357-58 (*id.* ¶ 144) (citing JA18789; JA19201; JA18988-19061). Similarly, Dr. Dellaporta cites a patent application titled "Improved

Transgenic Plants Events and Related Methods" that describes specifics of Inari's gene-editing activities, as well as ████████████████████████████████████ ██████████, in opining that "Inari had a plan as early as July 2020 to modify DAS-44406-6 from the PTA-11336 seeds stored at ATCC." JA2659-60 (Dellaporta Op. Rpt. ¶ 146-47) (citing JA24847-944 as Exhibit 28); *see also* JA2670, JA2708-10, JA2714-17 (*id.* ¶¶ 166, 298, 306, 318-19, 328-29). And Dr. Mikel cites Inari's presentation on ███████████████████ ██████████████████████████████████████ to opine that "Inari had a plan to acquire … Corteva's PVP-protected inbred varieties, export them, … sequence the DNA, … incorporate the sequencing information into Inari's analytical tools, and use the output to inform Inari's breeding decisions." JA26530 (Mikel Op. Rpt. ¶ 108) (citing JA19086-110 as Exhibit 25). In its presentation, Inari proposed that ████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████ JA19096. The jury would undoubtedly find expert testimony helpful to its understanding of Inari's technical proposals.

These opinions are not about Inari's culpable intent, but about the actions Inari had taken or declared it would take. And Corteva's experts appropriately used Inari's own technical documents and testimony as the factual foundation for their opinions about Inari's infringing acts. The above examples, along with the other documents and testimony on which the experts rely, are technical in nature (e.g., patent specifications, presentations to industry trade associations) and are full of scientific terminology and industry jargon that a jury would not readily understand without the aid of expert testimony. This is exactly the type of testimony Rule 702 authorizes. By seeking to exclude well-founded opinions about its business plans, Inari's motion is overbroad, and it should be denied for that reason.

### 2. Inari disregards the necessity of expertise in plant breeding or genetics for understanding Inari's intent.

Other opinions Inari seeks to exclude also required the application of Drs. Wessler, Dellaporta, and Mikel's expertise to Inari's own statements, analyzed from the perspective of a plant breeder or molecular geneticist, and are properly directed to whether Inari had a requisite knowledge or intent under § 271(b) and § 271(f). Corteva's experts are permitted to opine on the elements of infringement, Fed. R. Evid. 704(a), and are permitted to analyze the evidence, apply their expertise, and draw conclusions therefrom, Fed. R. Evid. 702. Inari does not raise any methodology concerns; it instead suggests that no expert should be allowed to offer conclusions about a business's knowledge or intentions from corporate technical documents.[13] Careful review of the challenged opinions shows that they address relevant issues, are based on application of expertise to technical evidence, and are thus admissible.

Drs. Wessler and Dellaporta opined that Inari infringed the Asserted Patents under 35 U.S.C. § 271(f)(2), for which Inari's knowledge and intent are elements. In concluding that Inari infringed, Corteva's experts necessarily considered evidence that Inari supplied Corteva's seeds (1) "knowing that" they were "especially made or … adapted" as a component of a protected plant, and (2) "intending that" they would "be combined outside the United States in a manner that would infringe [Corteva's] patent[s]" if the combination occurred domestically. § 271(f)(2). Thus, Dr. Wessler's opinions regarding "Inari's plan to acquire PTA-11384 and PTA-11506 corn seeds from

---

[13] To the extent Inari suggests that testimony from Drs. Wessler, Dellaporta, and Mikel is inadmissible because it would "'substitute[e] the expert's judgment for the jury's,'" D.I. 540 at 37 (quoting *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 497 (D. Del. 2019)), that argument has no basis in the Federal Rules. As the Supreme Court recently reiterated, an ultimate-issue rule "exclud[ing] testimony that 'usurps the function' or 'invades the province of the jury'" "d[oes] not apply in federal courts." *Diaz v. United States*, 602 U.S. 526, 532-33 (2024) (quoting McCormick on Evid. 80 (7th ed. 2013)) (citing Fed. R. Evid. 704(a)). To the contrary, "[a]n opinion is *not objectionable* just because it embraces an ultimate issue." Fed. R. Evid. 704(a) (emphasis added).

