# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

CORTEVA AGRISCIENCE LLC,
PIONEER HI-BRED INTERNATIONAL,
INC., and AGRIGENETICS, INC.,

Plaintiffs,

v.

INARI AGRICULTURE, INC. and INARI
AGRICULTURE NV,

Defendants.

C.A. No. 23-1059 (JFM)

**REDACTED VERSION**

**PLAINTIFFS' BRIEF IN RESPONSE TO D.I. 572**

# TABLE OF CONTENTS

I. Introduction.......................................................................................................... 1

II. Relevant Factual Background ............................................................................ 2

III. Argument ............................................................................................................ 3

    A. ATCC's authorization is limited to providing seeds to the public for § 112 purposes and does not extend to authorization to infringe Corteva's patents. .................................................................................................. 3

        1. No statute, regulation, treaty, or contract authorizes Inari's infringement. ................................................................................... 4

        2. Corteva did not authorize Inari's infringement......................................... 7

        3. ATCC is not Corteva's bailee and cannot act beyond its authority, which is limited to furnishing seeds for § 112 purposes............................. 9

    B. Inari took active steps to cause ATCC to act beyond its limited authorization and infringe Corteva's patents, making Inari an inducer............... 10

    C. Corteva's depositing of seeds with ATCC, or ATCC furnishing seeds for § 112 purposes, was not a "sale" that exhausted Corteva's patent rights. ........... 13

    D. The MTAs do not apply post-expiration restrictions to seed deposits................. 16

IV. Conclusion ...................................................................................................... 17

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Boston Store of Chicago v. Am. Graphophone Co.*,
  246 U.S. 8 (1918) .............................................................................................................. 15

*Bowman v. Monsanto Co.*,
  569 U.S. 278 (2013) .......................................................................................................... 15

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) ........................................................................................ 12

*Gen. Talking Pictures Corp. v. W. Elec. Co.*,
  304 U.S. 175 (1938) ..................................................................................................... 13, 14

*Gen. Talking Pictures, Corp. v. W. Elec. Co.*,
  305 U.S. 124 (1938) .......................................................................................................... 13

*Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*,
  No. 24-889, 2026 WL 1593307 (U.S. June 4, 2026) ........................................................ 11

*Impression Prods., Inc. v. Lexmark Int'l., Inc.*,
  581 U.S. 360 (2017) .......................................................................................................... 16

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*,
  534 U.S. 124 (2001) ............................................................................................................ 5

*Kimble v. Marvel Ent., LLC*,
  576 U.S. 446 (2015) .......................................................................................................... 17

*Limelight Networks, Inc. v. Akamai Technologies, Inc.*,
  572 U.S. 915 (2014) .......................................................................................................... 12

*Quanta Comput., Inc. v. LG Elecs., Inc.*,
  553 U.S. 617 (2008) .......................................................................................................... 13

*United States v. Univis Lens Co.*,
  316 U.S. 241 (1942) ..................................................................................................... 14, 15

*Zila, Inc. v. Tinnell*,
  502 F.3d 1014 (9th Cir. 2007) .......................................................................................... 17

**TABLE OF AUTHORITIES**

**Page**

**Statutes**

7 U.S.C. § 2541(a)(2) ............................................................................................................. 3

35 U.S.C. § 112 ............................................................................................................. passim

35 U.S.C. § 271(a) ........................................................................................................ passim

35 U.S.C. § 271(b) ........................................................................................................ passim

35 U.S.C. § 271(f)(2) ..................................................................................................... 10, 12

**Other Authorities**

8A Am. Jur. 2d *Bailments* § 1 (2026) ............................................................................. 9

8A Am. Jur. 2d *Bailments* § 21 (2026) ........................................................................... 9

8A Am. Jur. 2d *Bailments* § 58 (2026) ......................................................................... 10

8A Am. Jur. 2d *Bailments* § 73 (2026) ........................................................................... 9

Brief for the U.S. as Amicus Curiae Supporting Reversal in Part and Vacatur in Part, *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, (U.S. Jan 24, 2017) (No. 15-1189) 2017 WL 371923 .................................................................................... 13, 14, 16

Budapest Treaty on the Int'l Recognition of the Deposit of Microorganisms for the Purpose of Patent Proc., Apr. 28, 1977, 32 U.S.T. 1241, *as amended*, Sept. 26, 1980 ................................ 6

Regulations Under the Budapest Treaty on the Int'l Recognition of the Deposit of Microorganisms for the Purposes of Patent Proc., Apr. 28, 1977, *as amended*, Jan. 20, 1981 and Oct. 1, 2002 ................................................................................................... 6

U.S. Const. Art. I, § 8, cl. 8 ........................................................................................... 15

**Regulations**

37 C.F.R. § 1.808 ...................................................................................................... passim

# I. INTRODUCTION

Corteva authorized ATCC to provide access to its seed deposits for compliance with 35 U.S.C. § 112. That is the extent of ATCC's authorization. Inari's brief (D.I. 578) is premised on the idea that because ATCC is required to furnish seed deposits to the public, the public is free to commit patent infringement as to those seeds. In other words, by applying for a patent and depositing seeds, Corteva authorized the public to violate Corteva's patent rights. Nothing in the Patent Act, the Plant Variety Protection Act (PVPA), the Budapest Treaty, supporting regulations, or the contracts between ATCC, Inari, and Corteva supports this premise. The public's right to access seeds to understand the invention coexists with, and is subject to, Corteva's rights under the Patent Act.

