**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **CORTEVA AGRISCIENCE LLC, PIONEER HI-BRED INTERNATIONAL, INC., AGRIGENETICS, INC.** | : | **CIVIL ACTION** |
| **v.** | : | **NO. 23-1059** |
| **INARI AGRICULTURE, INC., INARI AGRICULTURE NV** | : | |

# MEMORANDUM

**MURPHY, J.*** **August 21, 2026**

This is the second of several memoranda addressing different portions of cross-motions for summary judgment and *Daubert* motions filed by the parties in this intellectual property dispute set for trial in late September, 2026. We are splitting them up in the interest of time to aid counsel in trial preparation. An order summarizing the disposition of all motions will follow the last memorandum. In this memorandum, we grant Corteva's motion for summary judgment on Inari's counterclaims 1, 2, 4, 5, and 7 and affirmative defenses 2, 5, 8, 11 (anticipation); deny Corteva's motion for summary judgment on its own counts 18 and 19 (breach of contract); and grant in part and deny in part Corteva's motion as to Inari's affirmative defense 18 (PVP invalidity under § 2402). We also grant Corteva's *Daubert* motion on Dr. Riley, grant Corteva's *Daubert* motion on Dr. Silverstone, and grant Corteva's *Daubert* motion about the applicable

* Judge John Frank Murphy, of the United States District Court for the Eastern District of Pennsylvania.

law.[1]

## I. Background

We recently summarized this dispute as follows: "Corteva, a long-established player in agricultural science, alleges that Inari, a relatively new venture, has been wrongfully exploiting Corteva's seed technology to enter the market. Corteva's amended complaint asserts numerous utility patents and plant variety protection certificates. Inari counterclaims that Corteva's intellectual property is invalid, wrongly acquired, and being used for no purpose other than to disparage and bully Inari." *Corteva Agriscience LLC v. Inari Agriculture, Inc.*, 2026 WL 574624, at *1 (D. Del. Mar. 2, 2026). Further background is available in our rulings on Inari's motion to dismiss, *Corteva Agriscience LLC v. Inari Agriculture, Inc.*, 743 F. Supp. 3d 603 (D. Del. 2024), and Corteva's motion to dismiss, *Corteva Agriscience LLC v. Inari Agriculture, Inc.*, 2025 WL 1380763 (D. Del. May 13, 2025), as well as our October 14, 2025 claim construction order, DI 443.

Corteva and Inari each filed combined motions advancing numerous grounds for partial summary judgment and seeking to preclude each other's experts for various reasons. *See* DI 534, 537, 538, and associated briefing and exhibits. This included a statement of interest from the United States addressing certain issues. DI 562. We held oral argument on May 29, 2026, where the parties and the United States were heard. DI 577. For two issues, we invited further submissions and provided limited guidance, which we incorporate here. *See* DI 572, 584. Trial begins September 23, 2026.

---

[1] For Corteva's motions, this still leaves the damages *Daubert* for Dr. Goodwin. This will be resolved together with Inari's motion about Dr. Vellturo.

## II. Standards of review

We "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine and material if a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion addressed to an issue on which the other side has the burden of proof, the movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation modified). Alternatively, the movant may show that there is no genuine issue of material fact by pointing out "an absence of evidence to support the nonmoving party's case." *Id.* at 325. After that, the responding party must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation modified).

Turning to *Daubert*, Rule 702 requires the proponent of the expert to "demonstrate[ ] to the court that it is more likely than not that: . . . (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Where the challenged expert "testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has

'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (alteration in original) (citation modified) (quoting *Daubert*, 509 U.S. at 592). Courts must carefully distinguish between Rule 702's threshold gatekeeping analysis and disputes over factual weight that go to a jury. *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1338-40 (Fed. Cir. 2025) (en banc). "The distinction is particularly important in the context of patent damages because estimating a reasonable royalty 'necessarily involves an element of approximation and uncertainty.'" *Willis Electric Co., Ltd. v. Polygroup Ltd.*, 166 F.4th 1363, 1374 (Fed. Cir. 2026) (quoting *EcoFactor*, 137 F.4th at 1340).

## III. Analysis

As mentioned, this memorandum addresses Corteva's motion for summary judgment on Inari's counterclaims 1, 2, 4, 5, and 7 and affirmative defenses 2, 5, 8, 11 (anticipation); Corteva's motion for summary judgment on its own counts 18 and 19 (breach of contract); Corteva's motion as to Inari's affirmative defense 18 (PVP invalidity under § 2402); Corteva's *Daubert* motion on Dr. Riley; Corteva's *Daubert* motion on Dr. Silverstone; and Corteva's *Daubert* motion about the applicable law.

### a. We grant Corteva's motion with respect to Inari's counterclaims 1, 2, 4, 5, and 7 and affirmative defenses 2, 5, 8, 11 (anticipation).

