**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **CORTEVA AGRISCIENCE LLC, PIONEER HI-BRED INTERNATIONAL, INC., AGRIGENETICS, INC.** | : | **CIVIL ACTION** |
| **v.** | : | **NO. 23-1059** |
| **INARI AGRICULTURE, INC., INARI AGRICULTURE NV** | : | |

# MEMORANDUM

**MURPHY, J.*** **September 3, 2026**

This is the third of several memoranda addressing different portions of cross-motions for summary judgment and *Daubert* motions filed by the parties in this intellectual property dispute set for trial in late September, 2026. We are splitting them up in the interest of time to aid counsel in trial preparation. An order summarizing the disposition of all motions will follow the last memorandum. In this memorandum, we deny Inari's motion for summary judgment of noninfringement of Corteva's PVP certificates (Corteva's counts 1 and 2); grant as conceded Inari's motion for summary judgment of noninfringement of Corteva's 522, 363, and 441 patents under 35 U.S.C. § 271(a) (Corteva's counts 9 (also styled VIV), 12, and 15); deny the remainder of Inari's motion for summary judgment of noninfringement under § 271(a) (Corteva's counts 3 and 6); grant Inari's motion for summary judgment of noninfringement under § 271(b) (Corteva's counts 5, 8, 14, and 17); deny Inari's motion for summary judgment of

* Judge John Frank Murphy, of the United States District Court for the Eastern District of Pennsylvania.

noninfringement under § 271(f)(2) (Corteva's counts 4, 7, 10, 13, and 16); and deny Inari's motion for summary judgment as to legal estoppel.[1]

## I. Background

We recently summarized this dispute as follows: "Corteva, a long-established player in agricultural science, alleges that Inari, a relatively new venture, has been wrongfully exploiting Corteva's seed technology to enter the market. Corteva's amended complaint asserts numerous utility patents and plant variety protection certificates. Inari counterclaims that Corteva's intellectual property is invalid, wrongly acquired, and being used for no purpose other than to disparage and bully Inari." *Corteva Agriscience LLC v. Inari Agriculture, Inc.*, 2026 WL 574624, at *1 (D. Del. Mar. 2, 2026). Further background is available in our rulings on Inari's motion to dismiss, *Corteva Agriscience LLC v. Inari Agriculture, Inc.*, 743 F. Supp. 3d 603 (D. Del. 2024), and Corteva's motion to dismiss, *Corteva Agriscience LLC v. Inari Agriculture, Inc.*, 2025 WL 1380763 (D. Del. May 13, 2025), as well as our October 14, 2025 claim construction order, DI 443.

Corteva and Inari each filed combined motions advancing numerous grounds for partial summary judgment and seeking to preclude each other's experts for various reasons. *See* DI 534, 537, 538, and associated briefing and exhibits. This included a statement of interest from the United States addressing certain issues. DI 562. We held oral argument on May 29, 2026,

[1] For Inari's motions, this still leaves the damages *Daubert* for Dr. Vellturo. This will be resolved together with Corteva's motion about Dr. Goodwin. We will provide a written rationale as soon as possible, but for planning purposes, it is likely that neither expert will be precluded. *See EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1338 (Fed. Cir. 2025) (en banc) ("An absence of reviewable reasoning may be sufficient grounds for this court to conclude the district court abused its discretion.").

where the parties and the United States were heard. DI 577. For two issues, we invited further submissions and provided limited guidance, which we incorporate here. *See* DI 572, 584. Trial begins September 23, 2026.

## II. Standards of review

We "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine and material if a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion addressed to an issue on which the other side has the burden of proof, the movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation modified). Alternatively, the movant may show that there is no genuine issue of material fact by pointing out "an absence of evidence to support the nonmoving party's case." *Id.* at 325. After that, the responding party must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation modified).

## III. Analysis

As mentioned, this memorandum addresses Inari's motion for summary judgment of noninfringement of Corteva's PVP certificates (Corteva's counts 1 and 2) and Inari's motion for summary judgment of noninfringement of Corteva's utility patents under § 271(a) (Corteva's

counts 3, 6, 9, 12, and 15), § 271(b) (Corteva's counts 5, 8, 14, and 17), § 271(f)(2) (Corteva's counts 4, 7, 10, 13, and 16), and legal estoppel.

