**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CORTEVA AGRISCIENCE LLC, PIONEER HI-BRED INTERNATIONAL, INC. and AGRIGENETICS, INC., | ) | |
| Plaintiff, | ) | C.A. No. 23-1059 (JFM) |
| v. | ) | |
| INARI AGRICULTURE, INC. and INARI AGRICULTURE NV, | ) | |
| Defendants. | | |

# JOINT FINAL JURY INSTRUCTIONS

DISPUTES HIGHLIGHTED:
CORTEVA POSITIONS HIGHLIGHTED IN YELLOW
INARI POSITIONS HIGHLIGHTED IN GREEN

**TABLE OF CONTENTS**

**Page**

**1. GENERAL INSTRUCTIONS ..... 1**

1.1. Introduction ..... 1
1.2. Jurors' Duties ..... 2
1.3. Evidence Defined ..... 3
1.4. Direct and Circumstantial Evidence ..... 5
1.5. Consideration of Evidence ..... 6
1.6. Statements of Counsel ..... 7
1.7. Credibility of Witnesses ..... 8
1.8. Expert Witnesses ..... 10
1.9. Deposition Testimony ..... 11
1.10. Use of Notes ..... 12
1.11. Burdens of Proof ..... 13

**2. PATENT INFRINGEMENT ..... 15**

2.1. Summary of Patent Contentions ..... 15
2.2. Patent Claims Generally ..... 16
2.3. Patent Claims – Independent and Dependent Claims ..... 19
2.4. Patents on Seeds Generally ..... 20
2.5. Patent Infringement Generally ..... 22
2.6. Direct Infringement ..... 23
2.7. Infringement by Supply of a Component Especially Made or Adapted for Use in the Patented Invention into Another Country ..... 30
2.8. Patent Invalidity Generally ..... 35
2.9. Person of Ordinary Skill in the Art ..... 36
2.10. Prior Art Generally ..... 37
2.11. Obviousness ..... 39
2.12. Objective Indicia of Non-Obviousness ..... 41
2.13. Prior Public Use ..... 42
2.14. Written Description ..... 45
2.15. Enablement ..... 49
2.16. Patent Damages Generally ..... 52
2.17. Date Damages Begin ..... 54
2.18. Reasonable Royalty ..... 55
2.19. Reasonable Royalty—Factors ..... 59
2.20. Apportionment ..... 62
2.21. Willfulness ..... 63

**3. PLANT VARIETY PROTECTION CERTIFICATES ..... 65**

3.1. Summary of Plant Variety Protection Certificate (PVP) Contentions ..... 65
3.2. Plant Variety Protection Certificate and Patent Rights ..... 67
3.3. Infringement of Plant Variety Protection Certificates ..... 69
3.4. Plant Variety Protection Infringement – Prior Sale or Marketing Exemption ..... 71
3.5. Plant Variety Protection Infringement—Research and Breeding Exemption ..... 74

3.6. Plant Variety Protection Infringement—Inari Belgium ........ 75
3.7. Plant Variety Protection Infringement—Inari USA ........ 77
3.8. Plant Variety Protection Certificate Invalidity Generally ........ 79
3.9. Plant Variety Protection Certificate Invalidity—Lack of Newness ........ 80

**4. BREACH OF CONTRACT ........ 82**

4.1. Summary of Contract Contentions ........ 82
4.2. Contract Interpretation ........ 84
4.3. Breach ........ 86
4.4. Third-Party Beneficiary ........ 87
4.5. Third-Party Beneficiary—Waiver ........ 90
4.6. Damages ........ 91

**5. MASSACHUSETTS UNFAIR BUSINESS PRACTICES ........ 93**

5.1. Summary of Unfair Business Practices Contentions ........ 93
5.2. Primarily and Substantially in Massachusetts ........ 94
5.3. Violation ........ 95
5.4. Damages ........ 97
5.5. Willful or Knowing ........ 98

**6. CONVERSION ........ 99**

6.1. Summary of Conversion Contentions ........ 99
6.2. Elements of Conversion ........ 100
6.3. Damages ........ 102

**7. DELIBERATION AND VERDICT ........ 103**

# 1. GENERAL INSTRUCTIONS[1]

## 1.1. Introduction

Members of the jury, now it is time for me to instruct you about the law that you must follow in deciding this case. Each of you has been provided a copy of these instructions. You may read along as I deliver them if you prefer.[2]

I will start by explaining your duties and the general rules that apply in every civil case. Then I will explain some rules that you must use in evaluating particular testimony and evidence. Then I will explain the positions of the parties and the law you will apply in this case. Then we will hear the closing arguments of each party.

After that, I will explain the rules that you must follow during your deliberations in the jury room and the possible verdicts that you may return.

Please listen very carefully to everything I say. You must follow all of my instructions, including the ones that I gave you at the start of the case and the ones I have given during the trial, and not single out some and ignore others. They are all important.

You will have a written copy of these instructions with you in the jury room for your reference during your deliberations. You will also have a verdict form, which will list the questions that you must answer to decide this case.

[1] Court's Final Jury Instructions at 4, *CosmoKey Solutions GMBH & Co. KG v. Duo Security, Inc.*, No. 18-cv-1477-JLH, D.I. 535 ("CosmoKey Final Instructions") (D. Del. June 13, 2025).
[2] Corteva requests that the jurors be provided a copy of the instructions. Inari is not generally opposed to the jurors receiving a copy, but defers to the Court on its preference.

**1.2. Jurors' Duties[3]**

You have two main duties as jurors. The first is to decide what the facts are from the evidence that you saw and heard in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way. You are the sole judges of the facts.

Your second duty is to take the law that I give you, apply it to the facts, and decide under the appropriate burden of proof which party should prevail on any given issue. It is my job to instruct you about the law, and you are bound by the oath you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All of the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not guess or speculate, and do not let any bias, sympathy, or prejudice you may feel toward one side or the other influence your decision in any way.

[3] CosmoKey Final Instructions at 5.

**1.3. Evidence Defined**[4]

You must make your decision based only on the evidence that you saw and heard here in court. Do not let rumors, suspicions, or anything else that you may have seen or heard outside of court influence your decision in any way. The evidence in this case includes only what the witnesses said while they were testifying under oath, including deposition testimony that has been played by video or read to you, the exhibits that I allowed into evidence, and any facts the parties agreed to by stipulation. During the course of the trial, you have seen many exhibits. Many of these exhibits were admitted as evidence. You will have these admitted exhibits in the jury room for your deliberations.

Certain models, reproductions, charts, summaries, and graphics have been used to illustrate certain evidence and testimony from witnesses. You may have heard these models, reproductions, charts, summaries, or the like, referred to as "demonstratives" during the trial. Unless I have specifically admitted them into evidence, these demonstratives are not themselves evidence, even if they refer to, identify, or summarize evidence. You will not have these demonstratives in the jury room. Rather, it is the underlying testimony of the witness that you heard and the exhibits cited in the demonstratives that are the evidence in this case.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. The arguments of the lawyers are offered solely as an aid to help you in your determination of the facts. Their questions and objections are not evidence. My legal rulings are not evidence. You should not be influenced by a lawyer's objection or by my ruling on that objection. None of my comments and questions are evidence.

[4] CosmoKey Final Instructions at 6–7.

During the trial I may have not let you hear the answers to some of the questions that the lawyers asked. I also may have ruled that you could not see some of the exhibits that the lawyers wanted you to see. And, sometimes I may have ordered you to disregard things that you saw or heard, or that I struck from the record. You must completely ignore all these things. Do not speculate about what a witness might have said or what an exhibit might have shown. These things are not evidence, and you are bound by your oath not to let them influence your decision in any way. Make your decision based only on the evidence, as I have defined it here, and nothing else.

### 1.4. Direct and Circumstantial Evidence[5]

During the preliminary instructions, I told you about "direct evidence" and "circumstantial evidence." I will now remind you what each means. Direct evidence is simply evidence like the testimony of an eyewitness which, if you believe it, directly proves a fact. If a witness testified that he saw it raining outside, and you believe him, that would be direct evidence that it was raining.

Circumstantial evidence is proof of a fact or facts from which you may infer or conclude that other facts do or do not exist. If someone walked into the courtroom wearing a raincoat covered with drops of water and carrying a wet umbrella, that would be circumstantial evidence from which you could conclude that it was raining.

It is your job to decide how much weight to give the direct and circumstantial evidence. The law makes no distinction between the weight that you should give to either one, nor does it say that one is any better evidence than the other. You should consider all the evidence, both direct and circumstantial, and give it whatever weight you believe it deserves.

[5] CosmoKey Final Instructions at 8.

### 1.5. Consideration of Evidence[6]

You should use your common sense in weighing the evidence. Consider it in light of your everyday experience with people and events, and give it whatever weight you believe it deserves. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

[6] Third Circuit, General Instructions for Civil Cases, Preliminary Instruction 1.5; CosmoKey Final Instructions at 9.

### 1.6. Statements of Counsel[7]

A further word about statements of counsel and arguments of counsel. The attorneys' statements and arguments are not evidence. Instead, their statements and arguments are intended to help you review the evidence presented.

If you remember the evidence differently from the way it was described by the attorneys, you should rely on your own recollection.

[7] CosmoKey Final Instructions at 10.

### 1.7. Credibility of Witnesses[8]

As I stated in my preliminary instructions at the beginning of the trial, in deciding what the facts are you must decide what testimony you believe and what testimony you do not believe. You are the sole judges of the credibility of the witnesses. Credibility refers to whether a witness is worthy of belief: Was the witness truthful? Was the witness' testimony accurate? You may believe everything a witness says, or only part of it, or none of it.

You may decide whether to believe a witness based on his or her behavior and manner of testifying, the explanations the witness gave, and all the other evidence in the case, just as you would in any important matter where you are trying to decide if a person is truthful, straightforward, and accurate in his or her recollection. In deciding the question of credibility, remember to use your common sense, your good judgment, and your experience.

In deciding what to believe, you may consider a number of factors:

1. The opportunity and ability of the witness to see or hear or know the things about which the witness testified;
2. The quality of the witness' knowledge, understanding, and memory;
3. The witness' appearance, behavior, and manner while testifying;
4. Whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice;
5. Any relation the witness may have with a party in the case and any effect the verdict may have on the witness;
6. Whether the witness said or wrote anything before trial that was different from the witness' testimony in court;

[8] Final Jury Instruction at 51, *Graco Inc. v. Carlisle Construction Materials, LLC*, No. 21-cv-245-JFM (D. Del. Dec. 12, 2024), D.I. 540 ("Graco Final Instructions").

7. Whether the witness' testimony was consistent or inconsistent with other evidence that you believe; and

8. Any other factors that bear on whether the witness should be believed. Inconsistencies or discrepancies in a witness' testimony or between the testimony of different witnesses may or may not cause you to disbelieve a witness' testimony. Two or more persons witnessing an event may simply see or hear it differently. Mistaken recollection, like failure to recall, is a common human experience. In weighing the effect of an inconsistency, you should also consider whether it was about a matter of importance or an insignificant detail. You should also consider whether the inconsistency was innocent or intentional.

You are not required to accept testimony even if the testimony was not contradicted and the witness was not impeached. You may decide that the witness is not worthy of belief because of the witness' bearing and demeanor, or because of the inherent improbability of the testimony, or for other reasons that are sufficient to you.

After you make your own judgment about the believability of a witness, you can then attach to that witness' testimony the importance or weight that you think it deserves.

The weight of the evidence to prove a fact does not necessarily depend on the number of witnesses who testified or the quantity of evidence that was presented. What is more important than numbers or quantity is how believable the witnesses were, and how much weight you think their testimony deserves.

**1.8. Expert Witnesses**[9]

Expert testimony is testimony from a person who has a special skill or knowledge in some science, profession, or business. This skill or knowledge is not common to the average person but has been acquired by the expert through special study or experience. In weighing expert testimony, you may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors I have previously mentioned for weighing testimony of any other witness. Expert testimony should receive whatever weight and credit you think appropriate, given all the other evidence in the case. You are free to accept or reject the testimony of experts, just as with any other witness.

[9] CosmoKey Final Instructions at 9.

### 1.9. Deposition Testimony[10]

During the trial, certain testimony was presented to you by the playing of video excerpts or read into evidence from a deposition. The testimony may have been edited or cut to exclude irrelevant testimony as the parties have only a limited amount of time to present you with evidence. You should not attribute any significance to the fact that the testimony may appear to have been edited.

Deposition testimony that is given under oath is entitled to the same consideration you would give it had the witnesses personally appeared in court.

[10] CosmoKey Final Instructions at 10.

**1.10. Use of Notes[11]**

You may use notes taken during the trial to assist your memory. Remember that your notes are for your personal use. They may not be given or read to anyone else. Do not use your notes, or any other juror's notes, as authority to persuade fellow jurors. Your notes are not evidence, and they are by no means a complete outline of the proceedings or a list of the highlights of the trial. Some testimony that is considered unimportant at the time presented and, thus, not written down, may take on greater importance later in the trial considering all the evidence presented. Your notes are valuable only to refresh your memory. Your memory is what you should be relying on when it comes time to deliberate and render your verdict in this case.

[11] CosmoKey Final Instructions at 11.

### 1.11. Burdens of Proof[12]

In any legal action, facts must be proven by a required standard of evidence, known as the "burden of proof." In this case, there are two different burdens of proof that are used. The first is called "preponderance of the evidence." The second is called "clear and convincing evidence." I told you about these two standards of proof during my preliminary instructions to you and I will now remind you what they mean.

Corteva has the burden of proving its infringement, willfulness, breach of contract, conversion, and unfair business practices claims by what is called the preponderance of the evidence. That means Corteva has to prove to you, in light of all the evidence, that what it claims is more likely so than not so. To say it differently: if you were to put the evidence favorable to Corteva and the evidence favorable to Inari on opposite sides of the scales, Corteva would have to make the scales tip somewhat (no matter how little) on its side. If Corteva fails to meet this burden, the verdict must be for Inari on that claim. If you find after considering all the evidence that a claim or fact is more likely so than not so, then the claim or fact has been proved by a preponderance of the evidence.

In determining whether any fact has been proved by a preponderance of evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have introduced them.

Clear and convincing evidence is evidence that produces in your mind a firm belief or conviction that the allegations sought to be proved by the evidence are true. Clear and convincing evidence involves a higher degree of persuasion than is necessary to meet the preponderance of

[12] Explanation of burdens of proof based on Preliminary Jury Instruction at 18–19, *Graco Inc. v. Carlisle Construction Materials, LLC*, No. 21-cv-245-JFM, D.I. 522 (D. Del. Dec. 2, 2024).

the evidence standard. But it does not require proof beyond a reasonable doubt, the standard applied in criminal cases.

The law presumes that patent claims are valid and that the Patent Office acted correctly in issuing a patent. Therefore, Inari has the burden of proving invalidity of Corteva's patents by clear and convincing evidence.

## 2. PATENT INFRINGEMENT[13]

### 2.1. Summary of Patent Contentions

I will first give you a summary of each side's contentions regarding patent infringement. I will then provide you with detailed instructions on what each side must prove to win on each of its contentions.

Corteva seeks money damages from Inari for allegedly infringing certain claims of Corteva's Asserted Patents. These are collectively referred to as the "asserted claims." You must determine whether the asserted claims have been infringed on a claim-by-claim basis.

Inari denies that it has infringed the asserted claims and further argues that Corteva's Asserted Patents are invalid because they are obvious or fail to satisfy the written description or enablement requirements. Inari also contends that the '378 patent is invalid for failure to satisfy the enablement requirements and were the subject of a public use more than one year before the relevant patent application was filed.[14] Your job is to decide whether Inari has infringed any asserted claim and whether any claim is invalid. If you decide that any asserted claim has been infringed and that same claim is not invalid, you will then need to decide the amount of money damages to be awarded to Corteva for the infringement. If you find that the asserted claims are invalid, or that there was no infringement, you do not need to consider patent-related damages.

---

[13] Graco Final Instructions at 5.

[14] Corteva's position: The Court granted summary judgment as to invalidity for prior public use, including as to Inari's counterclaim 7, concerning the '378 patent. D.I. 627 at 4-8. In any event, Inari's counterclaim 7 did not plead invalidity due to prior public use. D.I. 160 at 142-43. Inari's position: Inari has asserted an argument for invalidity of the '378 patent for prior public use separate from the regulatory field trials that were at issue in the Court's summary judgment ruling. Corteva did not move for summary judgment on this additional theory. Inari's full position is set forth in the proposed Joint Pretrial Order.

