**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **CORTEVA AGRISCIENCE LLC, PIONEER HI-BRED INTERNATIONAL, INC., AGRIGENETICS, INC.** | : | **CIVIL ACTION** |
| **v.** | : | **NO. 23-1059** |
| **INARI AGRICULTURE, INC., INARI AGRICULTURE NV** | : | |

# MEMORANDUM

**MURPHY, J.*** **September 8, 2026**

This is the fourth and last memorandum addressing different portions of cross-motions for summary judgment and *Daubert* motions filed by the parties in this intellectual property dispute set for trial in late September, 2026. We split them up in the interest of time to aid counsel in trial preparation. An order summarizing the disposition of all motions will follow this memorandum. In this memorandum, we deny Inari's *Daubert* motion to preclude Corteva's damages expert Dr. Vellturo and grant in part and deny in part Corteva's motion to preclude Inari's damages expert Dr. Goodwin.

## I. Background

We recently summarized this dispute as follows: "Corteva, a long-established player in agricultural science, alleges that Inari, a relatively new venture, has been wrongfully exploiting

* Judge John Frank Murphy, of the United States District Court for the Eastern District of Pennsylvania.

Corteva's seed technology to enter the market. Corteva's amended complaint asserts numerous utility patents and plant variety protection certificates. Inari counterclaims that Corteva's intellectual property is invalid, wrongly acquired, and being used for no purpose other than to disparage and bully Inari." *Corteva Agriscience LLC v. Inari Agriculture, Inc.*, 2026 WL 574624, at *1 (D. Del. Mar. 2, 2026). Further background is available in our rulings on Inari's motion to dismiss, *Corteva Agriscience LLC v. Inari Agriculture, Inc.*, 743 F. Supp. 3d 603 (D. Del. 2024), and Corteva's motion to dismiss, *Corteva Agriscience LLC v. Inari Agriculture, Inc.*, 2025 WL 1380763 (D. Del. May 13, 2025), as well as our October 14, 2025 claim construction order, DI 443.

Corteva and Inari each filed combined motions advancing numerous grounds for partial summary judgment and seeking to preclude each other's experts for various reasons. *See* DI 534, 537, 538, and associated briefing and exhibits. This included a statement of interest from the United States addressing certain issues. DI 562. We held oral argument on May 29, 2026, where the parties and the United States were heard. DI 577. For two issues, we invited further submissions and provided limited guidance, which we incorporate here. *See* DI 572, 584. Trial begins September 23, 2026.

## II. Standard of review

Rule 702 requires the proponent of the expert to "demonstrate[ ] to the court that it is more likely than not that: . . . (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Where the challenged

expert "testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (alteration in original) (citation modified) (quoting *Daubert*, 509 U.S. at 592). Courts must carefully distinguish between Rule 702's threshold gatekeeping analysis and disputes over factual weight that go to a jury. *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1338-40 (Fed. Cir. 2025) (en banc). "The distinction is particularly important in the context of patent damages because estimating a reasonable royalty 'necessarily involves an element of approximation and uncertainty.'" *Willis Electric Co., Ltd. v. Polygroup Ltd.*, 166 F.4th 1363, 1374 (Fed. Cir. 2026) (quoting *EcoFactor*, 137 F.4th at 1340).

## III. Analysis

As mentioned, this memorandum addresses Inari's *Daubert* motion to preclude Corteva's damages expert Dr. Vellturo and Corteva's motion to preclude Inari's damages expert Dr. Goodwin.

### a. We deny Inari's *Daubert* motion to preclude Corteva's damages expert Dr. Vellturo.

Inari moves to preclude Dr. Vellturo's damages opinions in several categories: (i) patent infringement; (ii) Mass. Gen. Law Ch. 93A; and (iii) breach of contract. We address each in turn.

