# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CORTEVA AGRISCIENCE LLC, PIONEER HI-BRED INTERNATIONAL, INC., and AGRIGENETICS, INC.,<br>Plaintiffs,<br><br>v.<br><br>INARI AGRICULTURE, INC. and INARI AGRICULTURE NV,<br><br>Defendants. | C.A. No. 23-1059 (JFM) |

**EXHIBIT 4 TO THE PROPOSED FINAL PRETRIAL ORDER**
**CORTEVA'S STATEMENT OF ISSUES OF LAW**
**THAT REMAIN TO BE LITIGATED**

Pursuant to Local Rule 16.3(c)(5), Corteva respectfully submits the following Statement of Issues of Law that Remain to be Litigated. To the extent this Court deems an issue one of fact rather than of law, or vice versa, it should be so considered. Corteva reserves the right to revise, amend, supplement, or modify this statement of issues of law that remain to be litigated as necessary in light of the Court's pretrial orders, evidentiary rulings, or other new developments, including any new issues or allegations raised by Inari. By including a legal issue herein, Corteva does not assume the burden of proof or production with regard to the issue.

The following statement of issues of law is not exhaustive and Corteva reserves the right to prove any matters identified in the pleadings, interrogatory responses, contentions, and/or expert reports.

# I. <u>PATENT INFRINGEMENT</u>

## A. Infringement

1. Whether Inari literally infringed claims 1, 8, or 14-15 of the '434 patent or claims 12-13 of the '246 patent in violation of 35 U.S.C. § 271(a).

2. Whether Inari induced infringement of claims 1, 8, or 14-15 of the ’434 patent; claims 12-13 of the ’246 patent; claims 1 or 12-13 of the ’522 patent; claim 8 of the ’363 patent; or claim 1 of the ’441 patent in violation of 35 U.S.C. § 271(b).

3. Whether Inari infringed claims 2-6 or 9 of the ’434 patent; claims 4 or 10-11 of the ’246 patent; claim 2 of the ’522 patent; or claims 7 or 9 of the ’363 patent in violation of 35 U.S.C. § 271(f)(2).

4. Whether a soybean or corn plant is made up of components, whether soybean seeds or corn seeds are components of the plants grown from them, and whether a soybean or corn seed contains components (such as cells, organelles, DNA, or events) that are also components in the plants grown from them.

5. Whether Inari willfully infringed any asserted claim of the ’434 patent, ’246 patent, ’522 patent, ’363 patent, or ’441 patent.

***Legal Authority***

6. The determination of patent infringement is a two-step process. First, the court construes the claims. Second, the court compares the properly construed claims to the accused device. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc).

7. To prove its direct infringement allegations against Inari, Corteva must demonstrate by a preponderance of the evidence that Inari, without authorization, made, used, offered to sell, sold within the United States, or imported into the United States, accused products that practice each element required by those claims. 35 U.S.C. § 271(a); *Riles v. Shell Expl. & Prod. Co.*, 298 F.3d 1302, 1308 (Fed. Cir. 2002).

8. To prove direct infringement via joint infringement, Corteva must show that Inari personally performed all acts necessary to infringe or that acts performed by another party such as

Iowa State University are attributable to Inari. Acts performed by Iowa State University are attributable to Inari if Inari exercised direction or control over Iowa State University when Iowa State University performed those acts. *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1023 (Fed. Cir. 2015) (en banc).

9. To prove induced infringement under § 271(b), Corteva must show (a) that a third party has committed an act of direct infringement in the United States; (b) Inari took affirmative steps to encourage the third party to commit acts that constitute direct infringement in the United States; (c) at the time Inari took affirmative steps to encourage the third party to perform those acts, Inari knew about the asserted patent and intended that the third party directly infringe an asserted claim of that patent; and (d) Inari knew that those acts, if taken, would constitute direct infringement of Corteva's asserted patent claim. *Commil USA, LLC v. Cisco Sys., Inc.*, 572 U.S. 632 (2015).

10. To prove infringement by exportation under § 271(f)(2), Corteva must show that Inari, without authorization, supplied a component of the patented invention from the United States into a foreign country or caused such a component to be supplied from the United States to a foreign country; Inari knew or should have known that the components were especially made or adapted for use in the patented invention; those components have no substantial non-infringing use; and Inari intended for the components to be combined into the patented invention. *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407 (2018).

11. No affirmative rights—and in particular, no right to use, export, infringe, or otherwise do anything beyond "access" deposits—arises from the Budapest Treaty on the International Recognition of the Deposit of Microorganisms for the Purposes of Patent Procedures, Apr. 28, 1977, 32 U.S.T. 1241, *as amended*, Sept. 26, 1980. Article 4(1)(a)(ii) of the Budapest

Treaty contemplates cases in which a "depositary authority cannot furnish samples" because "the furnishing of samples would require that they be sent abroad and the sending or the receipt of the samples abroad is prevented by export … restrictions." Article 5 of the Treaty states only that "[e]ach Contracting State recognizes that it is highly desirable that, if and to the extent to which the export from or import into its territory of certain kinds of microorganisms is restricted, such restriction should apply to microorganisms deposited; or destined for deposit, under this Treaty only where the restriction is necessary in view of national security or the dangers for health or the environment." These provisions do not purport to override domestic statutory restrictions on either use of or export of protected intellectual property. Even if they did, they are not self-executing, as they "read[] like 'a compact between independent nations' that 'depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it,'" and do not indicate that "the Senate that ratified the [Treaty] intended" to give it "immediate legal effect in domestic courts." *Medellín v. Texas*, 552 U.S. 491, 508-09 (2008) (quoting *Head Money Cases*, 112 U.S. 580, 598 (1884)).