ATCC," JA2342-43 (Wessler Op. Rpt. ¶ 110), and Inari's "plans for Corteva's event," JA2357 (*id.* ¶ 143); *see also* JA2357-58, JA2416, JA2418, JA2423 (*id.* ¶¶ 144, 359, 367, 384), are directly relevant to Corteva's claims for infringement of the '246 and '434 patents, as are her opinions that "Inari knew that [Corteva's] seeds were … made or adapted for use in" protected plants, and knew that "combining the … seeds" to "make the … plants would infringe" if done "within the United States," JA2426-27, JA2429-2430 (*id.* ¶¶ 395-96, 404-05). Each of these opinions is based on Inari's own documents, *see, e.g.*, JA2357-58 (*id.* ¶¶ 143-44) (citing JA19244, JA18789; JA19201; JA18988-19061), and statements of its witnesses, *see, e.g.*, JA2416-17 (*id.* ¶¶ 359-60), that confirm Inari's plans and knowledge. And Dr. Wessler's expertise and knowledge of how plant events are edited and developed qualified her to evaluate this evidence of Inari's plans to do those very things. For example, Dr. Wessler's conclusion that "Inari knew that the PTA-11384 corn seeds were … made or adapted for use in the ███████ corn plants" and that "combining the PTA-11384 corn seeds with water, light, air, and nutrient-rich soil to make the ███████ corn plants would infringe the '246 patent," JA2426-27 (*id.* ¶ 395), required her expert understanding of the relationship between the PTA-11384 seeds and the '246 patent, and of what it meant for Inari to have "identified the PTA-11384 corn seeds as a source of DAS-59122-7 from which it could make [a] modification" while having also "identified the '246 patent as being associated with DAS-59122-7," JA2343-44 (*id.* ¶ 113 (cited by JA2426-27 (*id.* ¶ 395)). Inari does not even attempt to argue that Dr. Wessler's explanation of these technical relationships would not "help the trier of fact to understand the evidence" of Inari's intent. Fed. R. Evid. 702.

Dr. Dellaporta's opinions that Inari "had a plan as early as July 2020 to modify" Corteva's protected events "from … seeds stored at ATCC," JA2659-60, JA2670 (Dellaporta Op. Rpt. ¶¶ 146, 166), that Inari "believed it could source" and "edit" Corteva's events from those seeds, and that "Inari knew that the … seeds were covered by patents," JA2660, JA2670 (*id.* ¶¶ 147, 167),

- 36 -

are similarly relevant to Corteva's claims for infringement of the '522, '363, and '441 patents, as are his opinions that "Inari knew that [Corteva's] seeds were … made or adapted for use in" protected plants, "knew that combining the … seeds" to "make the … plants would infringe" if done within the United States, and "intended that the … seeds would be combined outside the United States," JA2714-17 (*id.* ¶¶ 318-19, 328-29). And Dr. Dellaporta's opinion on what "Inari assumed" about its ability to modify DAS-81419-2, JA2692 (*id.* ¶ 220), is relevant to Inari's intention in making that modification outside the United States. Each of Dr. Dellaporta's opinions was informed by testimony and documentary evidence. *See, e.g.*, JA2692 (*id.* ¶ 220) (quoting Inari's presentations as a reflection of what it "assumed"); JA2717 (*id.* ¶ 329) (citing Inari's own "expla[nation] … that Inari could not receive the seeds in the United States, or else the patents would be infringed" as evidence that "Inari knew growing plants … in the United States would infringe the '363 and '441 patents' claims"). And each was the product of Dr. Dellaporta's knowledge, skill, and experience in making events through genetic modification—none of which Inari challenges—which qualified Dr. Dellaporta to explain what it would take to accomplish the modifications Inari sought to make, and in light of that, to understand and explain the import that Inari's statements about the status of Coreteva's seeds have to one skilled in this field.

Drs. Wessler and Dellaporta applied their expertise in a similar manner when evaluating Inari's infringement on other grounds. Each opined that Inari induced infringement of the Asserted Patents in violation of 35 U.S.C. § 271(b), which includes elements that Inari acted "knowingly" and "possessed specific intent to encourage another's infringement." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1320 (Fed. Cir. 2009) (cleaned up). Dr. Wessler's opinions that "Inari intentionally encouraged ATCC" and "Iowa State to directly infringe" the '246 and '434 patents, JA2416-23 (Wessler Op. Rpt. ¶¶ 359, 367, 376, 384), and that "Inari had knowledge that ATCC's sale" and "Iowa State's use" of Corteva's seeds "would constitute infringement," JA2417-25 (*id.*