Corteva does not accuse Inari of infringement based on Inari accessing the seeds to understand Corteva's patented inventions. Instead, Corteva's alleges that Inari violated 35 U.S.C. § 271(b) by inducing ATCC to "furnish" (or provide or sell) seeds for a different purpose—infringement and commercial use. Because ATCC was not authorized to furnish seeds for that purpose, ATCC committed an act of direct infringement. And because Inari took affirmative steps to cause that direct infringement—by representing that it was acquiring the seeds for ███████ ███████ JA5123, filling out order forms for the seeds, and paying for the seeds—despite knowing both of Corteva's patents and that Inari's actions would cause ATCC to infringe, Inari is liable as an inducer.

Inari's exhaustion, post-sale restriction, and related arguments all miss the mark because there was no authorized first sale of the ATCC deposits. The jury will need to decide whether, at the time Inari ordered and obtained the ATCC deposits, Inari had the requisite knowledge and intent to infringe Corteva's patents.

1

## II. RELEVANT FACTUAL BACKGROUND

The Court ordered supplemental briefing to address Corteva's infringement allegations under § 271(b), and specifically whether ATCC is a direct infringer. D.I. 572 at 2. The facts relevant to this issue are recounted briefly here; Corteva's motion for summary judgment (D.I. 535), Corteva's opposition to Inari's motion for summary judgment (D.I. 557), and the parties' Statements of Undisputed Facts (D.I. 536 and 539) contain further detail.

Corteva deposited seeds with ATCC and authorized ATCC to make the seeds available to the public for the purpose of facilitating compliance with 35 U.S.C. § 112. Corteva's asserted utility patents state that Corteva is making a deposit under the Budapest Treaty, and three of the patents explicitly clarify that Corteva's deposit "does not waive any infringement of their rights granted under this patent or under the [PVPA]." JA1 at JA18 ('246 patent at 19:10-14); JA48 at JA57 ('434 patent at 7:2-4) (same); *see also* JA171 at JA181 ('665 patent at 9:29-25) (seeds comprising the events "have been deposited and made available to the public without restriction (*but subject to patent rights*), with the American Type Culture Collection (ATCC)") (emphasis added)); *see also* JA97 at JA101-102 ('363 patent at 4:60-5:6) ( "This deposit was made and will be maintained in accordance with and under the terms of the Budapest Treaty with respect to seed deposits for the purposes of patent procedure."); JA134 at JA139-140 ('441 patent at 4:64-5:10) (same).

Corteva's deposits did not give ATCC or Inari a license to Corteva's utility patents. *See* JA5236 at JA5236 ('434 patent deposit receipt); JA5305 at JA5305 ('363 and '441 patents deposit receipt); JA5340 at JA5340 ('246 patent deposit receipt); JA5408 at JA5408 ('655 patent deposit receipt). Instead, Corteva's authorization to ATCC was limited to providing samples for purposes of compliance with § 112. JA5296 ('434 patent providing authorization to "furnish a sample"); JA5329 (same for '363 and '441 patents); JA5399 (same for '246 patent).

When Inari wished to obtain seeds from ATCC, it entered into contracts with ATCC including the Material Transfer Agreement or MTA. The MTA provides the ███████████ ████████████████████████████████████████████████████████████ ██████████████████████████ JA16298 at JA16299 (2019 MTA). Inari also filled out order forms for the seeds it wished to purchase. On those forms, Inari selected ██████████████ when it ordered seeds from ATCC. JA5121 at JA5123 (ATCC New Account Application by Inari (2018)). Inari then acquired seeds from ATCC subject to the MTAs. *See* JA5119; JA5120. Inari never acquired a license from Corteva nor from ATCC for Corteva's patents. There is a dispute of fact over whether Inari, at the time it acquired the seeds for █████████████ in fact intended to use the seeds for commercial use/non-research purposes, which should be tried to the jury.

## III.   ARGUMENT

### A.   ATCC's authorization is limited to providing seeds to the public for § 112 purposes and does not extend to authorization to infringe Corteva's patents.