Inari's counterclaims 1, 2, 4, 5, and 7 and affirmative defenses 2, 5, 8, 11 relate to invalidity of Corteva's utility patents. Under these headings, Corteva moves for summary judgment on Inari's anticipation by prior public use defense. Inari's defense centers around Corteva's pre-critical-date field trials of its patented transgenic plants. These field trials were part of the relevant regulatory process, and on this motion, there is no dispute that the trials were before the pertinent critical dates, and that the plants were ready for patenting. Inari's expert, Dr.

Silverstone, sums up his opinion that these field trials were invalidating public use as follows (using the 434 patent as an example):

> 80. Prior to conducting these regulatory field trials, Corteva applied to the USDA for a permit to conduct the field trials. An excerpt from the USDA APHIS website of the publicly available list of permits Corteva sought to conduct regulatory field trials for the events claimed in the Asserted Patents is provided in Exhibit C to my report. The applications for the USDA permits were accessible to the public and available for public comment through the Freedom of Information Act (FOIA). The USDA permit application informed the public of the use of the DP- 004114-3 event in field trials that occurred more than one year before the filing of the application for the ’434 patent. The information available from the USDA under FOIA was sufficient for a POSA to understand the nature of the plants subject to the field trials. The subject matter of each of the claims of the ’434 patent was reduced to practice and ready for patenting prior to the filing of the application for permit for the regulatory field trials. The DP-004114-3 plants grown in the extensive regulatory field trials embody the subject matter of the claims of the ’434 patent. The regulatory field trials were not conducted to alter or perfect the DP-004114-3 event. The DP-004114-3 event field trials were a public use more than one year before the application for the ’434 patent. Regulatory field trials are a commercial use of the DP-004114-3 plants. The only purpose of the field trials is to obtain regulatory clearance to market the DP-004114-3 corn plants which had been previously reduced to practice and were ready for patenting.
>
> 81. Event DP-004114-3, and each of the claims 1-24 of the ’434 patent, were reduced to practice and ready for patenting before the application for the permits to conduct the field trials of 4114 Maize commenced in 2006. The field trials were conducted to obtain regulatory approval for the sale of DP-004114-3 event plants, that is to deregulate DP-004114-3 corn event plants so that they could be sold and not to modify or refine the DP-004114-3 event. The DP-004114-3 was reduced to practice and ready for patenting and the field trials for deregulation of the event were not an experimental use. Regulatory trials require extensive plantings. For example, Corteva’s APHIS petition states that over 180 separate plantings were conducted. In my experience in the industry, most of the regulatory trials were conducted with Contract Research Organizations (CROs). I understand that the extensive regulatory trials conducted on DP-004114-3 plants were for the most part conducted by non-Corteva independent farmers on their land. Even if such farmers were subject to confidentiality provisions when they conducted the trials such secrecy does not negate the commercial use of the regulatory trials and public use.
>
> 82. Because the invention as defined in each of claims 1-28 of the ’434 patent was in public use in this country more than one year prior to the date of the application for the ’434 patent, it is my opinion that the ’434 patent is invalid.

Silverstone Opening R. ¶¶ 80-82. Corteva argues that the field trials are not public use as a matter of law.

The parties frame the issue under *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374 (Fed. Cir. 2005). "Whether a patent is invalid due to public use under § 102(b) is a question of law based on underlying questions of fact." *Id.* at 1378. Further,

> [t]he proper test for the public use prong of the § 102(b) statutory bar is whether the purported use: (1) was accessible to the public; or (2) was commercially exploited. Commercial exploitation is a clear indication of public use, but it likely requires more than, for example, a secret offer for sale. Thus, the test for the public use prong includes the consideration of evidence relevant to experimentation, as well as, *inter alia*, the nature of the activity that occurred in public; public access to the use; confidentiality obligations imposed on members of the public who observed the use; and commercial exploitation.

*Id.* at 1380. "[E]vidence of experimental use may negate . . . 'public use.'" *Id.* at 1380-81. As the Federal Circuit explained, secret internal testing without compensation is not "public use" even if the testing furthers other projects or generated commercial benefits. *Id.* at 1380, 1383. But, secret use of a process to create parts for sale is public use of that process. *Id.* at 1382 (discussing and adopting *Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516 (2d Cir. 1946)). Corteva argues that no reasonable jury could conclude that the field trials were accessible to the public or constituted commercial exploitation. Inari disagrees on both points.

**Commercial exploitation.** Neither party identified a case addressing whether an inventor's own secret crop field trials or something closely analogous is public use under *Invitrogen* because of supposed commercial exploitation.[2] Part of the reason for this is that the

[2] DI 577 at 236:6-13 (Inari counsel acknowledging lack of authority).