Because the issues addressed in this opinion revolve around Corteva's allegations of PVP certificate and utility patent infringement, especially the accused acts of infringement, we begin with a brief statement of Corteva's version of the relevant facts, which we must accept on Inari's motion for summary judgment. As part of its process of applying for utility patents, Corteva deposited many of its seeds with the American Type Culture Collection (ATCC) under agreements that ATCC did not have a license to infringe the relevant patent(s), nor would the release of the seeds grant a license. Relevant terms of the agreements between ATCC and Corteva include:

> The deposit of these seeds/strain(s) does not grant ATCC® a license, either express or implied, to infringe the patent, and our release of these seeds/strain(s) to others does not grant them a license, either express or implied, to infringe the patent. . . .
>
> Prior to the issuance of a U.S. Patent, the ATCC® agrees in consideration for a one-time service charge, not to distribute these seeds/strain(s) or any information relating thereto or to their deposit except as instructed by the depositor or relevant patent office. After relevant patent issues we are responsible to release the seeds/strain(s) and they will be made available for distribution to the public without any restrictions.
>
> * * *
>
> a. ATCC® may furnish as permitted by or required under Budapest Treaty or applicable law. Notwithstanding anything to the contrary, ATCC may, without restriction, furnish samples of the deposit at any time after the issuance of any relevant patent.
> b. Do you wish the patent deposit to be made available to requesters that satisfy the requirements of any patent or industrial property office, not signatory to the Budapest Treaty? []Yes [x] No . . .
>
> Notification:
> a. ATCC will notify you of your ATCC number in a certificate of deposit after

> viability of the deposit has been confirmed. A certificate of deposit is sent via email or mail to the depositor and attorney of record.
> b. Would you like to be informed when samples of the deposit microorganism have been furnished by ATCC to third parties? [x]Yes [] No

JA5236, 5240.

Later, in the United States, Inari obtained many of Corteva's seeds from ATCC under material transfer agreements (MTAs) that prohibited commercial use of the seeds. JA5219; JA16299. The MTAs between Inari and ATCC, for example, provide:

> **Scope of Use**
> **ATCC Material and Progeny**: ATCC Material and Progeny **<u>may only be used by</u>** Purchaser's Investigator for research purposes and only in Investigator's laboratory.
>
> * * *
>
> **Any Commercial Use of the Biological Material is strictly prohibited without ATCC's prior written consent.** Purchaser acknowledges and agrees that Purchaser's use of certain Biological Material may require a license from a person or entity not party to this MTA, or be subject to restrictions that may be imposed by a person or entity not party to this MTA ("Third Party Terms"). . . . Use of the Biological Materials may be subject to the intellectual property rights of a person or entity not party to this MTA, the existence of which rights may or may not be identified in the ATCC catalog or website, and ATCC makes no representation or warranty regarding the existence or the validity of such rights. Purchaser shall have the sole responsibility for obtaining any intellectual property licenses necessitated by its possession and use of the Biological Materials.
>
> * * *
>
> **Intellectual Property; Identification**
> As between the parties, ATCC and/or its Contributors shall retain ownership of all right, title and interest in the Biological Materials. Purchaser retains ownership of: (a) Modifications (except that, as between the parties, ATCC retains ownership rights to ATCC Material incorporated therein) and (b) those substances created through the use of Biological Material, but which do not contain or constitute Biological Material. Notwithstanding the foregoing, Purchaser acknowledges and agrees that the Biological Material is subject to the restrictions noted in the "Scope of Use" section above.

JA5218-20.

After Inari acquired seeds from ATCC, Inari handled them differently. For purposes of this motion, Inari divides them into three groups (DI 540 at 1-2):

Group 1: Seeds that are also the subject of asserted PVP certificates. Inari subjected these to phytosanitary testing and then exported them to Belgium, where they were commercially exploited.

Group 2: Seeds that are not the subject of asserted PVP certificates. Inari subjected these to phytosanitary testing and then exported them to Belgium, where they were commercially exploited.

Group 3: Seeds that are also the subject of asserted PVP certificates, but the Corteva utility patents with which those seeds had been associated at the time of deposit expired by the time of purchase. Inari generated progeny of these seeds and exported those progeny to Chile, where they were commercially exploited.

In no case did Inari ask for or obtain permission from ATCC or Corteva to use the seeds for commercial purposes. And Inari affirmatively told ATCC that the material transfer was for research use only, which, according to Corteva, was a misrepresentation designed to induce ATCC into transferring the seeds under that false understanding:

> **Intended Use**
> **NOTE:** Material purchased from ATCC is usually intended for research use only.
> For commercial use please contact Licensing@atcc.org.
>
> **I will use ATCC Material for (check one):**
> [x] Research use only
> [ ] Commercial use
> [ ] Both research and commercial use
>
> **Product Use**
> **Please provide a scope of use for the materials:**
> Plant breeding research

JA5123. Inari exported the seeds or their progeny to attempt to avoid Corteva's U.S. intellectual property rights. To conduct the phytosanitary testing required for exportation, Inari employed a company called Infinite-Eversole Strategic Crop Services (Eversole) to test the seeds, obtain the required USDA certificate, and then export the seeds. Eversole in turn sent the seeds to a laboratory at Iowa State University to conduct the tests.