**2.2. Patent Claims Generally**[15]

Before you can decide the patent issues in this case, you will need to understand the role of the patent "claims." The patent claims are the numbered sentences at the end of a patent. The claims are intended to define, in words, the boundaries of the inventor's rights. Only the claims of the patent can be infringed. The figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but neither the written description nor the drawings of a patent can be infringed. Therefore, what a patent covers depends, in turn, on what each of its claims covers.

To know what a claim covers, a claim sets forth, in words, a set of requirements. Each claim sets forth its requirements in a single sentence. The requirements of a claim are often referred to as "claim elements" or "claim limitations." The coverage of a patent is assessed claim-by-claim. When a thing (such as a product) meets all of the requirements of a claim, the claim is said to "cover" that thing, and that thing is said to "fall" within the scope of that claim. In other words, a claim covers a product where each of the claim elements or limitations is present in that product.

It is my job as judge to provide to you the meaning of any claim language that must be interpreted. You must accept the meanings I give you and apply those meanings to the issues that you are asked to decide. You must ignore any different interpretation given to these terms by the witnesses or by attorneys.

The preambles to several of the asserted claims use the terms "comprising" or "comprises." These terms mean "including the following but not excluding others." For example, if a claim recites a table "comprising" a tabletop, legs, and glue, the claim will cover

[15] Graco Final Instructions at 6-7; *Am. Intell. Prop. L. Ass'n* (hereinafter "AIPLA") Model Patent Jury Instructions 2.0, 2.1 (2025).

any table that contains these structures, even if the table also contains other structures, such as a leaf or wheels on the legs.[16]

I will now tell you the meanings of the following words and groups of words from the patent claims, which are also found in your juror notebooks.

| Term | Patent, Claim(s) | Construction |
| --- | --- | --- |
| "flanked by" | '434 patent, cl. 1<br>'378 patent, cl. 1 | Plain and ordinary meaning, which is joined or connected at the side to |
| "derived from" | '434 patent, cl. 14 | Plain and ordinary meaning, which is formed or developed out of |
| "wherein said sample comprises a nucleotide sequence selected from the group consisting of SEQ ID NO: 27 and SEQ ID NO: 28, or the complement thereof"" | '434 patent, cl. 14 | "wherein said sample comprises a nucleotide sequence comprising any of: SEQ ID NO: 27, the complement of SEQ ID NO: 27, SEQ ID NO: 28, or the complement of SEQ ID NO: 28" |
| "DNA construct" | '434 patent, cls. 5-6, 8, 14-15 | Plain and ordinary meaning, which is assembly of DNA molecules linked together |
| "corn event DP-004114-3" | '434 patent, cls. 5-6, 8, 14-15 | A Cry1F-encoding expression cassette, a Cry34Ab1-encoding expression cassette, a Cry35Ab1-encoding expression cassette, and a pat-encoding expression cassette, located between SEQ ID NO: 27 at the 5' end and SEQ ID NO: 28 at the 3' end |
| "the genotype of the corn event DP-004114-3" | '434 patent, cls. 5-6 | Plain and ordinary meaning, which is the genetic constitution of the corn even DP-004114-3 |
| "linked" | '246 patent, cls. 1, 3 | Plain and ordinary meaning, which is joined or connected |
| "wherein: (a) said flanking region comprises a nucleotide sequence | '246 patent, cl. 1 | "wherein (a) said flanking region comprises a nucleotide sequence |

[16] AIPLA 3.6; Court's Final Jury Instructions at 9, *Fundamental Innovation Sys. Int'l LLC v. Anker Innovations Ltd.*, No. 21-cv-00339-RGA, D.I. 336 (D. Del. March 7, 2025).

| | | |
|---|---|---|
| selected from the group consisting of the nucleotide sequence set forth in SEQ ID NO: 19 and the nucleotide sequence set forth in SEQ ID NO: 20” | | comprising SEQ ID NO: 19 or SEQ ID NO: 20” |
| “a polynucleotide that encodes a protein having aryloxyalkanoate dioxygenase activity” | ’522 patent, cl. 1 | Plain and ordinary meaning.<br>A polynucleotide is a polymeric molecule composed of multiple nucleotides. A protein having aryloxyalkanoate dioxygenase activity is a protein with the ability to degrade or diminish the activity of an aryloxyalkanoate herbicide. |

If I have not provided a specific definition for a given term, you are to use the plain and ordinary meaning of that term as understood by a person of ordinary skill in the art at the time of the invention. You should not take my definition of the language of the claims as an indication that I have a view regarding how you should decide the issues that you are being asked to decide, such as infringement and invalidity. These issues are yours to decide.

### 2.3. Patent Claims – Independent and Dependent Claims[17]

There are two different types of claims in the patent. One type is called an independent claim. The other is called a dependent claim.

An "independent claim" sets forth all of the requirements that must be met in order to be covered by that claim. Thus, it is not necessary to look at any other claim to determine what an independent claim covers. For example, claim 1 of the '434 patent is an independent claim. An independent claim must be read separately from the other claims to determine the scope of the claim.

A "dependent claim" does not itself recite all of the requirements of the claim but refers to another claim for some of its requirements. In this way, the claim "depends" on another claim. For example, claim 2 of the '434 patent is a dependent claim that refers to claim 1. A dependent claim includes all elements recited in the dependent claim, as well as all elements of the independent claim to which it refers.

[17] AIPLA 3.5; May 2020 Federal Circuit Bar Association Model Patent Jury Instructions (hereinafter "FCBA") at 2.1a.

### 2.4. Patents on Seeds Generally[18]

I will now provide you with some background on obtaining a patent on seeds and plants.

In order to obtain a patent, the inventor must provide to the public a complete description of the invention, sufficient for a person of ordinary skill in the art to understand that the inventor actually possessed the invention, and to allow others skilled in the art to make and use the invention after the patent is expired without undue experimentation. These are called the "written description" and "enablement" requirements for patents. For most inventions, the patent's specification—the words, figures, and other information—provides the disclosure necessary to meet the written description and enablement requirements. [For patents to seeds and plants, like those claimed in Corteva's Asserted Patents, an inventor can comply with these requirements by providing enough detail in the written specification of the patent and/or by making samples of the claimed seeds available to the public.][The written description requirement for patents that claim plants includes a deposit of the biological material claimed by the patent, for example seeds, and mandates that such material be available to the public without restriction after the patent issues, just like the written text of an issued patent is available to the public.][19]

---

[18] 35 U.S.C. § 112; 37 C.F.R. § 1.808(a) (providing procedure regarding deposits made for written description and enablement purposes); *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 142 (2001) (the "disclosure . . . quid pro quo" is that "a breeder must describe the plant with sufficient specificity to enable others to 'make and use' the invention after the patent term expires."); *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 965 (Fed. Cir. 2002) ("[a] person of skill in the art" can "read[] the accession numbers in the patent specification [and] obtain the claimed sequences from the ATCC depository by following the appropriate techniques to excise the [patented material] from the deposit[s].").

[19] Corteva's position: As the Court recently explained, D.I. 627 at 12-14, neither § 112 nor any other applicable law requires that a deposit of biological material be made when the patent's written description is otherwise satisfactory. To the extent *J.E.M. Ag Supply* suggests otherwise in its discussion of the PTO's practices, 534 U.S. at 131, it was not purporting to interpret § 112, nor was the interpretation of § 112 at issue in the case. Inari's proposed instruction that the law

Here, the patent specifications contain written descriptions of covered events, seeds, and plants, and Corteva also deposited samples of its seeds with ATCC. Because Corteva deposited its seeds for purposes of complying with the written description and enablement requirements, the law authorizes Inari and other members of the public to obtain seeds from ATCC after the patents were granted and to "read" those seeds to understand the inventions claimed in Corteva's patents, similarly to how any member of the public can read the words of a patent's written specification to understand the invention.

To determine whether Corteva has proven its patent infringement claims, you will have to decide whether Inari's actions in the United States with the patent deposit seeds it obtained from ATCC [went beyond Inari's right to access and read seeds deposited with ATCC to understand Corteva's patent. Put differently, you may only find patent infringement if you find that Inari did something more than access and understand Corteva's invention—specifically, something that meets ][meet ]the legal requirements for patent infringement which I will now provide you.[20]

---

mandates that deposited material be "available to the public without restriction" is likely to mislead the jury. Inari's comparison of a deposit to the written text of an issued patent is incorporated in Corteva's proposed instruction below.
Inari's position: The Supreme Court ruled in *J.E.M. Ag Supply* that "the plant must meet the specifications of § 112, which require a written description of the plant ***and*** a deposit of the seed that is publicly accessible." 534 U.S. at 131 (emphasis added).

[20] Corteva's position: Corteva's instruction is consistent with the Court's guideposts about access. D.I. 627 at 12-13. The Court held that "reading activities are privileged" but that "other acts" are "subject to background … patent law." D.I. 627 at 13. The jury needs to know that infringement occurs if Inari's acts go beyond reading and cross the line to infringement.
Inari's position: Corteva's proposed instruction improperly shifts the burden to Inari to demonstrate its actions were "reading" the patent which is inconsistent with patent law. This does not appear in any model instruction.

### 2.5. Patent Infringement Generally[21]

I will now instruct you as to the rules you must follow when deciding whether Corteva has proven that Inari has infringed the asserted claims. Corteva asserts two types of infringement. I will explain the requirements for each type of infringement in detail.

To prove any type of infringement, Corteva must prove that the requirements for infringement are met by a preponderance of the evidence.

[21] *See* AIPLA 3.0 (providing structure for infringement instructions generally).

### 2.6. Direct Infringement[22]

The first type of infringement is direct infringement. Corteva alleges that Inari Belgium directly infringed claims 6, 8, and 12-13 of the ’246 patent and claims 1, 8, and 14-15 of the ’434 patent by using IE-SCS, acting as Inari Belgium’s agent, to instruct Iowa State University to perform phytosanitary testing on seeds acquired from ATCC.[23]

You must determine direct infringement separately for each patent claim that Corteva asserts is directly infringed.

These claims are directly infringed only if Corteva proves by a preponderance of the evidence that:

(1) the phytosanitary testing is a use of the accused corn seeds;

(2) the phytosanitary testing was performed without Corteva’s authorization; and

(3) the phytosanitary testing performed by Iowa State University is attributable to Inari.

You may find that the phytosanitary testing is attributable to Inari if you find that Inari exercised direction or control over Iowa State University when Iowa State University performed the phytosanitary testing, either because Iowa State University was contractually obligated to Inari to carry out the phytosanitary testing, or because Iowa State University performed the phytosanitary testing to receive a benefit from Inari and Inari established how or when the

---

[22] Corteva’s source: AIPLA 3.2 & 3.3.
Inari’s source: FCBA 3.1(a); AIPLA 3.0; *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005); *Centillion Data Sys.*, 631 F.3d at 1284 (to “use” a system for purposes of infringement, a party must put the invention into service, *i.e.*, control the system as a whole and obtain benefit from it); *Grecia v. McDonald’s Corp.*, 724 F. App’x 942, 947 (Fed. Cir. 2018) (non-precedential, affirming dismissal of direct infringement claim based on “use” where complaint failed to explain how the defendant put each claimed component into service and failed to plausibly allege that defendant obtained a benefit).

[23] Corteva’s position: Corteva pleaded direct infringement against all defendants, not only Inari Belgium.
Inari’s position: All of the infringing acts alleged by Corteva were performed by Inari Belgium and the specification of Inari Belgium clarifies who performed the accused acts.

phytosanitary testing was performed. The phytosanitary testing may also be attributable to Inari if you find that IE-SCS acted as Inari's agent, which requires Corteva to show that IE-SCS was acting on Inari's behalf and was subject to Inari's control, and that IE-SCS agreed to act on behalf of Inari.

If you find that Corteva has proven each of these elements, then you must find direct infringement.

Inari Belgium contends that the phytosanitary testing performed by Iowa State University was in furtherance of the USDA requirements for testing for the USDA to issue a phytosanitary certificate required for the export of the seeds to Belgium. Inari Belgium contends the phytosanitary testing did not put the invention into action or service in a manner that derived a benefit from the claimed inventions because it was a test for a bacterial contaminant on the seeds that destroyed the seeds themselves without deriving any benefit from the claimed inventions and therefore was not patent infringement.

Inari Belgium contends that Corteva consented to access to the patent deposit seeds to all members of the public including those outside the United States and their export was authorized when Corteva made the deposits under the Budapest Treaty and that the phytosanitary testing did not put the inventions into action or service in a manner that derives a benefit from the claimed invention.[24]

---

[24] Corteva's position: Inari's proposed instruction misstates the law, in that § 271(a) does not require Inari to have "put the invention into action or service in a manner that derived a benefit from the claimed invention" or to have used the seeds non-destructively in order to have infringed. *See* D.I. 557 at 14-15. Inari's proposed reference to "USDA requirements" and suggestion that export was certified by the USDA will likely confuse or mislead the jury and would be prejudicial to Corteva. Inari's legal contentions regarding access are for the court to address, not the jury, and in any event are incorrect. *See* D.I. 641 at 7 n.2, 19; D.I. 557 at 3-4.

Inari's position: Inari disagrees on the substance of the law as set forth in its pending summary judgment motion and the cases identified above. *See* D.I. 540 at 15-16. Including the parties' contentions here are helpful to the jury in understanding the issues they are being instructed to decide.

**Inari Proposed Instruction: Infringement Under Vicarious Liability**[25]

Vicarious liability allows a patent owner to hold a party responsible for infringing acts committed by another. Corteva accuses Inari Belgium of direct infringement by instructing Iowa State University through IE-SCS to conduct phytosanitary testing of seeds covered by the '246 and '434 patent.

Inari asserts that it has not directly infringed the '246 and '434 patents because the testing accused of constituting an infringing use was a USDA approved test required for the USDA to issue a phytosanitary certificate performed by Iowa State University, not Inari Belgium. Inari Belgium contends that Iowa State University was a lab qualified by USDA to conduct the testing needed for USDA to issue a phytosanitary certificate before corn seeds can be exported to Belgium.

You must first consider whether the phytosanitary testing performed by Iowa state University is a direct infringement of the '246 and '434 asserted patent claims. If you find that Iowa State University directly infringed, you must then determine whether Inari is vicariously liable for the infringement. Vicarious liability is not limited to principle-agent relationships, contractual arrangements, or alter ego theories. You should consider all the facts and the context of the activity in determining whether Iowa State University's activities can be attributed to Inari.

Inari Belgium contends that neither Inari Belgium nor IE-SCS instructed Iowa State University on how to conduct the USDA test.

You may find that the steps performed by Iowa State University are attributable to Inari Belgium if you find that either (1) Inari exercised direction or control over Iowa State University

---

[25] Inari's source: *Green Revolution Cooling, Inc. v. Riot Platforms, Inc. et al*, Case No. 6:24-CV-152-ADA (WDTX), Final Jury Instructions, Instruction 19.

when Iowa State University performed infringing acts, or (2) Iowa State University acted as the agent of Inari with respect to infringement.

**(1) Direction and Control**

To prove that Inari directed or controlled Iowa State University, Corteva must show by a preponderance of the evidence that (1) Iowa State University is the agent of Inari Belgium or is contractually obligated to Inari to carry out the infringing acts, (2) Iowa State University performed the infringing acts to receive a benefit from Inari Belgium and that Inari Belgium established how or when the acts were performed, or (3) that Inari Belgium profits from the direct infringement and has the right and ability to stop that infringement.

**(2) Agency**

When a principal provides an agent with authority to act on the corporation's behalf, the corporation is liable for those actions of the agent. Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.

If you find that the acts performed by Iowa State University are attributable to Inari Belgium and that the phytosanitary testing constitutes a use of the patented invention, then Inari Belgium directly infringed the '246 and '434 patents[26]

[26] Corteva's position: Because vicarious infringement is a form of direct infringement, this instruction is duplicative. Corteva has incorporated the relevant elements of Inari's proposed instruction into Instruction 2.6 (Direct Infringement). Corteva does not allege that Iowa State University acted as Inari's agent. Inari's proposed reference to "USDA requirements" and suggestion that export was certified by the USDA will likely confuse or mislead the jury and would be prejudicial to Corteva.

Inari's position: The parties appear to agree on the need to include the elements of vicarious liability. Inari believes that it is more clear and helpful for the jury to separate out the vicarious liability standard into its own instruction. This is consistent with the example identified by Inari.