**Patent infringement.** This case was always sure to test the extraterritorial reach of patent infringement damages because it involves seemingly discrete or prefatory domestic acts with huge consequences. *See* DI 35 at 55:19-56:12. Some of the liability issues are laid out in

other opinions. *E.g.*, *Corteva Agriscience LLC v. Inari Agriculture, Inc.*, 2026 WL 2606659 (D. Del. Sept. 3, 2026); *Corteva Agriscience LLC v. Inari Agriculture, Inc.*, 2026 WL 2454283, at *4-*8 (D. Del. Aug. 21, 2026); *Corteva* 743 F. Supp. 3d 603, 607-20 (D. Del. 2024). Dr. Vellturo opines that at the time of first infringement, May 2020, Corteva and Inari would have agreed to a very large lump-sum payment as a reasonable royalty for Inari's infringement. Here is the premise of Dr. Vellturo's opinion, extracted from Corteva's brief:

> That amount takes account of both the value to Inari of accelerating its product development timeline without having to wait for patent expiration and the expected harm to Corteva from enabling Inari to compete sooner than it would otherwise. . . . By that time, Inari had commenced a strategy . . . through which it sought to edit Corteva's existing GM events, create "me-too" versions of those events, and even seek its own patents for those modified versions. Doing so would allow Inari to shortcut the time and cost of developing new events by editing Corteva's patented events. Inari also believed that editing Corteva's events would reduce the time and expense associated with obtaining the necessary regulatory approvals from government authorities worldwide. But Inari could only develop its edited versions of Corteva's events by infringing Corteva's IP rights either by editing in the United States or by exporting seeds to grow plants in order to edit them abroad.
>
> The hypothetical negotiation proceeds on the assumption that Corteva would have been aware of Inari's intent to use Corteva's patented events, edit them, and sell products containing the edited events in the United States in competition with Corteva. Because delaying product development until after patent expiration would reduce Inari's expected financial gains, Inari would be willing to pay an amount up to that delay cost to obtain a license for pre-expiration rights to edit and commercially exploit the patented events. In other words, Inari's commercialization "head start" through infringing is a benefit for which it would be willing to pay at the hypothetical negotiation. To estimate that benefit, Dr. Vellturo relied on Inari's own internal projections (which Inari shared with actual and potential investors in order to obtain funding). Dr. Vellturo also estimated the expected financial harm to Corteva associated with licensing a competitor, which would inform Corteva's willingness to accept any license terms, by relying on economic data from both parties. He explained that Inari's willingness to pay and Corteva's willingness to accept define the bargaining range within which the parties could have agreed to a royalty.
>
> Dr. Vellturo then went on to consider, in detail, the Georgia-Pacific factors, including the terms (financial and otherwise) of previous licensing and

> distribution agreements both Corteva and Inari had entered into with other parties; the significant existential threat that would be posed to Corteva's events, regulatory relationships, and business if Inari were granted rights to edit and market "me-too" copies of the patented events; the critical nature of the patented inventions to Corteva's business; and the benefits provided by the asserted patents. . . . [Dr. Vellturo's] estimate is consistent with Inari's own assessment, from a June 2021 proposal to Corteva, of the value to Inari . . . and risks to Corteva . . . of lnari's plans.

DI 557 at 21-23. Inari argues that Dr. Vellturo exceeds the limits of Rule 702(d) because, as Dr. Vellturo acknowledges, Inari's alleged growing, editing, copying, and so forth, that Dr. Vellturo says harmed Corteva, happened outside the United States. Thus, Dr. Vellturo's opinion lacks "fit" under Rule 702(d) because "it relies entirely on Inari's projected future sales of products developed through the alleged use of Corteva's patented seeds in Belgium." DI 540 at 30. And as Inari correctly states, "Corteva's entitlement to damages, if any, under Section 284 is limited to damages arising from the domestic acts of purchasing seeds from ATCC, testing the seeds for pathogens, and exporting the seeds abroad." *Id.*