12. "The requirement of 'authority' in order to avoid infringement, in its natural meaning, refers to a grant of permission." *Lexmark Int'l, Inc. v. Impression Prods., Inc.*, 816 F.3d 721, 733 (Fed. Cir. 2016) (en banc), *rev'd on other grounds sub nom. Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 581 U.S. 360 (2017). The "without authority" element of § 271(a) and (f)(2) "by its terms requires that whoever engages in the enumerated acts receive permission from the patentee (directly or indirectly) for the acts being performed, which otherwise are infringing." *Id.* Without that permission, any acts of infringement are not authorized within the meaning of § 271.

**B. Remedies**

13. The amount of damages to which Corteva is entitled due to Inari's infringement, which must be damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer.

14. Whether Corteva is entitled to interest, costs, or attorney fees.

15. Whether Corteva is entitled to injunctive relief with respect to infringement of the '434, '246, '522, '363, and/or '441 patent.

16. Whether Corteva has satisfied the marking requirements of 35 U.S.C. § 287 with respect to the Asserted Patents in this case.

***Legal Authority***

17. 35 U.S.C. § 284 provides that the Court "shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." Determining a "reasonable royalty" under § 284 involves imagining a "hypothetical negotiation" between a willing licensor and a willing licensee at the time the alleged infringement began. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012). The *Georgia-Pacific* factors may be relevant to determining the amount of the reasonable royalty. *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *Minks v. Polaris Industries, Inc.*, 546 F.3d 1364, 1372 (Fed. Cir. 2008) (acknowledging widespread use of *Georgia-Pacific* factors).

18. The hypothetical negotiation analysis permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators. *Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988), *overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v.*

*Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333-34 (Fed. Cir. 2009).

19. Once infringement has been established, the Court "may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. Enhanced damages are "designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior," commonly described as "willful, wanton, malicious, bad faith, deliberate, consciously wrongful, flagrant, or ... characteristic of a pirate." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103 (2016). The jury will decide whether Inari acted willfully and the Court will decide whether to enhance damages.

20. Once damages are quantified, "prejudgment interest should be awarded under § 284 absent some justification for withholding such an award." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983). Similarly, post-judgment interest should be awarded under 28 U.S.C. § 1961.

21. Corteva may be awarded costs and/or expenses pursuant to § 284 and may be awarded attorney fees pursuant to 35 U.S.C. § 285. *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 552-55 (2014).

22. 35 U.S.C. § 283 provides that "[t]he several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."

23. Courts may grant injunctive relief where the party seeking relief demonstrates: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

## II. PATENT VALIDITY

### A. Obviousness

24. Whether Inari has proven by clear and convincing evidence that each claim of the ’246, ’434, ’363, ’441, or ’522 patents is invalid as obvious under 35 U.S.C. § 103.

***Legal Authority***

25. An issued patent claim may be found invalid if it can be shown, by clear and convincing evidence, that the differences between the subject matter covered by the patent and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. *See* 35 U.S.C. § 103(a). Obviousness is a question of law based on underlying factual inquiries first set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966): first, determining the scope and content of the prior art; second, ascertaining the differences between the claimed invention and the prior art; and third, resolving the level of ordinary skill in the pertinent art.

26. The person of ordinary skill in the art is a hypothetical person who is presumed to have known the relevant art at the time of the invention. *Takeda Chem. Indus. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1355 (Fed. Cir. 2007). “A person of ordinary skill in the art is also a person of ordinary creativity, not an automaton.” *KSR Int’l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). In assessing obviousness to one of ordinary skill at the time of the invention, factfinders “must be cautious of arguments reliant on *ex post* reasoning” and account for “the distortion caused by hindsight bias.” *Id.*

27. Conclusory assertions or generalizations will not support a finding of obviousness. “[T]here must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.” *KSR Int’l*, 550 U.S. at 418; *see also KIS Himpp v. Hear-Wear Techs.*, 751 F.3d 1362, 1365-66 (Fed. Cir. 2014) (no obviousness where “an important structural limitation

is not evidently and indisputably within the common knowledge of those skilled in the art"); *Arendi SARL v. Apple Inc.*, 832 F.3d 1355, 1366 (Fed. Cir. 2016) (rejecting expert testimony that it was common sense to add a claim element where "a key limitation was missing from the prior art reference"); *Shire LLC v. Amneal Pharms.*, 802 F.3d 1301, 1308-09 (Fed. Cir. 2015) (affirming summary judgment of no invalidity where prior art did not disclose limitation).

28. "A party seeking to invalidate a patent based on obviousness must demonstrate 'by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so.'" *Procter & Gamble v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009) (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)). "While an analysis of any teaching, suggestion, or motivation to combine elements from different prior art references is useful in an obviousness analysis, the overall inquiry must be expansive and flexible." *InTouch Techs., Inc. v. VGo Commc'ns., Inc.*, 751 F.3d 1327, 1347 (Fed. Cir. 2014). Nonetheless, a reason for the combination must be articulated in order to sustain a finding of obviousness. *Id.* at 1348 (even though "the references were like separate pieces of a simple jigsaw puzzle" there was no showing of obviousness because the expert "did not explain what reason or motivation one of ordinary skill in the art at the time of the invention would have had to place these pieces together.").

29. "A finding … that a patent challenger has demonstrated a motivation to combine references does not necessarily imply that the challenger has also met its burden of showing a reasonable expectation of success." *Eli Lilly & Co. v. Teva Pharms. Int'l GmbH*, 8 F.4th 1331, 1334 (Fed. Cir. 2021) (citing *Novartis Pharms. Corp. v. West-Ward Pharms. Int'l Ltd*, 923 F.3d 1051, 1062 (Fed. Cir. 2019)). "The reasonable expectation of success requirement refers to the

likelihood of success in combining references to meet the limitations of the claimed invention." *Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016). Failure to establish a reasonable expectation of success obviates a finding of obviousness. *West-Ward*, 923 F.3d at 1059.