- 37 -

¶¶ 362-63, 370-71, 379-80, 387-88), are directly relevant to these elements. So are Dr. Dellaporta's comparable opinions regarding the '522, '363, and '441 patents. *See* JA2708-15 (Dellaporta Op. Rpt. ¶¶ 298, 306 (intentional encouragement); ¶¶ 301-02, 309-10, 318-19 (knowledge)). And Dr. Wessler further opined that Inari infringed the '246 and '434 patents under 35 U.S.C. § 271(a), focusing on Inari's control over and benefit from Corteva's protected seeds. *See* JA2412-14 (Wessler Op. Rpt. ¶¶ 341, 349). That Inari was motivated to acquire, test, and export Corteva's seeds is relevant to her conclusion that it received a benefit from doing so.

In the same manner, Dr. Mikel appropriately opined that Inari infringed Corteva's PVP certificates by exporting protected seeds in violation of 7 U.S.C. § 2541(a). Because the PVPA does not prohibit "any act done privately and for noncommercial purposes," *id.* § 2541(e), Dr. Mikel appropriately analyzed the "scope, purpose, and intent of Inari's acquisition, export, and use of Corteva … varieties," JA26530 (Mikel Op. Rpt. ¶ 106). His opinions that "Inari's acquisition, export, and use … was for commercialization purposes," *id.*, and that "Inari had a plan" to conduct those infringing acts so as "to inform Inari's breeding decisions" and "take a shortcut to making its own elite germplasm," *id.* (¶ 108), are directly relevant to his opinion that Inari violated § 2451 and are supported by statements from Inari's own technical documents and witnesses. And given Inari's argument that it qualifies for the PVPA's research exemption, 7 U.S.C. § 2544 (permitting "use and reproduction"—though not export—"for plant breeding or other bona fide research"); *see, e.g.*, JA3079, JA3103, JA3105-06 (de Leon Gatti Rebuttal Rpt. ¶¶ 25, 79, 86), Dr. Mikel appropriately "consider[ed] Inari's stated objectives" from his perspective as a "scientist, researcher, and breeder" in stating that Inari's activities did not "meet[] the common English meaning of 'bona fide,'" JA2184-86 (Mikel Reply Rpt. ¶¶ 52-54 & n.7), which Inari's motion does not challenge. Dr. Mikel's conclusions rest on documentary evidence, *see, e.g.*, JA26521-24 (Mikel Op. Rpt. ¶¶ 81-86), to which he applied his industry knowledge and experience in crop

science and commercialization, *see, e.g.*, JA26496-97, JA26512-13 (*id.* ¶¶ 11, 14-15, 68). Once again, Inari does not argue against those conclusions' reliability.

### 3. Inari's cited authority is inapposite.

The authorities Inari cites do not bind this Court and do not support exclusion. First, several expressly acknowledge that "[experts] *are* permitted to opine regarding the underlying facts that may show a person's state of mind or that are otherwise relevant to the elements" of the parties' claims. Mem. Order, at 13, *Midwest Energy Emissions Corp. v. Arthur J. Gallagher & Co.*, No. CV 19-1334 (D. Del. Nov. 3, 2023), Dkt. 613[14]; *accord I-Mab Biopharma v. Inhibrx, Inc.*, No. CV 22-276, 2024 WL 4581539, at *2 (D. Del. Oct. 21, 2024); accordingly, even if the Court were to grant Inari's motion, it should exclude only statements that directly express a conclusion on intent, *see, e.g.*, JA2416, JA2418-19 (Wessler Op. Rpt. ¶¶ 359, 367) ("Inari intentionally encouraged ATCC to directly infringe"); JA2420-21, JA2423, JA2427, JA2429-30 (*id.* ¶¶ 376, 384, 396, 405); JA2708-11, JA2714-15, JA2717 (Dellaporta Op. Rpt. ¶¶ 298, 306, ¶¶ 319, 329).