Corteva does not dispute that ATCC is authorized to provide patent deposits to members of the public for purposes of facilitating compliance with 35 U.S.C. § 112. Inari's position is that because ATCC can "furnish" seed deposits, the public can do anything it wants with the deposits, including infringe Corteva's intellectual property rights.[1] Inari's attempts to conflate authorization to furnish seeds as required by 37 C.F.R. § 1.808 with "authorization from Corteva to ATCC to

---

[1] Inari asserts that its authorization, exhaustion, and post-sale restriction arguments also apply to seeds protected by PVPA certificates, not just utility patents. Br. at 17. To the extent these doctrines even apply to material protected by the PVPA, which has unique statutory features from the Patent Act, all of Corteva's responses would apply. Corteva does note that it is not relying on infringement under § 271 of the Patent Act or induced infringement under the PVPA with respect to Inari's acquisition of inbred seed varieties. Br. at 17. Instead, for inbred seed varieties protected by PVPA certificates, the PVPA makes it an act of infringement to "import the variety into, or *export* it from, the United States." 7 U.S.C. § 2541(a)(2) (emphasis added). Because Inari exported Corteva's inbred seeds in violation of the PVPA, Inari is a direct infringer for at least that reason.

sell the patent deposit seeds without restriction" should be rejected.  Br. at 7.  Inari cites no authority for this position because there is none.

### 1. No statute, regulation, treaty, or contract authorizes Inari's infringement.

There is no dispute that Corteva deposited seeds with ATCC for purposes of facilitating compliance with disclosure requirements under 35 U.S.C. § 112.[2]  Section 112 requires "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same."  35 U.S.C. § 112 ¶ 1 (2006) (pre-AIA).  One way of complying with § 112 is by depositing seeds and allowing the public to access the seeds to read and understand the invention.  In that way, the deposit is simply a more convenient substitute for written words.  And just as any member of the public is free to access and read a written patent specification without committing an act of infringement, a member of the public can access and "read" a seed deposit without infringing.  That is all § 112 and 37 C.F.R. § 1.808 require and allow.  Indeed, the United States equates "activities that amount to accessing and 'reading' biological material" with "sequencing genetic material."  D.I. 562 at 15 (US Statement of Interest).

---

[2] Corteva does not, and has not, admitted that such deposits were necessary to comply with § 112 as to Corteva's "event" patents, which are the utility patents underlying Corteva's § 271 allegations.  The specifications of the event patents include a complete description of the invention, including the sequence of the DNA insert and its insertion location within the plant genome.  Inari does not need access to Corteva's event seed deposits for written description purposes.  Corteva also deposited inbred seeds with ATCC.   (Inbreds may be protected by both utility patents and PVPA certificates; Corteva is not asserting any utility patents on inbreds in this case.)  Whether a deposit is necessary for a person of skill in the art to understand that the inventors had possession of an inbred variety may turn on the specific claims and disclosure at issue.  Thus, Inari's criticism of Corteva's statements in post-grant review proceedings relating to a patented inbred seed are irrelevant here.  For example, that patent claimed certain "physiological and morphological characteristics" of a plant, unlike the claims of the event patents at issue here.

What § 112 and § 1.808 do not require or permit is for the public to acquire seed deposits to engage in patent infringement or commercial use of the deposits. So just as Inari could not, during the term of a patent, freely use a written specification disclosing a new computer keyboard to build the patented keyboard, modify the keyboard, and make its own knock-off keyboard to sell, Inari cannot use Corteva's patented seed deposits to make knock-off seeds for sale. Instead, any infringing act beyond access and "reading" Corteva's seed deposits requires a license from Corteva.

Rule 1.808 provides that seed depositories like ATCC can furnish samples of seeds to the public. The depositor (Corteva) may not place "restrictions . . . on the availability to the public of the deposited material," § 1.808(a)(2), but may require disclosure of who requests samples from the depository, § 1.808(b). Notably, Rule 1.808 does not compel the depositor (Corteva) to provide authorization to the depository beyond making the deposits publicly available. It says *nothing* about what the public can do with the seeds it acquires from a depository; it simply requires that the material be made available. Section 112 also says nothing about what the public is allowed to do with a patent disclosure, whether that disclosure is in writing or accomplished through a deposit. Instead, § 112 provides parameters for an adequate disclosure. Neither § 1.808 nor § 112 thus grants rights to infringe a patent to ATCC or to those obtaining deposits from ATCC.