"commercially exploited" prong of *Invitrogen* is not a particularly good fit for situations other the one in *Metallizing Engineering* — secret use of a process to generate goods for sale. If the patent claims cover the goods themselves (like plant crops), then this would all be addressed under the on-sale bar, which Inari has not asserted here. Indeed, Inari has not identified any evidence that the field trials yielded money for Corteva.[3] Rather, benefits of the field trials were far more consistent with the follow-on commercial benefits held insufficient by *Invitrogen*. Inari's argument to the contrary is that Corteva's use was "before approval and sale" of the patented plants and that is enough. DI 555 at 21. That sweeping argument, if accepted, would render any pre-critical-date use by an inventor who is in business automatically public use by commercial exploitation. Thus, the analysis should, and will, proceed entirely under the "accessible to the public" prong of *Invitrogen*.

**Accessible to the public.** Field tests happen outdoors and often on third-party land. But neither party appears concerned about random members of the public who might see a crop from a distance or happen upon it.[4] Rather, the focus is on the third-party "cooperator farmers" who actually grow the crops. In its motion, Corteva presents evidence that these activities were

[3] A contrasting example might be an inventor using software before the critical date to earn money for himself. *See Trading Techs. Intern., Inc. v. eSpeed, Inc.*, 507 F. Supp. 2d 883, 891-95 (N.D. Ill. 2007), *aff'd,* 595 F.3d 1340 (Fed. Cir. 2010). Even in cases where money does change hands, it might be experimental use. *See Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1327-29 (Fed. Cir. 2019) (finding no public use even though surgeon charged money for pre-critical-date surgeries).

[4] Perhaps this is because there is no way a member of the public could be put into possession of a claimed invention on specific transgenic events by looking at a corn plant. *See Dey, L.P. v. Sunovion Pharms., Inc.*, 715 F.3d 1351 (Fed. Cir. 2013) (explaining that although there is no enablement requirement for public access, the claimed features of the invention must still be placed into public's possession); JA3884 at 73:9-18 (Inari's Dr. Silverstone agreeing).

conducted confidentially, and that farmers and contract research organizations were bound by confidentiality agreements. DI 535 at 19-20. Corteva's showing carries the motion because Inari has not adduced evidence sufficient for a jury to find public access by clear and convincing evidence. Inari does not identify any person or organization who had unrestricted access to Corteva's field trials. DI 555 at 22-24. Rather, Inari resorts to burden-shifting and speculation: "To support its allegations that the field trials were 'thoroughly confidential,' Corteva relies"; "The evidence Corteva cites"; "Corteva has identified only one"; "Corteva has not referred"; "Even if Corteva can come forward"; "The non-Corteva cooperator farmers conducting the pre-critical date field trials were all likely." *Id*. at 23. Asked about how Inari would make out this defense in its case-in-chief, Inari counsel said that Dr. Silverstone would carry the load. DI 577 at 233:1-10. But on this point, Dr. Silverstone merely observes that the third parties would have to be subject to confidentiality provisions and leaves it at that. *E.g.*, Silverstone Opening R. ¶ 81.[5]

Because Inari did not adduce evidence that Corteva's field trials were accessible to the public or were commercial exploitation of the invention, we enter judgment in Corteva's favor on Inari's public use defense under its counterclaims 1, 2, 4, 5, and 7 and affirmative defenses 2, 5, 8, 11.

[5] Dr. Silverstone includes an exhibit to which Corteva objects. The exhibit is a list of the field trials that Dr. Silverstone or counsel apparently prepared. Dr. Silverstone says that the list is "[a]n excerpt from the USDA APHIS website of the publicly available list of permits Corteva sought to conduct regulatory field trials for the events claimed in the Asserted Patents" and that the permit applications were available to the public. *Id.* at ¶ 80. Dr. Silverstone does not explain, and we fail to see, how this relates to public accessibility of the *crops*, which is the basis of Inari's public use defense. Inari's counsel may have some other concept of how these applications factor into public use, but nothing resembling admissible evidence.

**b. We deny Corteva's motion with respect to Corteva's counts 18 and 19 (breach of contract).**

Corteva's counts 18 and 19 allege breach of contract against Inari Belgium and Inari USA, respectively.[6] DI 148 at 96-102. The contracts are material transfer agreements (MTAs) between Inari and the American Type Culture Collection (ATCC), which is a nonprofit organization where patent applicants like Corteva deposit biological samples like seeds. Over 200 times, Inari acquired Corteva's seeds from ATCC under several different MTAs. To win an affirmative summary judgment motion on breach of contract, Corteva has to run a bit of an obstacle course: first, Corteva has to show as a matter of law that it is a third-party beneficiary of the MTAs such that it can assert breach; second, Corteva has to overcome Inari's arguments that its activities are immune to the transfer and commercial use restrictions in the MTAs;[7] third, Corteva must establish breach as a matter of law of either transfer or the commercial use restrictions.