**a. We deny Inari's motion for summary judgment of no infringement of Corteva's PVP certificates (Corteva's counts 1 and 2).**

Inari asks for summary judgment against Corteva's PVP infringement claims for three reasons: (i) Corteva authorized ATCC to distribute the seeds, which extinguishes Corteva's inducement claim under 7 U.S.C. § 2541(a)(10), DI 540 at 8; (ii) there is no "export" infringement under § 2541(d) because Corteva's seeds were sold and Belgium and Chile protect corn varieties, DI 540 at 9; and (iii) Inari's use was for bona fide research or breeding, which activities are not infringement under § 2544, DI 540 at 10.[2] We take these in turn.

**Inducement.** The parties are a bit out of alignment on this issue. Inari says that "Corteva accuses Inari of violating Corteva's rights under 7 U.S.C. § 2541(a)(10) by inducing ATCC to sell patent deposits also covered by the Asserted PVP Certificates." DI 540 at 8. Inari goes on to argue that ATCC's transfers to Inari were authorized as a matter of law. Therefore, Inari reasons, ATCC's transfers cannot be direct infringement, and in turn, Inari cannot be liable

[2] In its motion to dismiss, Inari argued that Corteva waived any right to assert infringement of PVP certificates under any theory because Corteva had deposited the seeds with ATCC, thus making them available to the public. *See Corteva*, 743 F. Supp. 3d at 614-16. We disagreed, and we stand by our decision and reasoning. *Id.* At the summary judgment stage, although some of Inari's general discussion alludes to the same overarching concept, Inari's brief instead advances three specific arguments under the PVPA, which we address. DI 540 at i (listing the three arguments under section I.F.3).

for inducing ATCC's infringement. *Id.* In response, Corteva explains the following:

> Inari refers at times to induced PVP infringement. *E.g.*, D.I. 540 at 8. The infringement contentions make clear Corteva's claim is not that Inari induced ATCC's PVP infringement; it is that Inari directly infringed the asserted PVP certificates by exporting the protected seed varieties outside of the United States, either personally or through its agent Eversole. JA4184-86.

DI 557 at 6 n.2. Because Corteva is not alleging induced PVP infringement, this aspect of Inari's motion may be denied as moot.

**Exportation.** Among other acts, Corteva alleges that Inari infringes Corteva's PVP rights by "export[ing] [varieties] from[] the United States." 7 U.S.C. § 2541(a)(2). Inari argues that its alleged "export" infringement is exempted by § 2541(d), which provides:

> (d) Acts not considered infringing
> It shall not be an infringement of the rights of the owner of a variety to perform any act concerning propagating material of any kind, or harvested material, including entire plants and parts of plants, of a protected variety that is sold or otherwise marketed with the consent of the owner in the United States, unless the act involves further propagation of the variety or involves an export of material of the variety, that enables the propagation of the variety, into a country that does not protect varieties of the plant genus or species to which the variety belongs, unless the exported material is for final consumption purposes.

From this, Inari reasons that it cannot be "export"[3] infringement under § 2541(a)(2) to buy Corteva's seeds from ATCC and then export covered varieties to countries (here, Belgium and Chile) that protect the same variety (here, corn) as the one exported. DI 540 at 9. To break the statute down a bit, it provides a defense that one is free "to perform any act concerning propagating material of any kind, or harvested material, including entire plants and parts of

[3] Inari's brief contains some ambiguities about which alleged acts this defense addresses, but we take Inari at its word that the topic is: "The Export of the Seeds to Belgium and Chile." DI 540 at 9. This is somewhat confusing because § 2541(d) appears to say that the defense is addressed more broadly to "any act concerning propagating material of any kind, or harvesting material." § 2541(d). We suppose Inari means propagating or harvesting as part of exporting.

plants." § 2541(d). But there are several hurdles to take advantage of this defense:

- First, the defense applies ***only*** if the protected variety "is sold or otherwise marketed with the consent of the owner in the United States." *Id.*
- Second, the defense does ***not*** apply if the "act involves further propagation of the variety or involves an export of material of the variety, that enables the propagation of the variety, into a country that does not protect varieties of the plant genus or species to which the variety belongs." *Id.*
- Third, even if number two above appears to negate the defense because there is a qualifying export to a non-protecting country, the defense is ***not*** negated if the exportation is for final consumption purposes.

The arguable ambiguities in § 2541(d) leap off the page. Fortunately, we need address only Corteva's argument that Inari falls short at the first hurdle because there is a dispute about whether the Corteva protected varieties are "sold or otherwise marketed with the consent of the owner in the United States." DI 557 at 6; § 2541(d). At least for purposes of its motion, Inari argues only that ATCC's sales of Corteva's deposited samples to Inari satisfy the requirement that the varieties be "sold or otherwise marketed with the consent of the owner." DI 563 at 4-5. We disagree. Consider the absurdity of what Inari is proposing: that it can claim the safe harbor of § 2541(d) by — according to Corteva's facts, which we must accept here — purchasing on false premises sample seeds made available only for research purposes and then using those seeds to appropriate Corteva's technology for commercial exploitation. In the scenario Inari outlines, Corteva's seeds were not "sold or otherwise marketed with the consent of the owner."