### 2.7. Infringement by Supply of a Component Especially Made or Adapted for Use in the Patented Invention into Another Country[27]

The second type of infringement is the export of any component of a patented invention. A component is a constituent part, element, or ingredient of an invention.[28] Corteva asserts that Inari Belgium infringed claims 2-6 and 9 of the ’434 patent; claims 4, 10, and 11 of the ’246 patent; claims 7 and 9 of the ’363 patent; and claim 2 of the ’522 patent by [supplying or causing to be supplied a component of a claimed plant, from the United States into a foreign country, where the exported components were especially made or especially adapted for use in an invention covered by the Asserted Patents and have no substantial non-infringing use, and where Inari knew the components were especially made or adapted for use in the claimed invention and intended for the components to be combined in a way that would have infringed the Asserted Patents if the combination had occurred in the United States][exporting patent deposit seeds with the intent to combine the seeds with water, air, light, nutrients and physical support to grow a plant covered by the patent claims. Corteva contends that water, air, light, nutrients and physical support are components of the claimed plants. Corteva contends that combining the patented seeds with water, air, light, nutrients, and physical support to grow a plant would be infringing if done in the United States. Corteva further contends that the seeds are especially

[27] AIPLA 3.11; FCBA 3.4.

[28] Corteva’s source: *Microsoft v. AT&T*, 550 U.S. 437 (2007).
Corteva’s position: The first sentence is a helpful signpost to the jury and is consistent with the agreed language of Instructions 2.6 and 2.7. The second sentence states definitions recited by the Supreme Court in a case “constru[ing] § 271(f)’s terms.” *Id.* at 449. Inari’s addition improperly limits Corteva’s infringement theory by omitting the argument that the seed contains components of the invention. Moreover, Corteva pleaded direct infringement against all defendants, not only Inari Belgium.
Inari’s position: No additional language is necessary; this statement is not part of the model instruction and misleading and confusing to the jury on what is required under the law in its use of “any component.”

made for use in the inventions and do not have substantial non-infringing uses].[29] Corteva contends that the component can be a seed or a part of a seed, such as a cell, organelle, DNA, event, or gene.[30]

Inari Belgium contends that it is entitled to access and export the patent deposit seeds to Belgium under the Budapest Treaty and the regulations under 37 CFR 1.808 providing public access to patent deposits. It is the act of export with the intent to combine that occurred in the United States that is accused of infringement and not Inari's activities with the seeds in Belgium. Inari further contends that the export of patent seed deposits is authorized by law and authorized by Corteva when it deposited the seeds with ATCC under the Budapest Treaty for the purpose of obtaining patents in the United States and in Europe based on one patent deposit for each patent with ATCC. Inari contends that Corteva obtained patents on the same inventions in Belgium claiming the benefit of the ATCC patent seed deposits and that as a result Inari Belgium was legally entitled under the Budapest Treaty to obtain the patent deposits and export them to Belgium free of allegations of infringement under United States patent laws.

Inari contends that the seeds contain plant embryos, the initial developmental stage of the plant with all the components of the plant grown from the seed, and thus the seed and the plant

---

[29] Corteva's position: Corteva's proposed instruction accurately describes the nature of infringement under § 271(f)(2). Inari is not entitled to an instruction characterizing Corteva's legal theory, particularly an instruction that omits part of Corteva's theory.
Inari's position: Including the parties' contentions here are helpful to the jury in understanding the issues they are being instructed to decide.

[30] Corteva's position: It is appropriate to identify the alleged component about which the jury is to make a factual finding.
Inari's position: As explained in Inari's reply on summary judgment, "Corteva has introduced and included additional components to be combined: cells, organelles, DNA, and events. D.I. 557 at 16 & n.7. This moving target of components is not a fact question for the jury but a legal question of claim construction for the Court." D.I. 563 at 11. Corteva did not plead these additional elements in its Second Amended Complaint. *See, e.g.*, D.I. 148 ¶ 206.

are the same organism and the complete invention and not a component of the invention. Inari also contends that water, air, light, nutrients, and physical support are not components of the patented plants.[31]

To show infringement by export of a component, Corteva must prove by a preponderance of the evidence for each asserted claim of the patents that:

(1) Inari either supplied a component from the United States into a foreign country or caused the component to be supplied from the United States to a foreign country;

(2) the exported component is uncombined in whole or part;

(3) Inari knew or should have known that the component was especially made or adapted for use in a product that infringes a claim of the Asserted Patents; and

(3) knowing that the component is especially made or especially adapted and intending that such component will be combined outside the United States in a manner that would infringe the patent if such combination occurred in the United States;[32]

[31] Corteva's position: A lengthy discussion of the parties' theories will not help the jury to understand the factual findings it is asked to make. Inari's proposed instruction does not identify any factual issues for the jury, and its discussion of its legal contentions regarding the Budapest Treaty and federal regulations is improper, as Inari's legal contentions are irrelevant to the factual issues the jury will decide. Moreover, Inari's proposed instruction on its entitlement to export seeds conflicts with the Court's order denying Inari's motion for summary judgment. D.I. 641 at 19.
Inari's position: Including the parties' contentions here are helpful to the jury in understanding the issues they are being instructed to decide.

[32] Corteva's position: Inari's proposal confusingly incorporates parts of element (5) into element (3).
Inari's position: Inari's language is consistent with the language in 35 U.S.C. § 271(f)(2).

(4) the component is not a staple article or commodity of commerce suitable for substantial non-infringing use; and

(5) Inari intended for the component to be combined in a manner that would have infringed a claim of the Asserted Patents if they had been combined in the United States. It is not necessary for you to find that the components actually were combined to infringe, as long as you find that Inari intended the components to be combined in a manner that would have infringed a claim of the Asserted Patents if they had been combined in the United States.[33]

(6) Corteva must prove by a preponderance of the evidence that a person of ordinary skill in the art would conclude that a seed, water, air, light, nutrients, and physical support are components of a plant.[34]

If you find that Corteva has proven all five of these elements by a preponderance of the evidence, then you must find infringement by export of a component.

If you find that either the seed exported by Inari is itself the invention of claims 2-6 and 9 of the '434 patent; claims 4, 10, and 11 of the '246 patent; claims 7 and 9 of the '363 patent;

---

[33] Corteva's position: The additional language is needlessly duplicative and misleadingly suggests that an infringing combination must be a "product."
Inari's position: The use of the term "product" is consistent with Corteva's use of the term in its proposal on element (3). The language is consistent with the law that does not require actual combination.

[34] Corteva's position: Inari's proposed element is duplicative of element (2), needlessly repeats the standard of review, and improperly limits Corteva's infringement theory by foreclosing the possibility that the seed contains components of the invention.
Inari's position: Element (6) is distinct from element (2) in that it calls out the specific components alleged by Corteva in its Second Amended Complaint. As explained in Inari's reply on summary judgment, "Corteva has introduced and included additional components to be combined: cells, organelles, DNA, and events. D.I. 557 at 16 & n.7. This moving target of components is not a fact question for the jury but a legal question of claim construction for the Court." D.I. 563 at 11. Corteva did not plead these additional elements in its Second Amended Complaint. *See, e.g.*, D.I. 148 ¶ 206.

and claim 2 of the ’522 patent; that Inari was authorized to obtain the patent deposit seeds under the Budapest Treaty; or that water, air, light, nutrients, and physical support are not components of the claimed plants, there can be no infringement under this theory.[35]

[35] Corteva’s position: The first and third clauses are needlessly duplicative of element (2) and likely to confuse the jury, and the third improperly limits Corteva’s infringement theory by foreclosing the possibility that the seed contains components of the invention. The second clause, proposing an instruction on authorization, is not supported by the law and is inconsistent with this Court’s rulings. *E.g.*, D.I. 641 at 19-20.
Inari’s position: The language in element (2) identifies a “component” of the invention. The language in Inari’s proposal clarifies for the jury that if they find that the seed is not a component, but the invention itself, then there is no infringement under this theory.

### 2.8. Patent Invalidity Generally[36]

I will now instruct you on the rules you must follow in deciding whether Inari has proven that the Asserted Patents and the ’378 patent are invalid. Patents are presumed valid. To prove that any claim of a patent is invalid, Inari must persuade you by clear and convincing evidence, that is, you must be left with a clear conviction that the claim is invalid.

Like infringement, you must determine whether the asserted claims are invalid on a claim-by-claim basis.

Claims are construed in the same way for determining infringement as for determining invalidity. You must apply the language consistently and in the same manner for issues of infringement and for issues of invalidity.[37]

Inari contends that the Asserted Patents are invalid because they are obvious or fail to satisfy the written description or enablement requirements. Inari also contends that the ’378 patent is invalid for failure to satisfy the enablement requirements and were the subject of a public use more than one year before the relevant patent application was filed.[38]

---

[36] Graco Final Instructions at 12; FCBA 4.1; *see* AIPLA 4.0.

[37] Corteva’s position: The claim construction instructions do not expressly state this, and it will be most helpful to the jury if included at this point.
Inari’s position: This is redundant of the claim construction instructions.

[38] Corteva’s position: the Court granted summary judgment as to invalidity for prior public use, including as to Inari’s counterclaim 7, concerning the ’378 patent. D.I. 627 at 4-8. In any event, Inari’s counterclaim 7 did not plead invalidity due to prior public use. D.I. 160 at 142-43.
Inari’s position: Inari has asserted an argument for invalidity of the ’378 patent for prior public use separate from the regulatory field trials that were at issue in the Court’s summary judgment ruling. Corteva did not move for summary judgment on this additional theory. Inari’s full position is set forth in the proposed Joint Pretrial Order.

### 2.9. Person of Ordinary Skill in the Art[39]

The question of invalidity of a patent claim is determined from the perspective of a person of ordinary skill in the art in the field of the claimed invention as of the time of the invention. A person of ordinary skill in the art in this case would have at least a graduate degree, such as an M.S. or a Ph.D. in biochemistry, cell biology, genetics, molecular biology, or a related field, and several years of training or practical experience in a relevant discipline, such as plant molecular biology or plant genetics and breeding of insect resistant and herbicide tolerant transgenic plants. Such a person would have practical experience in the identification and modification of genes responsible for plant traits[,][ or] in the development of new plant varieties through conventional and nonconventional breeding methods, and in gene transformation technology.[40] These persons may be aided by a plant breeder in assessing the integrity and expression of the transgenic events. For the '522 patent, these persons may be aided by an enzymologist with several years of experience in the design or development of enzymes and enzyme variants, as well as familiarity with alpha-ketoglutarate-dependent dioxygenases.

[39] AIPLA 5.3

[40] Corteva's position: Reference to "conventional and nonconventional breeding methods" and "gene transformation technology" is redundant with "identification and modification of genes" and "development of new plant varieties." To the extent that it is not redundant, it inappropriately suggests that a person of ordinary skill in the art must have cutting-edge experience or be familiar with non-conventional technology having no connection with the patents-in-suit. If the instruction is nonetheless included, it should refer to "conventional or nonconventional" methods, rather than to experience in both.
Inari's position: The breeding methods used and the technology for gene transformation is distinct from the identification and modification the genes. The transformation technology can include the methods of inserting genes into the plant genome and the breeding methods can be both traditional breeding and other forms of breeding. In the plant industry, gene transformations is considered non-conventional breeding.

### 2.10. Prior Art Generally[41]

In order for someone to be entitled to a patent, the invention must be "new" and not obvious over what came before, which is referred to as the prior art. Prior art is considered in determining whether the asserted claims are obvious.[42] Prior art includes any of the following:

1. any product that was publicly known or used by others in the United States before the claimed invention was invented;
2. any product that was in public use or on sale in the United States more than one year before the application for patent was filed in the United States;
3. patents granted in this or a foreign country more than one year before the application for patent was filed in the United States;
4. any publications in this or a foreign country having dates of public accessibility more than one year before the application for patent was filed in the United States;
5. any product that was made by anyone in the United States before the date of invention where the claimed invention was not later abandoned, suppressed, or concealed.

[Inari contends that the following is prior art:

[Inari to add]]

[A list of what Inari contends is prior art is provided in your juror notebook.][43]

---

[41] Graco Final Instructions at 14; AIPLA 5.0.1.

[42] Corteva's position: This is a helpful explanation of the relevance of prior art, drawn directly from this Court's instructions in *Graco*.
Inari's position: This language is unnecessary and inconsistent with the AIPLA model instruction.

[43] Corteva's position: Listing Inari's asserted prior art here will ensure that the jury has it available while also ensuring that only admitted evidence is presented to the jury. Inclusion of a list in the juror notebook risks juror confusion and prejudice to Corteva to the extent that Inari does not ultimately develop its invalidity theories before the jury.

Inari's position: Inari relies on numerous pieces of prior art as both combination references and state of the art evidence. Allowing the jury to have a list of the those references will aid in the deliberations.

### 2.11. Obviousness[44]

Even though an invention may have not been identically disclosed or described before it was made by an inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field of technology of the patent at the time the invention was made.

Inari may establish that a patent claim is invalid by proving, by clear and convincing evidence, that the claimed invention would have been obvious to a person having ordinary skill in the art at the time the invention was made. In determining whether the claimed invention was obvious, consider each claim separately.

In determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field of the invention that someone would have had at the time the invention was made, the scope and content of the prior art, any differences between the prior art and the claimed invention, and, if present, so-called objective evidence or secondary considerations, which I will describe shortly. Do not use hindsight; consider only what was known at the time of the patent's filing date. Keep in mind that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness. Most, if not all, inventions rely on building blocks of prior art. In considering whether a claimed invention is obvious, you should consider whether, at the time the invention was made, there was a reason that would have prompted a person having ordinary skill in the field of the invention to combine the known elements in the prior art in a way the claimed invention does, taking into account such factors as:

---

[44] Graco Final Instructions at 17–18; FCBA 4.3(c); *see also* AIPLA 7.0, 7.2.

(1) whether the claimed invention was merely the predictable result of using prior art elements according to their known function(s);

(2) whether the claimed invention provides an obvious solution to a known problem in the relevant field;

(3) whether the prior art teaches or suggests the desirability of combining elements claimed in the invention;

(4) whether the prior art teaches away from combining elements in the claimed invention;

(5) whether it would have been obvious to try the combinations of elements, such as when there is a design incentive or market pressure to solve a problem and there are a finite number of identified, predictable solutions.

To find it rendered the claimed invention obvious, you must find that the prior art provided a reasonable expectation of success.

### 2.12. Objective Indicia of Non-Obviousness[45]

In determining whether the claimed invention was obvious, you should take into account any objective evidence (sometimes called "secondary considerations") that may shed light on whether or not the claimed invention was obvious. These indicia of non-obviousness include:

- Were products covered by the claimed invention commercially successful due to the merits of the claimed invention rather than due to advertising, promotion, salesmanship, or features of the product other than those found in the claim?
- Was there long-felt need for a solution to the problem facing the inventors, which was satisfied by the claimed invention?
- Did others try, but fail, to solve the problem solved by the claimed invention?
- Did others copy the claimed invention?
- Did the claimed invention achieve unexpectedly superior results over the closest prior art?
- Did others in the field praise the claimed invention or express surprise at the making of the claimed invention?
- Did others accept licenses under the Asserted Patents because of the merits of the claimed invention?

These factors should be considered along with all the other evidence in the case in determining whether the asserted claims would have been obvious. In considering this kind of evidence, you should consider whether Corteva has established the objective indicia were attributable to the features of the asserted claims as opposed to features already found in the prior art.

[45] Graco Final Instructions at 19; FCBA 4.3(c); AIPLA 7.4.

### 2.13. Prior Public Use[46]

Inari also contends that the asserted claims of the '378 patent are invalid because the invention defined in those claims was publicly used in the United States at least one year before the earliest filing date of the '378 patent.

The asserted claims of a patent are invalid if the invention defined in those claims was publicly used by others in the United States more than one year before the inventors filed their patent application.

The '378 patent application was filed on May 2, 2003.

An invention was publicly used in the United States if an embodiment of the claimed invention was both: (1) accessible to the public or commercially exploited in the United States, and (2) ready for patenting.

An invention may be publicly used by the inventor or by a person who is not under any limitation, restriction, or obligation of secrecy to the inventor more than one year before the patent's effective filing date.[47]

---

[46] AIPLA 6.2.1.
Corteva's position: The Court granted summary judgment as to invalidity for prior public use, including as to Inari's counterclaim 7, concerning the '378 patent. D.I. 627 at 4-8. In any event, Inari's counterclaim 7 did not plead invalidity due to prior public use. D.I. 160 at 142-43. Corteva's proposals and objections regarding particular parts of this instruction do not indicate assent to the inclusion of the instruction as a whole.
Inari's position: Inari has asserted an argument for invalidity of the '378 patent for prior public use separate from the regulatory field trials that were at issue in the Court's summary judgment ruling. Corteva did not move for summary judgment on this additional theory. Inari's full position is set forth in the proposed Joint Pretrial Order.