Inari puts its finger on an important principle, but its argument is behind the times. Inari's very first legal step in its argument is a misdirection: "It is axiomatic that foreign use of a patented invention is not an infringement of a U.S. patent that gives rise to damages under Section 284." DI 540 at 28-29 (citing *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013)). Not exactly. As the Federal Circuit has recognized, the Supreme Court displaced *Power Integrations* in *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407 (2018). *See Brumfield v. IBG LLC*, 97 F.4th 854, 871 (Fed. Cir. 2024) (explaining that "the decision in *WesternGeco* established a framework of analysis that necessarily supersedes the analysis set forth in our earlier decision *Power Integrations*"). The question is what damages are adequate to compensate for the infringement, and those damages

could potentially extend to harms abroad caused by the domestic infringement. *WesternGeco*, 585 U.S. at 416-17 (holding that recovery for patent infringement "can include lost foreign profits when the patent owner proves infringement under § 271(f)(2)"). The Federal Circuit built on *WesternGeco* and explained that the analysis must start from an act of infringement (cognizable under § 271) and then make a causal connection to the harm experienced, even if quantifying the harm sweeps in foreign conduct. *Brumfield*, 97 F.4th at 871-78. In *Brumfield*, the Federal Circuit faulted the expert for not starting with an act of infringement and for not presenting a "coherent explanation of the required causal connection to domestic infringement." *Id*. at 880. The Federal Circuit did not answer every question about how to formulate the causation analysis, but it seems fairly clear that but-for cause and proximate cause are important considerations if not requirements. *Id.* at 877-78. Inari's brief, however, does not say a thing about how to apply *Brumfield* here, or whether or not Dr. Vellturo's causation analysis holds water.[1] Corteva, for its part, shows that Dr. Vellturo operates under the state-of-the-art law and endeavors to draw a tight connection between the acts of domestic infringement and the value of that the domestic infringement. It strikes us as a question for the jury, upon review of the evidence at trial, to determine whether the harm he outlines was the entirely foreseeable and intended result of Inari's domestic infringement. Inari did not move for summary judgment on

[1] Inari addressed these issues — the obviously central issues — for the first time in reply. DI 563 at 14-18. That is not a fair approach to this *Daubert* motion, and we deem the reply arguments waived. *See Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief."); *Hayes v. Silvers, Langsam & Weitzman, P.C.*, 441 F. Supp. 3d 62, 66-67 n.4 (E.D. Pa. 2020) ("[T]he Court declines to consider arguments raised for the first time in a Reply brief."); *In re BlackRock Mut. Funds Advisory Fee Litig.*, 327 F. Supp. 3d 690, 736 n.42 (D.N.J. 2018) (explaining that "courts ordinarily decline to consider arguments raised for the first time in a reply brief").

this issue, so we have no occasion to consider whether a reasonable jury could so find.

Inari also argues that Dr. Vellturo exceeded the limits of Rule 702(d) by using "Inari's projections from 2022 and 2023, which were not available at the time of the May 2020 Hypothetical Negotiation and project sales that never happened and may never happen during the term of the Asserted Patents." DI 540 at 31. Inari says its own projections are "pure speculation" and argues that an "opinion based on post-hoc projections is not relevant to what the parties would have negotiated in May 2020 and is therefore speculative and unreliable and should be excluded under Rule 702." *Id.* at 31-32. We disagree. On top of the projections being Inari's in the first place, Dr. Vellturo points to additional evidence of their reliability. DI 557 at 27. And as to the timing, it is well established that evidence from after the hypothetical negotiation can be insightful, so long as it is not treated as limiting or a substitute for the required hypothetical negotiation analysis. *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014); *Monolithic Power Systems, Inc. v. Reed Semiconductor Corp.*, 2026 WL 995299, at *10-*11 (D. Del. Apr. 13, 2026). We agree with others who have observed that "post-infringement information is at its most relevant when the infringer experienced a windfall as a result of their misconduct." *On Track Innovations Ltd. v. T-Mobile USA, Inc.*, 106 F. Supp. 3d 369, 410 (S.D.N.Y. 2015). Inari's motion to preclude Dr. Vellturo's patent damages opinions is denied.