30. Objective indicia of non-obviousness may be used as evidence to establish a finding of non-obviousness. *See KSR Int'l*, 550 U.S. at 399. "Objective evidence of nonobviousness can include copying, long felt but unsolved need, failure of others, commercial success, unexpected results created by the claimed invention, unexpected properties of the claimed invention, licenses showing industry respect for the invention, and skepticism of skilled artisans before the invention." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1368 (Fed. Cir. 2013).

31. It is well established that copying is a relevant consideration in the objective indicia analysis. *See Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004); *Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1567 (Fed. Cir. 1984). "Copying requires duplication of features of the patentee's work based on access to that work." *Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337, 1347-48 (Fed. Cir. 2013). Evidence of copying may also include disassembly of products. *See Iron Grip Barbell*, 392 F.3d at 1325. "Evidence of copying … has greater force when the infringer tries but fails to circumvent the claimed invention." *Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 714 F. Supp. 3d 652, 748 (N.D. W.Va. 2024); *see Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1139 (Fed. Cir. 2019).

32. Objective evidence of non-obviousness requires proof of a "nexus" with the claims and must be commensurate in scope with the claims. *Wyers v. Master Lock*, 616 F.3d 1231, 1246 (Fed. Cir. 2010); *Asyst Techs. Inc. v. Emtrak Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008). The

patentee has the burden to show the required nexus between the objective indicia and the claimed invention. *Prometheus Laboratories, Inc. v. Roxane Laboratories, Inc.*, 805 F.3d 1092, 1101-02 (Fed. Cir. 2015).

**B. Obviousness-Type Double Patenting**

33. Whether Inari has proven by clear and convincing evidence that claims 1-4 and 6 of the '363 patent are invalid for obviousness-type double patenting in view of claims 1-4 and 7 of U.S. Patent No. 9,738,904.

***Legal Authority***

34. "Nonstatutory obviousness-type double patenting is a question of law with underlying findings of fact." *Otsuka Pharma. Co., Ltd. v. Sandoz, Inc.*, 678 F.3d 1280, 1297 (Fed. Cir. 2012). "The obviousness-type double patenting analysis involves two steps: First, the court construes the claims in the earlier patent and the claims in the later patent and determines the differences. Second, the court determines whether those differences render the claims patentably distinct." *Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*, 764 F.3d 1366, 1374 (Fed. Cir. 2014) (cleaned up). "A later claim that is not patentably distinct from, i.e., is obvious over or anticipated by, an earlier claim is invalid for obviousness-type double patenting." *Id.* (cleaned up).

35. "Unless the earlier claim anticipates the later claim under § 102, the question whether the two claimed [inventions] are 'patentably distinct' implicates the question of obviousness under § 103." *Otsuka Pharma. Co.*, 678 F.3d at 1297. Thus, "an analysis of nonstatutory obviousness-type double patenting—like an analysis under § 103—entails determining, *inter alia,* whether one of ordinary skill in the art would have had reason or motivation to modify the earlier claimed [invention] to make the [invention] of the asserted claim with a reasonable expectation of success." *Id.* at 1298; *see also In re Kaplan*, 789 F.2d 1574, 1579

(Fed. Cir. 1986) ("[T]here must be some clear evidence to establish why the variation would have been obvious" to one of ordinary skill in the art.).

**C. Statutory Double Patenting**

36. Whether Inari has proven by clear and convincing evidence that claim 2 of the '441 patent is invalid for double patenting, as claiming the same invention as claim 9 of the '363 patent.

***Legal Authority***

37. "In § 101, title 35 precludes more than one patent on the same invention." *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1377 (Fed. Cir. 2003). "Section 101, however, only prohibits a second patent on subject matter identical to an earlier patent." *Id.* "A good test, and probably the only objective test, for 'same invention,' is whether one of the claims could be literally infringed without literally infringing the other. If it could be, the claims do not define identically the same invention." *Application of Vogel*, 57 C.C.P.A. 920, 924 (C.C.P.A. 1970). "Double patenting is a question of law." *In re Fallaux*, 564 F.3d 1313, 1316 (Fed. Cir. 2009).

**D. Written Description**

38. Whether Inari has proven by clear and convincing evidence that claims 1, 3, and 6 of the '246 patent and/or claims 1-14 of the '522 patent are invalid for lack of a written description as required by 35 U.S.C. § 112.

***Legal Authority***

39. 35 U.S.C. § 112 requires that "[t]he specification shall contain a written description of the invention." The purpose of the written description is to "enable others to 'make and use' the invention after the patent term expires." *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 142 (2001).

40. To meet the written description requirement, the patent must "[convey] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). In other words, the patent specification must show that the patentee invented what is claimed. *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005); *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1562-64 (Fed. Cir. 1991) (a patent applicant must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention. The invention is, for purposes of the 'written description' inquiry, whatever is now claimed."). The specification need not use the exact claim terms, so long as it contains an equivalent description of the claimed subject matter. *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997).

41. Whether a patent claim satisfies the written description requirement is a question of fact. *Ariad Pharm.*, 598 F.3d at 1351. "[O]ne must make an 'objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art.'" *Boston Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366 (Fed. Cir. 2011) (quoting *Ariad Pharm.*, 598 F.3d at 1351).

42. Patents that claim a genus must disclose "either a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus." *Ariad Pharm.*, 598 F.3d at 1350 (quoting *Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1568-69 (Fed. Cir. 1997)). Specifying "structure, formula, chemical name, physical properties, or other properties" may offer "an adequate written description." *Id.* "Functional claim language can meet

the written description requirement when the art has established a correlation between structure and function." *Id.*

**E. Enablement**

43. Whether Inari has proven by clear and convincing evidence that claims 1, 3, and 6 of the '246 patent or claims 1-14 of the '522 patent are invalid for lack of enablement as required by 35 U.S.C. § 112.[1]

44. Whether Inari has proven by clear and convincing evidence that the '378 patent is invalid for lack of enablement as required by 35 U.S.C. § 112.

45. Whether Inari has proven by clear and convincing evidence that Corteva's assertion of breach of the MTAs renders the '246, '434, '363, or '441 patents invalid under 35 U.S.C. § 112.