Second, Inari's citations demonstrate at most that a particular expert's opinion was not found helpful in those particular cases. The opinions of Corteva's experts are distinguishable, and as demonstrated above, their testimony easily satisfies Rule 702. None of the cases Inari cites involve the sort of technical evidence at issue here. *E.g.*, *Zimmer Surgical*, 365 F. Supp. 3d at 497 (excluding a patent attorney's opinion that an alleged infringer's "subjective reliance on the opinions of counsel" was "unreasonable"). In several, the expert's opinions on intent had no grounding in their particular expertise or were fundamentally speculative. *See I-Mab Biopharma*, 2024 WL 4581539, at *1-2 (computer security consultant opining on, among others, whether someone had deleted documents "with an intent to destroy evidence" and had "truthfully

---

[14] The ruling cited by Inari, 2023 WL 7411710, at *3 (D. Del. Nov. 3, 2023), does not appear to address testimony about intent in any respect.

represented his then-present belief" about the documents' deletion (cleaned up)); *Midwest Energy*, No. CV 19-1334, Dkt. 613, at 14 (D. Del. Nov. 3, 2023) (expert in power plant chemistry and operations opining on, among others, whether party had entered contracts "with indemnity provisions" in order to "engage in infringing conduct with the expectation" of "fac[ing] a diminished risk of infringement" liability); *Shire Viropharma Inc. v. CSL Behring LLC*, No. 17-414, 2021 WL 1227097, at *6 (D. Del. March 31, 2021) (expert opining that a company "likely … would have discontinued development" of a drug regardless of intervening action by the Food and Drug Administration, based on factors ranging from a comparison between drugs' perceived efficacy and profitability to predictions about the likelihood of agency action). Meanwhile, *AstraZeneca LP v. TAP Pharma. Prods., Inc.* concerned a "supplemental report [of] only one page" and offered *no* reasoning for excluding testimony on intent—nor did the case on which it relied. *See* 444 F. Supp. 2d 278, 293 (D. Del. 2006) (citing *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 443 (D. Del. 2004)).

By contrast, the opinions of Corteva's experts specifically relate to the manners in which plants and seeds are developed and used, and the necessary implications that related technical information has to those (including Inari) who breed or genetically modify plants. *Supra* 33-39. Even if Inari's cited authority established a rule of thumb—though none of it rests upon or is itself binding precedent—it would not overcome Rule 702's allowance for expert testimony that "will help the trier of fact to understand the evidence or to determine a fact in issue." Because Inari neither objects to reliability nor offers any argument against helpfulness in the circumstances of this case, its motion should be denied.

## IV.    CONCLUSION

Corteva respectfully requests the Court deny Defendants' motion for summary judgment of noninfringement and Defendants' motion to exclude, as detailed above.

Dated:  May 1, 2026
**Redacted Version filed on May 8, 2026**

**BARNES & THORNBURG LLP**

*/s/  Chad S.C. Stover*
Chad S.C. Stover (No. 4919)
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801
Tel. (302) 300-3474
Email: Chad.Stover@btlaw.com

OF COUNSEL:

Peter Bicks (*Pro hac vice*)
Kim B. Goldberg (*Pro hac vice*)
Jordan B. Fernandes (*Pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Tel: +1 212 506 5000
Fax: +1 212 506 5151
pbicks@orrick.com
kgoldberg@orrick.com
jfernandes@orrick.com

David Gindler (*Pro hac vice*)
Lauren Drake (*Pro hac vice*)
Christopher Lynch (*Pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
355 South Grand Avenue
Suite 2700
Los Angeles, CA 90071-1596
Tel: +1 213 629 2020
Fax: +1 213 612 2499
dgindler@orrick.com
ldrake@orrick.com
christopher.lynch@orrick.com

Gary Frischling (*Pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
631 Wilshire Blvd., Suite 2-C
Santa Monica, CA 90401
Tel: +1 310 633 2800
Fax: +1 310 633 2849
gfrischling@orrick.com

Carly Romanowicz (*Pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
222 Berkeley St.
Suite 2000
Boston, MA 02116
Tel: +1 617 880 1800
Fax: +1 617 880 1801
cromanowicz@orrick.com

Todd Vare (*Pro hac vice*)
BARNES & THORNBURG LLP
11 S. Meridian St.
Indianapolis, IN 46204
Tel: (317) 231-7735

Ronald Cahill (*Pro hac vice*)
Heather B. Repicky (*Pro hac vice*)
BARNES & THORNBURG LLP
One Marina Park Drive, Suite 1530
Boston, MA 02210
Tel: (617) 316-5312
Ronald.Cahill@btlaw.com
hrepicky@btlaw.com

Lauren Baker (*Pro hac vice*)
BARNES & THORNBURG LLP
3340 Peachtree Road N.E., Suite 2900
Atlanta, GA 30326
Tel: (404) 264-4036
Lauren.Baker@btlaw.com

*Attorneys for Plaintiffs*

- 42 -