Inari argues that ATCC must be allowed to infringe Corteva's patents to satisfy "the mandated disclosure *quid pro quo* based on patent deposits for utility patents for plants." Br. at 5. That is not the law: The "disclosure . . . *quid pro quo*" is that "a breeder must describe the plant with sufficient specificity to enable others to 'make and use' the invention ***after the patent term expires***." *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 142 (2001) (emphasis added). There is no requirement that patented seeds be released before the patent term

5

expires on terms that allow the public to undertake any and all activities it desires.  If ATCC were compelled to do so, as Inari suggests, the patentee's act of depositing the seed would not be a *quid pro quo* at all; upon the seeds becoming available through ATCC the public would be able to infringe with impunity.  Thus, during the term of the patent, the public can request and receive deposits for activities that are necessary in a particular case to accomplish the equivalent of "reading" a written specification, like genetic sequencing.  But the public may not require or induce ATCC to furnish the deposits for any other purpose or otherwise infringe.

The Budapest Treaty likewise gives no rights to ATCC or to Inari to infringe Corteva's patents.  It requires a depository to "furnish samples of any deposited microorganism under the conditions and in conformity with the procedure prescribed in the Regulations."  Budapest Treaty on the Int'l Recognition of the Deposit of Microorganisms for the Purpose of Patent Proc. ("Budapest Treaty"), Art. 6(2)(viii), Apr. 28, 1977, 32 U.S.T. 1241, *as amended*, Sept. 26, 1980. The Regulations then require "that any international depositary authority must furnish samples of deposited microorganisms in an expeditious and proper manner."  Regulations Under the Budapest Treaty on the Int'l Recognition of the Deposit of Microorganisms for the Purposes of Patent Proc. ("Budapest Regulations"), Regulation 2.3, Apr. 28, 1977, *as amended*, Jan. 20, 1981 and Oct. 1, 2002.  Samples must be provided to anyone who "has a right to a sample of the microorganism under the law governing patent procedure."  *Id.*, Regulation 11.3(a)(iii).  The Treaty and Regulations do not provide any authorizations for ATCC to infringe, nor do they give members of the public the right to make, use, sell, or otherwise engage in infringement with the samples it receives.

Corteva and Inari's agreements with ATCC also confirm that Corteva did not grant, and ATCC was not authorized to provide, permission to infringe Corteva's patents.  First, the deposit

agreements between Corteva and ATCC give ATCC limited permission to maintain the deposit and "distribute" deposits to requestors. Second, the deposit slips confirm that █████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████ JA5305. Thus, the only thing ATCC is "authorized" to do is provide the public with access to the deposits. Anything beyond providing access to the seeds is unauthorized by Corteva.

Inari's agreements with ATCC do not give Inari a license to Corteva's patents either. To the contrary, they expressly provide that Inari *does not* have a license and ATCC has no authority to grant a license. For example, the 2017 MTA states that ████████████████

███████████████████████████████████████████████

███████████████ JA5218 at 5219 (emphasis added).

Finally, even Corteva's patents put Inari on notice that Corteva "does not waive any infringement of their rights granted under this patent or under the [PVPA]." JA1 at JA18 (19:10-14). In sum, Inari cannot point to any source for its contention that by depositing seeds with ATCC, as required by § 112 and § 1.808, Corteva authorized Inari to induce ATCC to make accessible the deposits for any purpose beyond the statutory mandate.

### 2. Corteva did not authorize Inari's infringement.

Inari admits that it "purchased the patent deposit samples from ATCC through its sales agent, LGC." Br. at 6; *see also* Br. at 8 ("particular seeds were sold by ATCC"). But Inari contends this sale authorized infringement because Corteva "never communicated its reliance on the MTA terms [restricting commercial use] to ATCC or anyone else." Br. at 6.

That is wrong for multiple reasons. First, Corteva *did* communicate its intent to retain its patent rights in the patents themselves. *See, e.g.*, JA1 at JA18 (19:10-14). So too in the deposit forms. JA5236 at JA5236. Inari never acknowledges these express reservations of rights. Second,

Corteva did not have to communicate reliance on the commercial use restrictions because it was never at risk of waiving its patent rights in the first place. Corteva did not give ATCC blanket permission to sell its seeds. *A fortiori*, Corteva is not now trying to claw back something it previously gave ATCC. Rather, all Corteva gave ATCC was the very limited authorization required by § 1.808 to furnish seeds to allow members of the public access to Corteva's seeds for purposes of complying with § 112. *Supra* § A.1. And when Corteva made its deposits, Corteva and ATCC acknowledged that the "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" JA5305. That acknowledgement encompasses a restriction on commercial use, as one form of infringement is "use" of any type under § 271(a).