**The allegations.** The MTAs forbid Inari from using Corteva's seed deposits for commercial use: "Any Commercial Use of the Biological Material is strictly prohibited without ATCC's prior written consent" and "ATCC Materials . . . shall not be used for any Commercial Use without . . . license." JA16299; JA5219; JA16294. The MTAs also forbid transfer: "ATCC Material and Progeny may only be used by Purchaser's Investigator for research purposes and

[6] On summary judgment, the parties treat the two Inari entities together, so we will too.

[7] Inari did not cross-move for summary judgment on Corteva's breach of contract counts, and it is unclear what exactly happens to the breach counts if we were to deny summary judgment to Corteva on this second ground — that ATCC cannot legally restrict the activities Corteva says breached the MTAs. Inari suggests sua sponte summary judgment to the non-movant. DI 555 at 10. That seems a rather unfair and opportunistic suggestion in a Delaware patent case where summary judgment practice is so tightly constrained.

only in Investigator's laboratory." JA16298; JA5218. According to Corteva, Inari obtained Corteva's seeds from ATCC, transported them outside the United States, and exploited them to further Inari's commercial purposes, both in breach of the MTAs. DI 535 at 6-12.

**Third-party beneficiary.** Whether one may enjoy third-party beneficiary standing for a breach of contract claim tends to be an intensive question of state law. One of the MTAs specifies New York Law, and the other two say nothing, so Corteva suggests Delaware law; Corteva also suggests the Second Restatement specifically for the third-party beneficiary question. DI 535 at 3 n.2 & 4 n.3. Inari did not respond to those assertions. Because it did not appear to factor into a specific dispute raised in the briefing, we will accept the hodgepodge of authorities advanced by the parties.

Corteva argues, and Inari does not dispute, that it must establish "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for the third party's benefit and (3) that the benefit to the third party is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate the third party if the benefit is lost." DI 535 at 4 (quoting *Walton v. Comfort Sys. USA (Syracuse), Inc.*, 155 F.4th 144, 158 (2d Cir. 2025)). Corteva lays out a compelling factual basis for satisfying these three factors for the MTAs. *Id.* at 4-6. As Corteva points out, the MTAs exist to protect the interests of the depositor. Here those obvious interests go beyond mere implication. In the MTAs, Corteva is the "Contributor," which the MTAs expressly define to include anyone who deposits material. JA5218; JA16294; JA16298. And the MTAs expressly outline the rights of the Contributor. Inari does not dispute Corteva's basic factual premise, and so we accept it as well.

Inari's arguments in opposition on this point require accepting Inari's legal arguments about the effectiveness of the MTAs against Inari's conduct. First, Inari argues that Corteva disclaimed any purported right under the MTAs against Inari's conduct here by agreeing to deposit seeds free of encumbrance. DI 555 at 9-10. This is a defense to breach repackaged under the heading of whether Corteva has third-party beneficiary standing. As Inari pointed out, "Corteva's purported rights as a third-party beneficiary are subject to 'any claim or defense arising from [its] own conduct or agreement.' Restatement (Second) of Contracts § 309 (4)." *Id.* at 9. Second, Inari argues that whether Corteva is a "Contributor" is for the jury: "In view of the conflict with federal law . . . it is a question of fact whether a patent depositor can be a third-party beneficiary as a contributor under the MTA." DI 555 at 12. This argument also adds nothing because, if there is no conflict with federal law, as we explain next, then the premise of the argument vanishes. And if there were a conflict with federal law, then Inari's conduct would be immune and third-party beneficiary status would be irrelevant.

Because Inari did not identify any dispute specifically about whether Corteva is a third-party beneficiary under the MTAs, we proceed to consider whether Inari's activities are legally immune from breach.

**Immunity.** At the outset of this case, Inari moved to dismiss Corteva's breach of contract counts because, according to Inari, "it could not have breached the MTAs as a matter of law because to the extent that some part of either MTA purports to restrict use of the purchased seeds, those restrictions are ineffective because of the Patent Office regulations on the public availability of deposits." *Corteva*, 743 F. Supp. 3d at 619. We denied Inari's motion because "the Patent Office regulations require that the seeds be available to the public, and that is not

inconsistent with the restrictions on commercial use at issue" in the MTAs. *Id.* Now, in opposition to Corteva's motion for summary judgment, Inari presents a more detailed version of the same argument. And we reach the same result.