§ 2541(d). Rather, they were misappropriated.[4] For that reason alone, we may deny Inari's motion for summary judgment that its exportation of Corteva's seeds did not infringe Corteva's PVP rights under § 2541(d).

**Bona fide research.** Among the statutory PVP infringement provisions is a research exception: "The use and reproduction of a protected variety for plant breeding or other bona fide research shall not constitute an infringement of the protection provided under this chapter." 7 U.S.C. § 2544. Inari argues that its allegedly infringing conduct falls within this exception as a matter of law. DI 540 at 10-11. We cannot agree. First, Inari did not explain why its alleged conduct is entirely covered within the umbrella of "use and reproduction of a protected variety." § 2544. But assuming that all of Inari's conduct could be considered "use and reproduction," the bigger problem is that Inari presents no legal authority defining its conduct to be "for plant breeding or other bona fide research." *Id.* On Corteva's facts, Inari's supposed research activities were simply the first steps of Inari's scheme to commercialize Corteva's technology, and as Corteva points out, the question is for the jury to determine. DI 557 at 9-11.

**b. We deny Inari's motion for summary judgment of no infringement of Corteva's utility patents under § 271(a) (Corteva's counts 3, 6, 9, 12, and 15).**

Corteva alleges direct infringement under 35 U.S.C. § 271(a) of its utility patents. Inari moves for summary judgment of no infringement for three reasons: (i) the 363, 441, and 522 patents were not infringed because the accused soybean seeds were not tested by Iowa State, DI

[4] Corteva points out that another district court understood "sold or otherwise marketed" in § 2541(d) to mean "placed into the stream of commerce." *AGSouth Genetics, LLC v. Georgia Far Servs., LLC*, 22 F. Supp. 3d 1342, 1348 (M.D. Ga. 2014). Maybe, but, that interpretation warrants some careful consideration and is unnecessary for our narrower holding that *the unauthorized misappropriation itself* cannot be the sale or marketing that opens the door to the defense.

540 at 13-14; (ii) for the accused seeds that were tested, Inari is not responsible because Inari did not direct or control the testing or engage in a joint enterprise under *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015), DI 540 at 14-15; and (iii) the testing is not "use" patent infringement as a matter of law under *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005) and *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011), DI 540 at 15-16. We take each argument in turn.

**Untested seeds.** Corteva acknowledges that it is not contending that Inari infringed the 522, 363, and 441 patents under 35 U.S.C. § 271(a) and consents to dismissal of counts 9 (also styled VIV), 12, and 15. DI 540 at 13-14; DI 557 at 15.

**Inari's role.** Inari argues that it is not responsible for any infringing testing performed by Iowa State. DI 540 at 14-15. But the argument, reprinted below in its entirety, is conclusory:

> To hold an entity responsible under 35 U.S.C. § 271(a) for another's performance of an infringing act, one must prove that the entity directed or controlled the other's performance or that the entity and the other form a joint enterprise. Neither Inari nor [Eversole] directed or controlled [Iowa State's] performance of the USDA-standard test for contamination. [Iowa State] performed the USDA-approved ELISA test for Stewart's Wilt as a qualified USDA testing laboratory. There is no basis for finding Inari vicariously liable for an allegedly infringing act by ISU, an act that was itself not patent infringement, as explained below.

DI 540 at 14-15 (citations omitted). We disagree. Corteva amply established a triable dispute on this issue, pointing out that Inari hired Eversole to test and export the seeds, and Eversole in turn arranged for Iowa State to perform the testing. DI 557 at 12-13. Paying someone else to infringe is garden-variety vicarious liability. *Akamai*, 797 F.3d at 1023 ("In the past, we have held that an actor is liable for infringement under § 271(a) if it acts through an agent (applying traditional agency principles) or contracts with another to perform one or more steps of a claimed method.").

**Testing as "use."** Finally, Inari argues that the phytosanitary testing performed by Iowa State is not "use" of the seeds under § 271(a) as a matter of law. DI 540 at 15-16. Inari raised this argument in its motion to dismiss, and based on a preliminary record of what phytosanitary testing comprises, we denied the motion. *Corteva*, 743 F. Supp. 3d at 616-17. Now, Inari adds a few factual clarifications that Corteva concedes: phytosanitary testing does not involve growing the plants, eating them, or processing them into some other item. DI 540 at 15. The testing merely determines whether the seeds are contaminated with a pathogen, and testing a seed destroys it. *Id.*