[47] Final Jury Instruction No. IV.4, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. 04-1371, 2007 WL 2859933 (D. Del. 2007); Final Jury Instruction No. 3.7, *Tristrata Tech., Inc. v. Mary Kay, Inc.*, No. 01-CV-00127, 2001 WL 36237883 (D. Del. 2001) ("Tristrata Tech Instructions").
Corteva's position: The additional text is unnecessarily duplicative of the instruction's second paragraph.

A patent is not invalidated if the invention is used by someone other than the inventor, under circumstances where it is not made accessible to the public.[48] To be publicly accessible, the claimed features of the invention must have been placed in the public's possession.[49] Visibility or a lack of secrecy may not amount to a public use if members of the public are not informed of, and cannot readily discern, the claimed features of the invention.[50] For a patented invention to be commercially exploited, the inventor must use the invention to manufacture or produce other items for sale.[51] Secret internal testing without compensation is not commercial exploitation even if the testing furthers other projects or generates commercial benefits.[52]

If the prior public use was an experimental use that was performed to perfect or complete the invention to determine that it will work for its intended purpose, such use will not invalidate the patent.[53]

Factors relevant to determining whether a claimed invention was in public use include:

1. the nature of the activity that occurred in public;
2. public access to the use;
3. confidentiality obligations imposed upon observers;
4. commercial exploitation, even if the specifics of the invention are kept secret; and
5. the circumstances surrounding any testing and experimentation.

---

Inari's position: The additional text clarifies that secrecy or confidentiality obligations are relevant for the period more than one year before the effective filing date.

[48] Tristrata Tech. Instruction No. 3.7; *see* D.I. 627 at 7-8 (granting summary judgment).

[49] *Dey, L.P. v. Sunovian Pharmas., Inc.*, 715 F.3d 1351, 1355 (Fed. Cir. 2013).

[50] *Delano Farms Co. v. Cal. Table Grape Comm'n*, 778 F.3d 1243, 1249 (Fed. Cir. 2015).

[51] *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1382-83 (Fed. Cir. 2005).

[52] *Id.*

[53] Tristrata Tech. Instruction No. 3.7.

Secret use by a third party is not public, unless members of the public or employees of the third party have access to the invention.[54]

To be a public use, the invention must have been ready for patenting at the time of the alleged public use. An invention is ready for patenting either when (1) it is reduced to practice or (2) the inventor has prepared drawings or other descriptions of the invention sufficient to enable a person of ordinary skill in the art to make or use the invention. An invention is reduced to practice when the inventor(s) (1) constructed an embodiment or performed a process of the invention, and (2) determined that it would work for its intended purpose.[55]

If you find that Inari has proven by clear and convincing evidence that an embodiment of a claim of the '378 patent was in public use in the United States more than one year before the inventors filed the '378 patent application, then you must find that claim invalid.

[54] Inari's source: AIPLA 6.2.1.
Corteva's position: By treating various conditions as "factors," Inari's proposed instruction misstates the law and leaves the jury without necessary guidance. For example, public access and commercial exploitation are dispositive elements that are left undefined; confidentiality obligations may be dispositive to public access regardless of other "factors"; and the "nature of the activity that occurred" and the "circumstances surrounding any testing and experimentation," without more, do not adequately explain the facts that the jury must find. Moreover, whether employees of a third party "have access to the invention" does not resolve the public-access question independent of whether the employees were subject to an obligation of secrecy.
Inari's position: Inari's proposed instruction is taken directly from the AIPLA model instruction.

[55] AIPLA 6.2.1.
Corteva's position: The additional language is unnecessary, as Inari does not base invalidity on drawings or descriptions.
Inari's position: Inari's proposed instruction is taken directly from the AIPLA model instruction.

### 2.14. Written Description[56]

Inari contends that claims 1, 3, and 6 of the '246 patent and claims 1-14 of the '522 patent are invalid for failure to satisfy the written-description requirement.

Inari bears the burden of establishing by clear and convincing evidence that the specification fails to satisfy the written-description requirement. A patent must contain a written description of the product claimed in the patent. The written-description requirement helps ensure that the patent applicant actually invented the claimed subject matter. To satisfy the written-description requirement, the patent specification must describe each and every limitation of a patent claim, with clear, concise, and exact terms. When determining whether the specification discloses the claimed invention, the claim must be viewed as a whole. As I explained earlier, for patents to seeds and plants, a deposit of seeds can also satisfy the written description requirement.

The disclosure of an invention through the written description in a patent required by the Patent Act is the quid pro quo of the right to exclude others from making, using, selling or offering to sell the patent invention. The written description requirement for patents that claim plants includes a deposit of the biological material claimed by the patent, for example seeds, and mandates that such material be available to the public without restriction after the patent issues, just like the written text of an issued patent is available to the public.

To succeed, Inari must show by clear and convincing evidence that a person having ordinary skill in the field reading the patent specification as of the effective filing date would have recognized that it does not describe the full scope of the invention as it is finally claimed. If a patent claim lacks adequate written description, it is invalid.[57]

[56] AIPLA 9.
[57] Corteva's source: AIPLA 9.

The written-description requirement is satisfied if a person of ordinary skill in the field of the invention would recognize, from reading the patent specification or associated deposits, that the inventor possessed the subject matter finally claimed in the patent. The written-description requirement is satisfied if the specification shows that the inventor possessed his or her invention as of the effective filing date of the claimed invention, even though the claims may have been changed or new claims added since that time.

The exact words found in the claims need not be used. It is unnecessary to spell out every detail of the invention in the specification, and specific examples are not required. Enough must be included in the specification to convince a person of ordinary skill in the field of the invention that the inventor possessed the full scope of the claimed invention. In evaluating whether the specification has provided an adequate written description, you may consider such factors as:

1. the nature and scope of the patent claims;
2. the complexity, predictability, and maturity of the technology at issue;
3. the existing knowledge in the relevant field; and
4. the scope and content of the prior art.

---

Inari's source: FCPA 4.2(a); AIPLA 9; *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124 (2001).
Corteva's position: Inari's proposed instruction misstates the law, inasmuch as the "written description requirement for patents that claim plants" does *not* "include[] a deposit of the biological material claimed by the patent." Moreover, its statements regarding "quid pro quo" and availability to the public are irrelevant, as it is undisputed that any deposits made in connection with the patents-in-suit are available. The final sentence of Inari's proposed instruction is duplicative of the agreed language that immediately follows.
Inari's position: The Supreme Court ruled in *J.E.M. Ag Supply* that "the plant must meet the specifications of § 112, which require a written description of the plant ***and*** a deposit of the seed that is publicly accessible." 534 U.S. at 131 (emphasis added). Inari disputes that the patent deposits at issue are available without restriction as required under 37 C.F.R. §1.808 in view of Corteva's claims in this case and thus the language is not irrelevant.

The sufficiency of the written description is decided on a claim-by-claim basis, not as to the entire patent or groups of claims.

[In this case, the ’522 patent claims are directed to plants and seeds that produce a specific class of enzymes. You may have heard the witnesses talk about this class of enzymes as a “genus.”][Claims 1 and 12 of the ’522 patent are directed to plant cells that contain a polynucleotide encoding a protein having aryloxyalkanoate dioxygenase activity wherein the protein has at least 95% (claim 1) or 99% (claim 12) amino acid sequence identity with the sequences of amino acids in either SEQ ID NO: 2 or SEQ ID No: 4. The many proteins that meet the definition of claim 1 or 12 are considered a genus.][58] The specification need not describe every species in a claimed genus in order to meet the written description requirement. One way to consider whether the written description is sufficient is to assess whether the patent specification identifies structural features common to the members of the claimed genus that have the aryloxyalkanoate dioxygenase activity so that a person of ordinary skill in the art can “visualize or recognize” the members of the claimed invention.[59] [Structural features may be disclosed by functional language when][The written description requirement is satisfied in this

[58] Corteva’s position: The claims at issue speak for themselves. The technical detail in Inari’s proposal is not necessary to describe the concept of a genus and is likely to confuse the jury or distract from jurors’ understanding of the relevant legal standard.
Inari’s position: Including the parties’ contentions here are helpful to the jury in understanding the issues they are being instructed to decide, particularly on highly technical matters.

[59] Corteva’s position: The inclusion of “aryloxylalkanoate dioxygenase activity” is unnecessary and distracts from the relevant legal standard.
Inari’s position: Including the parties’ contentions here are helpful to the jury in understanding the issues they are being instructed to decide, particularly on highly technical matters.

circumstance when] there is an established correlation between structure and function described in the specification or known in the art at the time of filing.[60]

If you find that Inari has proven by clear and convincing evidence that the ’246 and ’522 patents do not contain an adequate written description of the inventions recited in claims 1, 3, or 6 and claims 1-14 respectively, then you must find those claim(s) invalid.

[60] FCBA 4.2; AIPLA 9; Final Jury Instructions at 14-15, *Amgen Inc. et al v. Sanofi et al*, No. 14-cv-01317-RGA (D. Del. Feb. 25, 2019), D.I. 812.
Corteva’s position: The requirement of a correlation between structure and function relates to the disclosure of structural features through functional language, not to any circumstance in which a genus is defined by the identification of structural features.
Inari’s position: The language Inari proposed is identical to the FCBA 4.2 model instruction.

**2.15. Enablement[61]**

Inari contends that the claims of the Asserted Patents are invalid for lack of enablement as a result of Corteva's restriction on access of the patent seed deposits and the '378 patent is invalid for lack of enablement because Corteva failed to make a deposit for the '378 patent and restricts access to the commercially marketed event through Technology Use Agreements. Separately, Inari contends that claims 1, 3, and 6 of the '246 patent, claims 1-14 of the '522 patent, and all claims of the '378 patent are invalid for lack of enablement.[62] Inari bears the burden of establishing by clear and convincing evidence that the specification fails to satisfy the enablement requirement.

A patent must disclose sufficient information to enable or teach a person of ordinary skill in the field of the invention to make and use the full scope of the claimed invention without undue experimentation. This requirement is known as the enablement requirement. If a patent claim is not enabled, it is invalid.

In considering whether a patent complies with the enablement requirement, you must keep in mind that patents are written for persons of ordinary skill in the field of the invention. Thus, a patent need not expressly state information that a person of ordinary skill in the field of the invention would be likely to know or could obtain. [Also keep in mind that deposited materials can be used to satisfy the enablement requirement.[63] The deposit must be made before or during

[61] AIPLA 8.

[62] Corteva's position: There is no legal or factual basis for Inari's contention that Corteva restricts access to any patent seed deposits. Except as to the specifically identified patent claims, that legally incorrect theory is Inari's only basis for claiming lack of enablement. In any event, introducing distinct theories that have overlapping scope before offering any context will likely confuse the jury. To the extent the instruction refers to the '378 patent, it suffices to list it among the other patent claims at issue.

Inari's position: Including the parties' contentions here are helpful to the jury in understanding the issues they are being instructed to decide. Inari's position in this case on access has been consistent and Corteva did not move for summary judgment on this issue.

[63] MPEP 2402 (citing 37 CFR 1.801-1.809).

the pendency of an application for the patent for at least a term of thirty years, and must be available upon issuance of the patent.[64] The samples must be stored under agreements that would make them available beyond the enforceable life of the patent for which the deposit was made][When a deposit is made to satisfy the written description and enablement requirements, the deposit must be made available to the public upon issuance of the patent without restriction].[65]

The fact that some experimentation may be required for a person of ordinary skill in the field of the invention to practice the claimed invention does not mean that a patent does not meet the enablement requirement. Factors that you may consider in determining whether a person of ordinary skill in the field of the invention would require undue experimentation to make and use the full scope of the claimed invention include:

1. the breadth of the claims;
2. the nature of the invention;
3. the relative skill of those in the art;
4. the state of the prior art;
5. the predictability of the art;
6. the amount of direction or guidance disclosed in the patent;
7. the quantity of experimentation necessary and whether that experimentation involves only known or commonly used techniques; and

---

[64] *Feldman v. Aunstrup*, 517 F.2d 1351, 1355 (C.C.P.A. 1975).
[65] 37 CFR 1.806.
Corteva's position: Corteva's proposed instruction correctly states the law in explaining the substantive relationship between enablement and the deposit of biological materials, and it is not disputed that samples are available to the public. Inari's proposed instruction is likely to mislead the jury by failing to explain the substance of "without restriction."
Inari's position: Inari's instruction clarifies the requirements for availability as laid out in 37 C.F.R. § 1.808, which is a component of the substantive relationship between enablement and the deposit of biological materials.

8. the presence or absence of working examples in the patent.

No one or more of these factors is alone dispositive. Rather, you must make your decision about whether or not the degree of experimentation required is undue based upon all the evidence presented to you. You should weigh these factors and determine whether or not, in the context of this invention and the state of the art at the time of the effective filing date, a person having ordinary skill would need to experiment unduly to make and use the full scope of the claimed invention.[66]

If you find that Inari has proven by clear and convincing evidence that Corteva restricts access to the asserted patent deposits and the ’378 patented technology, that the claims of the Asserted Patents are not enabled, or that the respective patents did not enable the inventions recited in claims 1, 3, or 6 of the ’246 patent, claims 1-14 of the ’522 patent, or all claims of the ’378 patent, then you must find those claim(s) invalid.[67]

[66] FCBA 4.2(b).

[67] Corteva’s position: There is no legal or factual basis for Inari’s contention that Corteva restricts access to any patent seed deposits. Except as to the specifically identified patent claims, that legally incorrect theory is Inari’s only basis for claiming lack of enablement. As well, Corteva maintains that this court lacks jurisdiction over Inari’s claims regarding the ’378 patent.
Inari’s position: Inari’s instruction clarifies the requirements for availability as laid out in 37 C.F.R. § 1.808, which is a component of the substantive relationship between enablement and the deposit of biological materials.

### 2.16. Patent Damages Generally[68]

I will now give you some instructions related to patent damages. By instructing you on damages, I am not suggesting which party should win this case on any issue. These instructions are only to guide you in case you find that Inari infringed a valid claim.

If you find that Inari infringed an asserted claim, and that claim is not invalid, you must determine the amount of damages to be awarded to Corteva. On the other hand, if you find that the asserted claims are invalid or not infringed, then you should not consider patent damages in your deliberations.[69]

The damages you award must be adequate to compensate Corteva for the infringement. They are not meant to punish an infringer. Your damages award, if you reach this issue, should put Corteva in approximately the same financial position that it would have been in had the infringement not occurred.[70]

Corteva has the burden to prove each element of its damages—including the amount of the damages—by a preponderance of the evidence. In other words, you should award only those damages that Corteva establishes that it more likely than not has suffered.[71] While Corteva is not required to prove its damages with mathematical precision, it must prove them with reasonable certainty. You may not award damages that are speculative or based on guesswork.

In this case, Corteva seeks a reasonable royalty. A reasonable royalty is defined as the money amount Corteva and Inari would have agreed upon as a fee for use of the invention at the time just prior to when infringement began. But, regardless of the type of damages you may

[68] Graco Final Instructions at 22.
[69] *See also* AIPLA 10.0 (suggesting analogous language in the first paragraph).
[70] FCBA 5.1.
[71] FCBA 5.1.

choose to award, you must be careful to ensure that award is no more and no less than the value of the patented invention.[72]

[72] FCBA 5.1.
Corteva's position: The jury will be instructed below on reasonable-royalty damages. It is unnecessary to duplicate those instructions piecemeal. The reasonable royalty instruction includes the concept of apportionment.
Inari's position: The proposed language is taken almost verbatim from the model instruction FCBA 5.1.

### 2.17. Date Damages Begin[73]

Corteva and Inari agree that the date for the hypothetical negotiation to determine a reasonable royalty for any damages for patent infringement would [be][begin in] May 2020.[74]

[73] CosmoKey Final Instructions at 35; AIPLA 10.1.
[74] Corteva's position: As above, introducing the hypothetical negotiation piecemeal is unnecessarily confusing.
Inari's position: The proposed language clarifies for the jury the reason for providing the date for hypothetical negotiations.

**2.18. Reasonable Royalty**[75]

If you find that an asserted claim is infringed and not invalid, Corteva is entitled to at least a reasonable royalty to compensate it for that infringement.

Corteva is seeking damages in the amount of a reasonable royalty. A royalty is a payment made to a patent holder in exchange for the right to make, use, and/or sell the claimed invention. A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time just prior to when the infringement first began.

In considering the hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been if they had entered into an agreement at that time, and if they had acted reasonably in their negotiations.