**Mass. Gen. Law Ch. 93(A).** On the premise that Inari violated Chapter 93A by, *inter alia*, "making misrepresentations to ATCC to obtain Corteva seed deposits and proposing a *quid pro quo* arrangement to Corteva [] in service of its attempt to use Corteva's seeds to accelerate its commercialization plans," Dr. Vellturo opines that Inari "realized the benefit of being able to

accelerate its commercialization timeline and therefore increase its expected profitability and secure a higher valuation from investors." DI 557 at 29. Dr. Vellturo values this alleged unjust enrichment at two very large figures for soybeans and corn. Dr. Vellturo also places a large figure on "the projected financial harm to Corteva resulting from Inari's Alleged Conduct, . . . which reflects the sales Corteva will likely lose to competing products Inari planned to develop using the Corteva seeds that it acquired through its deceptive practices." Vellturo Op. R. ¶ 224. Inari argues the latter theory, future lost profits, exceeds the actual damages for loss of money or property allowed by Chapter 93A; and the former theory, unjust enrichment, relies on Inari's projected profits, which contradicts Massachusetts law that unjust enrichment recovery is only for gains actually obtained. DI 540 at 33-34. As to future lost profits, Corteva appears to concede the point, responding that the discussion of future lost profits is just part of a showing of "unquantifiable" harms to demonstrate economic loss. DI 557 at 29-30. But Corteva argues that Dr. Vellturo's unjust enrichment theory should reach the jury. We agree. As Corteva explains, Inari "was unjustly enriched because it obtained benefits that it never paid Corteva to receive, including the ability to accelerate its commercialization timelines for, and thus increase the expected profitability of, the Inari Edited GM Product Lines." *Id.* at 30. Chapter 93A unjust enrichment damages must reflect actual gains, meaning "direct benefit conferred on one party by another." DI 540 at 34 (citing *Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co.*, 534 F. Supp. 340, 347 (D. Mass. 1982). Dr. Vellturo correctly aims to establish the required current economic harm as the law requires. Whether the evidence will be sufficient for a reasonable jury is not at issue here. Inari's motion to preclude Dr. Vellturo's Chapter 93A damages opinion on unjust enrichment is denied.

**Breach of contract.** Dr. Vellturo also assumes that Inari breached its MTAs with ATCC and that Corteva was a third-party beneficiary. From that starting point, he calculates two large figures (one for soybeans and one for corn) that are meant to "reflect the difference in the position in which Corteva finds itself following Inari's breach of the MTAs compared to Corteva's position had Inari not violated those agreements." DI 557 at 31. He quantified Corteva's forecasted cash flows in the absence of Inari's commercialization of Inari's Edited GM Product Lines, figured out how much revenue would drop with Inari on the market, and then determined the net present value of the decreases in expected future cash flows. Vellturo Op. R. ¶ 232. Inari argues that Dr. Vellturo's analysis is impermissibly speculative.

Inari relies on Virginia and New York law because the MTAs so specify. Corteva does not disagree with the choice of law and does not disagree that either state's law requires a reasonable degree of certainty projection-based analysis for breach of contract. DI 540 at 35-36 (Inari's outline of the law). Inari does not criticize Dr. Vellturo's forecasts of Corteva's business, except that Inari says that Dr. Vellturo strayed into speculation by relying on Inari's internal projected future earnings from 2022 and 2023, but "did not independently validate the reliability of those projections as a basis for estimating contract damages." *Id*. at 36. Inari characterizes Dr. Vellturo's analysis of the necessary future events (e.g., "successful completion of product development, approval from regulators in major soy and corn markets, execution of necessary commercial agreements with independent seed companies and other partners, and ultimately consumer choices") as unreliable, remote, and not reasonably certain. *Id.* We agree with Corteva that it is not *per se* speculative to base damages on forecasts, and Inari's cited authority criticizes experts with much flimsier approaches. Further, we see good reason why Dr.

Vellturo should be able to rely on Inari's own forecasts, and he persuasively outlined why his approach was conservative. Vellturo Op. R. ¶¶ 231, 235. A jury may decide whether Corteva, through Dr. Vellturo, carries its burden of proof on damages for breach of contract. We deny Inari's motion to preclude Dr. Vellturo on its entirety.