***Legal Authority***

46. 35 U.S.C. § 112 requires that "[t]he specification shall … enable any person skilled in the art of which it pertains, or with which it is most nearly connected, to make and use the same…." The enablement requirement ensures that the public will be able "to 'make and use' the invention after the patent term expires." *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 142 (2001). Typically, to satisfy this requirement "the specification must contain sufficient disclosure to enable an ordinarily skilled artisan to make and use the entire scope of the claimed invention at the time of filing." *Enzo Life Sciences Inc. v. Roche Molecular Sys., Inc.*, 928 F.3d 1340, 1346 (Fed. Cir. 2019) (alterations omitted). But "[w]here an invention depends on the use of living materials such as microorganisms or cultured cells, it may be impossible to enable the public to make the invention (i.e., to obtain these living materials) solely by means of written disclosure." *In re Wands*, 858 F.2d 731, 735 (Fed. Cir. 1988). "One means that has been developed

[1] Inari's contention that claims 3-11 of the '522 patent are invalid under § 112 for lack of a patent deposit is subsumed in its broader enablement contention regarding claims 1-14 of the '522 patent.

for complying with the enablement requirement is to deposit the living materials in cell depositories which will distribute samples to the public who wish to practice the invention after the patent expires." *Id.*

47. Where an invention concerns biological material, "the availability of a sample to the public after the patent has issued will meet the enablement requirement." *In re Lundak*, 773 F.2d 1216, 1223 (Fed. Cir. 1985). But depositing biological material like seeds is not automatically required, and a deposit may or may not be necessary to provide adequate disclosure, depending on the exact issue. *See Lundak*, 773 F.2d at 1221; *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 965 (Fed. Cir. 2002) (explaining how deposits may help satisfy either the written description or enablement requirements).

48. Although the USPTO has adopted regulations concerning the deposit of biological materials, *see* 37 C.F.R. §§ 1.801-09, those regulations "do[] not attempt to identify what biological material either needs to be or may be deposited to comply with the requirements of 35 U.S.C. § 112." Manual of Patent Examining Procedure § 2403. The regulation concerning the "[n]eed or opportunity to make a deposit," 37 C.F.R. § 1.802, merely specifies that "[b]iological material need not be deposited unless access to such material is necessary for the satisfaction of the statutory requirements for patentability under 35 U.S.C. 112." In adopting this regulation, the Office contemplated that "[i]f a biological material is known and readily available at the time the patent is granted, and there is no reasonable basis to believe that the biological material will cease to be available during the life of the patent, no requirement for a separate deposit would be made." Advance Notice of Proposed Rulemaking, 52 Fed. Reg. 34080, 34081 (Sept. 9, 1987). This is consistent with the Federal Circuit's holding that § 112 "does not require … assured access to a microorganism deposit as of the filing date" of a patent application, but rather "assurance of access

to the microorganism culture by the public upon issuance of a patent on the application." *Feldman v. Aunstrup*, 517 F.2d 1351, 1355 (C.C.P.A. 1975) (parentheses omitted).

49. Claims to a genetic sequence may be enabled and described by providing the sequence in the written specification, without the need for a biological deposit, because "an adequate description of a DNA requires … a description of the DNA itself." *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1566–67 (Fed. Cir. 1997).

50. A patent need not "describe with particularity how to make and use every single embodiment within a claimed class," particularly if "the specification … discloses some general quality running through the class that gives it a peculiar fitness for the particular purpose." *Amgen, Inc. v. Sanofi*, 598 U.S. 594, 610-11 (2023) (cleaned up). Relatedly, a patent may enable the claimed invention even if a degree of experimentation is necessary to practice the claims. *Wands*, 858 F.2d at 736-37. "Factors to be considered in determining whether a disclosure would require undue experimentation include (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *Id.* at 737.

51. 37 C.F.R. § 1.808 requires "access" to biological deposits but does not grant any rights to intellectual property. A right of access to deposited seeds does not provide any rights to exploit deposited seeds. Enforcement of patent rights through an infringement suit does not negate validity. 35 U.S.C. § 112.

## III. PVP CERTIFICATE INFRINGEMENT

### A. Infringement

52. Whether Inari exported from the United States seeds of varieties identified in Appendix A, either personally or through its agent, in violation of the PVPA, 7 U.S.C. § 2541(a).

53. Whether Inari exported from the United States seeds of varieties identified in Appendix B, either personally or through its agent, in violation of the Plant Variety Protection Act, 7 U.S.C. § 2541(a).

54. Whether Corteva has the burden of showing that any exemptions to infringement, under 7 U.S.C. § 2541(d) or § 2544, do not apply to Inari's conduct.[2]

***Legal Authority***

55. 7 U.S.C. § 2541(a) provides "it shall be an infringement of the rights of the owner of a protected variety to perform without authority, any of the following acts in the United States" including "sell or market the protected variety, or offer it or expose it for sale, deliver it, ship it, consign it, exchange it, or solicit an offer to buy it, or any other transfer of title or possession of it."

56. 7 U.S.C. § 2541(d) provides that "[i]t shall not be an infringement of the rights of the owner of a variety to perform any act concerning propagating material of any kind, or harvested material, including entire plants and parts of plants, of a protected variety that is sold or otherwise marketed with the consent of the owner in the United States…." Section 2541(d) applies when a protected variety is "placed into the stream of commerce." *AGSouth Genetics, LLC v. Ga. Farm Servs., LLC*, 22 F. Supp. 3d 1342, 1348 (M.D. Ga. 2014) (discussing legislative history). Seeds deposited with ATCC are not placed into the stream of commerce. *Commerce*, Black's Law Dictionary (12th ed. 2024) (defining "commerce" to mean "[t]he exchange of goods and services, esp[ecially] on a large scale"). Moreover, Corteva does not place any protected inbred varieties

[2] The parties agree that Inari has the burden of proving the bona fide research and breeding elements required to invoke § 2544. *See* Inari's Statement of Contested Issues of Law ¶¶ 82-84.

into the stream of commerce and hybrids of the protected variety are not themselves protected varieties.