ATCC's role is to furnish the deposited materials to members of the public who make an adequate request for the material. But when ATCC does more than furnish deposits to someone who simply "reads" a deposit, ATCC has committed an act of direct infringement. That is the "legal rule for distinguishing authorized from unauthorized sales." D.I. 572 at 2 (Court's Order). It does not matter if ATCC can "tell the difference," *id.*, when it distributes seeds, because direct infringement has long been a strict liability tort under which knowledge and intent are irrelevant, *see Commil USA, LLC v. Cisco Sys., Inc.,* 575 U.S. 632, 639 (2015) (for infringement under § 271(a), "mental state is irrelevant. Direct infringement is a strict-liability offense."). Thus, many "innocent" (or ignorant) infringers may be liable for infringement—for example, a doctor administering a medicine may unknowingly practice a method of treatment patent. The law addresses the "innocent" infringer problem through § 271(b), which allows the patent owner to target the more culpable party who induces that direct infringement—e.g., a drug manufacturer supplying the medicine used in the method of treatment. That is exactly what Corteva seeks to do

here—instead of suing ATCC as the direct infringer, Corteva has elected to sue Inari as the inducer.[3]

### 3. ATCC is not Corteva's bailee and cannot act beyond its authority, which is limited to furnishing seeds for § 112 purposes.

In an effort to avoid the unauthorized sale of seeds, Inari contends that ATCC merely acts as a custodian of Corteva's seeds "analogous in some respects to a bailment under common law." Br. at 14. Corteva does not agree that ATCC acts as a bailee under common law. For one thing, ATCC is not obligated to return or otherwise account for the seeds once the bailment is complete, which is "an essential aspect of the bailment relationship." 8A Am. Jur. 2d *Bailments* § 21 (2026); *see also* 8A Am. Jur. 2d *Bailments* § 1 (2026) ("Inherent in the bailment relationship is the requirement that the property be returned to the bailor, or duly accounted for by the bailee, when the purpose of the bailment is accomplished, or that it be kept until it is reclaimed by the bailor." (footnote omitted)).[4]

In any event, if ATCC were analogized to a bailee holding Corteva's seeds for the purpose of compliance with § 112, then ATCC would still be a direct infringer. A bailee (ATCC) is liable to a bailor (Corteva) for conversion for "[a]ny unauthorized delivery of the bailed property by the bailee, even delivery to the wrong person resulting from the bailee's good-faith mistake." 8A Am. Jur. 2d *Bailments* § 73 (2026). That is what happened here—ATCC mistakenly delivered seeds to Inari, believing in good faith that Inari was only accessing the seeds for § 112 purposes, when in fact Inari's purpose was infringing commercial use. For the same reason ATCC would be liable for conversion, it would also be strictly liable for the tort of direct infringement.

---

[3] ATCC could also protect itself from incurring damages through, e.g., requiring requesting parties to indemnify ATCC for any infringement.

[4] ATCC's deposit form for seeds deposited under the Budapest Treaty contains no provision for returning or destroying seeds. *E.g.*, JA5354-5358. All deposits relevant to the § 271(b) contentions are deposits under the Budapest Treaty.

And even if the Court agreed that, due to a bailment relationship or otherwise, ATCC had not taken title to the seeds and therefore could not "sell" the seeds such that ATCC was not a direct infringer under 271(a), Inari is not off the hook. Inari's argument would just mean that Inari's acquisition of the seeds would be an act of direct infringement by Inari because § 271(a) would apply to Inari's use of deposited seeds for anything beyond assessing compliance with § 112, including (as currently alleged) phytosanitary testing and other uses. And § 271(f)(2) applies, regardless of ATCC's title to the seeds, to Inari's export of the seeds with the intent to combine the seeds to grow an infringing plant. Likewise, for inbred seeds, the PVPA applies regardless of ATCC's title because Corteva never gave Inari the authority to ship or export protected seeds. 7 U.S.C. § 2541(a)(1), (2).

At bottom, the thrust of Inari's bailment argument seems to be that if ATCC does not own the seeds, it cannot impose post-sale or post-furnishment restrictions on use of the seeds. Br. at 14-15. Inari gets this point entirely backwards. If ATCC has no ownership rights in the seeds, it cannot remove or diminish Corteva's rights in the seeds, because "regardless of the innocence of a purchaser or transferee to whom an unauthorized sale or transfer is made, the purchaser or transferee acquires no title to the property as against the bailor, who may recover the property from that third party or hold that party liable for its value." 8A Am. Jur. 2d *Bailments* § 58 (2026). And because Corteva never, in any sense, gave up title to the seeds to Inari nor waived its patent rights in the deposited seeds, neither could ATCC.

### B. Inari took active steps to cause ATCC to act beyond its limited authorization and infringe Corteva's patents, making Inari an inducer.