To begin, as there was at the motion-to-dismiss stage, there is significant overlap between Inari's arguments opposing Corteva's motion on breach and Inari's arguments in support of its own motion on noninfringement. This is what we could call Inari's central thesis of the case. Inari engaged in a deliberate and thoughtful plan to exploit Corteva's seed technology while hoping to evade Corteva's U.S. intellectual property rights. The situation is not unlike any other at-risk launch, but on an extraordinary scale. On Inari's reading of the law, everything it did was permissible. We stand by and adopt our earlier introduction to and explanation of these issues. *Corteva*, 743 F. Supp. 3d at 614-19. Helpfully, and this will come up again addressing Inari's motion for summary judgment, the parties and the United States were able to agree with us on common ground of background principles that set the stage for the dispute:

1. A patent applicant may choose to deposit biological material along with a patent application, but it is not a requirement.[8]

2. Absent some contrary indication in the prosecution history, deposited biological material — just like any particular portion of the written specification — may or may not be necessary to provide adequate disclosure under 35 U.S.C. § 112. That does not usually get determined unless and until a particular claim is put under the light of a § 112 defense calling upon the patent owner to rely upon

[8] DI 577 at 18:1-3; 22:23-23:16; *See In re Argoudelis*, 434 F.2d 1390, 1392 (C.C.P.A. 1970).

the biological material.[9]

3. If an applicant deposits biological material and if that biological material is necessary to establish § 112 compliance, then the biological material must be available to the public in such a way that it allows the public to learn whatever information is necessary to establish § 112 compliance. One might call this "reading" the biological sample to analogize to reading the written specification. What activities are tantamount to "reading" a biological sample depend on the technology, claim, and § 112 issue — call these the reading activities.[10]

4. The reading activities are privileged. But other than the reading activities, any other acts committed by third parties are subject to background contract or patent law — fair game, so to speak.[11]

Assuming for the moment that Inari engaged in acts that breach the MTAs as Corteva says, we consider Inari's legal rebuttal to Corteva's breach of contract claims with this common ground firmly under our feet.

First, Inari argues that the patent deposit rules do not permit patent owners to restrict transfer and use of patent deposits by contract. DI 555 at 4-6. As we have explained before, the Patent Office implemented rules to govern the biological deposit process. *Corteva*, 743 F. Supp. 3d at 615; 37 C.F.R. §§ 1.801-09. Inari relies on Rule 1.808:

---

[9] DI 577 at 18:4-12; 20:23-21:18; 22:23-23:16; *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 965 (Fed. Cir. 2002) (explaining how deposits may help satisfy either the written description or enablement requirements).

[10] DI 577 at 22:4-16; 22:23-23:16; 37 C.F.R. §§ 1.801-09.

[11] DI 577 at 22:17-24:11.

> § 1.808 Furnishing of samples.
> (a) A deposit must be made under conditions that assure that:
> (1) Access to the deposit will be available during pendency of the patent application making reference to the deposit to one determined by the Director to be entitled thereto under § 1.14 and 35 U.S.C. 122, and
> (2) Subject to paragraph (b) of this section, all restrictions imposed by the depositor on the availability to the public of the deposited material will be irrevocably removed upon the granting of the patent.
> (b) The depositor may contract with the depository to require that samples of a deposited biological material shall be furnished only if a request for a sample, during the term of the patent:
> (1) Is in writing or other tangible form and dated;
> (2) Contains the name and address of the requesting party and the accession number of the deposit; and
> (3) Is communicated in writing by the depository to the depositor along with the date on which the sample was furnished and the name and address of the party to whom the sample was furnished.
> (c) Upon request made to the Office, the Office will certify whether a deposit has been stated to have been made under conditions which make it available to the public as of the issue date of the patent grant provided the request contains:
> (1) The name and address of the depository;
> (2) The accession number given to the deposit;
> (3) The patent number and issue date of the patent referring to the deposit; and
> (4) The name and address of the requesting party.

The rule is unambiguous and entirely consistent with the common ground above.[12] Biological samples must be available to the public so that they may be "read," to use the metaphor. Hence, Rule 1.808 ensures that any limits on availability imposed by the depositor (the patent applicant, presumably) are removed upon granting of the patent. We remain unpersuaded by Inari's view that somehow this rule prohibits ATCC's restrictions on commercial use or transfer when the rule says not a word about commercial use or transfer.

Second, Inari argues that Corteva's enforcement of the MTAs is barred because it

[12] Both parties included an interesting assortment of background information about the rule — USPTO comments, old amicus briefs, evidence from the ATCC, and so forth. None of this disturbs the clear meaning of the rule, although for what it's worth, the dueling extrinsic evidence appears roughly in equipoise.