We stand by our view and incorporate our earlier analysis concluding that "use" carries a broad meaning that generally includes testing, even when the objective of the testing differs from the invention's primary purpose. "Use is general and indicates any putting to service of a thing, usually for an intended or fit purpose." Webster's Third New International Dictionary 2524 (1993). Aside from the general principles of *NTP* and *Centillion*, which we explained before are most relevant to identifying <u>who</u> is using a multi-component system or <u>where</u> they are using it, Inari offers only one new authority, *Grecia v. McDonald's Corp.*, 724 F. App'x 942, 947 (Fed. Cir. 2018) (non-precedential). In *Grecia*, the defendant was alleged to have used a multi-component computer system even though the defendant was not in possession of any component of the system. 724 F. App'x at 946. The Federal Circuit therefore considered "what is considered 'use' of a claimed system when the accused infringer must act to put the claimed system into service, but the accused infringer does not appear to possess any element of the claimed system." *Id.* at 945-46. The Federal Circuit affirmed the district court's dismissal of the complaint because the complaint did not allege that the infringer benefited from "each and every

element of the claimed system." *Id*. at 947 (quotation omitted). *Grecia* had no occasion to consider the conventional definition of use for a defendant who is in possession of the invention because *Grecia* examined the far outer reaches of system infringement — when the defendant possesses not even a piece of the invention. Indeed, it is not so easy to tell if someone is using an invention when that someone does not even have it. The tough standard of benefiting from each and every element of the claimed system is generally inapplicable for mine-run situations like this one where the defendant possesses the whole invention and may put it to service in any number of ways.

Returning to the basic question: has Inari demonstrated that no reasonable jury could conclude that one way to put a seed to service for any intended or fit purpose is by testing it for pathogens? We think not. As both sides acknowledge, such testing is *required* to cross the border, and therefore the testing is plainly useful for a productive enterprise involving the seeds. Indeed, in this situation, the testing arguably increased the value of the seeds that Inari acquired from ATCC from nominal to prized for Inari's business aspirations (because exporting the seeds was an essential part of Inari's plan to try to avoid Corteva's U.S. intellectual property rights). Surely, testing so vital is a fit purpose of the seeds and could constitute use of the seeds for patent infringement purposes.

Inari's motion with respect to § 271(a) is denied except as to conceded counts 9 (also styled VIV), 12, and 15.

**c. We deny Inari's motion for summary judgment of no infringement of Corteva's utility patents under § 271(b) (Corteva's counts 5, 8, 14, and 17).**

Corteva alleges that Inari violated 35 U.S.C. § 271(b) by inducing ATCC to sell samples of deposited seeds, which sales infringe Corteva's utility patents covering those seeds. The first

requirement for induced infringement is an underlying act of direct infringement. *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 923 (2014). Inari argues that ATCC's sales to Inari cannot infringe because Corteva authorized ATCC to make the sales. DI 540 at 12-13.

When Inari raised this argument in its motion to dismiss, we simply accepted as true Corteva's allegations that ATCC sold the seeds to Inari, and that ATCC lacked authority to sell the deposited seeds for commercial use. *Corteva*, 743 F. Supp. 3d at 618 (citing DI 19 ¶¶ 94, 162). And we stand by our view that "[t]he public is entitled to availability of the deposits — not to exploit them in any way. A restriction on commercial use is entirely consistent with" Patent Office rules, Corteva's representations, the Budapest Treaty, and so on. *Id.* at 619; *see also Corteva v. Inari*, 2026 WL 2454283, at *4-*8 (D. Del. Aug. 21, 2026) (discussing Corteva's breach of contract claim). Corteva argues that we should therefore deny Inari's motion for summary judgment and send inducement to trial so that Corteva can prove that ATCC's sales were outside of ATCC's authority, and the other elements of induced infringement.

Corteva's path is tempting, but it is strewn with obstacles. Now that we have access to the agreements between Corteva and ATCC, and those between ATCC and Inari, we appreciate how poorly they guide this analysis. And in that already challenging context, if you consider what it means for "ATCC to transfer Corteva's patented seeds to Inari ***for commercial purposes***," it leads to a lot of questions that were largely unbriefed. DI 557 at 11. What is the nature of ATCC's authority in the first place? How would a jury distinguish authorized from unauthorized sales? How is ATCC supposed to tell the difference? Does it matter what ATCC knew? Does it matter what Inari represented to ATCC or only what Inari did with the seeds? Are there reasons to doubt Corteva's or ATCC's ability to restrict the use of the transferred seeds

post-sale? Does the nature of ATCC's property interest in the seeds matter? Did ATCC actually sell the seeds to Inari within the meaning of § 271(a)? Normally, when ownership of a patented article passes from the patent owner to another party, patent rights are extinguished, and subsequent activities with that article cannot be restricted. *Impression Prods., Inc. v. Lexmark Intern.*, Inc., 581 U.S. 360, 370-71 (2017). But only authorized sales exhaust patents, and the general rule might not apply to a licensee, because "if a patentee has not given authority for a licensee to make a sale, that sale cannot exhaust the patentee's rights." *Id.* at 377 (explaining *General Talking Pictures Corp. v. Western Elec. Co.*, 305 U.S. 124, 127 (1938). We sought additional briefing and received some helpful guidance, albeit still incomplete. DI 572, 578, 581.