In determining this, you must assume that both parties to the hypothetical negotiation believed the patent was valid and infringed and that both parties were willing to enter into an agreement. The reasonable royalty you determine must be a royalty that would have resulted from arms-length negotiation, and not simply a royalty either party would have preferred. Keep in mind that a reasonable royalty is not capped based on the infringer's expected profits, but on what a willing licensor and licensee would bargain for at a hypothetical negotiation on the date infringement started.[76]

---

[75] Graco Final Instructions at 24.

[76] *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1238 (Fed. Cir. 2011) ("[I]t is settled law that an infringer's net profit margin is not the ceiling by which a reasonable royalty is capped."); *State Indus., Inc. v. Mor–Flo Indus., Inc.*, 883 F.2d 1573, 1580 (Fed. Cir. 1989) ("The determination of a reasonable royalty, however, is based not on the infringer's profit margin, but on what a willing licensor and licensee would bargain for at hypothetical negotiations on the date infringement started.").

In determining a reasonable royalty, you may also consider evidence concerning the availability and cost of acceptable non-infringing substitutes to the patented invention. An acceptable substitute must not infringe the patent.[77]

[You must ensure that the damages compensate Corteva only for Inari's acts of infringement within the United States. Here, this means that you should determine the value of Corteva's lost opportunity to obtain a reasonable royalty that Inari would have been willing to pay if Inari had been barred from infringing. However, if Inari needed to commit the infringing act within the United States in order to then undertake foreign conduct, you may take that foreign conduct into account in determining the value to Corteva and the amount Inari would be willing to pay.][Corteva has not accused Inari's activities in Belgium of infringement of U.S. patents. Corteva accuses Inari of infringement based on phytosanitary testing of the deposit seeds and export of the patent deposit seeds with the intent to combine them abroad, all of which occurred within the United States. You must ensure that the damages compensate Corteva only for Inari's acts of infringement within the United States. Corteva may obtain reasonable royalty damages if

---

Corteva's position: The proposed instruction correctly states the law and will help the jury avoid misapprehending or speculating about the relevant standard.
Inari's position: No additional language is needed, nor was it part of the *Graco* final instruction or a model rule.

[77] AIPLA 10.2.5.8.
Corteva's position: Whether Inari needed to infringe upon Corteva's protected events to create marketable products is a relevant consideration to the amount Inari would have been willing to pay in a hypothetical negotiation, *see AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334-35 (Fed. Cir. 2015), and the proposed instruction correctly states the law.
Inari's position: No additional language is necessary. This language is not relevant to issues raised in this case and would therefore only serve to confuse the jury.

it can prove that the foreign sales were proximately caused by the infringement in the United States.][78]

Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation just prior to the first infringement. In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.[79] [Sales projections that reflect the parties' expectations at the time of the hypothetical negotiation are a permissible basis for a reasonable-royalty calculation, but limiting the reasonable royalty to an after-the-fact counting of actual sales is not permissible.][Reasonable royalty damages must be based on the parties' reasonable expectations at the time of the hypothetical negotiation, including projections of sales that were

---

[78] *Brumfield, Trustee for Ascent Trust v. IBG LLC*, 97 F.4th 854, 877 (Fed. Cir. 2024) ("If patentee seeks to increase that amount by pointing to foreign conduct that is not itself infringing, the patentee must, at the least, show why that foreign conduct increases the value of the domestic infringement itself . . . .").
Corteva's position: Corteva's proposed instruction accurately states the law and appropriately directs the jury to focus on domestic conduct. Inari's proposed instruction characterizes Corteva's theories, introduces proximate causation without explanation, and refers to unspecified "foreign sales." It is therefore likely to mislead or confuse the jury.
Inari's position: Inari's position is consistent with the standard as outlined in the case law noted above. The language clarifying Corteva's contentions and what activities are not accused of infringement will aid the jury its consideration of damages.

[79] *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1313 (Fed. Cir. 2002) ("A reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred, and not be an after-the-fact assessment."); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012) ("[A] reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred, and not be an after-the-fact assessment.") (quoting *Riles*, 298 F.3d at 1313); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1079 (Fed. Cir. 1983) ("The key element in setting a reasonable royalty ... is the necessity for return to the date when the infringement began.").

reasonably possible, but not on expectations or sales projections that did not exist until after the date of the hypothetical negotiation.][80]

---

[80] Corteva's source: *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001).
Inari's source: *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1313 (Fed. Cir. 2002) ("A reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred, and not be an after-the-fact assessment."); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012) ("[A] reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred, and not be an after-the-fact assessment.") (quoting *Riles*, 298 F.3d at 1313); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1079 (Fed. Cir. 1983) ("The key element in setting a reasonable royalty ... is the necessity for return to the date when the infringement began.").
Corteva's position: Corteva's proposal correctly states that sales projections must "reflect the parties' expectations at the time of the hypothetical negotiation." Inari's exclusion of "sales projections that did not exist until after the date of the hypothetical negotiation" is unsupported by the authority it cites, and violates the book of wisdom principle by suggesting that calculations or economic analyses made after the date of the hypothetical negotiation must be discounted or disregarded.
Inari's position: The book of wisdom is intended to fill a gap in evidence as to parties' expectation at the time of first infringement. It does not permit a plaintiff to rely on expectations that only existed after the date of first infringement as the case law above notes. Inari's proposed language is consistent with this principle.

### 2.19. Reasonable Royalty—Factors[81]

In determining the amount of a reasonable royalty, you may consider evidence on any of the following factors, in addition to any other evidence presented by the parties on the economic value of the patent:[82]

1. Any royalties received by Corteva for the licensing of the patent-in-suit, proving or tending to prove an established royalty.
2. The rates paid by Inari to license other patents comparable to the Asserted Patents.
3. The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of its territory or with respect to whom the manufactured product may be sold.
4. Corteva's established policy and marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention, or by granting licenses under special conditions designed to preserve that exclusivity.
5. The commercial relationship between Corteva and Inari, such as whether they are in the same territory in the same line of business, or whether they are inventor and promoter.
6. The effect of selling the patented specialty in promoting sales of other products of Inari, the existing value of the invention to Corteva as a generator of sales of Corteva's nonpatented items, and the extent of such derivative or convoyed sales.

---

[81] Graco Final Instructions at 25–26.

[82] The below criteria follow the *Georgia-Pacific* factors for determining a reasonable royalty rate, which has since been adopted by the Federal Circuit. *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (providing "some of the factors" used in the "determination of the amount of a reasonable royalty for a patent license . . . drawn from a conspectus of the leading cases"); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012) (adopting the *Georgia-Pacific* factors).

7. The duration of the Asserted Patents and the term of the license.
8. The established profitability of the product made under the patents, its commercial success, and its current popularity.
9. The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results.
10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by or for Corteva; and the benefits to those who have used the invention.
11. The extent to which Inari has made use of the invention and any evidence probative of the value of that use.
12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable business to allow for the use of the invention or analogous inventions.
13. The portion of the realizable profits that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.
14. The opinion testimony of qualified experts.
15. The amount that a licensor (such as Corteva) and a licensee (such as Inari) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay

as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

No one factor is dispositive, and you can and should consider the evidence that has been presented to you in this case on each of these factors.[83] You may also consider other factors which in your mind would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent holder would have been willing to accept, acting as normally prudent business people.[84]

---

[83] *Georgia-Pacific*, 318 F. Supp. at 1120.

### 2.20. Apportionment[85]

The amount you find as damages must be based on the value attributable to the patented invention, as distinct from unpatented features of the accused product or other factors such as marketing or advertising, or Corteva's size or market position. A royalty compensating the patent holder for damages must reflect the value attributable to the infringing features of the product, and no more. The process of separating the value of the allegedly infringing features from the value of all other features is called apportionment. When the accused infringing products have both patented and unpatented features, your award must be apportioned so that it is based only on the value of the patented features, and no more.

[85] FCBA 5.12; AIPLA 10.2.5.4.

### 2.21. Willfulness[86]

In this case, Corteva contends that Inari willfully infringed Corteva's patents when it conducted phytosanitary testing on patent deposit seeds for the purpose of export and exported the seeds to Belgium with the intent they be combined outside the United States with other claimed components in a manner that would infringe if done in the United States.[87] If you find that it is more likely than not that Inari infringed a valid claim of Corteva's patents, then you must also determine whether or not Inari's infringement was willful.

To show that Inari's infringement was willful, Corteva must prove by a preponderance of the evidence that Inari knew of Corteva's patent and intentionally infringed at least one asserted claim of the patent. You may consider whether Inari's behavior was deliberate or intentional. However, you may not find that Inari's infringement was willful merely because Inari knew about the patent, without deliberate or intentional infringement.

To determine whether Inari acted willfully, you must consider all facts and assess Inari's knowledge at the time of the challenged conduct. Facts that may be considered include, but are not limited to:

(1) Whether or not Inari acted consistently with the standards of behavior for its industry;

(2) [Whether or not Inari intentionally copied a product of Corteva's that is covered by the Asserted Patents][Whether or not the ATCC was authorized to furnish patent deposit seeds to Inari];

---

[86] *See* AIPLA 11.0.

[87] Corteva's position: It is unnecessary to summarize the infringement allegations here. Doing so risks suggesting to the jury that it may find willfulness only as to Inari's overall scheme, rather than as to individual infringing acts.
Inari's position: Including the parties' contentions here are helpful to the jury in understanding the issues they are being instructed to decide.

(3) Whether or not Inari reasonably believed it did not infringe or that the patent was invalid;

(4) Whether or not Inari made a good-faith effort to avoid infringing the Asserted Patents, for example, whether Inari conducted infringing acts in the United States or attempted to design around the Asserted Patents; and

(5) Whether or not Inari tried to cover up its infringement.[88]

If you determine that any infringement was willful, you may not allow that decision to affect the amount of any damages award you give for infringement.

---

[88] FCBA 3.10.

Corteva's position: (1) The FCBA instructions cite no authority supporting an industry-specific measure of willfulness. The relevant question is whether Inari intentionally infringed the relevant patent claim, and the elements of infringement are not industry specific. This item should therefore be omitted, as it likely to mislead the jury. (2) Inari's replacement of intentional copying with reference to authorization to "furnish patent deposit seeds" omits the central consideration in the willfulness analysis and suggests instead an irrelevant one, as ATCC's authorization to furnish seeds does not bear on Inari's specific intent. (4) Inari's addition of a reference to domestic conduct is likely to mislead the jury. Only domestic conduct is at issue, and the jury may not consider willfulness without concluding that Inari conducted infringing acts in the United States. Inari has identified no legal basis for suggesting that the unlawful use of and covert export of protected seeds could be grounds for the jury to conclude it acted in good faith.

Inari's position: (1) The language was taken from the FCBA 3.10 and has been adopted by the case law. *Bioverativ Inc. v. CSL Behring LLC*, C.A. No. 17-914-RGA, 2020 WL 1332921, at *3 (D. Del. Mar. 23, 2020) (citing Fed. Cir. Bar Ass'n, *Model Patent Jury Instructions*, July 2016, and *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1377-80 (Fed. Cir. 2020)). (2) Corteva's use of the term "product" is misleading in that Corteva does not accuse any Inari products of infringement. (4) Contrary to Corteva's position, including the reference to domestic conduct will further clarify that only domestic conduct is at issue.

## 3. PLANT VARIETY PROTECTION CERTIFICATES[89]

### 3.1. Summary of Plant Variety Protection Certificate (PVP) Contentions

I will now instruct you as to the law you must follow when deciding whether Corteva has proven that Inari infringed Corteva's Plant Variety Protection certificates, and whether Inari has proven that Corteva's PVP certificates are invalid. You will find a list of these certificates in your jury notebooks along with an exemplary PVP certificate. The list of asserted certificates is also in evidence as Joint Trial Exhibit XX. A seed covered by a Plant Variety Protection certificate is called a "protected variety."

A Plant Variety Protection certificate affords federal law protection to the owner of a plant variety for a period of twenty (20) years. A Plant Variety Protection Certificate is obtained by making written application to the Secretary of the Plant Variety Protection Office, United States Department of Agriculture, who then approves the application after making a determination that the variety is novel and useful.

A Certificate is for varieties that are new, distinct, uniform, and stable. A Certificate is presumed valid upon issuance, and proof by clear and convincing evidence can be used to establish invalidity.

The owner of a Plant Variety Protection Certificate has the right to exclude others, who without authority in the United States, sell the variety, or offer it for sale, stock it, reproduce it, import it, or export it for purposes prohibited under the Plant Variety Protection Act.

It is not an act of infringement of a Plant Variety Protection Certificate to use or reproduce a protected variety for plant breeding or other bona fide research.

---

[89] *See generally* 7 U.S.C. § 2541 (defining infringing acts); 7 U.S.C. § 2483(a)(1) (specifying rights of the certificate holder).

It is not an act of infringement of a Plant Variety Protection Certificate to export a protected variety, that enables propagation of the variety into a country that protects varieties of the plant genus or species to which the variety belongs.[90]

[90] Corteva's position: Inari's proposed instruction includes a significant amount of irrelevant and inaccurate material, including shorthand treatments of topics which the parties agree should be addressed in standalone instructions. It is not necessary to explain how a PVP certificate is obtained, but if such an instruction were included, it should explain that the Secretary approves applications after determining that a variety is new, distinct, uniform, and stable—not just novel and useful. Similarly, a later instruction will explain the certificate-holder's right to exclude, but if a summary were appropriate here, it should correspond to the rights described in the instruction on infringement. Finally, Inari's statements about non-infringing acts misstate the law (as explained below) and will mislead the jury.
Inari's position: Including an instruction on the PVP certificates is analogous to providing an instruction on patents and patent claims generally as seen in proposed Instructions 2.1 and 2.2.

### 3.2. Plant Variety Protection Certificate and Patent Rights[91]

Corteva has obtained a utility patent for each of the Asserted Plant Variety Protection Certificates. It is permissible to have both a utility patent and a plant variety protection certificate on the same variety. Plant Variety Protection differs significantly from utility patent protection in that it permits the use of the variety for breeding new varieties of plants and for use in research.

To obtain utility patent protection, a plant breeder must show that the plant developed is new, useful, and non-obvious. In addition, the plant must meet the requirements of the Patent Law 35 U.S.C. § 112, which requires a written description of the plant and that the patent describe the invention sufficiently to enable a person of skill in the art to make and use the invention. The description and enablement requirements for utility patents on plant varieties includes a deposit of biological material and mandates that such material be accessible to the public when the patent is granted.

A breeder may obtain a plant variety protection certificate for any sexually reproduced or tuber propagated plant variety who has so reproduced the variety when the variety is new, distinct, uniform, and stable. A plant variety protection certificate protects any variety that is essentially derived from a protected variety, and any variety whose production requires the

---

[91] Inari's source: 35 U.S.C. §§102, 103, 112; 7 U.S.C. §§ 2402(a), 2541(c)(1), 2451(c)(3), 2451(a)(4); *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124 (2001).
Corteva's position: No factual determination requires the jury to compare the scope of patent and PVP protections. Therefore, a comparison between PVP and patent rights is unnecessary and likely to confuse the jury. To the extent such an instruction is given, it should not include inaccurate summaries of topics to be treated fully in later instructions, much less summaries of topics not at issue, such as the PVPA's allowance for farmers to save seed from their own crops to replant.
Inari's position: Providing an explanation to the jury on the differences between patent and PVP protection is helpful to the jury in understanding that the regimes are distinct with distinct legal requirements and is consistent with the Supreme Court's explanation in *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.* Corteva does not identify any inaccuracies in the instruction.

repeated use of a protected variety. Hybrids created from a protected plant variety are also protected but it is not an infringement to use a protected variety to develop a hybrid or new variety.

The Plant Variety Protection Act allows for use of the variety in breeding new varieties, research, and for farmers saving of seed. In contrast utility patent holders receive greater rights of exclusion including prohibiting others from using the variety even for research and breeding purposes in the United States.

### 3.3. Infringement of Plant Variety Protection Certificates[92]

The Plant Variety Protection Act, or PVPA, gives the owner of a valid plant certificate the right to exclude others from, among other things, importing, exporting, or delivering a protected variety during the term of the certificate. Any person or business entity that has engaged in any of those acts without the certificate holder's permission infringes the certificate.[93]

In this case, Corteva alleges that Inari U.S.A. and Inari Belgium have infringed Corteva's rights under the Plant Variety Protection Act by exporting the protected varieties to Chile and Belgium, respectively. Corteva has the burden of proving by a preponderance of the evidence that, more likely than not, Inari infringed Corteva's rights under the Plant Variety Protection Act by exporting seeds of the variety without authority and in violation of the Plant Variety Protection Act.