**b. We grant in part and deny in part Corteva's *Daubert* motion to preclude Inari's damages expert Dr. Goodwin.**

Corteva moves to preclude Dr. Goodwin's reasonable-royalty damages opinions. Dr. Goodwin rebuts Dr. Vellturo on a variety of topics. For reasonable-royalty damages, Dr. Goodwin summarizes his opinions as follows: "Dr. Vellturo's reasonable royalty framework suffers from numerous additional conceptual and methodological defects. As a result, Dr. Vellturo's resulting framework is economically unsound, speculative, internally inconsistent, and disconnected from the factual and commercial realities of this case." Goodwin R. ¶ 9. Dr. Goodwin's reasonable-royalty analysis covers topics like hindsight, economic feasibility, manner of negotiation, motivating factors, and how to weigh underlying financial data. *Id.* Corteva argues that Dr. Goodwin exceeds the limits of Rule 702 in two ways: (i) "he failed to account for Corteva's economic interests at the hypothetical negotiation" and (ii) he failed to accept "facts of Inari's infringing use." DI 535 at 33-37.

Corteva argues that Dr. Goodwin impermissibly discounted Corteva's interests in the hypothetical negotiation, and "[i]t is incorrect in a hypothetical negotiation inquiry for a [fact finder] to limit its analysis to only one side of the negotiating table because the . . . task is to determine the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer." DI 535 at 34 (quoting *Gaylord v. United States*, 678 F.3d 1339, 1343 (Fed. Cir. 2012)). Similarly, Corteva argues that Dr. Goodwin fatally erred by

ignoring what happened with Corteva's seeds once Inari took them outside the United States, which harm is fundamental to Dr. Vellturo's opinions about the consequences of Inari's infringement. We agree with Corteva that some of Dr. Goodwin's analysis rests on an incorrect legal premise, but not all of it. As Corteva points out, Dr. Goodwin has no opinion on what reasonable-royalty would be appropriate in this case. DI 535 at 33 n.14. To offer selected critiques of Dr. Vellturo, Dr. Goodwin was not obliged to address every aspect of the analysis that would be required to reach a full conclusion. Thus, as a general matter, Dr. Goodwin may respond to how Dr. Vellturo selected and applied facts to the correct legal standard.

That said, there are portions of Dr. Goodwin's analysis that are unsustainable in light of our denial of the motion to preclude Dr. Vellturo. *See* DI 577 at 245:11-246:21. One way to read Dr. Goodwin's discussion of the economic effects of Inari's export is that under his view of the *WesternGeco* and *Brumfield*, those damages are *per se* unavailable. Goodwin R. ¶¶ 41-43. We disagree, as explained above in our denial of the motion to preclude Dr. Vellturo. For example, Dr. Goodwin states: "Inari's long-term commercial outcomes, such as its foreign development work or projected U.S. or foreign sales years later (including between 2024 and 2032), occur well outside the temporal and geographic boundaries that I understand *WesternGeco* and related authority permit." *Id.* at ¶ 41. If that statement were a conclusion about causation based on analysis of data using the same legal premise as Dr. Vellturo, it would be admissible. But it appears to be a sweeping and incorrect judgment of how the law works. The same goes for Dr. Goodwin's statement that "[t]he appropriate measure of damages would therefore be limited to the tangible, realized cost savings, if any, directly attributable to Inari's accused testing and export activity, rather than the speculative value of its future sales." *Id.* at

¶ 43. Corteva's motion to preclude is therefore granted to the extent that Dr. Goodwin offers any incorrect statement of the law or conclusory opinion flowing from that incorrect statement. We think this error infects much of Dr. Goodwin's ¶¶ 37-43,[2] but to the extent that Dr. Goodwin has a fact-based criticism of Dr. Vellturo's causation analysis, he may offer it. Otherwise, Corteva's motion to preclude Dr. Goodwin is denied.[3]

**IV. Conclusion**

For the reasons explained above, we deny Inari's *Daubert* motion to preclude Corteva's damages expert Dr. Vellturo and grant in part and deny in part Corteva's motion to preclude Inari's damages expert Dr. Goodwin.

[2] Dr. Goodwin styles some of his criticism here as rooted in "apportionment" principles. Goodwin R. at ¶¶ 38-39. This is not an apportionment issue in the sense of placing focus on the patented features, and using the term "apportionment" to describe the causation analysis of *WesternGeco* and *Brumfield* is a distraction.

[3] There may be other areas of Dr. Goodwin's report that should be precluded under this reasoning. We are reluctant to stray too far from the relatively thin briefing, but this might include parts of ¶¶ 60-63, 67, 70. We leave it to Corteva and Inari to reach agreement on this and raise disputes with the court.