57. Section 2541(d) does not apply to propagation of protected seeds. *AGSouth Genetics*, 22 F. Supp. 3d at 1348 (explaining that § 2541(d) "exempts acts taken in relation to that variety [from infringement liability] to the extent the acts ***do not involve propagation***" (emphasis altered)).

58. Section 2544 provides "[t]he use and reproduction of a protected variety for plant breeding or other bona fide research shall not constitute an infringement of the protection provided under this chapter." The PVPA separately defines export and use. 7 U.S.C. § 2541(a)(2), § 2541(a)(4). Section 2544 specifies "use" and not "export" is exempted. Congress's choice not to list the export of protected varieties in § 2544 as protected by the research exemption despite distinguishing between "use" and "export" of protected varieties elsewhere in the PVPA must be given effect. *See Nken v. Holder*, 556 U.S. 418, 430 (2009) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

59. "[B]ona fide" research must be done in good faith, and "the use of unlawfully secured samples of proprietary seed to develop a competing plant variety would violate the PVPA." Jim Chen, *The Parable of the Seeds: Interpreting the Plant Variety Protection Act in Furtherance of Innovation Policy*, 81 Notre Dame L. Rev. 105, 134-36 (2005); *see also Ariz. Grain Inc. v. Barkley Ag Enters. LLC*, No. CV-18-03371, 2021 WL 3144896, at *4 (D. Ariz. July 23, 2021) (ruling that the research exemption under § 2544 could not apply in connection with a breeding program because the biological materials "were not properly, nor legally obtained").

**B. Remedy**

60. Whether Corteva is entitled to costs or attorney fees.

61. Whether Corteva is entitled to injunctive relief with respect to Inari's infringement of Corteva's PVP certificates listed in Appendices A and B.

***Legal Authority***

62. Corteva may be awarded costs and/or expenses pursuant to 7 U.S.C. § 2564(a) and may be awarded attorney fees pursuant to 7 U.S.C. § 2565. *Cf. Octane Fitness*, 572 U.S. at 552-55 (discussing parallel Patent Act provision).

63. 7 U.S.C. § 2563 provides that "[t]he several courts having jurisdiction of cases under this subchapter may grant injunctions in accordance with the principles of equity to prevent the violation of any right hereunder on such terms as the court deems reasonable."

64. Courts may grant injunctive relief where the party seeking relief demonstrates: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay*, 547 U.S. at 391.

## IV. PVP CERTIFICATE VALIDITY

65. Whether Inari has proven by clear and convincing evidence that any variety identified in Appendices A and B was not new, as defined by 7 U.S.C. §§ 2402(a)(1) and 2401(b)(1)-(3), at the time of filing for protection under the PVPA.[3]

***Legal Authority***

66. "Certificates of plant variety protection shall be presumed valid," and the "burden of establishing invalidity of plant variety protection shall rest on the party asserting invalidity." 7

[3] Inari's contentions regarding newness are irrelevant in light of the Court's ruling excluding that theory of invalidity. D.I. 519. By addressing this topic, Corteva does not concede that it remains at issue in the case.

U.S.C. § 2562(a). The statute's use of "presumed valid" incorporates a "settled meaning," "requiring proof of [invalidity] by clear and convincing evidence." *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 101-02 (2011) (discussing same language in 35 U.S.C. § 282(a)).

67. To be protectible under the PVPA, a variety must be "new, in the sense that, on the date of filing of the application for plant variety protection, propagating or harvested material of the variety has not been sold or otherwise disposed of to other persons, by or with the consent of the breeder, or the successor in interest of the breeder, for purposes of exploitation of the variety … in the United States, more than 1 year prior to the date of filing." 7 U.S.C. § 2402(a)(1)(A). "The sale or disposition of hybrid seed shall be considered to be a sale or disposition of harvested material of the varieties from which the seed was produced." *Id.* § 2401(b)(3). However, "[t]he sale or disposition, for other than reproductive purposes, of harvested material produced as a result of experimentation or testing … to ascertain the characteristics of the variety, or as a by-product of increasing a variety, shall not be considered to be a sale or disposition for purposes of exploitation of the variety." *Id.* § 2401(b)(1).

## V. CORTEVA'S STATE LAW CLAIMS

### A. Breach of Contract

68. Whether Inari breached the MTAs between Inari and ATCC by using deposits obtained from ATCC for commercial purposes or by transferring deposits or other materials.

69. Whether Corteva is a third-party beneficiary of the MTAs.

70. The amount of damages to which Corteva is entitled for breach of the MTAs.

71. Whether Corteva is entitled to specific performance of the MTAs.

72. Whether Corteva is entitled to injunctive relief with respect to the MTAs.

***Legal Authority***

73. The elements of breach of contract are "(1) the existence of a contract, express or implied; (2) breach of an obligation imposed by the contract; and (3) damages." *Prime Victor Int'l Ltd. v. Simulacra Corp*., 682 F. Supp. 3d 428, 437 (D. Del. 2023).

74. A third party "may enforce a contractual promise … if the contract has been made for his benefit," that is, if Corteva is an intended beneficiary of the contract, as opposed to an incidental beneficiary. *Triple R. Railcar Serv., Inc. v. City of Wilmington*, 630 A.2d 629, 633 (Del. 1993) (citations omitted); *see also Greater New York Mut. Ins. Co. v. Travelers Ins. Co.*, No. CIV. 10-01107-LPS, 2011 WL 4501207, at *3 (D. Del. Sept. 28, 2011) ("To create third party beneficiary rights, a contract should confer an intended benefit on the third party, and the conferral of such benefit must be a material part of the contract's purpose."). Corteva is an intended beneficiary if, by looking at the language and circumstances of the contract, it is clear that the parties to the contract intended that performance of the contract would result in a benefit to Corteva. "[T]hird parties may sue as beneficiaries on contracts made for their benefit." *Walton v. Comfort Sys. USA (Syracuse), Inc*., 155 F.4th 144, 157 (2d Cir. 2025); *see* Restatement (Second) of Contracts § 302.