The Supreme Court recently clarified the three requirements for induced infringement. First, there must be direct infringement by a third party. Second, the inducer must know that the induced acts constitute patent infringement. Third, the inducer must take active steps to encourage

direct infringement. *Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.,* No. 24-889, 2026 WL 1593307, at *4 (U.S. June 4, 2026) (quotations and citations omitted). Corteva will prove each of these elements at trial, and believes there are ample facts of record from which a jury could find that Inari acquired the seeds for purposes beyond "reading" the seeds and thus took active steps to cause ATCC's direct infringement. Corteva expects the trial will show that Inari knew about Corteva's patents; it used the patents' specifications to locate the accession number of the deposits it needed to order the specific patented seeds. Inari also knew that sales by ATCC for more than just reading and understanding Corteva's patents—namely sales for commercial purposes—constituted infringement. And Inari took active steps to cause those sales, including by filling out the order forms for the seeds, paying for the seeds, and misrepresenting that its intent was only research.

*Hikma* thus supports a finding of induced infringement because Inari intended to cause and took affirmative acts to cause ATCC's infringement. Inari induced ATCC to do more than distribute seeds to give the public access to the deposit. Inari requested seeds under the guise of using the seeds for ▮▮▮▮▮▮▮▮▮▮ acknowledging that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

JA5121 at JA5123 (ATCC New Account Application by Inari (2018)). But Inari never obtained any permission for commercial use, which ATCC confirmed, indicating that it has never "given written consent to Inari to use any material obtained from the patent deposit commercially." D.I. 536 ¶ 143.

While ATCC may not have known Inari's intent, that is irrelevant. Br. at 12 (agreeing that "ATCC's state of mind is not relevant to whether the sale to Inari was a direct infringement"); *Commil USA, LLC v. Cisco Sys., Inc.,* 575 U.S. 632, 639 (2015) (for infringement under § 271(a),

"mental state is irrelevant. Direct infringement is a strict-liability offense."). What matters is Inari's intent at the time it purchased Corteva's seeds.[5] Corteva will show that Inari knew, and had the intent at the time of the purchases, that it would use the seeds for more than just reading and understanding Corteva's patents; in particular, that it would use the seeds to edit the patented events and commercialize those edited events as its own. While Inari disputes this, Br. at 11-12, "[q]uestions of intent are quintessential jury questions," *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1222 (Fed. Cir. 2014).

Inari contends that its "state of mind or intent has no relevance to whether ATCC's authorized sale can be a direct infringement of the Asserted Patents," citing *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 572 U.S. 915 (2014). Br. at 13. *Limelight* does not support this proposition; *Limelight* holds that there is no liability for "inducing infringement of a patent under 35 U.S.C. § 271(b) when no one has directly infringed the patent under § 271(a) or any other statutory provision." *Id.* at 917. Here, the allegation of direct infringement is based on ATCC exceeding its authority to sell or furnish seeds for § 112 purposes. ATCC exceeded its authority if Inari acquired the seeds for commercial use or other infringing purposes. So Inari's intent is relevant because if Inari caused ATCC to go beyond its authorization, such as by misrepresenting its true intent, then ATCC infringed and Inari induced that infringement.

---

[5] The Court asked what would happen if Inari first obtained the seeds with only the intent to understand the patent's written description, then later decided to use the seeds to develop its own products. D.I. 572 at 2. In that case, ATCC would not be a direct infringer and Corteva would pursue its allegations of direct infringement under §§ 271(a) and 271(f)(2). Similarly, if Inari "told ATCC something in good faith that, ultimately, under the correct legal rule for distinguishing non-commercial use from commercial, was incorrect," *id.*, ATCC's liability would turn on whether and when Inari went beyond accessing the deposits for § 112 purposes and crossed the line into commercial or infringing uses.

**C.     Corteva's depositing of seeds with ATCC, or ATCC furnishing seeds for § 112 purposes, was not a "sale" that exhausted Corteva's patent rights.**

**1.**     Inari admits that "a sale outside the scope of a license does not result in patent exhaustion." Br. at 8. That is enough to end the inquiry, as patent exhaustion presupposes an "initial authorized sale of a patented item," *Quanta Comput., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008), which is absent here. ATCC's role was limited to ensuring the deposits were available for purposes of § 112 and § 1.808. To the extent ATCC went beyond that role, it did so without authority from Corteva. *Supra* § A. Just as a licensee cannot arrogate to itself authorization beyond that granted by the license, ATCC could not act beyond its role as depository. *Gen. Talking Pictures Corp. v. W. Elec. Co.*, 304 U.S. 175, 189-90 (1938). So, consistent with *General Talking Pictures*, actions by ATCC that went beyond compliance with § 112, including sales of seeds for commercial purposes, were taken "as if no license whatsoever had been granted," *Gen. Talking Pictures, Corp. v. W. Elec. Co.*, 305 U.S. 124, 127 (1938), and thus were "not an authorized sale that can trigger patent exhaustion," Brief for the U.S. as Amicus Curiae Supporting Reversal in Part and Vacatur in Part ("US *Lexmark* Br.") at 20, *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, (U.S. Jan 24, 2017) (No. 15-1189) 2017 WL 371923, at \*20.