imposes restrictions that conflict with federal patent deposit regulations. DI 555 at 6-9. Inari's rule is correct — either because of background contract law or the express provisions in the MTAs stating that the agreements comply with federal law. But Inari's arguments are unpersuasive either because, as explained above, there is no conflict, or because of Inari's frequent imprecision about what conduct this case is really about. For example, Inari says: "If ATCC were to deny a requester ***access*** to a patent deposit because they declined to agree to the MTA restrictions and execute the MTA, this would run afoul of § 1.808. ATCC cannot deny ***access*** to patent deposits to anyone who does not agree to the transfer and commercial use restrictions in the MTAs." DI 555 at 7 (emphasis added). As set out in the common ground, Corteva has no concern about "access." "Access" is necessary for reading. Inari puts another twist on the argument, suggesting that the MTAs serve as post-expiration restrictions on patented technology in violation of *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 452 (2015). We fail to see what a contractual restriction on commercial use of a biological sample has to do with the Supreme Court's rule that a royalty-bearing naked patent license cannot extend past expiration of the patent. Furthermore, Inari's argument is speculative; the record gives no indication of how ATCC would respond to a request to obtain biological deposits for commercial use after patent expiration. Finally, in this part of its argument, Inari references the Budapest Treaty, which provides that "Pursuant to Rule 11.3 of the Regulations Under the Budapest Treaty, ATCC is required to furnish a sample of any deposited microorganism to any authority, natural person, or legal entity that has a right to the sample under the law governing patent procedure where a patent referencing the deposit has been filed." DI 555 at 9. Once again, that is undisputed

common ground and decidedly not the conduct that Corteva is alleging breached the MTAs.[13]

Third, Inari argues that Corteva disclaimed any benefit from the MTA restrictions. DI 555 at 9-10. Inari contends that "Corteva authorized ATCC on patent grant to distribute the patent deposits 'to the public pursuant to [the] Budapest Treaty and U.S. patent law' and acknowledged that it 'does not have the right to prevent the furnishing of samples to parties legally entitled, whatever [its] personal wishes may be.'" DI 555 at 9-10 (quoting the Corteva-ATCC deposit paperwork). We need not explore the details of this alleged disclaimer because, accepting it at face value, it again stays within the common ground. Corteva has never suggested that the public cannot obtain access to the samples.

There is a critical misdirection in Inari's central thesis of the case. Inari has ample authority to show that the public is entitled to engage in reading activities and should not be charged with patent infringement or breach of contract for doing so. Inari even persuaded the United States to appear in this case to say the same thing. But while that may be what Inari thinks this case is about (or wants this case to be about), that is not what this case is about. Corteva — the plaintiff and therefore the master of the pleadings — does not dispute that the public is entitled to read the deposited samples. The real fight is over whether Inari's activities ***were*** reading activities, or if they violated Corteva's intellectual property and contractual rights. And one final point is that of course whether particular acts are reading activities could very well be a fact question. And as we explain below, we see factual disputes on the ultimate question of

[13] Inari has not persuaded us at any point in this case that the Budapest Treaty is an independent defense to patent infringement or breach of contract. But it is no matter because Inari is always careful to say that Rule 1.808 is consistent with and implements the Budapest Treaty, so in that sense, we may simply address Rule 1.808 and consider Inari's frequent references to the Treaty as non sequitur.

breach.

**Breach.** Inari argues that even if Corteva were a third-party beneficiary of the MTAs, and even if Inari's alleged activities could legally be deemed breach, then it still remains for a jury to determine what, exactly, Inari did with the seeds and whether those activities breach the transfer and commercial use restrictions in the MTAs. We agree with Inari for two reasons. First, Inari has identified genuine disputes of material fact about exactly what acts Inari engaged in and how the language of the MTAs applies to those acts. DI 555 at 10-15. Application of contractual language to alleged conduct to determine breach is a jury's responsibility. Second, the infringement and damages issues in this case are also hotly contested, and Inari's acts giving rise to those alleged infringement and damages are going to be a significant part of the trial. There is extensive overlap between the conduct relevant to infringement and damages and the conduct that Corteva alleges breached the MTAs. Hence, there is little to be gained, and some potential confusion at risk, to take the breach of contract claims away from the jury. Therefore, we deny Corteva's motion for summary judgment in its favor on breach of contract (counts 18 and 19) and commend the factual question of breach to the jury.

**c. We grant in part and deny in part Corteva's motion with respect to Inari's affirmative defense 18 (PVP invalidity under § 2402).**

Inari's eighteenth affirmative defense is: "Invalidity of the Plant Variety Protection Certificates Each of the PVP Certificates identified in Exhibit A and Exhibit B of the SAC is invalid for failure to meet the requirements of protectability under 7 U.S.C. §§ 2401 et seq., including without limitation those set forth in § 2402." DI 160 at 78. Section 2402 recites various requirements for obtaining PVP protection — analogous to, e.g., 35 U.S.C. §§ 101, 102, 103, and 112 for utility patents. And in a way similar to 35 U.S.C. § 282 for utility patents, PVP

infringement defendants have available an affirmative defense of proving that one of the requirements of 7 U.S.C. § 2402 was not met: "invalidity of the plant variety protection in suit on any ground specified in section 2402 of this title as a condition for protectability." 7 U.S.C. § 2562. PVP certificates are presumed valid. *Id.* Inari does not dispute that the clear-and-convincing standard applies to an affirmative defense under § 2562. Corteva seeks summary judgment on the "distinctness" aspect of Inari's PVP-invalidity defense.[14] Aside from the statutes, the parties have identified no authority explaining the legal framework for a PVP certificate invalidity attack.