The parties, and we, have at times been imprecise with using words like deposit, sale, transfer, provide, furnish, distribute, and so forth to describe the legal context for physical possession of the seeds passing from Corteva to ATCC to Inari. The details matter here. Neither side suggests that ATCC took title to Corteva's seeds.[5] That makes sense, because if ATCC had taken title, then under *Impression*, patent rights are exhausted and ATCC is free to dispose of the seeds as it wishes (subject to potential contractual restrictions). So both parties conceive of ATCC as some sort of bailee[6] or custodian (librarian, perhaps?) that holds on to the seeds and

[5] Corteva seems to hint that ATCC took title, saying "***even if the Court agreed that***, due to a bailment relationship or otherwise, ***ATCC had not taken title*** to the seeds and therefore could not 'sell' the seeds such that ATCC was not a direct infringer under 271(a), Inari is not off the hook." DI 581 at 10 (emphasis added). One might think that statement would be preceded by an argument that ATCC took title to the seeds. It was not. And later in the brief, Corteva takes the position that "there was no authorized first sale to ATCC." *Id.* at 14. In any event, if ATCC did take title, exhaustion is the inevitable result and Corteva never says otherwise.

[6] Corteva rejects the label "bailee" but offers no alternative.

then transfers them to requesting parties according to some combination of the terms of deposit, applicable law, and ATCC's own discretion, which appears to be considerable. DI 578 at 13-16; DI 581 at 9-10.

The next question is whether ATCC sold the seeds to Inari within the meaning of § 271(a). We have serious doubts. As an initial matter, the Federal Circuit endeavors to apply "the ordinary meaning of 'sale' when addressing the term under § 271 and related patent-law provisions," but does not explicitly define that ordinary meaning. *Milo & Gabby LLC v. Amazon.com, Inc.*, 693 F. App'x 879, 886 (Fed. Cir. 2017) (non-precedential) (citing *NTP*, 418 F.3d at 1319). Nevertheless, the Federal Circuit has sensibly explained that while "not of 'talismanic' significance . . . the presence or absence of passage of title [is] a significant indicator of whether a sale has occurred in the patent law context." *Milo & Gabby*, 693 F. App'x at 886 (citing *Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1375-76 (Fed. Cir. 2016) (en banc)). For instance, in *Milo & Gabby*, the Federal Circuit determined that Amazon could not be considered a seller even "[t]hough FAC System shipped its product to an Amazon warehouse for storage and Amazon boxed up and shipped the product when a sale was consummated on the website," because, *inter alia*, "Amazon never held title to the accused products" and "[t]he third-party seller also could request that Amazon return the product to the third-party seller at any time." 693 F. App'x at 886-889. With that background in mind, we turn to the question presented here.

Again, consistent with the deposit agreements, neither party says that ATCC owned the seeds, so the notion of ATCC "selling" seeds it did not own is already awkward. The MTAs between Inari and ATCC expressly state that ATCC or Corteva (Contributor) "shall retain ownership of all right, title and interest in the Biological Materials." JA5219. So ATCC never

had title, and Inari never gets title. While perhaps not dispositive, that is a big strike against deeming the transfer a sale. *See, e.g.*, *Medicines*, 827 F.3d at 1375 (explaining in the § 102 context "[t]he passage of title is a helpful indicator of whether a product is 'on sale,' as it suggests when the inventor gives up its interest and control over the product."); *Milo & Gabby*, 693 F. App'x at 886. And from ATCC's point of view, there is presumptively no commercial character to the transfer of patent deposits from ATCC to requesters; certainly, there is no sign that ATCC is in business to exploit its deposits. *See Milo & Gabby*, 693 F. App'x at 889 (explaining that "the circumstances where a person without title can be a seller . . . are those where the person's actions are motivated by a desire to further his own financial interests — such as by receipt of a share of the profits from a sale — or those of the seller, rather than a desire to aid the buyer in consummating his desired purchases."). Corteva itself argues: "Corteva received no monetary or commercial benefit from the sale. Quite the opposite. Patent regulations require Corteva to provide seeds to ATCC (or another depository), and then pay ATCC to store them and make them available to the public for purposes of facilitating compliance with § 112. Corteva does not 'sell' its seeds to ATCC in any meaningful sense and receives no compensation from ATCC or from ATCC's distributions of seeds." DI 581 at 14. We cannot accept all that (which seems correct) and then pronounce that ATCC "sold" the seeds — which ATCC did not own or have rights to — to Inari. Hence, we think the most correct terminus for Corteva's inducement argument is that ATCC's transfers to Inari were not sales within the meaning of § 271(a).