If you find that Corteva has proven by a preponderance of the evidence that Inari exported seeds protected by a PVP certificate, then you must find the certificate(s) infringed.

If you find that Inari exported the variety seeds without authority, and used seeds in a manner not otherwise permitted by the Plant Variety Protection Act, then your verdict should be for Corteva. If, on the other hand, Corteva has failed to meet their burden of proof, your verdict should be for Inari.[94]

---

[92] Corteva's source: 7 U.S.C. § 2541(a) (enumerating infringing acts under the PVPA). Inari's source: *AGSouth v. Cunningham*, Case No. 1:09-cv-745 (S.D. Al.), Plaintiffs' proposed Jury Instructions at 5.

[93] Corteva's position: This brief explanation of the right to exclude will be helpful to the jury's understanding of the applicable legal understanding.
Inari's position: Inari agrees that the explanation of the right to exclude is helpful, but only when taken in context with other portions of the instruction clarifying that certain acts are exempt from infringement as identified at least in 7 U.S.C. § 2541(d) and § 2544.

[94] Corteva's position: Corteva's proposed instruction matches agreed language in prior instructions. Inari's proposed instruction improperly adds an element of "use … in a manner not

otherwise permitted by the Plant Variety Protection Act." Corteva alleges PVP infringement only by export, not use, and unauthorized export constitutes infringement regardless of use. Inari's position: The PVPA provides that certain acts are exempt from infringement as identified at least in 7 U.S.C. § 2541(d) and § 2544 and Inari's proposed language clarifies this principle.

### 3.4. Plant Variety Protection Infringement – Prior Sale or Marketing Exemption[95]

It is not an act of infringement of the rights of the owner of a plant variety protection certificate to [perform any acts concerning propagating material ][export seeds] of a protected variety that is sold or otherwise marketed with the consent of the owner in the United States so long as the act does not involve further propagation of the variety or export of material of the variety to enable further propagation into a country that does not protect varieties of the plant genus or species to which the variety belongs.[96] Inari contends that Corteva authorized the sale by ATCC and the export of the patent deposit seeds it made to obtain utility patents on the same varieties covered by the asserted PVP certificates. Inari further contends that Belgium and Chile are countries that protect varieties of corn and soybean and that the export to those countries of the seeds for purposes of Inari's activities is not an infringement.[97]

---

[95] 7 U.S.C. § 2541(d).
Corteva's position: There is no factual or legal basis for Inari's proposed instruction, as Corteva does not sell or otherwise market the inbred varieties protected by PVP certificates and exported by Inari. (Corteva sells hybrid varieties.) To the extent that an instruction on prior sale or marketing is given, it should be tailored to the disputes in this case. Corteva proposes specific language only in case an instruction is to be given.
Inari's position: Inari's proposed instruction is consistent with the language of 7 U.S.C. § 2541(d).

[96] Corteva's position: Any instruction on this topic should explain the specific question the jury is asked to decide, rather than addressing theories that are not at issue. Corteva does not contend that the countries of export do not protect corn or soy, but in any event, whether Belgium and Chile provide the necessary protection is a legal question, Fed. R. Civ. P. 44.1, not a factual dispute about which the jury needs instruction.
Inari's position: Inari is accused of exporting the material of the variety to Belgium and Chile and asserts as a defense § 2541(d). This instruction is therefore relevant in providing the jury with the law and Inari's proposed instruction is consistent with the language of 7 U.S.C. § 2541(d).

[97] Corteva's position: Even if this instruction were to be given, there is no factual or legal basis for instructing the jury on authorization. The making of a patent deposit does not authorize infringement of any sort, much less infringement of distinct rights granted under the PVPA.
Inari's position: Inari's contention on authorization relates to authorization of the underlying sale and as such instructing the jury is consistent with Inari's contentions in this case and the infringement statute.

[You must evaluate this exemption on a certificate-by-certificate basis. To qualify for this exemption with regard to a particular certificate, Inari must prove by a preponderance of the evidence that:

(1) Plants or seeds of the variety Inari exported were sold or otherwise marketed in the United States with Corteva's consent; and

(2) Inari's export of seeds of the protected varieties did not involve further propagation of the variety.

A variety is not "sold or otherwise marketed" merely because seeds of the variety are furnished by a patent depository or are made available for non-commercial purposes. Rather, you may find that a variety was sold or otherwise marketed only if plants or seeds of the variety were placed into the stream of commerce.[98]

If you find that Inari has proven both these elements by a preponderance of the evidence, then you must find the PVP certificate corresponding to the variety was not infringed.]

[You must evaluate infringement on a certificate-by-certificate basis. To prove infringement Corteva must prove by a preponderance of the evidence that:

(1) That patent deposit seeds of the variety Inari purchased from ATCC and exported were sold or otherwise marketed in the United States without Corteva's consent;

(2) Inari's export of the patent deposit seeds to Belgium or Chile was to a country whose laws did not protect varieties of corn; and

(3) Inari's export of the protected varieties was to enable propagation of the variety and not for permitted breeding and research.

[98] *AGSouth Genetics, LLC v. Ga. Farm Servs., LLC*, 22 F. Supp. 3d 1342, 1348 (M.D. Ga. 2014).

If you find that Corteva has proven these elements by a preponderance of the evidence, then you must find the PVP certificate corresponding to the variety was infringed.

If you find that Corteva consented to and authorized the sale of patent deposit seeds of the protected variety by ATCC and that the material of the variety was exported to a country that protects the plant genus or species, or that Inari used the varieties for research or breeding, then you must find for Inari.][99]

[99] Corteva's position: Inari incorrectly places the burden on Corteva. "[T]he burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits." *FTC v. Morton Salt Co.*, 334 U.S. 37, 44-45 (1948). In particular, when a statute has "exemptions laid out apart from the prohibitions," and the exemptions "expressly refe[r] to the prohibited conduct as such," the exemptions ordinarily constitute "affirmative defense[s]" that are "entirely the responsibility of the party raising" them. *Meacham v. Knolls Atomic Power Laboratory*, 554 U.S. 84, 91, 95 (2008). Moreover, Inari's proposed instruction misstates the law, ignoring the requirement that an act not involve further propagation and presuming that seeds were sold or marketed. Finally, if a standalone instruction were to be given, the charge to the jury should match those given in other instructions, explaining the elements and focusing only on the factual issues in dispute. While Corteva maintains that there is no basis for instructing the jury on authorization, it proposes this language in case such an instruction is to be given.
Inari's position: Corteva's proposed language misstates the statute and ignores the export exemption to countries that protect the varieties. Corteva's paragraph on "sold or otherwise marketed" is not supported by the case law. Inari's proposal is consistent with the language of the statute.

**3.5. Plant Variety Protection Infringement—Research and Breeding Exemption**[100]

It shall not infringe any right under the Plant Variety Protection Act for a person to use and reproduce a protected variety for plant breeding or other bona fide research. Inari contends that its use of the seeds was limited to non-infringing research and plant breeding. If you find that Inari used the protected varieties for breeding or research purposes, you must find in Inari's favor.

[100] 7 U.S.C. §2544.
Corteva's position: There is no factual or legal basis for this instruction, as Corteva alleges PVP infringement only by export, not use or reproduction.
Inari's position: Inari has asserted 7 U.S.C. §2544 as a defense to infringement and this instruction is therefore relevant. Inari's position is outline in the proposed Joint Pretrial order.

### 3.6. Plant Variety Protection Infringement—Inari Belgium[101]

Corteva alleges that Inari Belgium infringed Corteva's rights under the Plant Variety Protection Act by exporting patent deposit seeds of the protected varieties in Appendix A to Belgium. Corteva has the burden of proving by the preponderance of evidence that Inari infringed Corteva's rights under the Plant Variety Protections Act by exporting the variety without authority and in violation of the Plant Variety Protection Act. Corteva most demonstrate that (1) the sale of the patent deposit seeds by ATCC to Inari Belgium was not a sale made with Corteva's consent, (2) Inari exported the seeds to a country (here Belgium) that does not protect varieties of corn, and that (3) the export was done to enable further propagation of the variety, that is to grow and multiply the variety.

Inari Belgium contends that it did not infringe the plant variety protection certificates in Appendix A because Corteva consented to the public access to the patent deposit seeds for the utility patents on the same varieties and the sale of patent deposit seeds to the public by ATCC. Inari contends that in the deposit agreements and in the text of the U.S. patents, Corteva consented to ATCC's furnishing of the patent seed deposits. Inari further contends that Belgium protects varieties of the plant genus, corn, of the Appendix A seeds. Inari further contends that it did not propagate the seeds to grow and multiply the variety but rather used the seeds solely for research purposes permitted under the PVPA.

---

[101] *AGSouth v. Cunningham*, Case No. 1:09-cv-745 (S.D. Al.), Plaintiffs' proposed Jury Instructions at 5; 7 U.S.C. § 2541(d).
Corteva's position: This instruction is duplicative of the general instruction on PVP infringement and needlessly recapitulates the parties' positions rather than explaining the factual questions the jury is charged with deciding. Corteva further objects on the grounds described above regarding the inclusion of legally and factually baseless theories, consistency with other instructions, and inaccurate description of the elements of infringement.
Inari's position: Including the parties' contentions here are helpful to the jury in understanding the issues they are being instructed to decide.

If you find that Corteva did not consent to ATCC's sale of the patent deposit seeds, that Belgium is a country whose laws do not protect varieties of corn, and that Inari exported the seeds to further propagate the varieties, then your verdict should be for Corteva. If you find any one or all of the following, that Corteva consented to the sale the patent deposit seeds of the protected varieties in the United States, that Belgium is a country that protects the plant genus, corn, or that Inari used the seeds for research purposes and did not further grow or multiply the varieties, then you must find for Inari Belgium.

### 3.7. Plant Variety Protection Infringement—Inari USA[102]

Corteva alleges that Inari USA has infringed Corteva's rights under the Plant Variety Protection Act by exporting the protected varieties in Appendix B to Chile.

Inari USA contends that it purchased the Appendix B patent deposit seeds from the ATCC after the U.S. patents on the varieties had expired and under U.S. patent law any member of the public is free to make, use, and sell the invention covered by the patent. Inari contends that the sale of the patent deposit seeds by the ATCC to Inari USA was with Corteva's consent. Inari USA also contends that it used the Appendix B seeds for breeding and that its activities including the export to Chile were exempt from infringement under the PVPA. Inari USA contends that the laws of Chile protect varieties of corn and that it did not further propagate the varieties for sale or marketing.

Corteva has the burden of proving by a preponderance of the evidence that the sale of the Appendix B patent deposit seeds after the U.S. patents on the varieties had expired was made without Corteva's consent, that export of the varieties was without authority, and that Inari USA's activities with the Appendix B patent deposit seeds was not for breeding new varieties and in violation of the PVPA.

If you find that Inari USA exported the variety without authority and did not use the seeds for breeding, then your verdict should be for Corteva. If you find that Corteva authorized the

---

[102] *AGSouth v. Cunningham*, Case No. 1:09-cv-745 (S.D. Al.), Plaintiffs' proposed Jury Instructions at 5; 7 U.S.C. § 2541(d).
Corteva's position: This instruction is duplicative of the general instruction on PVP infringement and needlessly recapitulates the parties' positions rather than explaining the factual questions the jury is charged with deciding. Corteva further objects on the grounds described above regarding the inclusion of legally and factually baseless theories, consistency with other instructions, and inaccurate description of the elements of infringement.
Inari's position: Including the parties' contentions here are helpful to the jury in understanding the issues they are being instructed to decide.

sale or marketing of the protected variety in the United States and that the material of the variety was exported to Chile, a country that protects the plant genus, or used for breeding purposes, then you must find for Inari.

### 3.8. Plant Variety Protection Certificate Invalidity Generally[103]

I will now instruct you on the rules you must follow in deciding whether or not Inari has proven that the Asserted PVP Certificates are invalid. PVP Certificates are presumed valid. To prove that a PVP Certificate is invalid, Inari must persuade you by clear and convincing evidence that the PVP Certificates are invalid, that is, you must be left with a clear conviction that the claim is invalid.

Like infringement, you must determine whether the asserted PVP certificates are invalid on a certificate-by-certificate basis.

[103] Modeled on FCBA 4.1; *see* 7 U.S.C. § 2562.

### 3.9. Plant Variety Protection Certificate Invalidity—Lack of Newness[104]

Inari contends that the Asserted PVP Certificates are invalid because propagated or harvested material of the PVP varieties was sold or otherwise disposed of to other persons with Corteva's consent in the United States for purposes of exploitation of the variety more than one year prior to the date each application for PVP certification was filed. Inari contends that Corteva's extensive field trials for hybrid testing of the varieties after a variety was stable and uniform was not an experimental use or testing of the variety and was a disposition hybrid seed produced from the protected variety rendering the Asserted PVP Certificates invalid for prior sale or disposition.

Specifically, Inari contends that Corteva evaluated hybrids made from protected inbred varieties by engaging independent third-party farmers or contract research organizations to grow the hybrids on their farms in field trials. Inari contends that as part of the compensation for the use of the farmers land and growing services, Corteva permitted the farmers to sell the hybrid seed grain produced from the hybrids to grain elevators and to use harvested materials from the field trials on their farms. Inari contends that this sale and use of the hybrid grain and harvested materials more the one year before the filing of the plant variety protection certificate is an invalidating sale or disposition of the variety.[105]

---

[104] Corteva's source: 7 U.S.C. §§ 2401(b)(1), 2402(a)(1)(A).
Inari's source: Modeled on AIPLA 6.2.1; *see* 7 U.S.C. § 2402(a)(1); "Disposition," *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/disposition, accessed July 1, 2026; "Disposition," Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/disposition, accessed July 1, 2026.

[105] Corteva's position: Inari's lengthy description of its legal contentions is unnecessary and prejudicial.
Inari's position: Including the parties' contentions here are helpful to the jury in understanding the issues they are being instructed to decide.

To establish that a PVP certificate is invalid, Inari must prove by clear and convincing evidence that:

(1) Propagated or harvested material of the protected variety or a hybrid of the protected variety was sold or disposed of to other persons;

(2) the sale or disposal of the material took place with Corteva's consent in the United States more than one year prior to the date of application for PVP protection of the variety; and

(3) the sale or disposal was made for purposes of commercial exploitation.

If the material was produced as a result of experimentation or testing of a variety to ascertain the characteristics of the variety, and the sale or disposition was for other than reproductive purposes, you may not find that the sale or disposition was for purposes of commercial exploitation.

If you find that Inari has proven all three of these elements by clear and convincing evidence, then you must find the PVP certificate corresponding to the variety is invalid.

The Asserted PVP Certificates are invalid if hybrid seed of the varieties protected by the Asserted PVP Certificates were sold or disposed of in the United States more than one year before Corteva filed its applications on the Asserted PVP Certificates.

To determine if Corteva disposed of the variety more than one year before the application you should consider whether Corteva transferred, gave, or sold the variety to another or authorized its cooperator farmers to use harvested material or sell grain of the hybrids produced from the varieties.[106]

[106] Corteva's position: An instruction on this subject should clearly explain the relevant legal standard and clearly identify the disputed factual elements. Inari's proposed instruction misstates

## 4. BREACH OF CONTRACT

### 4.1. Summary of Contract Contentions

I will now instruct you as to the law you must follow when deciding whether Corteva has proven that Inari breached certain contracts.

Corteva alleges that Inari entered into contracts with the ATCC called the Material Transfer Agreements, [or "MTAs."][the 2017 MTA between Inari USA and ATCC and the 2019 MTA between Inari Belgium and ATCC.][107] Corteva contends that the MTAs required that Inari agree to a provision prohibiting commercial use of materials obtained from ATCC and a provision prohibiting transfers of material obtained from ATCC. Corteva claims that Inari has made commercial use of the Corteva seeds and transferred the seeds that Inari obtained from ATCC in violation of the contract terms.

Inari contends that while the MTAs contain similar terms, the 2017 MTA applies to Inari USA and purchase of the Appendix B seeds while the 2019 MTA applies to Inari Belgium and the purchase of the Appendix A and Asserted Patent seeds and that the facts related to whether there was a breach of either agreement are distinct. Inari contends that both material transfer agreements contain "Compliance With Laws" terms that preclude the application of the commercial use and transfer restrictions to patent seed deposits and that for patent deposits the

---

the law, as it omits (and fails to explain) the commercial-exploitation element and experimental/testing exception, wrongly suggesting that any use or sale is invalidating.
Inari's position: Inari's language is appropriate because it is consistent with the statute and clarifies that a sale or disposition of hybrid seed is a sale or disposition of the variety which is distinct from the experimental use for characterization of the variety. *Compare* 7 U.S.C. § 2401(b)(1) to 7 U.S.C. § 2401(b)(3).