75. Direct, or compensatory, breach of contract damages are intended to reflect the value of the promised performance under the contract—i.e., by what it would take to put Corteva in the same position it would have been in had Inari not breached the contract. *See Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146-47 (Del. 2009).

76. Consequential damages, which do not flow directly and immediately from the breach, may be recovered if they were foreseeable at the time of contracting. *In re Dura Medic Holdings, Inc. Consol. Litig.*, 333 A.3d 227, 261 (Del. Ch. 2025).

77. The remedy of specific performance "may be defined as the actual accomplishment of a contract by the party bound to fulfil it.... It is an equitable remedy available in appropriate circumstances to protect rights under contract." *Potter v. Potter*, 251 A.2d 578, 580 (Del. Ch. 1968); *see also* Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery, § 12-3, p. 816 (1998) (specific performance "aims to protect the expectations of the parties to a contract by giving the party who seeks such remedy the benefit of his or her contract in specie by compelling the other party to the contract to do that which he or she has agreed to do."). "[A] party seeking the equitable remedy of specific performance must prove the existence and terms of an enforceable contract by clear and convincing evidence" and "must demonstrate that there is no adequate remedy at law." *Minnesota Invco of RSA No. 7, Inc. v. Midwest Wireless Holdings LLC*, 903 A.2d 786, 793 (Del. Ch. 2006). The "mere fact that a litigant may have a remedy at law" does not mean that remedy is adequate; "[t]he question is whether the remedy available at law will afford the plaintiff full, fair, and complete relief." *El Paso Nat. Gas Co. v. TransAmerican Nat. Gas Co.*, 669 A.2d 36, 39 (Del. 1995).

78. To obtain permanent injunctive relief for breach of contract, "a plaintiff must demonstrate: (1) actual success on the merits, (2) irreparable harm, and (3) that the balance of the equities weighs in favor of issuing the injunction." *Concord Steel, Inc. v. Wilmington Steel Processing Co.*, No. CIVA3369-VCP, 2009 WL 3161643, at *14 (Del. Ch. Sept. 30, 2009), aff'd, 7 A.3d 486 (Del. 2010).

79. Delaware law applies to the 2017 and 2019 MTAs under Delaware's choice of law rules. The 2022 MTA specifies that New York law applies. There are no relevant conflicts between New York and Delaware law on the issues to be litigated. *See also* D.I. 535 at 3 n.2.

80. In its operative Answer, Inari expressly waived any challenge to venue in the District of Delaware. D.I. 160 ¶¶ 20, 22. Moreover, any challenge to venue at this stage would be untimely. Fed. R. Civ. P. 12(b).

**B. Violation of Massachusetts General Law Ch. 93A Unfair Trade Practices**

81. Whether Inari (i) engaged in trade or commerce and (ii) committed acts or practices in trade or commerce that were deceptive or unfair and (iii) damaged Corteva.

82. Whether Inari willfully or knowingly engaged in unfair or deceptive trade practices.

83. The amount of damages to which Corteva is entitled for Inari's violation of Massachusetts General Law Ch. 93A.

84. Whether Corteva's damages should be increased by up to three, but not less than two, times the amount of the damages for Inari's willful or knowing violation of Massachusetts General Law Ch. 93A.

85. Corteva's entitlement to have the jury hear its claims for violation of Massachusetts General Law Ch. 93A.

***Legal Authority***

86. General Law Ch. 93A, § 11 provides, "Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property ... as a result of the use ... by another person who engages in any trade or commerce of ... an unfair or deceptive act or practice ... may ... bring an action in the [S]uperior [C]ourt ...."

87. Section 11 reaches "actions and transactions" that "occurred primarily and substantially within the commonwealth" of Massachusetts. General Law Ch. 93A, § 11, para. 8. This focuses on the "center of gravity of the circumstances that give rise to the claim" and "is not a determination that can be reduced to any precise formula." *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 438 Mass. 459, 472-73 (2003). In "cases involving wrongful conduct in

multiple jurisdictions," it "may … be appropriate to decide" the issue "based on which jurisdiction was the source of the most instances of misconduct" or of "a single instance of misconduct" with "greater significance" than others. *Id.* at 473. "[T]he burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth." General Law Ch. 93A, § 11, para. 8.

88. A violation of General Law Ch. 93A, § 11 requires showing (1) that Inari is engaged in trade or commerce; (2) that Inari's acts or trade practices were unfair or deceptive; and (3) that Inari's acts or practices caused Corteva to lose money or property.

89. A "deceptive" act or practice is one which has the capacity to deceive. An act or practice is deceptive if it could reasonably cause a person to act differently from the way he would act if he knew the truth about the matter. *Purity Supreme v. Attorney Gen.*, 380 Mass. 762, 777 (1980). An act or practice is "unfair" if it was immoral, unethical, oppressive, unscrupulous, or otherwise unconscionable. An act that might be unfair in a business transaction with an unsophisticated consumer might not be unfair when it takes place in a transaction between two sophisticated businessmen. *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975).

90. "Proof of unquantifiable monetary loss satisfies the § 11 requirement that the plaintiff suffered a loss of money or property," and "disgorgement of profits unfairly earned" is recoverable even if it "is difficult to quantify." *Vicarious Surgical Inc. v. Tragakis*, No. 2284CV02321, 2023 WL 3304305, at *6 (Mass. Super. Ct. Apr. 27, 2023) (cleaned up).

91. Corteva is entitled to enhanced damages of up to three, but not less than two, times the amount of its damages if the use or employment of the method of competition or the act or practice was a willful or knowing violation. General Law Ch. 93A, § 11.