There is little doubt that ATCC was not authorized to distribute seeds for commercial or other infringing uses. The ATCC deposit receipt acknowledges that the deposit "does not grant ATCC a license … and our release of these seeds/strain(s) to others does not grant them a license" to infringe. In other words, when ATCC furnishes the seeds, it provides the seeds subject to all rights and remedies of the patent owner. So this is not a situation in which Corteva seeks to enforce a post-sale restriction on commercial use. It is instead a case in which Corteva has withheld authorization for ATCC to furnish seeds for anything beyond access for purposes of complying with § 112 and now seeks to enforce the infringement laws against Inari. Even assuming Corteva

had granted ATCC a "license" to provide § 112 access, sales for anything beyond that access would exceed the scope of that license. And where a licensee goes "outside the scope of its license, [the licensee] infringe[s] the patents embodied" in the patented products sold. *Gen. Talking Pictures Corp*, 304 U.S. at 181-82.[6] Because there was no authorized first sale to ATCC or to Inari, exhaustion does not apply and any violation of Corteva's authorization to ATCC thus would be enforceable through infringement liability.

**2.** Even if there were a question as to whether ATCC's sales to Inari were authorized, exhaustion should not apply. The sale does not implicate either of the two traditional bases for exhaustion: the principle that the patent owner is entitled to one, and only one, reward for any patented article and the common law's disfavor of restraints against alienation.

**2.a.** Start with the "reward" Corteva received for the sale of seeds to Inari. Corteva received no monetary or commercial benefit from the sale. Quite the opposite. Patent regulations require Corteva to provide seeds to ATCC (or another depository), and then pay ATCC to store them and make them available to the public for purposes of facilitating compliance with § 112. Corteva does not "sell" its seeds to ATCC in any meaningful sense and receives no compensation from ATCC or from ATCC's distributions of seeds. That takes away the key premise of the exhaustion doctrine, namely that "the patentee has received his *reward* … by the sale of the article." *United States v. Univis Lens Co.*, 316 U.S. 241, 251 (1942) (emphasis added). Here, there was no "sale" by Corteva to ATCC of its seeds, much less by Corteva to Inari, that provided any compensation in exchange for Corteva's exclusionary rights. Because Corteva received no

---

[6] While *General Talking Pictures* involved a licensee and purchaser who knowingly violated the scope of the license, that is not "legally relevant given that direct patent infringement is, and traditionally has been, a strict-liability tort." US *Lexmark* Br. at 20 n.4 (citing *Commil*, 575 U.S. at 639).

reward for its innovation, "the purpose of the patent law" was not "fulfilled." *Id.*

Corteva is not in the position of a patentee "who ha[s] sold a patented machine and received the price, and ha[s] thus placed the machine so sold beyond the confines of the patent law." *Boston Store of Chicago v. Am. Graphophone Co.*, 246 U.S. 8, 25 (1918). Instead, Corteva remains in the position of a patentee who has taken no steps to diminish its patent rights; just the opposite, Corteva's steps were taken to *secure* its patent rights. Thus, allowing a "sale" by ATCC—particularly when that sale was solely for purposes of satisfying § 112—to exhaust Corteva's patent rights would result in an impermissible "mismatch between invention and reward." *Bowman v. Monsanto Co.*, 569 U.S. 278, 286 (2013). A "patent would provide scant benefit," because as soon as the inventor deposits its patented material for purposes of compliance with § 112, members of public could obtain the deposit, export the deposit, and then "reproduce the product ..., thus depriving [the inventor] of its monopoly." *Id.* at 285. And each person receiving the deposit could export the seeds and then "multiply his initial purchase, and then multiply that new creation, *ad infinitum*—each time profiting from the patented [product] without compensating its inventor." *Id.* at 285-86. That result does not honor the bargain between Corteva and the Patent Office. U.S. Const. Art. I, § 8, cl. 8. Notably, it is not only seeds that are at risk under Inari's scheme, but many other biological materials that are deposited with ATCC and similar depositories, including bacteria, fungi, yeasts, and algae that have been modified to produce important proteins and antibodies; cell lines that have been modified to express specific proteins or antibodies; viruses; purified DNA, RNA, plasmids, and vectors; and other biological materials all may be protected by patents and deposited for purposes of compliance with § 112. Inari's rule would mean that competitors could simply buy samples of those protected materials and freely infringe, with no recourse from patent owners.