The PVPA provides that a variety may be protected only if it is "distinct, in the sense that the variety is clearly distinguishable from any other variety the existence of which is publicly known or a matter of common knowledge at the time of the filing of the application." 7 U.S.C. § 2402(a)(2). Thus, for Inari to prevail in an affirmative defense on this basis, it must prove, by clear and convincing evidence, that a challenged variety is ***not*** "clearly distinguishable from any other variety the existence of which is publicly known or a matter of common knowledge at the time of the filing of the application." *Id.* This conclusion flows from the text and structure of 7 U.S.C. § 2562. To establish "invalidity," the challenger must negative the presumed validity. So one might expect Inari would marshal evidence designed to prove that one or more of Corteva's varieties is ***not*** "clearly distinguishable from any other variety the existence of which is publicly

[14] Corteva argues that distinctness is the only live issue under Inari's affirmative defense 18 but Inari disagrees and the briefing does not reference any record on that question (some equivalent, of, e.g., invalidity contentions indicating as much). And Corteva's argument about the fate of the analogous counterclaim is indecipherable. So to err on the side of caution, we limit this ruling to distinctness, and leave the rest to trial preparation and Rule 37. Most assuredly, there will not be *more* summary judgment briefing. *See* DI 564 at 14 n.6.

known or a matter of common knowledge at the time of the filing of the application." 7 U.S.C. § 2402(a)(2). For example, Inari might present a then-known variety that is not clearly distinguishable from the challenged variety. But that is not what Inari did.

Rather, Inari's approach, through its expert Dr. Riley, was to attack the soundness of Corteva's original submission to the PVP Office. Corteva treats the distinctness requirement like the novelty or nonobviousness requirements for utility patents, arguing that this sort of application-submission-based attack on validity would never work in the familiar utility-patent context, so it should not work for distinctness either. Inari does not clearly explain why Corteva's argument is wrong, but to be sure, 7 U.S.C. § 2402 does not have language similar to 35 U.S.C. § 102 that "[a] person shall be entitled to a patent ***unless***" the claims are shown by the Patent Office to lack novelty (emphasis added). Rather, § 2402 provides that an applicant (breeder) "shall be entitled to plant variety protection for the variety, subject to the conditions and requirements of this chapter, ***if the variety is . . . distinct***" (emphasis added). To that end, the PVP application requires an applicant to make a showing:

> 19b. Give a summary of the variety's distinctness. Clearly state how this application variety may be distinguished from all other varieties in the crop. If the new variety is most similar to one variety or a group of related varieties: (1) identify these varieties and state all differences objectively; (2) attach replicated statistical data for characters expressed numerically and demonstrate that these are clear differences; and (3) submit, if helpful, seed and plant specimens or photographs (prints) of seed and plant comparisons which clearly indicate distinctness.

JA26135.

We agree with Corteva that even taking everything Dr. Riley says as true, Inari has not adduced clear and convincing evidence of invalidity for lack of distinctness. Attacking a PVP

applicant's initial method showing of distinctness could be relevant,[15] but in the end, the issued PVP certificate is presumed valid and the challenger has to prove the negative — prove that the challenged variety is ***not*** "clearly distinguishable from any other variety the existence of which is publicly known or a matter of common knowledge at the time of the filing of the application." 7 U.S.C. § 2402(a)(2). Dr. Riley's opinions conspicuously fall short of and avoid the real goal. Here is a sampling from his opening report:

- "In my opinion, Corteva, in applying for the Asserted PVP Certificates, did not comply with the requirements of 7 U.S.C. § 2402 during the application and examination process." Riley Opening R. at ¶ 69.
- "In my opinion, in view of the USDA Guidelines requiring a comparison of morphologic characteristics, I do not believe Corteva's methodology . . . would consistently achieve [an appropriate submission] contemplated by the USDA Guidelines for each subject variety." *Id.* at ¶ 77.
- "Corteva's [method] appears to be made based on internal policies and convenience rather than the USDA Guidelines." *Id.* at ¶ 83.
- "In my opinion, Corteva's process . . . is not a selection process contemplated by the

[15] We disagree that Inari's entire attack is beside the point because, Corteva says, it is legally impossible to demonstrate invalidity by clear and convincing evidence exclusively by undermining the PVP application's showing of distinctness. DI 564 at 14. The language of § 2402 frames distinctness as somewhat akin to the disclosure requirements of 35 U.S.C. § 112, which specify what the utility patent application "shall" include. And an invalidity defense based on 35 U.S.C. § 112 of course includes undermining the sufficiency of what was submitted to the Patent Office. There's no reason why attacking the applicant's showing of distinctness could not be an ingredient of an invalidity defense, so long as the evidence together negatives the distinctness requirement for that variety. Hence, we cannot agree with Corteva's suggestion that the only way to prove invalidity for lack of distinctness is to compare the variety to another-then known and show that they are not distinct. DI 535 at 24.