In its supplemental brief, Corteva throws up a considerable smokescreen. But we think Corteva understood the inevitability of this conclusion as it shifted to the firmer ground of direct

infringement by Inari:

> And even if the Court agreed that, due to a bailment relationship or otherwise, ATCC had not taken title to the seeds and therefore could not "sell" the seeds such that ATCC was not a direct infringer under 271(a), Inari is not off the hook. Inari's argument would just mean that Inari's acquisition of the seeds would be an act of direct infringement by Inari because § 271(a) would apply to Inari's use of deposited seeds for anything beyond assessing compliance with § 112, including (as currently alleged) phytosanitary testing and other uses. And § 271(f)(2) applies, regardless of ATCC's title to the seeds, to Inari's export of the seeds with the intent to combine the seeds to grow an infringing plant. Likewise, for inbred seeds, the PVPA applies regardless of ATCC's title because Corteva never gave Inari the authority to ship or export protected seeds. 7 U.S.C. § 2541(a)(1), (2). . . .
>
> If ATCC has no ownership rights in the seeds, it cannot remove or diminish Corteva's rights in the seeds . . . . And ***because Corteva never, in any sense, gave up title to the seeds to Inari nor waived its patent rights in the deposited seeds, neither could ATCC***.

DI 581 at 10 (emphasis added). Indeed, as the rest of this memorandum indicates, we agree with Corteva that upon receiving the seeds from ATCC, Inari does *not* also receive a patent or PVP license. Hence, Inari will infringe if its activities are more than mere "reading"[7] and fall within one of the infringement statutes.

We enter judgment in Inari's favor on Corteva's § 271(b) counts because ATCC did not directly infringe by selling Corteva's seeds within the meaning of § 271(a).

**d. We deny Inari's motion for summary judgment of no infringement of Corteva's utility patents under § 271(f)(2) (Corteva's counts 4, 7, 10, 13, and 16).**

Corteva alleges that Inari infringed Corteva's utility patent claims on certain transgenic corn and soybean plants under 35 U.S.C. § 271(f)(2). In our memorandum denying Inari's motion to dismiss, we outlined the law and resolved several arguments Inari raised at the time. *Corteva*, 743 F. Supp. 3d at 617-18. Infringement under § 271(f)(2) is analogous to contributory

[7] *Corteva*, 2026 WL 2454283, at *4-*8.

infringement where the especially made component is exported from the United States. It provides:

> (2)Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

35 U.S.C. § 271(f)(2). Corteva's theory is simple enough: Inari exported seeds that are a "component of a patented [plant]" and are "especially made or especially adapted for use in the [plants]," with the intention of combining those seeds with water, nutrients, light, air, and physical support to yield the patented plants. *Id.* Inari moves for summary judgment of noninfringement, and we take each argument in turn.

**Authorization.** First, Inari argues that its conduct accused of infringement under § 271(f)(2) was authorized by Corteva. DI 540 at 17. We disagree. There is no need to repeat what we have written before, but to summarize, "the rules do not require that Corteva give the world a blanket license to its invention just because it deposited the seeds. The public is entitled to availability of the deposits — not to exploit them in any way." *Corteva*, 743 F. Supp. 3d at 619. Further, it is now common ground among the parties in this case that "reading activities are privileged. But other than the reading activities, any other acts committed by third parties are subject to background contract or patent law." *Corteva*, 2026 WL 2454283, at *6. Inari has not indisputably shown that its activities accused of infringement under § 271(f)(2) were required for Inari (like anyone else in the public) "to learn whatever information is necessary to establish § 112 compliance" for particular patent claims. *Id.* Rather, a reasonable jury could conclude

that Inari's alleged activities went well beyond necessary "reading" and into the realm of commercial exploitation.

**Seeds as components.** Inari again argues that as a matter of law, a seed cannot be a component of a plant because a seed "self-replicates into a plant" and "does not require assembly with other components." DI 540 at 17-19. We stand by our reasoning at the motion to dismiss stage. The Supreme Court defined "component" broadly in the context of § 271(f)(1) in accordance with the word's ordinary meaning, which is "a constituent part, element, or ingredient." *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 449 n.11 (2007) (quoting Webster's Third New International Dictionary of the English Language 466 (1981)). The same broad meaning is appropriate for § 271(f)(2), and Inari has not demonstrated that a seed cannot fit the mold.

First, Inari pronounces without supporting authority that self-replication is mutually exclusive with combinability, but we have no idea why that should be true. And in any event, seeds do not spontaneously divide into new seeds. In the right conditions, seeds eventually become plants, which, again in the right conditions, may make more seeds. Second, Inari argues that a seed cannot be a component of a plant because "it is the plant." DI 540 at 18. That is an interesting philosophical notion, and perhaps the plant and the seed share the same genome. But surely even a kindergartener can tell the difference between a seed and a plant. They are manifestly not the same thing.[8] Third, Inari argues that Corteva "erroneously recharacterizes water, light, air, nutrients from the soil, and physical support as 'components' of a plant intended

[8] And on the legal front, if plants and seeds were the same thing, *Bowman v. Monsanto* would make no sense at all. 569 U.S. 278 (2013).