[107] Corteva's position: The language of the 2022 MTA is clear that it "supersedes all previous agreements between ATCC and Recipient relating to the ATCC material," which would cover materials obtained under the 2017 and 2019 MTAs. Regardless, all of the 2017, 2019, and 2022 MTAs prohibit transfers and commercial use.
Inari's position: The 2022 MTA does not apply under New York Law which governs the agreement.

patent laws and Budapest Treaty control. Inari contends that Inari USA and Inari Belgium did not breach the commercial use restrictions or transfer restrictions as those terms are defined in the 2017 MTA and 2019 MTA. Inari contends that even if the commercial use and transfer provisions were to apply, the activities of Inari USA and Inari Belgium with the patent deposit seeds do not violate the commercial use and transfer restrictions in the agreements. Inari contends that Corteva is not a third-party beneficiary to the 2017 MTA or 2019 MTA with ATCC and therefore has no rights under which it may assert a breach of contract claim.[108]

Corteva has the burden of proving, by a preponderance of the evidence, that Inari USA and Inari Belgium entered into the MTAs with ATCC, that both Inari USA and Inari Belgium breached those contracts, that Corteva was a third-party beneficiary of those contracts, and that Corteva sustained damages because of Inari's breach.[109]

---

[108] Corteva's position: The agreed language in the preceding paragraph briefly sets out the topics relevant to this claim. The jury will not be helped by a discussion of specific legal theories or facts that Inari would like to emphasize. Including those here would be prejudicial to Corteva. The Court has already rejected many of these arguments anyways.
Inari's position: Including the parties' contentions here are helpful to the jury in understanding the issues they are being instructed to decide.

[109] Corteva's position: The Court should resolve the third-party beneficiary issue prior to trial. *Freeman v. Doubletree by Hilton*, 90 Va. Cir. 182 (2015) (sustaining demurrer because contract "establishe[d] that [plaintiff] is not an intended third-party beneficiary as a matter of law").
Inari's position: As outlined in the Joint Pretrial Order, Inari believes the issue of third-party beneficiary status is a question for the jury.

### 4.2. Contract Interpretation

Clear and unambiguous language in a contract should be given its ordinary and usual meaning. Absent some ambiguity, contractual language must not be destroyed or twisted under the guise of construing it. A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. The test for whether ambiguity exists is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.[110]

There are certain rules to consider in interpreting contractual terms that appear ambiguous or unclear.

First, if the party that drafted the language of the contract can be determined, the language must be construed most strongly against that party.

Second, if the contract's language is susceptible of two constructions, one of which makes it a fair, customary, and reasonable contract that a prudent person would make, while the second interpretation makes the contract inequitable, unusual, or one that a prudent person would likely not make, the first interpretation must be preferred.

Third, to determine the parties' intent when there are ambiguous terms, the jury will look to the construction given to the terms by the parties as shown through their conduct during the

---

[110] *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195–96 (Del. 1992).
Corteva's position: The agreed language discusses particular points relevant to ambiguity. The proposed instruction ensures that the jury will understand how those points relate to the overarching issue, and will not improperly find or assume ambiguity.
Inari's position: No additional language is necessary. The proposed instruction is not supported by the Delaware model rule.

period after the contract allegedly became effective and before the institution of this lawsuit. The parties' conduct after a contract is made should be given great weight in determining a term's meaning.

Finally, explanatory circumstances existing when the contract was allegedly made may be considered in order to determine the parties' probable intent.[111]

[111] Del. P.J.I. Civ. § 19.15 (2025), available at https://courts.delaware.gov/forms/download.aspx?id=85928.

### 4.3. Breach[112]

To establish that [Inari is ][Inari USA and Inari Belgium are ]liable to Corteva for breach of an MTA, Corteva must prove by the preponderance of the evidence that Inari USA or Inari Belgium failed to comply with one or more obligations under the MTA and that Corteva has sustained damages as a result of Inari's failure to comply.

Corteva contends that Inari USA and Inari Belgium breached the MTAs in multiple independent ways:

- by acquiring Corteva's seeds and transferring those seeds, or progeny thereof, outside Inari to a third party;
- by acquiring Corteva's seeds and transferring modifications and/or unmodified derivatives of those seeds outside Inari to a third party;
- by acquiring Corteva's seeds and transferring unmodified derivatives of those seeds outside Inari to a third party;
- by acquiring Corteva's seeds for a commercial purpose; or
- by using Corteva's seeds for a commercial purpose.

If you find that Inari performed any of the above actions, and that such action constituted failure to perform Inari's obligations under the MTA, then you will conclude that Inari breached the MTA.

---

[112] *See generally* D.I. 148 Ex. H (providing the text of the Material Transfer Agreements at issue).

### 4.4. Third-Party Beneficiary[113]

To enforce the MTAs against Inari, Corteva must first prove that it is a third party beneficiary under the MTAs. Each MTA was between Inari and ATCC. Corteva contends that it is a third-party beneficiary of the MTAs. A third-party beneficiary is an entity who is entitled to enforce a contract even though that entity did not sign or participate in the formation of that contract. The rights of a third party claiming beneficiary status must be measured by the terms of the agreement between the signatories to the contract.

Here, Corteva claims that the no-commercial-use and no-transfer provisions in the MTAs are intended for the direct benefit of ATCC "Contributors," including Corteva, and that the reason

[113] *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1386–87 (Del. Super. 1990) ("In order for third-party beneficiary rights to be created, not only is it necessary that performance of the contract confer a benefit upon a third person that was intended, but the conferring of the beneficial effect on such third-party, whether it be creditor or donee, should be a material part of the contract's purpose."); *Greater New York Mut. Ins. Co. v. Travelers Ins. Co.*, No. CIV. 10-01107-LPS, 2011 WL 4501207, at *3 (D. Del. Sept. 28, 2011) ("To create third party beneficiary rights, a contract should confer an intended benefit on the third party, and the conferral of such benefit must be a material part of the contract's purpose."); *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 434 (Del. Ch. 2007) ("As a general rule, only parties to a contract and intended third-party beneficiaries may enforce an agreement's provisions. Mere incidental beneficiaries have no legally enforceable rights under a contract. A third-party beneficiary is an incidental beneficiary unless the parties to the contract intended to confer a benefit upon it." (footnotes omitted)); *White v. Mood*, No. CV S18C-02-012RFS, 2020 WL 996736, at *3 (Del. Super. Ct. Mar. 2, 2020) ("To seek recovery as a third-party beneficiary, the contracting parties 'must have intended to confer a benefit on the third-party, and the beneficial effect.... should be a material part of the contract's purpose." (citation omitted)); *Colbert v. Goodville Mut. Cas. Co.*, No. K10C-01-001 JTV, 2010 WL 2636860, at *3 (Del. Super. Ct. June 30, 2010) ("In order for a non-party to be a third-party beneficiary, the contracting parties must intend that the non-party receive a benefit sufficient to entitle that party to enforce the contract in the courts. The fact that a non-party receives an incidental, indirect, or consequential benefit is not sufficient." (footnote omitted)).
Corteva's position: The Court should resolve whether Corteva is a third-party beneficiary prior to trial. *Freeman v. Doubletree by Hilton*, 90 Va. Cir. 182 (2015) (sustaining demurrer because contract "establishe[d] that [plaintiff] is not an intended third-party beneficiary as a matter of law"). Corteva offers this instruction only to the extent the Court finds there is a material dispute of fact on this issue.
Inari's position: As outlined in the Joint Pretrial Order, Inari believes the issue of third-party beneficiary status is a question for the jury.

for those provisions is to protect the rights of contributors like Corteva. Inari contends that Corteva as a patent depositor is not a Contributor of ATCC Material and not a third-party beneficiary of the MTAs between Inari and ATCC. Corteva's patent deposits were made to fulfill its obligations under § 112 of the U.S. Patent laws for the public's right of access to the patents. Therefore, Inari contends that Corteva is not a "Contributor" as that term is defined in the MTAs. Inari also contends that it did not intend for Corteva to be a third-party beneficiary upon entering the material transfer agreement with ATCC.[114]

To qualify as a third-party beneficiary of the MTA, Corteva must prove by a preponderance of the evidence that:

(1) the contracting parties, each of ATCC and Inari, intended that Corteva benefit from the contract; and

(2) Corteva is an intended beneficiary of the contract, as opposed to an indirect or incidental beneficiary. Corteva is an intended beneficiary if, by looking at the language and circumstances of the contract, an intent to benefit Corteva is a material part of the parties' purpose in entering into the contract.[115] Corteva need not be identified by name in the contract to be a third-party beneficiary of the contract.[116]

---

[114] Corteva's position: Inari's proposed instruction once again seeks to inform the jury not about the issue in dispute, but rather about Inari's legal theories. Including such an instruction would not help the jury to understand the relevant legal standards and would be prejudicial to Corteva. Inari's argument that Corteva is not a contributor because it made deposits for compliance with § 112 lacks any support.
Inari's position: Including the parties' contentions here are helpful to the jury in understanding the issues they are being instructed to decide.

[115] *See Bako Pathology LP v. Bakotic*, 288 A.3d 252, 271 (Del. 2022); Del. P.J.I. Civ. § 19.21 (2025).

[116] *See Smith v. CSAA Gen. Ins. Co.*, No. CV N22C-05-089 CLS, 2022 WL 5431539, at *3 (Del. Super. Ct. Oct. 6, 2022) ("It is not essential to the creation of a right in an intended beneficiary that he be identified when a contract containing the promise is made.") (citing Restatement (Second)

(2) the benefit must have been intended by the contracting parties as a gift or in satisfaction of a pre-existing obligation to Corteva; and

(3) the intent to benefit the third-party must be a material part of Inari and ATCC's purpose in entering into the contract.[117]

To find an intent to benefit Corteva, Corteva must prove that both Inari and ATCC intended the MTAs to benefit Corteva. If you find that only one party to the MTA intended Corteva to benefit from the agreement or that neither party intended Corteva to benefit from the agreement, then you must find that the intend element is not met.[118]

If you find that Corteva has proven these elements by the preponderance of the evidence, then you must find that Corteva was a third-party beneficiary of the Material Transfer Agreements.

---

of Contracts § 308); *ECN Fin. LLC v. Galmor's/G&G Steam Servs., Inc.*, No. 2:17-CV-02760-CDJ, 2018 WL 3642268, at *7 (E.D. Pa. Aug. 1, 2018) ("A contract need not explicitly mention a third-party by name to recognize them as an intended third-party beneficiary of the contract.")

[117] Inari's source: Delaware Pattern Civil Instructions (2025), Instruction 19.21.

Corteva's position: Even if Virginia law were to apply, the jury should be instructed in a manner that will help it decide the factual issues. The Restatement of Contracts recognizes that descriptions invoking "donee", "gift," and "creditor" beneficiaries are unhelpful and therefore uses the terms "intended" and "incidental" beneficiaries to better convey the concepts. The Court should do the same. *See* Restatement (Second) of Contracts ch. 14, Introductory Note, at 439; *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.,* 66 N.Y.2d 38, 44 (1985) (explaining "the terms 'donee' beneficiary and 'creditor' beneficiary carry overtones of obsolete doctrinal difficulties, [so] the Restatement (Second) of Contracts has abandoned those terms in favor of the terms 'intended' beneficiary and 'incidental' beneficiary to distinguish beneficiaries who have rights from those who do not").

Inari's position: Inari's proposed language is consistent with the Delaware Pattern Civil Instructions (2025), Instruction 19.21.

[118] Inari's source: *Rottlund Homes of N.J., Inc. v. Saul Ewing, Remick & Saul LLC*, 243 F. Supp. 2d 145, 152 (D. Del. 2003); *Am. Fin. Corp. v. Comput. Scis. Corp.*, 558 F. Supp. 1182, 1185 (D. Del. 1983).

Corteva's position: Inari's proposed addition is wholly duplicative of the elements.

Inari's position: Inari's proposed language clarifies Inari's contentions on the elements.

**4.5. Third-Party Beneficiary—Waiver**[119]

Waiver is the voluntary relinquishment or abandonment of a legal right or advantage. A waiver may be expressly made or implied from conduct or other evidence. The party alleged to have waived a right must have known about the right and intended to give it up.

If you find that Corteva is an intended third-party beneficiary to the MTAs between Inari and ATCC, then you must determine whether Corteva waived its third-party beneficiary rights to assert a breach of contract cause of action.

Inari contends that Corteva waived its third-party beneficiary rights by agreeing in the deposit agreements that the patent deposits may be furnished to the public without restriction. Accordingly, Inari contends that Corteva cannot now assert alleged restrictions in the MTAs against Inari.

---

[119] Delaware Pattern Civil Instructions (2025), Instruction 19.23.
Corteva's position: There is no legal or factual basis for this instruction, and the Court has already explained that Inari's theory on this point involves a "critical misdirection." D.I. 627 at 16. Inclusion of this instruction would be misleading and highly prejudicial to Corteva.
Inari's position: Inari maintains its defense of waiver and therefore an instruction if warranted.

### 4.6. Damages[120]

If you find that Inari USA or Inari Belgium committed a breach of the Material Transfer Agreement and that Corteva was a third-party beneficiary of the agreement, then Corteva is entitled to compensation in an amount that will place it in the same position it would have been in if the contract had been properly performed. The measure of damages is the loss actually sustained as a result of the breach of the contract, which may include Corteva's lost profits which might have been made had Inari not breached the contract. Even if a loss was not a direct and immediate result of the breach, you may award compensation for the loss if it was foreseeable at the time Inari entered into the contract that the loss would result if the contract were breached.[121]

The amount of compensation you award must be reasonably certain and may not be based on speculation.

If you find that Corteva is entitled to a verdict in accordance with these instructions, but do not find that Corteva has sustained actual damages, then you may return a verdict for Corteva in some nominal sum, such as one dollar. Nominal damages are not given as an equivalent for the wrong but rather merely in recognition of a technical injury and by way of declaring the rights of Corteva.[122]

---

[120] Del. P.J.I. Civ. § 22.24 (2025); *In re Dura Medic Holdings, Inc. Consol. Litig.*, 333 A.3d 227, 261 (Del. Ch. 2025) (defining "consequential damages" as "damages that do not flow directly and immediately from the breach" and stating that a plaintiff "can recover consequential damages if they were foreseeable at the time of contracting" (cleaned up)).

[121] Corteva's position: Corteva is entitled to an instruction with regard to the full scope of damages it may recover. This instruction correctly states the law. *See Dura Medic*, 333 A.3d at 261.

Inari's position: Damages must be reasonably certain and not speculative. Corteva is not entitled to speculative future lost profits and therefore the inclusion of this language is likely to confuse and mislead the jury.

[122] Corteva's position: The parties agree that the measure of damages is the loss actually sustained. An instruction on nominal damages is unnecessary and will serve only to suggest to the jury that Corteva's damages were minimal.

Punitive damages meant to punish Inari for its wrong doing are not recoverable for breach of contract.[123]

Inari's position: This language is part of the Delaware model instruction. There is no prejudice to Corteva in including the model language.

[123] Corteva's position: Corteva does not seek an award of punitive damages for breach of contract, and the agreed language above explains that damages must be reasonably certain and must correspond to the loss Corteva actually sustained. Therefore, this instruction will not be helpful to the jury.

Inari's position: The inclusion of the language clarifies for the jury that punitive damages are not permitted and should be included especially in light of Corteva's position that it is not seeking punitive damages.

## 5. MASSACHUSETTS UNFAIR BUSINESS PRACTICES

### 5.1. Summary of Unfair Business Practices Contentions

Corteva claims that Inari U.S.A. has engaged in unfair or deceptive acts or practices in violation of Massachusetts General Laws, Chapter 93A. Corteva seeks damages for Inari U.S.A.'s unfair or deceptive acts. Inari U.S.A. denies that it engaged in any unfair or deceptive business practices and denies that it owes Corteva any damages.

Inari U.S.A. contends that its actions were not unfair or deceptive because it was honest with Corteva at the September 2021 meeting and described for Corteva its business proposals and actions Inari U.S.A. had undertaken with Corteva's patent seeds deposits.[124]

[124] Corteva's position: Inari once again seeks to instruct the jury on the specifics of its theory rather than on the basic substance of the legal issue to be decided. Inari's proposed instruction would not help the jury to understand the applicable legal standards and would be prejudicial to Corteva.
Inari's position: Including the parties' contentions here are helpful to the jury in understanding the issues they are being instructed to decide. Including Inari's contention is fair so the jury understands both parties' contentions.