92. Whether Corteva has a Seventh Amendment right to a jury trial on its Chapter 93A claim in this case is governed by federal, not state, law. *Full Spectrum Software, Inc. v. Forte Automation Systems, Inc.*, 858 F.3d 666, 677-78 (1st Cir. 2017) ("*Frappier* also explained that *Nei v. Burley*, 388 Mass. 307 (1983)] offered a construction of the jury trial right under the Massachusetts Constitution, not the Seventh Amendment to the federal Constitution, and 'a litigant's right to a jury under the Seventh Amendment for state-law claims in federal court is a matter of federal, not state, law.'"). Because Corteva's Chapter 93A claim is brought "in the aggregate"—including a claim for deception "analogous to 18th-century actions at law, such as fraud, deceit, or misrepresentation"—it is for the jury, not the Court. *Id.* at 676-78. Corteva's legal remedies pursuant to Chapter 93A are distinct from an equitable claim for unjust enrichment. *See Schuster v. Wynn Ma, LLC*, 118 F.4th 30, 38 (1st Cir. 2024) ("We have previously held that Chapter 93A provides an adequate legal remedy for similar unjust enrichment claims."); *Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 84 (1st Cir. 2020) ("[A]bsent any showing that Chapter 93A provides an insufficient remedy at law, Tomasella's Chapter 93A and unjust enrichment claims are mutually exclusive.").

### C. Conversion[4]

93. Whether Corteva retained ownership and possessory interests in its protected seeds that it deposited with ATCC.

94. Whether Inari wrongfully exercised dominion and control over Corteva's property, interfering with Corteva's property rights, by acquiring Corteva's protected seeds, or by using them for impermissible and unauthorized commercial use.

95. The amount of damages to which Corteva is entitled for Inari's conversion.

[4] Inari did not raise the affirmative defense of waiver as to Corteva's conversion claim. *See* D.I. 160; Fed. R. Civ. P. 8(c)(1). Corteva therefore does not address the issue.

96. Whether Corteva is entitled to injunctive relief for Inari's conversion.

97. Whether Corteva's conversion claim is preempted by federal patent law.

***Legal Authority***

98. "[C]onversion may be established by a showing that one person exercised dominion over the personal property of another, without right, and thereby deprived the rightful owner of its use and enjoyment." *In re Hilson*, 448 Mass. 603, 610 (2007). "There is no requirement that the one converting property be shown to have had the intent to deprive permanently the rightful owner of its use and enjoyment." *Id.*

99. "[T]he measure of damages in an action for conversion is the fair and reasonable market value of the property with interest, or what the property was actually worth if there is no market value, or the special value to the owner if the article had an inappreciable commercial value." *Jackson v. Innes*, 231 Mass. 558, 560 (1919). "[F]air market value is at least the highest price that a normal purchaser, not under peculiar compulsion, would have paid" at the time and place of the conversion. *E. Kronman, Inc. v. Bunn Bros.*, 256 Mass. 549, 553 (1929). While market value is "the general rule," that rule "presupposes the conversion of marketable property." *Stickney v. Allen*, 76 Mass. 352, 356 (1858). Where property is "to be used by [the rightful owner] only, in [its] special business, … the actual value to him who owns and uses [it] is the just rule of damages in an action against him who converts them to his own use." *Id.*; *see also* Restatement (Second) of Torts § 911(1) ("[V]alue means exchange value or the value to the owner if this is greater than the exchange value."). Corteva "may be entitled to recover reasonable royalty damages even if it cannot prove that it has suffered any direct loss" or that Inari "has profited from using" the converted property." *Vicarious Surgical*, 2023 WL 3304305, at *4 (Mass. Super. Ct. Apr. 27, 2023).

100. Courts may grant injunctive relief where the party seeking relief demonstrates: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay*, 547 U.S. at 391.

101. "It is hornbook law that a state law action for conversion will not be preempted if the plaintiff can prove the extra element that the defendant unlawfully retained the physical object embodying its work." *United States ex rel. Berge v. Bd. of Trustees of the Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997) (internal quotation marks and citations omitted). Thus, a conversion claim "concern[ing] … tangible property" is "not … preempted" by federal law on patent infringement. *Malik v. Lynk, Inc.*, No. CIV. A. 99-2015-KHV, 1999 WL 760217, at *3 (D. Kan. Aug. 18, 1999) (citing *id.*).

## VI. <u>INARI'S OTHER DEFENSES AND COUNTERCLAIMS</u>

### A. Exhaustion

102. Whether Inari has proven by a preponderance of the evidence that Corteva's patent rights in the seeds that Inari obtained from ATCC designated PTA-11506, PTA-11384, PTA-11336, and PTA-12006 are exhausted.

103. Whether Inari has proven by a preponderance of the evidence that Corteva's rights in the seeds that Inari obtained from ATCC and that are protected by the PVP certificates listed in Appendices A and B are exhausted.

***Legal Authority***

104. "Patent exhaustion reflects the principle that, when an item passes into commerce, it should not be shaded by a legal cloud on title as it moves through the marketplace." *Impression Prods.*, 581 U.S. at 376. Thus, "when a patentee sells one of its products … its patent rights are

said to 'exhaust.' The purchaser and all subsequent owners are free to use or resell the product just like any other item of personal property." *Id.* at 370-71.