**2.b.** The common law's disfavor of restraints on alienation and allowing a purchaser to take free title to property also do not apply here. *Impression Prods., Inc. v. Lexmark Int'l., Inc.*, 581 U.S. 360, 370-71 (2017). Inari had no basis to assume "a purchaser's traditional entitlement … that an unrestricted sale conveys all of a seller's rights in the article sold," let alone to assume that ATCC *could* convey patent rights. US *Lexmark* Br. at 7. Inari did not obtain the seeds from Corteva or from Corteva's licensee, let alone freely purchase the seeds on the market. Inari acquired the seeds from a seed depository whose sole function in this context is to provide seeds for compliance with § 112. And Inari took the seeds subject to an acknowledgement that neither ATCC nor Inari had a license to Corteva's patent rights; Inari acknowledged it ███████████ ████████████████████████████████████████████████ ███████████████████████ JA16298 at JA16299 (2019 MTA). Inari is thus not in the position of a purchaser who expects to take title to an article free of restraints on alienation.

## D.     The MTAs do not apply post-expiration restrictions to seed deposits.

Inari argues that the MTAs are unenforceable because they apply post-expiration restrictions on patented materials. Br. at 10. This argument has no relevance to infringement under § 271(b) because Corteva is not solely relying on the commercial use restrictions in the MTAs as the basis for infringement. Rather, Corteva's argument is that ATCC could not sell seeds for any purpose beyond access for compliance with § 112. That includes access for commercial use—because "use" is an act of direct infringement under § 271(a)—as well other uses. Corteva uses the MTAs as evidence that Inari acted with the requisite intent and knowledge required by § 271(b), but the breach of the MTA is not a necessary prerequisite for direct infringement. The breach of the MTA and violation on the prohibition on commercial use simply underscores that Inari was not accessing the seeds for § 112 purposes.

Even if Corteva needed to show a breach of the commercial use restrictions in the MTA to

show infringement (which it does not; the breach of contract claim is distinct from the infringement claims), the post-expiration argument is a red herring because Inari engaged in infringing and commercial use before the patents expired, so neither Corteva nor ATCC is attempting to *enforce* any post-expiration restrictions on use of the seed deposits. And putting aside these defects in Inari's argument, the remedy for a contract that purports to impose post-expiration restrictions on patented material is to cut off those restrictions upon expiration, not to disregard the entire contract. *See Zila, Inc. v. Tinnell*, 502 F.3d 1014, 1023 (9th Cir. 2007) (contract that "includes an invalid licensing agreement" not "void and unenforceable" altogether, but rather "unenforceable only [as to] that portion of a license agreement that demands royalty payments beyond the expiration of the patent for which the royalties are paid"); *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 450 (2015) (licensee need not pay post-expiration royalties).

## IV.    CONCLUSION

There are material disputes of fact as to whether Inari had the requisite mental state when it caused ATCC to directly infringe Corteva's patents through ATCC's unauthorized sale of patented materials. The Court should deny Inari's motion for summary judgment as to Corteva's infringement claims under § 271(b).

Dated: June 26, 2026
**Redacted version filed
on July 2, 2026**

**BARNES & THORNBURG LLP**

/s/ *Chad S.C. Stover*
Chad S.C. Stover (No. 4919)
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801
Tel. (302) 300-3474
Email: Chad.Stover@btlaw.com

OF COUNSEL:

Peter Bicks (*Pro hac vice*)
Kim B. Goldberg (*Pro hac vice*)
Jordan B. Fernandes (*Pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Tel: +1 212 506 5000
Fax: +1 212 506 5151
pbicks@orrick.com
kgoldberg@orrick.com
jfernandes@orrick.com

David Gindler (*Pro hac vice*)
Lauren Drake (*Pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
355 South Grand Avenue
Suite 2700
Los Angeles, CA 90071-1596
Tel: +1 213 629 2020
Fax: +1 213 612 2499
dgindler@orrick.com
ldrake@orrick.com

Gary Frischling (*Pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
631 Wilshire Blvd., Suite 2-C
Santa Monica, CA 90401
Tel: +1 310 633 2800
Fax: +1 310 633 2849
gfrischling@orrick.com

18

Carly Romanowicz (*Pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
222 Berkeley St.
Suite 2000
Boston, MA 02116
Tel: +1 617 880 1800
Fax: +1 617 880 1801
cromanowicz@orrick.com

Todd Vare (*Pro hac vice*)
BARNES & THORNBURG LLP
11 S. Meridian St.
Indianapolis, IN 46204
Tel: (317) 231-7735

Ronald Cahill (*Pro hac vice*)
Heather B. Repicky (*Pro hac vice*)
BARNES & THORNBURG LLP
One Marina Park Drive, Suite 1530
Boston, MA 02210
Tel: (617) 316-5312
Ronald.Cahill@btlaw.com
hrepicky@btlaw.com

Lauren Baker (*Pro hac vice*)
BARNES & THORNBURG LLP
3340 Peachtree Road N.E., Suite 2900
Atlanta, GA 30326
Tel: (404) 264-4036
Lauren.Baker@btlaw.com

*Attorneys for Plaintiffs*

19