USDA DUS Guidelines." *Id.* at ¶ 88.

In the posture of Corteva's summary judgment motion, there is no reason to question the scientific merits of Dr. Riley's analysis. But we must agree with Corteva that it serves no function but to raise doubts about whether Corteva's method was a good one. Accepting that Corteva's method had flaws, the next question is, does that mean that a challenged variety is ***not*** "clearly distinguishable from any other variety the existence of which is publicly known or a matter of common knowledge at the time of the filing of the application?" 7 U.S.C. § 2402(a)(2). Maybe, maybe not — who knows? On this record, it could easily be true that *even accepting* Dr. Riley's critique, the protected varieties are in fact distinct. Dr. Riley never suggests otherwise (indeed, although reaching the ultimate opinion is certainly not required, we could not help but notice that Dr. Riley never opined that a particular variety was not distinct). No reasonable jury could rely on that type of incomplete evidence to find clear and convincing evidence of invalidity.

**d. We grant Corteva's *Daubert* motion with respect to Dr. Riley.**

Corteva moves to preclude Dr. Riley's testimony in support of Inari's eighteenth affirmative defense of PVP certificate invalidity for lack of distinctness. DI 535 at 33 (citing Dr. Riley's Opening R. at ¶¶ 69-89 (JA2214-25) and Reply R. at ¶¶ 6-31 (JA2267-81)). We do not agree with Corteva's criticism of Dr. Riley, because there is nothing wrong with an expert providing pieces of a bigger picture where those pieces are relevant and helpful to the jury. But we grant the motion because Dr. Riley's opinions on distinctness are now irrelevant in light of our judgment against Inari on Inari's defense of lack of distinctness.

**e. We grant Corteva's motion with respect to Dr. Silverstone.**

Corteva moved to preclude two aspects of Dr. Silverstone's proposed testimony: prior

public use of the inventions claimed in Corteva's utility patents and the application of the following term from claim 1 of the 522 patent: "a polynucleotide that encodes a protein having aryloxyalkanoate dioxygenase activity." We grant as to both.

**Public use.** Corteva moves to preclude Dr. Silverstone's opinions on public use. As discussed above, we were able to resolve that aspect of the motion in Corteva's favor while taking Dr. Silverstone's opinions as true. Thus, we need not examine the details of Corteva's motion to preclude, but we grant the motion because Dr. Silverstone's opinions on public use are now irrelevant in light of our judgment against Inari on Inari's defense of public use.

**Claim construction.** On claim construction, we adopted Corteva's proposed construction of "a polynucleotide that encodes a protein having aryloxyalkanoate dioxygenase activity": "A polynucleotide is a polymeric molecule composed of multiple nucleotides. A protein having aryloxyalkanoate dioxygenase activity is a protein with the ability to degrade or diminish the activity of an aryloxyalkanoate herbicide." DI 442 at 9. Dr. Silverstone was called upon to apply this claim construction as part of his opinion that, e.g., claim 1 of the 522 patent is invalid under 35 U.S.C. § 112. Inari does not dispute that during his deposition, Dr. Silverstone repeatedly contradicted the claim construction. DI 555 at 32-33. But Corteva does not dispute that Dr. Silverstone's expert report relied on the correct construction. We see no reason to automatically preclude an expert who contradicts himself in his deposition. But of course (and Inari does not suggest a different result) we preclude Dr. Silverstone from testifying in any way inconsistent with the court's claim construction. Corteva's motion is granted in this respect.

**f. We grant Corteva's *Daubert* motion with respect to the applicable law.**

Together, Corteva's motion and Inari's response correctly state the law: A technical expert may not opine on the law, but may be instructed on the law and explain those legal

instructions. Thus, we will grant Corteva's motion to preclude any Inari technical expert from opining on the law. But at least for the examples identified by Corteva and Inari that we reviewed, it appears to us that Inari is correct that its experts intend to appropriately testify about their legal instructions as a premise of their technical opinions, not their opinions on the law.

## IV. Conclusion

For the reasons explained above, we grant Corteva's motion for summary judgment on Inari's counterclaims 1, 2, 4, 5, and 7 and affirmative defenses 2, 5, 8, 11 (anticipation); deny Corteva's motion for summary judgment on its own counts 18 and 19 (breach of contract); and grant in part and deny in part Corteva's motion as to Inari's affirmative defense 18 (PVP invalidity under § 2402). We also grant Corteva's *Daubert* motion on Dr. Riley, grant Corteva's *Daubert* motion on Dr. Silverstone, and grant Corteva's *Daubert* motion about the applicable law.