to be combined with a seed." *Id.* This is a red herring. Section 271(f)(2) says not a word about any components other than the one especially made for use in the invention — here, the seed. Rather, the requirement is intent that the key component "will be combined." We need not quibble about whether, e.g., light is a component of a plant, to accept that that a seed "will be combined" with light and other things to form a plant. § 271(f)(2). As we explained before, the "focus" of § 271(f)(2) is the domestic act of exporting the one especially adapted component. *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 415 (2018).[9] Finally, Inari argues that there is no infringement because Corteva did not invent the combination of seeds with water, light, air, nutrients from soil, and physical support. DI 540 at 19. We are at a loss to understand this argument but we suppose the simplest response is that Corteva *did* invent that combination — for the claimed transgenic plants at issue. In addition to addressing Inari's arguments above, we also note that Corteva advanced alternative § 271(f)(2) theories and disputed facts, all of which are triable. DI 557 at 16-17 & n.7.

**Substantial noninfringing uses.** Next, Inari argues that there is no dispute that the claimed seeds are commodities and have substantial noninfringing uses. DI 540 at 19-20. According to Inari, relevant seeds "are sold in the U.S. to farmers to grow plants to produce larger quantities of seed covered by the Asserted Patents that are sold in commerce as commodities." DI 540 at 20. Inari is not suggesting that the specific seeds it acquired from ATCC are commodities or have noninfringing uses. Rather, Inari argues that "[c]orn seeds

---

[9] This is in contrast to § 271(f)(1), which addresses multiple exported components. *See Regents of the University of California v. California Berry Cultivar*, 2017 WL 9531948, at *6 (N.D. Cal. 2017) (addressing § 271(f)(1) and stating that "[s]trawberry plants do not have 'components' that can be combined.").

comprising transgenic events represented by [the deposited seeds] are sold in the U.S. and exported as commodity grain." *Id.* (also arguing that the deposited seeds "are representative of the transgenic events that are the basis of Corteva's best-selling" crops.) The phrases "represented by" and "representative of" seem to be carrying a lot of weight in this argument, and Inari does not explain what it means by that. Nor does Inari provide any caselaw to help understand how evidence of noninfringing uses of "representative" products bears on the § 271(f)(2) question. Corteva, for its part, argues that the focus should be entirely on the exported seeds, which Inari does not argue have substantial noninfringing uses. That may be correct, but we will deny Inari's motion on this ground because Inari simply did not advance a comprehensible theory for granting it.

**Extraterritoriality.** Finally, Inari argues that Corteva's theory exceeds the extraterritorial limits of U.S. patent law. DI 540 at 21-22. Congress defines the extraterritorial limits of patent law in 35 U.S.C. § 271, so we understand Inari to be arguing that to the extent there are ambiguities introduced by Corteva's § 271(f)(2) theory, we should be construing against the extraterritorial application of § 271. Fair enough. *See Microsoft*, 550 U.S. at 454-56. But we perceived no ambiguity susceptible to narrow resolution under the presumption against extraterritoriality. Inari also appears to be arguing that an accused instrumentality cannot infringe both under § 271(a) and § 271(f)(2). That is incorrect; what Inari is missing is that Corteva has patent claims to seeds (hence the testing infringement under § 271(a)) and plants (hence the § 271(f)(2) infringement arising from exportation of seeds).

**e. We deny Inari's motion for summary judgment that Corteva is legally estopped from asserting utility patent and PVPA infringement claims.**

As its final basis for summary judgment of noninfringement, Inari argues that "legal

estoppel" bars Corteva from claiming that Inari infringed Corteva's utility patents and PVP certificates. DI 540 at 22-23. According to Inari, Corteva "promised the USPTO and the public that the patent deposits would be available to the public through ATCC after the patents were granted." *Id.* at 22. In exchange for those promises, Corteva received valuable patents and PVP certificates. And, the argument continues, having received valuable consideration in exchange for granting the right of public access, Corteva cannot retract its promise of public access by asserting its intellectual property against Inari. *Id.* Although the legal framework is different, Inari's error is the same as we discussed above and in other opinions: no one disagrees that Corteva was, and is, obliged to make the deposited seeds available to the public in satisfaction of the § 112 quid pro quo. What remains is whether Inari exceeded that permitted conduct and became an infringer.

## IV. Conclusion

For the reasons explained above, we deny Inari's motion for summary judgment of noninfringement of Corteva's PVP certificates (Corteva's counts 1 and 2); grant as conceded Inari's motion for summary judgment of noninfringement of Corteva's 522, 363, and 441 patents under 35 U.S.C. § 271(a) (Corteva's counts 9 (also styled VIV), 12, and 15); deny the remainder of Inari's motion for summary judgment of noninfringement under § 271(a) (Corteva's counts 3 and 6); grant Inari's motion for summary judgment of noninfringement under § 271(b) (Corteva's counts 5, 8, 14, and 17); deny Inari's motion for summary judgment of noninfringement under § 271(f)(2) (Corteva's counts 4, 7, 10, 13, and 16); and deny Inari's motion for summary judgment as to legal estoppel.