**5.2. Primarily and Substantially in Massachusetts[125]**

For you to consider whether Inari U.S.A.'s actions were unfair or deceptive in violation of Chapter 93A, you must determine whether those actions or transactions occurred "primarily and substantially" in Massachusetts. [There is no precise formula for this determination. Rather, the question is whether the actions that Corteva alleges were unfair or deceptive had their center of gravity in Massachusetts. You may consider whether Massachusetts was the source of the most instances of misconduct or of one or more instances of misconduct with greater significance than others.][While there is no clear definition of what "primarily and substantially" means, there are several factors that you may consider in reaching your conclusion. Those factors include:

1. whether Inari USA was involved in similar transactions or actions in the past;
2. whether Inari USA was motivated by business reasons in connection with taking those actions or being involved in those transactions, rather than personal reasons;
3. where Inari USA's conduct took place; and
4. where Corteva was located when it suffered any loss of money or property as a result of Inari USA's actions or transactions.][126]

It is Inari's burden to prove that the actions or transactions Corteva alleges were unfair or deceptive did not occur primarily and substantially within Massachusetts.[127]

---

[125] *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 472-73 (2003).
[126] Inari's source: Massachusetts Superior Court Civil Practice Jury Instructions, § 16.7.13.
Corteva's position: Corteva's proposed instruction accurately states the law and is tailored to the issues in dispute. Inari's proposed instruction is likely to confuse or mislead the jury, as it suggests factors that are not in dispute and fails to explain the substance of the "center of gravity" standard set out by *Kuwaiti*.
Inari's position: Inari's proposed instruction is consistent with the language of the model instruction.
[127] Mass. General Law Ch. 93A, § 11, para. 8.

### 5.3. Violation[128]

For Corteva to succeed on its unfair or deceptive practices claim, Corteva must prove, by a preponderance of the evidence, the following three elements:

(1) that Inari U.S.A. is engaged in trade or commerce;

(2) that Inari U.S.A., through its conduct, has committed unfair or deceptive acts or practices in the trade or commerce in which Inari is engaged. In a moment, I will speak further on this element. But note, it is not necessary to prove that Inari U.S.A.'s conduct was both unfair and deceptive. It is sufficient to permit recovery if it is proven by Corteva that Inari U.S.A.'s conduct was either unfair or deceptive; and

(3) that Inari's U.S.A.'s acts or practices caused Corteva to lose money or property.

What do we mean when we use the phrase "unfair or deceptive acts or trade practices"? Because there are infinite possibilities of business dealings, the phrase is intentionally a broad and flexible one. The concept of "unfair or deceptive acts or trade practices" allows you to balance the equities on both sides of a business transaction to determine whether a reasonable business person would find Inari's conduct reprehensible. Focus on the nature of the conduct and the purpose and effect of the conduct and keep in mind that even sophisticated businesspersons must deal with each other honestly.

In determining whether Inari USA's acts or practices are unfair you should consider the following factors:

1. Whether Inari U.S.A.'s acts fall within some established concept of unfairness. For something to be unfair, it does not need to violate some other law or a government regulation; however, whether or not it does is something you may

---

[128] Mass. District Court Civil Practice Jury Instructions § 6.00; Mass. Superior Court Civil Practice Jury Instructions §§ 16.4.1, 16.4.4 (Mass. Continuing Legal Ed. 3d ed. Supp. 2018).

consider. Not every illegal act is unfair. A material misrepresentation falls within an established basis of unfairness.

2. Whether Inari U.S.A.'s act or practice was immoral, unethical, oppressive, unscrupulous, or otherwise unconscionable. That obviously involves making a moral judgment about the ethics of the marketplace. You, the jury, are the collective conscience of the community. Use your common sense. Consider Inari's conduct in light of all the circumstances, keeping in mind that you must decide this question in the context of the commercial marketplace. An act that might be unfair in a business transaction with an unsophisticated consumer may not be unfair when it takes place in a transaction involving two sophisticated businesspersons.

3. Whether Inari U.S.A.'s act or practice would cause substantial injury to competitors or other businesspersons.

It is not necessary for Corteva to prove that Inari U.S.A.'s conduct was both unfair and deceptive. It is sufficient to permit recovery if it is proven by Corteva that Inari U.S.A.'s conduct was either unfair or deceptive.

You may find that Inari U.S.A.'s acts or practices caused Corteva to lose money or property even if Corteva's loss cannot be quantified.[129]

[129] *Vicarious Surgical Inc. v. Tragakis*, No. 2284CV02321, 2023 WL 3304305, at *6 (Mass. Super. Ct. Apr. 27, 2023) ("Proof of unquantifiable monetary loss satisfies the § 11 requirement that the plaintiff suffered a loss of money or property.").

**5.4. Damages**[130]

If you decide that Inari U.S.A. was engaged in a business or trade and that it also engaged in an unfair or deceptive act or practice, you must then consider whether Inari U.S.A.'s conduct has caused Corteva any damages.

If you decide that there was a causal connection between Inari U.S.A.'s unfair or deceptive acts or practices and a loss to Corteva, you must next determine whether Corteva experienced a loss and whether the loss was a foreseeable result of Inari U.S.A.'s conduct. That is, even though a particular loss may have been caused by a particular act, the law treats that loss as being compensable only if the loss was reasonably foreseeable or, said another way, was a reasonably expected result of the act.

If you find that Corteva is entitled to damages for a loss of money or property as a result of Inari's actions, you may award as damages any monetary gain Inari realized from those actions, including profits that Inari unfairly earned or unfairly took away from Corteva.[131]

[130] Mass. District Court Civil Practice Jury Instructions § 6.02; Mass. Superior Court Civil Practice Jury Instructions §§ 16.5.3, 16.5.4; *deBettencourt v. Aronson*, 2011 Mass. App. Div. 27, 27 (Dist. Ct. 2011).

[131] *Specialized Tech. Resources, Inc. v. JPS Elastomerics Corp.*, 80 Mass. App. Ct. 841, 850 (2011); *Vicarious Surgical*, 2023 WL 3304305, at *6 ("[D]isgorgement of profits unfairly earned" is recoverable even if it "is difficult to quantify.").
Corteva's position: Corteva is entitled to an instruction accurately conveying the applicable law.
Inari's position: Corteva's proposed language is ambiguous as to the actions accused. It is also misleading in that it implies that Inari achieved monetary gains which is a disputed issue. Under Massachusetts law, a plaintiff may not recover future potential gains by a defendant under an unjust enrichment theory only gains actually obtained. *See* D.I. 540 at 34.

### 5.5. Willful or Knowing[132]

If you find that Inari U.S.A.'s conduct was unfair or deceptive, you must also decide whether Inari U.S.A. committed those unfair or deceptive actions willfully or knowingly.

By instructing you about that second question, I am not suggesting how you should answer either question. The answers to either or both questions are your responsibility, and I have no opinion as to what your answers ought to be. I am only instructing you on the law that governs this area, in the event that you reach this second question.

An unfair or deceptive act is "willful" if the actor intends to commit an unfair or deceptive act. An unfair or deceptive act is "knowing" if the actor, whatever its intent, knows that by doing so it is committing an unfair or deceptive act.

If you have found that Inari committed an unfair or deceptive act or practice willfully or knowingly, then Corteva is entitled to an award of up to three times, but no less than two times, the actual damage you have determined the plaintiff to have sustained. You must, therefore, determine whether the damage caused by the defendant's unfair or deceptive act or practice should be doubled or trebled.

Multiple damages are designed to impose a penalty on the defendant. The purpose of multiple damages is to deter callous and intentional violations of the law and to promote prelitigation settlements by making it unprofitable for a defendant to ignore a plaintiff's request for relief. Multiple damages are not awarded to compensate particular harmed parties. In determining whether the actual damages should be doubled or trebled, take into consideration all the relevant circumstances, including the character and degree of the wrong as shown by the evidence, the necessity of preventing similar wrong, and Inari's degree of culpability.

---

[132] Mass. District Court Civil Practice Jury Instructions § 6.01; Mass. Superior Court Civil Practice Jury Instructions § 16.7.12.

## 6. CONVERSION

### 6.1. Summary of Conversion Contentions

Corteva contends that Inari converted Corteva's property by exercising dominion and control over Corteva's seeds in a manner inconsistent with Corteva's ownership rights.

Inari contends that Corteva deposited that the seeds at ATCC without restrictions on the public's access to fulfill Corteva's obligations in exchange for receiving patents on the inventions in the seeds. Inari contends that ATCC held and distributed the seed as authorized by Corteva and required by the law. Inari further contends that Corteva did not have any possessory interest in the seeds, only the right to exclude certain uses of the seeds in the United States under the patent laws. Inari contends that it was a good faith purchaser for value.[133]

[133] Corteva's position: Inari's proposed addition inappropriately instructs the jury on the specifics of its legal theory rather than on the issue the jury is asked to decide. Giving the proposed instruction would be prejudicial to Corteva. Inari's contention also conflict with prior rulings of the Court about what activities "access" permits.
Inari's position: Including the parties' contentions here are helpful to the jury in understanding the issues they are being instructed to decide. Including Inari's contention is fair so the jury understands both parties' contentions.

### 6.2. Elements of Conversion[134]

Conversion is the exercise of dominion or control over the personal property of another, without right, and thereby depriving the rightful owner of its use and enjoyment of the personal property. An action for conversion can be maintained only by the person having a property interest in and entitled to the immediate possession of the item alleged to have been wrongfully converted.[135] To establish conversion, Corteva must prove each of the following elements by a preponderance of the evidence:

(1) Inari exercised dominion over Corteva's protected seed deposits;

(2) Inari was without right in exercising such dominion;

(3) Inari thereby deprived Corteva of the use and enjoyment of its protected seed deposits.

(1) that Corteva had ownership or right to possession of the property at the time of the conversion; and

(2) that the wrongful exercise of dominion or control by Inari over Corteva's property deprived Corteva of possession.[136]

A plaintiff must have a proprietary right or interest at the time of the alleged conversion.[137]

There is no requirement that one converting property (Inari) be shown to have had the intent to deprive permanently the rightful owner (Corteva) of its use and enjoyment.

---

[134] Corteva's source: *In re Hilson*, 448 Mass. 603, 611 (2007).
Inari's source: *Economopoulos v. Kolaitis*, 259 Va. 806, 814 (2000) (quoting *United Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305 (1994)); *see generally* Restatement (Second) of Torts § 225 (1965) ("For a conversion the actor is subject to liability to one who at the time was entitled to immediate possession of the chattel."); *Airlines Reporting Corp. v. Pishvaian*, 155 F. Supp. 2d 659, 664 (E.D. Va. 2001) (citing *Universal C.I.T. Credit Corp. v. Kaplan*, 198 Va. 67, 75-76 (1956)).

[135] Inari's source: *Id.*

[136] Corteva's position: Corteva maintains that Massachusetts law applies to its conversion claim.
Inari's position: Inari contends the at Virginia law applies to the conversion claim.

[137] Corteva's position: Inari's proposed addition is duplicative of the elements, however stated.
Inari's position: Inari's addition clarifies there must be a "proprietary right or interest."

If you find that Corteva has proven each element of conversion, then you must find [Inari liable for conversion.][for Corteva. If you find that Corteva did not have a possessory interest in the patent deposit seeds and that ATCC was authorized to furnish the patent deposit seeds to Inari, you must find for Inari.][138]

[138] Corteva's position: The charge should match the agreed language in other instructions. Inari's instruction on the specifics of its legal theory will likely be misleading or confusing to the jury, particularly as it does not match the language of the instruction, and would in any event be prejudicial to Corteva.
Inari's position: The proposed charge clarifies when the jury need not find for Corteva and will aid the jury in its deliberations.

### 6.3. Damages

If you find that Inari is liable for conversion, you must determine the amount of Corteva's damages. The measure of damages for conversion is the fair market value of the property at the time of the conversion, together with interest from the date of conversion.[139] Fair market value is at least the highest price that a normal purchaser, not under peculiar compulsion, would pay a normal seller in an assumed free and open market.[140]

If you find that the property had little market value but was particularly valuable to Corteva's business, you may consider the property's actual value to Corteva.[141] Property may be uniquely valuable to a party if it is able to put the property to use in a way that others are not.

Where there is evidence of special injury, such as interruption of a business, further damages may be awarded.[142] **[143]**

[139] *George v. Coolidge Bank & Tr. Co.*, 360 Mass. 635, 641, 277 N.E.2d 278, 283 (1971); *Jackson v. Innes*, 231 Mass. 558, 560, 121 N.E. 489, 491 (1919).

[140] *E. Kronman, Inc. v. Bunn Bros*., 265 Mass. 549, 553, 163 N.E. 711, 712 (1929); *Clapp v. Haynes,* 11 Mass. App. Ct. 895, 897, 414 N.E.2d 359, 362 (1980).

[141] *See Stickney v. Allen*, 76 Mass. 352, 356 (1858) (where converted property was "to be used by [plaintiffs] only, in their special business," "fair value of the [property] to the plaintiffs" was the "proper rule of damages"); *Jackson*, 231 Mass. at 560, 121 N.E. at 491 (endorsing "the special value to the owner if the article had an inappreciable commercial value"); Restatement (Second) of Torts § 911(1) ("[V]alue means exchange value or the value to the owner if this is greater than the exchange value.").

[142] *Manhattan Clothing Co. v. Goldberg*, 322 Mass. 472, 476, 78 N.E. 2d 1, 3 (1948)

[143] Corteva's position: Corteva is entitled to an instruction that accurately explains the scope of its entitlement to damages. Inari does not identify any error in the proposed instruction.
Inari's position: No further language is necessary.

## 7. DELIBERATION AND VERDICT[144]

When you retire to the jury room to deliberate, you may take with you these instructions, your notes, and the exhibits that the Court has admitted into evidence. You should select one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open court.

You have two main duties as jurors. The first one is to decide what the facts are from the evidence that you saw and heard here in court. Deciding what the facts are is your job, not mine, and nothing that I have said or done during this trial was meant to influence your decision about the facts in any way.

Your second duty is to take the law that I give you, apply it to the facts, and decide if, under the appropriate burden of proof, the parties have established their claims. It is my job to instruct you about the law, and you are bound by the oath that you took at the beginning of the trial to follow the instructions that I give you, even if you personally disagree with them. This includes the instructions that I gave you before and during the trial, and these instructions. All the instructions are important, and you should consider them together as a whole.

Perform these duties fairly. Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way.

As jurors, you have a duty to consult with each other and to deliberate with the intention of reaching a verdict. Each of you must decide the case for yourself, but only after a full and impartial consideration of all of the evidence with your fellow jurors. Listen to each other carefully. In the course of your deliberations, you should feel free to re-examine your own views and to change your opinion based upon the evidence. But you should not give up your honest

[144] Graco Final Instructions at 54–55.

convictions about the evidence just because of the opinions of your fellow jurors. Nor should you change your mind just for the purpose of obtaining enough votes for a verdict.

When you start deliberating, do not talk to the jury officer, to me or to anyone but each other about the case. During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a smart phone or computer of any kind; the internet, any internet service, or any text or instant messaging service like Twitter; or any internet chat room, blog, website, or social networking service such as Facebook, Instagram, or Snapchat, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

You may not use these electronic means to investigate or communicate about the case because it is important that you decide this case based solely on the evidence presented in this courtroom. Information on the internet or available through social media might be wrong, incomplete, or inaccurate. Information that you might see on the internet or on social media has not been admitted into evidence and the parties have not had a chance to discuss it with you. You should not seek or obtain such information and it must not influence your decision in this case.

If you have any questions or messages for me, you must write them down on a piece of paper, have the foreperson sign them, and give them to the jury officer. The officer will give them to me, and I will respond as soon as I can. I may have to talk to the lawyers about what you have asked, so it may take some time to get back to you.

One more thing about messages. Never write down or tell anyone how you stand on your votes. For example, do not write down or tell anyone that a certain number is voting one way or another. Your votes should stay secret until you are finished.

Your verdict must represent the considered judgment of each juror. In order for you as a jury to return a verdict, each juror must agree to the verdict. Your verdict must be unanimous.

A form of verdict has been prepared for you. It has a series of questions for you to answer. You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will fill it in, and have your foreperson date and sign the form. You will then return to the courtroom and your foreperson will give your verdict. Unless I direct you otherwise, do not reveal your answers until you are discharged. After you have reached a verdict, you are not required to talk with anyone about the case unless I order you to do so.

Once again, I want to remind you that nothing about my instructions and nothing about the form of verdict is intended to suggest or convey in any way or manner what I think your verdict should be. It is your sole and exclusive duty and responsibility to determine the verdict.