105. Exhaustion applies only "[o]nce a patentee decides to sell." *Id.* at 377. "The purpose of the patent law is fulfilled with respect to any particular article when the patentee has received his reward for the use of his invention by the sale of the article," so a patentee who has "transferr[ed] to the buyer ownership of the invention with respect to [an] article" and "has received in the purchase price every benefit of that monopoly which the patent law secures to him" may not extend his monopoly "beyond the fair meaning of the patent statutes." *United States v. Univis Lens Co.*, 316 U.S. 241, 251-52 (1942). Obtaining seeds from a depository does not reflect either a decision by the patentee to sell a patented article or any reward to the patentee for use of the invention and thus is not an exhausting sale. *See id.*

106. Signatories to the Budapest Treaty agree that depositories will "furnish samples of deposited microorganisms" to the public under certain circumstances. *E.g.*, Regulations Under the Budapest Treaty on the Int'l Recognition of the Deposit of Microorganisms for the Purposes of Patent Proc., Regulations 2.3, 11.3(a)(iii), Apr. 28, 1977, *as amended*, Jan. 20, 1981 and Oct. 1, 2002. As implemented in the United States, regulations that govern the "[f]urnishing of samples" require a deposit to "be made under conditions that assure … [a]ccess to" and "the availability to the public of the deposited material." 37 C.F.R. § 1.808. In adopting this regulation, the USPTO declined to adopt a rule requiring "a requesting party [to] agree to comply with 35 U.S.C. [§] 271 as a condition precedent to obtaining a sample of deposited biological material," as that would amount to "an agreement not to infringe a corresponding valid patent, something which a requesting party is already bound not to do under law." Deposit of Biological Materials for Patent Purposes, 54 Fed. Reg. 34864, 34873 (Aug. 22, 1989).

107. An exhausting sale "leaves untouched the patentee's ability to prevent a buyer from making new copies of the patented item." *Bowman v. Monsanto Corp.*, 569 U.S. 278, 284 (2013). "That is because the patent holder has received his reward only for the actual article sold, and not for subsequent recreations of it. If the purchaser of that article could make and sell endless copies, the patent would effectively protect the invention for just a single sale." *Id.* (cleaned up). The exhaustion doctrine operates to avoid "a mismatch between invention and reward." *Id.* at 286.

108. The PVPA expressly permits "the owner of a protected variety" to "authorize the use of the variety … subject to conditions and limitations specified by the owner." 7 U.S.C. § 2541(b)(1).

**B. Judicial Estoppel**

109. Whether Corteva is judicially estopped from asserting claims for infringement of the PVP certificates identified in Appendices A or B, the '434 patent, the '246 patent, the '522 patent, the '363 patent, and/or the '441 patent.[5]

***Legal Authority***

110. "Judicial estoppel may be imposed only if: (1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity." *Montrose Med. Gr. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 777-78 (3d Cir. 2001).

[5] The Court dismissed Inari's counter-claims and defenses based on legal estoppel. D.I. 251. Corteva therefore includes responses to Inari's contentions on judicial estoppel and not legal estoppel.

111. "Judicial estoppel is designed to prevent the perversion of the judicial process and, as such, is intended to protect the courts rather than the litigants." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996). While "[t]he doctrine of judicial estoppel is one arrow in the quiver of sanctions at a court's disposal," *In re ESML Holdings Inc*, 135 F.4th 80, 91 (3d Cir. 2025) (cleaned up), courts "have not justified it as an exercise of the traditional sanctioning power" and "the doctrine appears to have no basis in any statute, any Federal Rule of Civil Procedure, or any traditional inherent power of federal courts," *Keathley v. Buddy Ayers Constr., Inc.*, 146 S. Ct. 1532, 1542 (2026) (Thomas, J., concurring).

112. "[T]he doctrine is not intended to eliminate all inconsistencies no matter how slight or inadvertent they may be. Rather, a litigant's change in position must demonstrate a degree of culpability amounting to an assault on the dignity or authority of the court, and because judicial estoppel is often the harshest remedy, it should only be applied to avoid a miscarriage of justice." *ESML Holdings*, 135 F.4th at 92 (cleaned up).

**C. Unenforceability**

113. Whether the PVP certificates identified in Appendices A or B; the '434 patent, the '246 patent, the '522 patent, the '363 patent, or the '441 patent; and/or the Unasserted Utility Patents (identified in Exhibit 1 to Inari's Answer, Affirmative Defenses and Counterclaims to the Second Amended Complaint) are unenforceable as to it under the doctrine of unclean hands.

114. Whether Inari has proven by a preponderance of the evidence that the Unasserted Utility Patents are unenforceable as to Inari due to Corteva's assertion of the PVP certificates identified in Appendices A or B, the '434 patent, '246 patent, '522 patent, '363 patent, or '441 patent.

***Legal Authority***

115. "The defense of unclean hands … is an equitable issue for the court." *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 15-CV-1202, 2017 WL 275465, at *15 (E.D. Tex. Jan. 20, 2017) (Bryson, J., sitting by designation).

116. An unclean hands equitable defense requires "the showing of five elements: (1) the party seeking affirmative relief (2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith (3) directly related to matter in issue (4) that injures other party (5) and affects balance of equities between litigants." *Sonos, Inc., v. D&M Holdings Inc.*, C.A. No. 14-1330-RGA-MPT, 2016 WL 4249493, at *5 (D. Del. Aug. 10, 2016) (citations omitted).

117. The doctrine of unclean hands remedies "misconduct" or "violations of conscience" that "affect the equitable relations between the parties." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933). The most important guardrail for unclean hands is that there be a clear and close connection between the troubling conduct and the claim brought before the court. *In re New Valley Corp.*, 181 F.3d 517, 525 (3d Cir. 1999). That is, a plaintiff's misconduct must have "immediate and necessary relation to the equity that [it] seeks in respect of the matter in litigation." *Keystone*, 290 U.S. at 245.

118. "To prove the defense of unclean hands," the defendant must show that the plaintiff "'conducted itself as to shock the moral sensibilities of the judge,'" *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 398 F. Supp. 2d 305, 310 (D. Del. 2005) (brackets omitted) (quoting *Gaudiosi v. Mellon*, 269 F.2d 873, 882 (3d Cir.1959)), "or stated otherwise, that [the plaintiff's] conduct was 'offensive to the dictates of natural justice,'" *id.* (quoting *Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369, 1375 (Fed. Cir. 2001)).